**2012-1636**
**VOLUME I OF III**
**(Pages 1 – 364)**

In The

# United States Court of Appeals

## For The Federal Circuit

# PIXION, INC.,

*Plaintiff – Appellant*,

**v.**

# CITRIX SYSTEMS, INC. and CITRIX ONLINE, LLC,

*Defendants – Appellees*.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**IN CASE NO. 09-CV-3496, JUDGE SUSAN ILLSTON.**

———————————

# CORRECTED NON-CONFIDENTIAL JOINT APPENDIX

———————————

Colby B. Springer
LEWIS AND ROCA LLP
2440 West El Camino Real, Suite 600
Mountain View, California  94040
(650) 391-1394

Brian M. Jacobs
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8199

*Counsel for Appellant*

*Counsel for Appellees*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

## <u>TABLE OF CONTENTS</u>
### VOLUME I OF III

<u>Appendix Page</u>

**Protective Order of**
**The Honorable Susan Illston,**
**With Attached Agreement,**
    **filed May 5, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Order Granting Defendants' Motion for Summary Judgment of**
**The Honorable Susan Illston**
    **filed August 13, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

**Judgment**
    **filed August 14, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

**U.S. Patent No. 7,877,489 B2**
    **issued January 25, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **55**

**U.S. Patent No. 7,369,515 B2**
    **issued May 6, 2080** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**

**U.S. Patent No. 7,426,191 B2**
    **issued September 16, 2008** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **162**

**U.S. Patent No. 7,715,331 B2**
    **issued May 11, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **220**

**U.S. Patent No. 7,813,304 B2**
    **issued October 12, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **280**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **340**

# TABLE OF CONTENTS
## VOLUME II OF III

**Appendix Page**

**Exhibits to Plaintiff's Complaint for Patent Infringement,**
    **filed July 30, 2009:**

    **A.**    **U.S. Patent No. 7,369,515 B2**
                **dated May 6, 2008** ................................. 429

    **B.**    **U.S. Patent No. 7,426,191 B2**
                **dated September 16, 2008** ......................... 431

**Plaintiff's First Amended Complaint for Patent Infringement**
    **filed September 15, 2009** ...................................... 490

**Defendants' Answer to Plaintiff's Complaint and Counterclaim**
    **filed November 6, 2009** ....................................... 505

**Plaintiff's Second Amended Complaint for Patent Infringement,**
**With Exhibits,**
    **filed December 17, 2010** ...................................... 583

    **Exhibits:**

    **C.**    **U.S. Patent No. 7,813,304 B2**
                **dated October 12, 2010** ........................... 770

    **D.**    **U.S. Patent No. 7,715,331 B2**
                **dated May 11, 2010** .............................. 831

**Declaration of Colby B. Springer in Support of**
**Plaintiff's Unopposed Motion to Consolidate Related Cases**
**Pursuant to Fed. R. Civ. P. 42(a) and Amend the Scheduling Order**
    **filed April 15, 2011** .......................................... 891

Plaintiff's Opening Claim Construction Brief,
With Exhibit,
     filed September 1, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 950

     <u>Exhibit</u>:

     E.    U.S. Patent No. 7,877,489 B2
                dated January 25, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1264

Defendants' [Provisional] Response to
Plaintiff's Opening Claim Construction Brief
     filed September 15, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1320

Defendants' Response to
Plaintiff's Opening Claim Construction Brief
     filed September 19, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1491

Claim Construction Order of
The Honorable Susan Illston
     filed November 1, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1786

Declaration of Colby B. Springer in Support of
Plaintiff's Opposition to Defendants' Motion for Leave to Amend,
With Exhibits,
     filed March 14, 2012, continued from Volume V:

     <u>Exhibits</u>, continued from Volume V:

     G.    Plaintiff's Responses to
              Defendants' First Set of Interrogatories
                dated June 20, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2380

Order Denying Defendants' Motion for
Leave to Amend Answer and Counterclaims
     filed April 16, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2826

[Defendants' Notice and Motion for Summary Judgment of
Non-Infringement and Invalidity of U.S. Patent Nos.
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489 and
Points and Authorities in Support Thereof
     filed June 15, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2892

[Exhibits to Declaration of Leigh Martinson in Support of
Defendants' Motion for Summary Judgment of
Non-Infringement and Invalidity of U.S. Patent Nos.
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489 and
Points and Authorities in Support Thereof
    filed June 15, 2012]:

2.      [U.S. Patent No. 7,426,191 B2
              dated September 16, 2008] . . . . . . . . . . . . . . . . . . . . . . . . 3033

7.      [Excerpts of Transcript of
        Videotaped Deposition of Robert Stevenson, Ph.D.
              on May 17, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3242

8A.     [Excerpts of Transcript of
        Videotaped Deposition of Kevin Jeffay
              on May 15, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3262

8B.     [Excerpts of Transcript of
        Videotaped Deposition of Kevin Jeffay
              on May 16, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3280

9A.     [Excerpts of Transcript of
        Videotaped Deposition of Albert Alexandrov
              on February 9, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3320

10.     [Noninfringement Expert Report of Kevin Jeffay, Ph.D.
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3364

11.     [Expert Report of Robert Stevenson, Ph.D.
              dated March 6, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3421

13.     [Excerpts of Transcript of
        Videotaped Deposition of Richard Cogger
              on February 13, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . 3447

14.     [Computer Programming
              dated January 16, 1995] . . . . . . . . . . . . . . . . . . . . . . . . . 3559

15.     [Computer Programming
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3575

[Exhibits to Declaration of Leigh Martinson in Support of Defendants' Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489 and Points and Authorities in Support Thereof filed June 15, 2012], continued:

16.    [Letter to
       Alfred Wilson from
       Eric Danty
       Re:  Enclosing Document on Behalf of Cornell University
              dated September 29, 1993] . . . . . . . . . . . . . . . . . . . . . . . . . 3585

17.    [Internet TV
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3604

18.    [CBS "Up to the Minute" - CU-SeeMe and the Internet
              dated August 25, 1995] . . . . . . . . . . . . . . . . . . . . . . . . . 3619

19.    [Global Schoolhouse KOCT-TV
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3622

20.    [Excerpts of Transcript of Deposition of Peter Madams
              on February 10, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . 3624

21.    [Invalidity Expert Report of Kevin Jeffay, Ph.D.
              dated March 6, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3646

23.    [Claim Chart for U.S. Patent No. 7,813,304
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3789

25.    [Claim Chart for U.S. Patent No. 7,715,331
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3815

26.    [Claim Chart for U.S. Patent No. 7,877,489
              undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3822

[Exhibits to Declaration of Leigh Martinson in Support of
Defendants' Motion for Summary Judgment of
Non-Infringement and Invalidity of U.S. Patent Nos.
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489 and
Points and Authorities in Support Thereof
     filed June 15, 2012], continued:

27.    [Expert Rebuttal Report of David Klausner
    Concerning Validity of U.S. Patent Nos.
    7,369,515; 7,426,191; 7,715,331; and 7,877,489,
    With Exhibits,
        dated April 9, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3837

# TABLE OF CONTENTS
## VOLUME III OF III

**Appendix Page**

[Plaintiff's Opposition to Defendants' Motion for
Summary Judgment of Non-Infringement and Invalidity,
With Attached Declaration and Exhibits,
    filed June 26, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3939

[Exhibits]:

1.     [Transcript of Videotaped Deposition of Robert Stevenson
        on May 17, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3959

2.     [U.S. Patent No. 7,369,515 B2
        dated May 6, 2008] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4198

7.     [Expert Report of Robert Louis Stevenson, Ph.D.
        dated March 6, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4497

8.     [Transcript of Videotaped Deposition fo David Klausner
        on May 9 and June 5, 2012] . . . . . . . . . . . . . . . . . . . . . . . 4528

9.     [Transcript of Videotaped Deposition of Kevin Jeffay
        on May 15, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4825

10.    [Transcript of Videotaped Deposition of Albert Alexandrov
        on February 9 and 10, 2012] . . . . . . . . . . . . . . . . . . . . . . 4905

15.    [Transcript of Videotaped Deposition of Richard Cogger
        on February 13, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . 5048

16.    [Transcript of Deposition of Peter Madams
        on February 10, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . 5122

17.    [Expert Rebuttal Report of David Klausner
        Concerning Validity of U.S. Patent Nos.
        7,369,515; 7,426,191; 7,715,331; and 7,877,489,
        With Exhibits,
        dated April 9, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5196

[Plaintiff's Opposition to Defendants' Motion for
Summary Judgment of Non-Infringement and Invalidity,
With Attached Declaration and Exhibits,
    filed June 26, 2012], continued:

    [Exhibits], continued:

    18.    [Invalidity Expert Report of Kevin Jeffay, Ph.D.
          dated March 6, 2012] .............................. 5263

[Defendants' Reply in Support of Its Motion for
Summary Judgment of Non-Infringement of U.S. Patent Nos
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489
    filed July 6, 2012] ........................................ 5495

[Exhibits to Declaration of Leigh Martinson in Support of
Defendants' Reply in Support of Its Motion for
Summary Judgment of Non-Infringement of U.S. Patent Nos
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489
    filed July 6, 2012]:

    28.    [Excerpts Transcript of
        Videotaped Deposition of Albert Alexandrov
          on February 10, 2012] ............................ 5511

    29.    [Invalidity of U.S. Patent No. 7,426,191
        Based on CU-SeeMe System
          undated] ..................................... 5515

    30.    [Invalidity of U.S. Patent No. 7,715,331
        Based on CU-SeeMe System
          undated] ..................................... 5533

    31.    [Invalidity of U.S. Patent No. 7,369,515
        Based on CU-SeeMe System
          undated] ..................................... 5551

    32.    [Invalidity of U.S. Patent No. 7,813,304
        Based on CU-SeeMe System
          undated] ..................................... 5578

[Exhibits to Declaration of Leigh Martinson in Support of
Defendants' Reply in Support of Its Motion for
Summary Judgment of Non-Infringement of U.S. Patent Nos
7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489
filed July 6, 2012], continued:

33.    [Invalidity of U.S. Patent No. 7,877,489
Based on CU-SeeMe System
undated] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5605

34.    [Subpoena in a Civil Case,
With Attachments,
dated January 23, 2012] . . . . . . . . . . . . . . . . . . . . . . . . 5630

35.    [Excerpts of Transcript of
Videotaped Deposition of Richard Cogger
on February 13, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . 5717

38.    [Excerpts of Transcript of
Videotaped Deposition of Robert Stevenson, Ph.D.
on May 17, 2012] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5777

Plaintiff's Notice of Appeal
filed August 28, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5833

## STATEMENT REGARDING CONFIDENTIAL MATERIAL

The material omitted in this Joint Appendix contains confidential
information redacted pursuant to the parties' Agreed Protective Order filed May
5, 2011. The material omitted contains Pixion, Inc. and Citrix Systems, Inc. and
Citrix Online, LLC confidential business documents and/or product
development materials.

1   ROBERT J. YORIO (SBN 93178)
    yorio@carrferrell.com
2   COLBY B. SPRINGER (SBN 214868)
    cspringer@carrferrell.com
3   CHRISTOPHER P. GREWE (SBN 245938)
    cgrewe@carrferrell.com
4   CARR & FERRELL *LLP*
    120 Constitution Drive
5   Menlo Park, California 94025
    Telephone: (650) 812-3400
6   Facsimile: (650) 812-3444

7   Attorneys for Plaintiff and Counterdefendant
    PIXION, INC.
8

9

10

11

12

                        TERRY W. AHEARN (SBN 216543)
                        tahearn@mwe.com
                        McDERMOTT WILL & EMERY LLP
                        275 Middlefield Rd., Suite 100
                        Menlo Park, California 94025
                        Telephone: (650) 815-7400
                        Facsimile: (650) 815-7401

                        SARAH CHAPIN COLUMBIA (Pro
                        Hac Vice)
                        scolumbia@mwe.com
                        LEIGH MARTINSON (Pro Hac Vice)
                        lmartinson@mwe.com
                        McDERMOTT WILL & EMERY LLP
                        28 State Street, 34th floor
                        Boston, Massachusetts 02109
                        Telephone: (617) 535-4000
                        Facsimile: (617) 535-3800

                        Attorneys for Defendants and
                        Counterclaimants
                        CITRIX SYSTEMS, INC., and
                         CITRIX ONLINE, LLC

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

17  PIXION, INC., a Delaware corporation,      CASE NO. CV09-03496-SI (PVT-CRB)

                                               *Consolidated* CASE NO. CV11-00694-SI
18          Plaintiff/Counter-
            Defendants,                         *Related* CASE NO. C03-02909-SI
19
        v.
20
    CITRIX SYSTEMS, INC., a Delaware
21  Corporation, CITRIX ONLINE, LLC, a          **[PROPOSED] PROTECTIVE ORDER**
    Delaware limited liability company,
22
            Defendants/Counter-
23          Plaintiffs.

24  AND RELATED COUNTERCLAIMS

25

26

27

28

## [PROPOSED] PROTECTIVE ORDER

The Court issues this Protective Order to address the confidentiality of certain materials and facilitate disclosure and production of such materials under the Local Rules of this Court and the Federal Rules of Civil Procedure.  Unless modified pursuant to the terms contained in this Order, this Order shall remain in effect through the conclusion of this litigation.

In support of this order, the Court finds that:

1. Documents or information containing confidential proprietary personal and business information and/or trade secrets ("Confidential Information") that bear significantly on the parties' claims or defenses are likely to be disclosed or produced during the course of discovery in this litigation.

2. The parties to this litigation may assert that public dissemination and disclosure of Confidential Information could severely injure or damage the party disclosing or producing the Confidential Information and could place that party at a competitive disadvantage;

3. Counsel for the party or parties receiving Confidential Information are presently without sufficient information to accept the representation(s) made by the party or parties producing Confidential Information as to the confidential, proprietary, and/or trade secret nature of such Confidential Information; and

4. To protect the respective interests of the parties and to facilitate the progress of disclosure and discovery in this case, the following Order should issue:

IT IS THEREFORE ORDERED THAT:

1. **Confidential Information**.  Documents or discovery responses containing Confidential Information disclosed or produced by any party in this litigation are referred to as "Confidential Information."

A. All information, documents or tangible items to be produced in tangible form that the producing party wishes to designate as Confidential Information must, prior to production to the receiving party, be labeled on each page by the producing party with the legend: CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER.

B.      All documents and information to be disclosed initially for inspection (such as for selection of materials for copying and production) that the producing party wishes to designate as Confidential Information must, prior to such disclosure, be specified in a writing provided to the receiving party (or orally, if followed by the necessary writing) that identifies the specified documents and/or information as Confidential Information.

C.      All information to be disclosed orally (such as at a deposition) shall be automatically designated as Confidential Information and the transcript shall automatically be designated as a Confidential Information for a period of thirty (30) days from the date the deposition transcript becomes available.  Thereafter, the information contained in the deposition transcript will no longer be deemed Confidential Information and the transcript will no longer be deemed Confidential Information unless: (1) in a writing sent to counsel for the receiving party before the expiration of the thirty-day period, counsel for the producing party claims in good faith that the deposition transcript (or a specified portion of it) contains Confidential Information; or (2) at the deposition, counsel for the producing party stated on the record that certain portions of the deposition transcript will contain Confidential Information.

2.      **Confidential Treatment**.  Documents or information containing Confidential Information shall not be used or shown, disseminated, copied, or in any way communicated to anyone for any purpose whatsoever, except as provided for below.  Confidential Information shall be used solely for the prosecution of this litigation.  Individuals receiving Confidential Information shall not under any circumstances sell, offer for sale, advertise, or publicize Protected Documents and/or Confidential Information

3.      **Restriction On Use Of Confidential Information**.  Confidential Information is entitled to Confidential Treatment and access to Confidential Information shall be strictly limited to the following persons as follows:

A.      ***Outside Counsel***.  Members and employees of outside counsel of record in this action, their support staff, and in-house copying services whose duties and responsibilities require access to such materials.

B.    ***Experts And Consultants***.  Outside experts or consultants for the receiving party and their supporting personnel, who have not been for the prior year and are not employees of a receiving party or any affiliated company or business and who are retained in connection with the disputes between or among the parties to this litigation, but only after compliance with Paragraph 3B(1)-(4), below.

(1)    Before a party can disclose Confidential Information to an actual or potential expert or consultant, the party wishing to disclose Confidential Information must provide written notice for same-day delivery to all counsel no less than ten (10) business days prior to any disclosure of the Confidential Information.  The written notice shall contain the name, title, business address, present occupation (or job description), past and present business relationships with the party retaining them or other party to the litigation, curriculum vitae of the person to whom the information will be disclosed, a list of all instances in which, during the last four (4) years, the expert or consultant provided consulting services (regardless of whether the purpose of the consultancy was litigation), was retained as an expert, and/or testified at trial or deposition, and an undertaking in the form of Exhibit A, signed by that person (such original signed document to be kept by the party retaining such person).  In the event such proposed expert or consultant is prohibited due to confidentiality obligations to a third party from disclosing a present or prior employment or consultancy, the expert or consultant shall so state and shall disclose such information as the expert or consultant is permitted to provide regarding the nature of the employment or consultancy (such as the industry or technology involved in the employment or consultancy; whether the employment or consultancy was for a competitor of a party or like information) to enable, to the extent possible, the other party to determine whether or not to object to the expert or consultant.

(2)    If, within ten (10) business days after receipt of the notice of intent to disclose set forth in Paragraph 3B(1), counsel for the party producing the

1    Confidential Information does not object to the disclosure, any Confidential

2    Information designated by the producing party may be disclosed to the designated

3    person.  Failure to object within the ten (10) day period shall be deemed approval,

4    but shall not preclude a producing party from objecting to continued access to

5    Confidential Information by that person where facts suggesting a basis for

6    objection are subsequently learned by the producing party or its counsel.  If within

7    ten (10) business days of receipt of the notice of intent to disclose set forth in

8    Paragraph 3B(1), counsel for the party producing the Confidential Information

9    objects to such intended disclosure of documents and/or information designated as

10   Confidential Information by the producing party shall not be disclosed until such

11   objection is resolved by agreement of the parties, by a ruling of a Court or as

12   otherwise set forth below.

13   (3)    Counsel's objection must be for good cause, stating with particularity the

14   reasons for the objection, and must be in writing and served on all parties to the

15   action within the ten (10) day period.  The parties shall meet and confer in an

16   attempt to resolve the dispute within ten (10) business days from the date of

17   mailing or electronic delivery of the objection.  If the parties cannot resolve the

18   dispute, the party wishing to retain the expert or consultant may move the Court

19   (in accordance with any applicable standing orders or local rules) for an order that

20   access to Confidential Information be granted to the designated person.  Such

21   motion shall be made within fifteen (15) business days of the mailing or electronic

22   delivery of the objection.  If the parties cannot resolve the dispute and the party

23   wishing to retain to retain the expert or consultant does not make such a motion

24   within fifteen (15) business days of the mailing or electronic delivery of the

25   objection, the Confidential Information shall not be disclosed to the designated

26   person.

27   (4)    Notwithstanding the above requirements, any proposed expert or consultant

28   who has worked for either party in previous litigation shall not be retained in this

[Proposed] Protective Order                     - 5 -                     CASE NO. 3:09-CV-03496-SI

1    litigation as an expert or consultant against that party.

2    C.    **Mock Jurors And Jury Consultants**.  Notwithstanding any other provision in

3    Paragraph 3B, disclosure of Confidential Information to mock jurors or jury consultants

4    may be made after the party retaining the mock jurors or jury consultant obtains a

5    completed and signed undertaking from each mock juror or jury consultant in the form of

6    Exhibit A attached hereto without any requirement that written notice or a *curriculum*

7    *vitae* be provide to the producing party.  The party need not disclose the identity of mock

8    jurors or jury consultants, or any other information pertaining to these individuals, to the

9    producing party.

10    D.    **Trial Graphics**.  Non-technical trial consultants and graphics or design firms,

11    including support personnel, retained by a party for the purpose of preparing

12    demonstrative or other exhibits provided that the disclosure of Confidential Information to

13    any such consultant or firm shall be made only after the party retaining the consultant or

14    firm obtains a completed and signed undertaking from such consultant or firm in the form

15    of Exhibit A attached hereto;

16    E.    **Document Vendors**.  Document printing or copying services and/or document

17    coding or computerization services which are not located within the offices of outside

18    counsel.  Notwithstanding any other provision of this Protective Order, access to

19    Confidential Information shall be permitted to such vendors, without the requirement of a

20    signed undertaking in form of Exhibit A.  Term "document" as used herein refers to paper

21    documents, electronically stored information, including but not limited to video tapes,

22    CD-ROMs, computer discs, other similar media, models, and similar physical renderings

23    of Virtual Private Networks of the parties.  The term "copy" as used herein means any

24    photographic, mechanical or computerized copy or reproduction of any document or

25    thing, or any verbatim transcript, in whole or in part, of such document or thing;

26    F.    **Court Reporters And Videographers** employed in connection with this litigation.

27    Any court reporter, transcriber or videographer who reports, transcribes or records

28    testimony in this action shall agree that all information designated Confidential

1    Information under this Order shall be given Confidential Treatment and shall not be

2    disclosed by them, except pursuant to the terms of this Order, and that any notes or

3    transcriptions of such testimony (and any accompanying exhibits) will be retained by the

4    reporter or delivered to counsel of record in accordance with the terms of this Order;

5    G.    *The Court* and its authorized personnel; and

6    H.    *Authors And Senders*.  Those individuals for whom a party has a good faith belief

7    are the authors, senders, addressees or intended copy recipients of such Confidential

8    Information as well as employees of the producing party.

9    I.    *Exception: Prosecution Bar*.  Notwithstanding any provision of this Order, every

10   person who receives information designated as Confidential Information or Highly

11   Confidential Code under this Order is precluded from preparing or prosecuting, or

12   supervising the preparation or prosecution of, or providing (verbally or in tangible form,

13   in whole or in part) Confidential Information or Code received under this Order to any

14   person involved in preparing or prosecuting, or supervising the preparation or prosecution

15   of, any patent applications, reissue proceedings, or reexamination proceedings with the

16   United States Patent and Trademark Office ("USPTO") or any similar proceedings in any

17   other country, involving any patent or patent application having claims or disclosures

18   related to methods, procedures, or devices that concern networked, online, computer

19   conferencing systems for collaborative online conferencing or webcasting.  This

20   preclusion is limited to proceedings involving patents and patent applications having an

21   effective filing date before this action, during this action, or within one (1) year after the

22   termination of this action.

23       (1)    *Prosecuting Counsel Of Carr & Ferrell, LLP*.  This bar specifically

24               applies to, but is not limited to, Pixion's prosecution counsel with the law firm of

25               Carr & Ferrell, LLP.  Pixion shall restrict access to all Confidential Information

26               and Highly Confidential Code, including any discussions regarding Confidential

27               Information and Highly Confidential Code, from any such prosecution counsel.

28   J.    *Exception: Development Bar*.  Notwithstanding any provision of this Order, every

1    person who receives information designated as Confidential Information or Highly

2    Confidential Code under this Order, is precluded (unless otherwise agreed to in writing)

3    from performing development work directly or indirectly intended for commercial

4    purposes related to methods, procedures, or devices that concern networked, online,

5    computer conferencing systems for collaborative online conferencing or webcasting of

6    any type, or products incorporating such methods, procedures or devices, for a period of

7    one (1) year after the termination of this action.  This prohibition shall not preclude such

8    persons from consulting in future litigation, so long as such consulting does not involve

9    development work directly or indirectly intended for commercial purposes related to

10    methods, procedures, or devices that concern networked, online, computer conferencing

11    systems for collaborative online conferencing or webcasting of any type, or products

12    incorporating such methods, procedures or devices.

13    4.    **Code**.  Any source code, register transfer language ("RTL"), hardware description

14    language ("HDL"), executable code which has not been publicly released, or other related

15    material (collectively "Code"), and copies thereof, produced in this matter shall be and is

16    designated as "Highly Confidential Code."  No electronic copies of Code may be made, except by

17    the producing party.  Under no circumstances shall Code be compiled into executable code by a

18    receiving party.  Only those individuals authorized and indentified in Paragraph 3A-C and E- H

19    shall be allowed to access Code or copies of Code and the prohibitions to access to Confidential

20    Information and Code outlined in Paragraphs 3I and 3J are specifically incorporated by reference

21    into this paragraph and Paragraphs 5 and 6.

22    5.    **Treatment Of Code.**  Information, documents and things designated under Paragraph 4

23    as Highly Confidential Code shall be subject to all the restrictions of Confidential Information

24    and shall be subject to the following additional restrictions and provisions:

25        A.    The producing party shall make its Code available through a dedicated server with

26            security software.  All Code other than executable code will be presented in a readable

27            format where the readable form does not change the content of the Code.  The law firm of

28            the receiving party shall be provided with UserIds and passwords sufficient to permit

1    simultaneous inspection of the Code from two remote computers.  Such inspection may

2    only take place at the offices of outside counsel of record of the receiving party, the office

3    of experts or consultants approved under this Order, or at an alternate location agreed

4    upon by the parties to this litigation.  Neither the producing party, nor its outside counsel,

5    will track or make any attempt to track which portions of the Code are accessed, reviewed,

6    or analyzed by outside counsel or by experts approved under this Order.  When a

7    computer at the office of an expert or consultant approved under this protective order is

8    being used to access Code and the computer is unattended, the computer shall be

9    contained in a locked room, password protected and, in this situation, the computer screen

10   shall not display Code.  The producing party agrees to install source code viewing and

11   analysis software consisting of TextPad (or an equivalent), Visual Studio and SlickEdit on

12   the dedicated server.

13       B.      For executable code that has not been publicly released, the producing party shall

14   either (at the receiving party's election) provide the executable code to an escrow service

15   selected by the receiving party or otherwise permit inspection of the code by the receiving

16   party, its outside counsel or experts or consultants approved under this Order.

17   6.    **Technical Support For Review Of Code**.  Although the receiving party will be able to

18   conduct its review of the producing party's Code at any time using the dedicated server, the

19   producing party only has an obligation to provide technical and other necessary support to the

20   requesting party during normal business hours (9:00 a.m. to 5:00 p.m. Pacific time, Monday-

21   Friday, excluding holidays) unless otherwise agreed.

22       A.      At the request of the receiving party, the producing party shall provide paper

23   copies of reasonable portions of the Code identified by the receiving party.  The receiving

24   party is strictly prohibited from printing or copying any of the producing party's Code

25   from the secure server.  The producing party shall provide the requested copies (paper and

26   text files) in line-numbered format similar to how the Code appeared on the screen during

27   the inspection and with the file directory path appearing on each page.  The producing

28   party shall provide such copies to the receiving party on the same day or within five (5)

1    business days of the receiving party's request, unless otherwise agreed.  The producing

2    party shall mark such copies clearly and prominently as HIGHLY CONFIDENTIAL

3    CODE and affix individual production numbers.

4    B.      All copies of Code shall be maintained in the custody and control of the receiving

5    party's outside counsel of record or experts or consultants approved under this Order.

6    When not in use, paper copies of Code must be stored in a secure manner at the offices of

7    counsel of record or at the office of an expert or consultant approved under this Order in a

8    locked drawer or a locked room.  Copies of Code may not be converted into electronic

9    format (including for emailing).  Copies of Code may not themselves be copied, except

10   that paper copies of Code may be copied and used as exhibits for depositions, expert

11   reports, motions, or trial, provided that such copies are stored in a secure manner at the

12   offices of outside counsel of record or at the office of an expert or consultant approved

13   under this Order in a locked drawer or a locked room.  Any copies of Code filed with the

14   Court shall be filed under seal.

15   C.      The receiving party may take written notes of portions of the Code and other such

16   notes as may be reasonably necessary to facilitate inspection of the Code, except that the

17   receiving party shall not make verbatim copies of any Code.  Any such notes shall be

18   treated the same way as Code, including being marked Highly Confidential Code and

19   being stored in a secure manner at the offices of counsel of record or at the office of an

20   expert or consultant approved under this Order in a locked drawer or a locked room.

21   D.      The receiving party may request that the producing party's Code be made

22   available at the deposition of any person authorized to review the Code under Paragraph

23   3A-C and E-G, or the deposition of the producing party, its employees, consultants or

24   experts, by giving the producing party at least three (3) business days notice of the request

25   before the deposition.  The producing party will then make a computer containing its Code

26   available in searchable format at the deposition.

27   7.      **Improper Disclosure Of Confidential Information**.  If Confidential Information is

28   disclosed to anyone other than in a manner authorized by this Order, by inadvertence or

1  otherwise, the party responsible for such disclosure must (1) immediately notify the producing

2  party in writing of the improper disclosure; (2) use its best efforts to retrieve all copies of the

3  Confidential Information; (3) inform the person or persons to whom improper disclosure was

4  made of the terms of this Order; and (4) request that such person execute an undertaking in the

5  form of Exhibit A, signed by that person.

6  8.      **Producing Party's Information**.  Nothing herein shall impose any restriction on the use

7  or disclosure by a producing party of its own Confidential Information, Code, discovery materials

8  or other information.

9  9.      **Publically Disclosed Or Available Information**.  Confidential Information shall not

10  include any information which has been or becomes part of the public domain by publication or

11  otherwise and not due to any unauthorized act or omission.  Confidential Information shall not

12  include (1) advertising materials; (2) materials that on their face show they have been published

13  to the general public; or (3) documents that have been submitted to any governmental entity

14  without request for confidential treatment.

15  10.     **Use Of Confidential Information At Depositions Or Meetings**.  To the extent that

16  Confidential Information is used, discussed, quoted, or referred to in any depositions or meetings,

17  the party using, discussing, quoting or referring to such information shall ensure that only those

18  persons permitted to have access to such Confidential Information in accordance with Paragraph

19  3A-G of this Order are present at the time of the disclosure.  The transcript of any depositions or

20  meetings shall remain subject to the provisions of this Order.  The use of any such Confidential

21  Information for the purpose of any hearing or trial which is open to the public is not addressed at

22  this time, but will be the subject of future agreements or orders as the need may arise.  If any

23  party desires to maintain the confidentiality of any document or information in a Court hearing or

24  at trial, it shall be the obligation of such party to raise the issue with the Court.

25  11.     **Challenging Designations**.

26      A.      ***Timing of Challenges***.  Any Party or Non-Party may challenge a designation of

27              confidentiality at any time. Unless a prompt challenge to a Designating Party's

28              confidentiality designation is necessary to avoid foreseeable, substantial

[Proposed] Protective Order           - 11 -              CASE NO. 3:09-CV-03496-SI

1    unfairness, unnecessary economic burdens, or a significant disruption or delay of

2    the litigation, a Party does not waive its right to challenge a confidentiality

3    designation by electing not to mount a challenge promptly after the original

4    designation is disclosed.

5    B.    ***Meet and Confer***.  The Challenging Party shall initiate the dispute

6    resolution process by providing written notice of each designation it is challenging

7    and describing the basis for each challenge. To avoid ambiguity as to whether a

8    challenge has been made, the written notice must recite that the challenge to

9    confidentiality is being made in accordance with this specific paragraph of the

10   Protective Order. The parties shall attempt to resolve each challenge in good faith

11   and must begin the process by conferring directly (in voice to voice dialogue; other

12   forms of communication are not sufficient) within 14 days of the date of service of

13   notice. In conferring, the Challenging Party must explain the basis for its belief that

14   the confidentiality designation was not proper and must give the Designating Party

15   an opportunity to review the designated material, to reconsider the circumstances,

16   and, if no change in designation is offered, to explain the basis for the chosen

17   designation. A Challenging Party may proceed to the next stage of the challenge

18   process only if it has engaged in this meet and confer process first or establishes that

19   the Designating Party is unwilling to participate in the meet and confer process in a

20   timely manner.

21   C.    ***Judicial Intervention***. If the Parties cannot resolve a challenge without court

22   intervention, the Designating Party shall file and serve a motion to retain

23   confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule

24   79-5, if applicable) within 21 days of the initial notice of challenge or within 14

25   days of the parties agreeing that the meet and confer process will not resolve their

26   dispute, whichever is earlier. Each such motion must be accompanied by a

27   competent declaration affirming that the movant has complied with the meet and

28   confer requirements imposed in the preceding paragraph. Failure by the

1       Designating Party to make such a motion including the required declaration within

2       21 days (or 14 days, if applicable) shall automatically waive the confidentiality

3       designation for each challenged designation. In addition, the Challenging Party

4       may file a motion challenging a confidentiality designation at any time if there is

5       good cause for doing so, including a challenge to the designation of a deposition

6       transcript or any portions thereof. Any motion brought pursuant to this provision

7       must be accompanied by a competent declaration affirming that the movant has

8       complied with the meet and confer requirements imposed by the preceding

9       paragraph.

10      The burden of persuasion in any such challenge proceeding shall he on the

11 Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass

12 or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party

13 to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to

14 file a motion to retain confidentiality as described above, all parties shall continue to afford the

15 material in question the level of protection to which it is entitled under the Producing Party's

16 designation until the court rules on the challenge.

17 12.    **Failure To Designate Confidential Treatment**.  The inadvertent or unintentional

18 production of information that is not designated CONFIDENTIAL INFORMATION – SUBJECT

19 TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL CODE but that, nevertheless,

20 contains Confidential Information or Highly Confidential Code shall not be deemed a waiver in

21 whole or in part of a claim for Confidential Treatment.  The party failing to properly designate

22 information containing Confidential Information or Highly Confidential Code shall have thirty

23 (30) business days from the discovery of such inadvertent disclosure to notify the receiving party

24 of the error and to provide the receiving party with the properly designated information.  Upon

25 receipt of the properly designated information, the receiving party shall either (1) immediately

26 obtain and destroy all copies of the inadvertently produced information, including any such

27 information disclosed to third parties; or (2) notify the producing party in writing within one (1)

28 business day that the receiving party intends to challenge the designation of the information as

1    Confidential Information or Highly Confidential Code.

2        A.    ***Challenges***.  In the event the receiving party challenges the designation of

3        previously undesignated information, the receiving party shall treat the information as

4        Confidential Information or Highly Confidential Code until the challenge is resolved in

5        accordance with Paragraph 11.  If the receiving party has provided the undesignated

6        information to a third party, the receiving party shall immediately notify the producing

7        party and the receiving party shall retrieve the information from the third party if the third

8        party is not an individual entitled to receive Confidential Information or Highly

9        Confidential Code in accordance with Paragraphs 3A-G.  If the third party who received

10        the undesignated information is an individual entitled to receive Confidential Information

11        or Highly Confidential Code in accordance with Paragraph 3A-G, such individual shall

12        treat the information as Confidential Information or Highly Confidential Code until the

13        challenge is resolved in accordance with Paragraph 11.

14        B.    ***Discovery By Receiving Party***.  If the receiving party, without notice from the

15        producing party, determines that information has been produced that is not designated

16        CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER or

17        HIGHLY CONFIDENTIAL CODE but that, nevertheless, contains Confidential

18        Information or Highly Confidential Code shall immediately contact the producing party

19        and advise of the failure to designate.  The receiving party may then proceed in

20        accordance with the terms of this paragraph.

21    13.    **Inadvertent Disclosure Of Privileged Information**.  Inadvertent production of

22    information shall be handled as follows, but this is without prejudice to the right of any party to

23    apply to the Court for further protection or disclosure relating to discovery:

24        A.    ***Notice By Producing Party***.  Pursuant to Federal Rules of Civil Procedure

25        26(b)(5), immediately upon receiving notice from the producing party that information

26        subject to the attorney-client privilege or work-product immunity has been inadvertently

27        produced, the receiving party shall not review, copy, or otherwise disseminate the

28        documents or materials, nor shall it disclose their substance.  The receiving party shall

1    return or destroy the documents or materials and all copies within three (3) business days

2    from receiving notice;

3    B.    ***Discovery By Receiving Party***.  If the receiving party, without notice from the

4    producing party, determines that information subject to the attorney-client privilege or

5    work-product immunity has been inadvertently produced, the receiving party shall

6    immediately contact the producing party and advise them of the inadvertent disclosure.

7    Pursuant to Federal Rules of Civil Procedure 26(b)(5), the receiving party shall not

8    review, copy, or otherwise disseminate the documents or materials, nor shall it disclose

9    their substance.  In addition, the receiving party shall return or destroy the documents or

10   materials and all copies within three (3) business days from discovery of the inadvertent

11   disclosure;

12   C.    ***Challenges***.  If the receiving party believes that it has a good-faith basis for

13   challenging the privilege claim, the receiving party shall provide the producing party with

14   a written explanation of the good-faith basis for the belief that the inadvertently produced

15   documents or materials are not privileged within three (3) business days of the producing

16   party's request for return.  The producing party shall respond in writing to the receiving

17   party's timely challenge to the privilege or immunity claim within five (5) business days

18   from receipt of the challenge;

19   D.    ***Motion To Compel***.  In the event the parties cannot agree as to the privilege or

20   immunity status of the inadvertently produced documents or materials, the receiving party

21   shall have five (5) business days from receipt of the producing party's written response to

22   the privilege challenge to file a motion (in accordance with any applicable standing orders

23   or local rules) seeking an order compelling production of the inadvertently produced

24   documents or materials.  The receiving party shall not use the substantive content of the

25   inadvertently produced documents or materials to challenge their status as privileged or

26   immune, but may submit the document under confidential seal for the Court's review.  In

27   the event that a motion is made, the producing party shall have the burden of proving that

28   the inadvertently produced documents or materials are privileged or immune from

1    discovery.

2        E.    ***No Waiver - Order***.  Inadvertent disclosure of information subject to the attorney-

3        client privilege, work-product immunity, or any other applicable privilege or immunity

4        shall not constitute a waiver of such privilege(s).  Pursuant to Rule 502(d) of the Federal

5        Rules of Evidence, the Court hereby orders that the attorney-client privilege or work

6        product protection is not waived by disclosure connected with the above-referenced matter

7        and any such disclosure is also not waived in any other Federal or State proceeding.

8    14.    **Filings Under Seal**.  Any pleading, paper or other document filed in this matter that

9    contains or discloses Confidential Information shall be lodged with the Court in accordance with

10    the Court's standing orders, local rules and clerk's instructions of the United States District Court

11    for the Northern District of California.  When filing pleadings which contain Confidential

12    Information, the party so filing shall designate the following on the first page of filed documents:

13    "UNDER SEAL – SUBJECT TO PROTECTIVE ORDER – CONTAINS CONFIDENTIAL

14    INFORMATION OR HIGHLY CONFIDENTIAL CODE."

15    15.    **Third Party Information**.  Information produced by third parties may be designated by

16    them as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" pursuant to the terms of

17    this Order and, when so designated, shall be treated by the parties in conformance with this Order.

18    *Exception:*  Unless the parties and the third party agree otherwise in writing, the restrictions in

19    this Order on the ability of individuals who have access to Confidential Information or Highly

20    Confidential Code to prosecute patents shall not apply to such third party information.

21    16.    **Termination Of Litigation**.  After termination of this litigation, the provisions of this

22    Order shall continue to be binding, except with respect to information that becomes a matter of

23    public record.  The Court shall have continuing jurisdiction over the parties and recipients of

24    Confidential Information for enforcement of the provisions of this Order following termination of

25    this litigation.

26    17.    **Destruction Of Confidential Information And Highly Confidential Code**.  Within

27    sixty (60) days of termination of this action by dismissal, judgment, or settlement, counsel for the

28    party receiving Confidential Information or Highly Confidential Code shall return all such

1    information to the producing party or certify that such information has been destroyed.  Outside

2    counsel of record may retain one (1) set of all depositions and deposition exhibits, and one (1) set

3    of all papers filed with the Court or served on opposing counsel.  The receiving party of

4    Confidential Information may retain their attorney work product which refers or relates to

5    Confidential Information.  Attorney work product may be used in subsequent litigation provided

6    that such use does not disclose Confidential Information in violation of this Order.

7    18.      **Successors And Assigns**.  This Order shall be binding upon the parties and their

8    attorneys, successors, executors, personal representatives, administrators, heirs, legal

9    representatives, assigns, subsidiaries, divisions, employees, agents, independent contractors, or

10    other persons or organizations over which they have control.

11              SIGNED this ___4th___ day of ____May____, 2011.

12

13                                                   _____

14                                                   SUSAN ILLSTON
                                                     UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

| | |
|---|---|
| PIXION, INC., a Delaware corporation, | CASE NO. CV09-03496-SI (PVT-CRB) |
| Plaintiff, | *Consolidated* CASE NO. CV11-00694-SI |
| v. | *Related* CASE NO. C03-02909-SI |
| CITRIX SYSTEMS, INC., a Delaware Corporation, CITRIX ONLINE, LLC, a Delaware limited liability company, | |
| Defendants. | |

**AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, _____, being duly sworn, state that:

1.      My home address is _____.

2.      My present employer is _____ and my present work address is _____.

3.      My present title, occupation or job description is _____.

4.      A copy of my *curriculum vitae* is attached hereto.

5.      I have read and understand the provisions of the Protective Order entered in this action, and I will comply with the provisions of this Protective Order.  I consent to be subject to the jurisdiction of this Court for enforcement of this Protective Order.

6.      I will hold in confidence and not disclose to anyone not qualified under the Protective Order any Confidential Information or Highly Confidential Code, or any summaries, abstracts, or indices of any Confidential Information or Highly Confidential Code, that is disclosed to me or that I prepare.

7.      Upon conclusion of the above-captioned action, including appeal, I will return all Confidential Information or Highly Confidential Code, and any summaries, abstracts, indices or

1    documents and materials that I received or prepared relating thereto in my possession to counsel

2    for the party for whom I was employed, retained or acted as a witness.

3           I declare under penalty of perjury that the foregoing is true and correct.

4

5    Dated: _____        By:_____

6

7    DM_US 12959655-6.082125.0013

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PIXION, INC.,                                          No. C 09-03496 SI

          Plaintiff,                        **ORDER GRANTING DEFENDANTS'**
                                         **MOTION FOR SUMMARY JUDGMENT**

   v.

CITRIX SYSTEMS, INC., and CITRIX
ONLINE, LLC.

          Defendants.
                                  /

On June 15, 2012, defendant Citrix Systems, Inc. ("Citrix") filed a motion for summary judgment of non-infringement and invalidity in this patent dispute. Plaintiff Pixion, Inc. opposed on June 26, 2012, and Citrix replied on July 6, 2012. The Court held a hearing on the motion on July 13, 2012. Having considered the arguments of counsel and the papers submitted, and for good cause shown, the Court GRANTS the motion.

**BACKGROUND**

Plaintiff Pixion, Inc. ("Pixion") is a corporation formed in 1995 that focuses on developing "cost-effective interactive online meeting environments such as web conferencing solutions." Second Am. Compl. (Doc. 62) at 2. Plaintiff alleges that defendants Citrix Systems, Inc. and Citrix Online, LLC (collectively "Citrix") "makes, uses, offers to sell, and sells in the United States and imports into the United States online conferencing and collaboration systems" that infringe various patents belonging to Pixion. *Id.* at 5. Specifically, plaintiffs allege infringement of four related patents: U.S. Patent Nos. 7,369,515 ("'515 Patent"), 7,426,191 ("'191 Patent"), 7,715,331 ("'331 Patent"), and 7,813,304 ("'304

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Patent") (collectively the "conference system patents"); and a fifth patent pertaining to introducing a client to a conference, U.S. Patent No. 7,877,489 ( "'489 Patent").[1]  Citrix brings this motion for summary judgment on non-infringement of the four conference system patents only, as well as invalidity of the asserted claims of all five patents (collectively the "patents-in-suit").[2]  The Court issued a Claim Construction Order in this case on November 1, 2011. *See* Doc. 91.  On March 8, 2012, the Court granted Pixion's motion for judgment on one of Citrix's counterclaims, finding that Pixion did not engage in inequitable conduct by failing to disclose certain office actions to the PTO during the concurrent prosecution of its patents. *See* Doc. 113.  On April 16, 2012, the Court denied Citrix's motion for leave to amend its counterclaim with additional allegations that Pixion engaged in inequitable conduct by failing to disclose certain prior art. *See* Doc. 132.

### A.    Conference System Patents

The '515, '191, '331, and '304 patents share the same written description, figures, and title: "Providing Conference Data In A Network Communications System Based On Client Or Server Information Examined During A Conference."  The patents aim to solve the problem of connecting computers with different network speeds and different hardware capabilities to a shared web conference. In the words of the patentee, "[v]aried techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess." '191, Abstract.  The invention "transports at varying speeds those streams where intermediate updates can be dropped if they are obsoleted by later arriving data updates, optimizing the utilization of network and node resources." *Id.*

The '515 and '191 patents were issued in 2008, and are the respective parents of the '304 and '331 patents, which issued in 2010. The conference system patents claim priority to Provisional Patent Application 60/014,242, filed March 26, 1996. The '515/'304 and '191/'331 patents (the parent/child

---

[1] Infringement of the '489 Patent was originally alleged in a separate complaint (Case No. CV 11-00694 EMC); that action was later consolidated with the present case.

[2] Pixion asserts claims 1 and 17 in the '304 and '515 Patents, claims 1 and 39 in the '331 and '191 Patents, and claims 1, 4, and 5 in the '489 Patent (the "asserted claims").

**United States District Court**
For the Northern District of California

patents have nearly identical claims) differ only as to when the conference server gathers the client information: in the '515/'304 patents, the capabilities of each attendee are collected <u>before</u> the client joins the conference (i.e. before the server sends conference data), whereas in the '191/'331 patents, the conference server gathers client capabilities <u>during</u> the conference. The central issue in the infringement dispute is how the conference data is provided, and whether the characteristics of the provided data are based on the capabilities of a client. Each of the conference system patents contains two independent claims, a system claim and a method claim. The '515/'304 patents claim the following (emphasis showing critical terms):

**1.** A conferencing system comprising:
a conference server;
at least one client the at least one client including a web browser; and
at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after the client-server connection is established, the client-server connection established via the web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference, and **wherein one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client validated after establishing the client-server connection but prior to** the at least one client joining the conference.

**17.** A method for conferencing between a server and at least one client in a conferencing system, the method comprising:
establishing a network connection between the server and the at least one client, the network connection established via a web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference;
determining one or more characteristics of conferencing data for delivery during the conference, the **determination based on current capabilities of the at least one client** validated after establishing the client-server connection but prior to the at least one client joining the conference; and
providing the conferencing data from the server to the at least one client after establishing the network connection between the server and the at least one client and validating the current capabilities of the at least one client, the **provided conference data based on the current capabilities** of the at least one client.

'515, 36:7-24, 37:14-32.

The '191/'331 patents contain a similar Claim 1 with the limitation: "wherein one or more characteristics of the provided conferencing data are **based on client or server information examined subsequent to** both the client-server connection having been established and the client joining the conference." '191 Patent; 35: 24-39. The method in '191/'331 patents is contained in Claim 39:

**39.** A method for conferencing between a server and at least one client in a conferencing system, comprising:

3

- 22 -

establishing a network connection between the server and the at least one client, the network connection established via a web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference;

**examining client or server information** subsequent to both the client-server connection having been established and the client joining the conference; and

providing conferencing data from the server to the at least one client alter establishing a client-server connection and the at least one client having joined the conference, **wherein one or more characteristics of the conferencing data are based on the examined client or server information**.

'191, 37:33-38:14.

The specification describes one embodiment of the invention as follows:

The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection.

'515, 21:5-11.

In this embodiment, a client's class will determine the number of "data blocks" from the conference it will receive. '515, 21:11-65. For example, "Class 2 is used for fast network connections to slow machines. . . A Class 2 client might not be able to process each block, even uncompressed blocks, in which case [the] filter will discard blocks." '515, 21:30-34. By adjusting the type and quantity of data sent and received from attendees, the system (and the conference) can maintain flexibility and performance.

The Court has construed the following terms relevant to the instant motion:

• **capabilities of the at least one client**: "client parameters relating to resources available to the client, including the client's display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to the client."

• **client or server information**: "the capabilities, requirements, demands and requests, or configurations and characteristics of the client or server. Information may include any data, facts, and measurements, or the display bit-depth, bandwidth of the connection between the client and the conference server, processor speed of the client, and the amount of memory available to each client."

• **characteristics of [the provided] conferencing data**: "qualities, properties, or attributes inherent in or ascribed to [the provided] conferencing data, including size, content, rate of transmission and reception."

• **a conference server**: "a computer or several networked computers running conference software and providing conference data to a client computer"

The parties have also agreed on the following terms:

• **Web Browser:** "an application executed by a computer to navigate among network resources."

4

United States District Court
For the Northern District of California

• **[Universal/Uniform] Resource Locator (URL) Associated with a Conference**: "an identifier that specifies where the conference is located on a network."

• **Conference Listing:** "an identifier or address of a particular conference."

### B.      '489 Patent

The '489 patent is named "Negotiation And Validation Of A Client In A Video Conference" and it contains a single independent claim with four dependent claims, of which Claims 1, 4 and 5 are asserted:

> **1.** A method for introducing a client to a conference, the method comprising:
> **publishing a conference listing** corresponding to the conference, wherein the conference listing is located by a client device seeking to enter into the corresponding conference;
> **receiving indicia from a client device** indicating that a **web browser** corresponding to the client device has been pointed to the conference listing;
> **receiving information allowing for conference attendance** by the client device;
> connecting the conference server and the client device; and
> allowing for entrance of the client into the conference.
>
> **4.** The method of claim 1, wherein the conference listing is published for subsequent location using a uniform resource locator (URL).
>
> **5.** The method of claim 1, wherein the receipt of information allowing for conference attendance occurs after a validation operation.
>
> '489, 35:17-36:7, 16-21.

The '489 patent has the same abstract and specification as the four conference system patents. Typically, an attendee connects to the conference server by typing a URL into the attendee's web browser and navigating to a web page. '489, 2:26-28. The parties agreed that "publishing/published" means "making/made known, findable, or locatable." "Receiving indicia from a client device" was construed as "receiving a sign from a client device." Finally, "receiving information allowing for conference attendance" was defined according to its plain and ordinary meaning, including a contemplated embodiment that a conference may require a password or key to attend. '489, 2:33-35. The key can determine the attendee's privileges, ranging from controlling a pointer to becoming a presenter. '489, 2:42-44.

5

United States District Court
For the Northern District of California

C.    **The Accused Products**

The accused products are Citrix's GoToMeeting and GoToWebinar software packages, which allow a user who is a conference "presenter" to share his computer screen, including all windows open on the desktop, with other users who are the conference "participants." This is called "screen sharing." Noninfringement Expert Report of Kevin Jeffay, Ph.D. (Ex. 10 to Martinson Decl. in Support of Citrix's Motion for Summary Judgment, "Jeffay Non-infringement Rep.") ¶ 25. The accused products utilize proprietary software technology developed by Citrix named SetSync and Atomic Push. In capturing the presenter's screen, the application represents each snapshot of the desktop (called an "epoch") as a set of data packets, where each data packet contains a portion of the screen's image. At each point in time, "the application determines what areas of the screen changed since the previous snapshot, and, for those areas that have changed, new data packets are created." *Id.* ¶ 3. Data packets are organized by a unique identifier number, and then "pushed" by Atomic Push into the SetSync layer in the Citrix application. *Id.* ¶ 33. On the presenter's computer, the data is then "pulled" out of SetSync by a communications layer, which establishes a connection to the server. The communications layer uses a "TCP [Transmission Control Protocol] socket" that is part of the underlying operating system on the presenter's computer. *Id.* ¶ 34. A TCP socket is a standard operating system component that maintains a connection with the network. When the connection with a participant is ready to accept data, "the transmission communications layer on the server pulls an epoch out of SetSync and atomically pushes that epoch to the participant over the socket." *Id.* ¶ 39. Citrix notes that it is the underlying connection, rather than the Citrix application, that determines when data is pulled from Set Sync and transmitted to the server. *Id.* ¶ 34.

Pixion alleges that Citrix's accused products infringe the asserted claims of Pixion's patents, claiming a conferencing system and a method of introducing a client to the conference. Citrix argues that its products do not infringe the patents in suit, and that the asserted claims are invalid due to anticipation by an earlier conferencing system, known as "CU-SeeMe."

**LEGAL STANDARD**

Summary adjudication is proper when "the movant shows that there is no genuine dispute as to

**United States District Court**
For the Northern District of California

1  any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In a

2  motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden

3  of identifying for the court those portions of the materials on file that it believes demonstrate the absence

4  of any genuine issues of material fact,  the  burden of production then shifts so that the nonmoving party

5  must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a

6  genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

7  (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

8  In judging evidence at the summary judgment stage, the Court does not make credibility determinations

9  or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving

10  party.  *Id.* at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106

11  S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. See

12  Fed.R.Civ.P. 56(c)(4). Conclusory, speculative testimony in affidavits and moving papers is insufficient

13  to raise genuine issues of fact and defeat summary judgment.  See *Thornhill Publ'g Co., Inc. v. GTE*

14  *Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

15      Summary judgment is improper when the record contains "evidence on which the jury could

16  reasonably find for the non-moving party." *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589

17  F.3d 1179, 1183 (Fed. Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct.

18  2505, 91 L.Ed.2d 202 (1986)).  With respect to infringement, a mere disagreement between experts is

19  not sufficient to raise a triable issue of fact; rather, an expert's opinion must present "sufficient detail

20  for the court to determine whether that factual foundation would support a finding of infringement under

21  the claim construction adopted by the court, with all reasonable inferences drawn in favor of the

22  non-movant." *Rambus Inc. v. Hynix Semiconductor Inc.*, 628 F. Supp. 2d 1114, 1122 (N.D. Cal. 2008)

23  (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046–48 (Fed. Cir. 2000)).  With

24  respect to invalidity, the presumption of a patent's validity must be overcome by clear and convincing

25  evidence.  *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir.

26  2007); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir.2003).

27

28

7

**DISCUSSION**

**A.    Non-Infringement**

To find infringement, "the court must determine that every claim limitation is found in the accused device." *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (internal citations omitted). Summary judgment of non-infringement is a two-step analysis. First, the claims of the patent must be construed to determine their scope, as a question of law. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). Second, "a determination must be made as to whether the properly construed claims read on the accused device." *Id.* The determination of infringement is generally a question of fact. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Since the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

Citrix argues that Pixion and its expert, Dr. Stevenson, have not shown that each and every limitation of each of the asserted claims is present in the accused products, and therefore Pixion has not established a genuine issue of material fact. *See id.* For each claim, Citrix points out which limitations have not been identified by Pixion, and argues that with the burden shifting onto the plaintiff, Pixion has not met its burden of production. *See supra T.W. Elec. Service*, 809 F.2d at 630. Citrix also argues that the accused products affirmatively do not infringe the patents-in-suit because they do not provide conference data based on either "client capabilities" or "client information," and do not validate client information before or during the conference.

**1.    The '515 and '304 Patents**

The '515/'304 patents contain the limitation: "wherein one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client <u>validated after</u> establishing the client-server connection <u>but prior to</u> the at least one client joining the conference." '515, 36:7-24. In other words, the patents are concerned with validating client capabilities that affect

United States District Court
For the Northern District of California

1  conference data before joining the conference.[3]  Citrix argues that Pixion's expert, Dr. Stevenson, was

2  unable to show how the accused products meet this limitation, and that the products do not validate any

3  client capabilities before sending conference data.  Citrix's Reply in Support of its Motion for Summary

4  Judgment (Doc. 169, "Def.'s Reply") at 3.  During the deposition, when asked "Where in your report

5  do you set forth your analysis that the current capabilities of the at least one client are validated after

6  the establishment of client-server connection but prior to the client joining the conference?"  Dr.

7  Stevenson responded with "I don't address it."  Dep. Stevenson (Springer Decl. Ex. 7, Doc. 161) at 90:10

8  - 92:1. Pixion contends that Dr. Stevenson addressed this limitation when he stated "this is one of those

9  [situations] that is abundantly clear. . . [t]he process of adjusting for the client-server connection has

10  been going on for a while, and . . . before they joined the conference."  Pixion's Opposition to Citrix's

11  Motion for Summary Judgment (Doc. 159, "Pl.'s Opp.") at 16, citing Dep. Stevenson, 91:13-20.  Citrix

12  argues this statement is an unsupported conclusion and is therefore insufficient to meet Pixion's burden

13  of production.  Def.'s Reply at 3.

14    The Federal Circuit has held that "[i]t is well settled that an expert's unsupported conclusion on

15  the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party

16  may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical

17  claim limitation is found in the accused device."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363

18  F.3d 1263, 1277-78 (Fed. Cir. 2004) (citing *Arthur A. Collins*, 216 F.3d at 1046).  The Circuit upheld

19  a summary judgment of non-infringement when an expert's statement "[did] not pinpoint where those

20  elements are found in the accused devices,"  holding that "opaque identification is not enough to permit

21  any reasonable juror to make that leap."  *Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589

22  F.3d 1179, 1184 (Fed. Cir. 2009).  The Circuit further held that an expert "needed to supply at a

23  minimum some description about the specific features" that show infringement of the asserted claims.

24  *Id.*

25    Pixion has provided no materials in the record regarding the steps that take place prior to a client

26

27

28

---

[3] Neither party offers a position on what constitutes "validating."

9

**United States District Court**
For the Northern District of California

1   joining a conference in the accused products.  Nor has Pixion addressed the "validating" limitation.[4]

2   Pixion does not identify any features of the software that validate any aspect of the user's capabilities.

3   The statement made by Dr. Stevenson is therefore an unsupported conclusion.  Citrix's expert report,

4   describing the functionality of the accused products and opining that they do not infringe the patents in

5   suit, therefore stands uncontradicted.  *See TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1375 (Fed.

6   Cir. 2002) (finding plaintiff "failed to provide evidence to explain how" accused products infringed,

7   leaving defendant's evidence uncontradicted).  The Court finds that Citrix has shown that evidence on

8   record "fails to establish a material issue of fact essential to the patentee's case" with respect to the

9   infringement of the '515/'304 patents."  *See Novartis Corp.*, 271 F.3d at 1046.

10

11         **2.**       **The '191 and '331 Patents**

12           Citrix asserts that Pixion cannot prove infringement of '191/331 patents because the claims

13   require that "one or more characteristics of the provided conferencing data are <u>based on</u> client or server

14   information <u>examined</u> subsequent to both the client-server connection having been established and the

15   client joining the conference." '191 Patent; 35: 24-39, see Def.'s Reply at 4.  Citrix argues that Pixion

16   has again failed to support its case for infringement with sufficient factual support, and that SetSync and

17   Atomic Push do not provide data " based on client or server information" that is "examined".  *Id.* at 7.[5]

18   Pixion counters that "[b]y not sending *all* data, SetSync adapts the communication traffic to the

19   available network bandwidth." Pl.'s Opp. at 11-12 (emphasis in the original).  Pixion quotes its expert's

20   report:

21           Both the presenter computer and the multicast communication server will modify
22         characteristics of the conferencing data (i.e., the screen-sharing data) by selectively not
             sending epochs and data packets (i.e., not sending through all the screen-sharing data). The
23         decision of which conferencing data that is not to be sent is based on the capabilities of the
             network link between computers. The capabilities of the network connection represents
24         information about both the client and the server.  Stevenson Rep. (Springer Decl. Ex. 7) ¶¶

25           [4] Nor would such an argument be consistent with Pixion's allegations of how Citrix's products
26   infringe, as discussed below. Pixion argues that by skipping epochs or data packets *during* the
     conference, conference data is changed, thus evincing bandwidth adaptability and infringing its
27   products. Pixion makes no allegations that before any skipping (which by definition occurs during the
     conference) has occurred, SetSync validates capabilities of the attendee.

28           [5] Neither party offers a position on what constitutes "examined."

1    52-53.

2    Dr. Stevenson further testified that "by skipping epochs, conference data would be changed" and "the

3    availability of the underlying network connection is used in [a] way to modify the characteristics of the

4    provided conferencing data" in that "it changes things like the size, and the content, and the bit rate of

5    . . . the conference data."  Pl.'s Opp. at 14-15.

6        Pixion provides lengthy string citations to the testimony of Citrix's expert and chief scientist.

7    However, Pixion's assertions do not identify what specific client information is being used by the

8    accused products, in what way that information is "examined," or how it forms the basis for modifying

9    characteristics of the conferencing data, as the claim requires.  The Federal Circuit has long held that

10   "a party may not avoid summary judgment simply by offering an opinion of an expert that states, in

11   effect, that the critical claim limitation is found in the accused device." *Arthur A. Collins*, 216 F.3d at

12   1048.  The statements provided by Pixion and Dr. Stevenson do not muster sufficient factual foundation

13   to rise above "little other than a conclusory opinion" that the application practices the limitations found

14   in the patent claims.  *Dynacore Holdings*, 363 F.3d at 1278; *see also TechSearch*, 286 F.3d at 1375.

15       Neither Pixion nor Dr. Stevenson addresses how the accused products engage in "selectively not

16   sending" data packets, or the specific structure or function of the application that makes the "decision"

17   not to send packets that is tied to specific client information.  The expert report provided by Dr.

18   Stevenson devotes several pages to repeating the description of the accused products provided by

19   Citrix's expert, Dr. Jeffay, and Citrix's chief scientist, Dr. Alexandrov.  The statements made by Dr.

20   Stevenson himself, however, provide little additional information or analysis of the alleged infringing

21   functions beyond vague and conclusory allegations.  *See* Stevenson Rep. ¶ 40 ("While there are many

22   layers that control the exact form of the communication, the SetSync layer controls the characteristics

23   of the conferencing data that is provided based on information about the client and server."); ¶ 53 ("The

24   decision of which conferencing data that is not to be sent is based on the capabilities of the network link

25   between the computers."); ¶ 57 ("[I]t was visibly clear that GoToMeeting modified the conference data

26   that was provided.").  Citrix's expert fails to demonstrate precisely how Citrix's technology meets the

27   claim limitations.

28       The most glaring absence from Dr. Stevensons' report is any description of an element of

United States District Court
For the Northern District of California

11

- 30 -

**United States District Court**
For the Northern District of California

1  Citrix's technology that describes basing the provided data on "client or server information examined"

2  during the conference. He nowhere describes any act of examination, nor what aspect of Citrix's

3  software does the examining.

4      As discussed with respect to the '515 and '304 patents above, Pixion does not "supply at a

5  minimum some description about the specific features" needed to support its allegations of infringement.

6  *Intellectual Sci. & Tech.*, 589 F.3d at 1186. Without adequate factual basis, these conclusory opinions

7  fail to move beyond "opaque identification" that is insufficient to raise a material question of fact. *Id.*

8  Therefore, Citrix's evidence stands uncontradicted. Drs. Jeffay and Alexandrov testified that the

9  application does not examine client information, but rather sends data packets that constitute each epoch

10  as the connection between the presenter and the network becomes available. Def.'s Reply at 5, *citing*

11  Alexandrov Dep. at 214:24-215:14; 274:20-275:19; Jeffay Dep. at 399:11-25; 400:12-14; 401:9-11;

12  440:16-20. Accordingly, the Court finds that Citrix has shown that the evidence on the record fails to

13  establish a material issue of fact essential to the patentee's case with respect to the infringement of the

14  '191/'331 patents.

15      Citrix's motion for summary judgment of non-infringement is GRANTED.

16

17  **B.    Invalidity**

18      Citrix separately moves for summary judgment on the grounds that the asserted claims in the

19  patents-in-suit are invalid. Citrix argues that "CU-SeeMe," a conferencing system developed at Cornell

20  University with funding from the National Science Foundation, anticipated these claims.

21

22      **1.    CU-SeeMe Overview**

23      CU-SeeMe was an early videoconferencing system that allowed participants to "meet" with one

24  another over the internet. Participants could view one another via cameras attached to their respective

25  computers. Funding to develop the program was provided in part by a grant from the National Science

26  Foundation. Martinson Decl., Ex. 16 (Letter Enclosing 1993 NSF Grant). It supported point-to-point

27  connections (i.e., client to client) as well as multi-party conferences using an application known as a

28  "reflector." The software was developed at Cornell University primarily by Richard Cogger and Tim

1   Dorcey. Def.'s MSJ at 13. By 1993, the software was freely available to anybody who wanted to

2   download it. Cogger Dep., 34:12-35:13. According to Mr. Cogger, many people downloaded the

3   program from Cornell's File Transfer Protocol ("FTP") site. *Id.* 67:20-68:4. The program, using

4   today's parlance, "had gone viral." *Id.*, 71:11-12. CU-SeeMe was distributed along with associated

5   documents known as "ReadMe" files, which were commonly provided along with downloaded software

6   in the early days of the internet. Martinson Decl., Ex. 8A (Jeffay Dep. 164:16-25). "ReadMe" files

7   would explain what was in the distributed files. *Id.*[6] Mr. Cogger authored many of the ReadMe files

8   provided with CU-SeeMe. Cogger Dep. 235:18-236:23. Citrix argues that CU-SeeMe was both

9   described in a printed publication and in public use more than one year prior to the priority date of

10  Pixion's patents. For the purposes of this motion, Citrix relies on the ReadMe files to describe the

11  functions of CU-SeeMe. Citrix provides claim charts and arguments matching the elements of the

12  patents in suit to the descriptions provided in the ReadMe files. The particular ReadMe files relied on

13  by Citrix are (1) the text file labeled "CU-SeeMe ReadMe file 1-16-95," Martinson Decl., Ex. 14 (the

14  "Jan. 16, 1995 ReadMe File"), and (2) the text file labeled "Cornell Reflector Version 3.00B1" (the

15  "3.00B1 Reflector ReadMe File"), *id.*, Ex. 15.

16

17      **2.      Anticipation analysis**

18          Under 35 U.S.C. § 102(b),

19      A person shall be entitled to a patent unless–

20          * * *

21      (b) the invention was patented or described in a printed publication in this or a foreign country or
        in public use or on sale in this country, more than one year prior to the date of the application for
22      patent in the United States . . . .

23          In determining validity of a patent claim over the prior art, the same two-step process applies

24  as in infringement analysis. The first step is the claim construction by the Court. *See Smiths Indus. Med.*

25  *Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999). The second step is a comparison of

26  the asserted claims against the prior art reference. A determination that a claim is invalid for

27  ———————————————

28      [6]According to Citrix's invalidity expert Dr. Jeffay, the name "ReadMe" was a play on the Alice
    in Wonderland story, in which Alice confronts magical treats labeled "Eat Me" and "Drink Me."

13

1    anticipation requires a finding that "each and every limitation is found either expressly or inherently in

2    a single prior art reference." *Celeritas Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360, 47

3    USPQ2d 1516, 1522 (Fed. Cir. 1998). The Federal Circuit has held that "it is axiomatic that that which

4    would literally infringe if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue*

5    *Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001); *see also Lewmar Marine, Inc. v. Barient, Inc.*,

6    827 F.2d 744, 747 (Fed. Cir. 1987). Thus, with respect to an allegedly anticipating device, anticipation

7    involves the same inquiry as infringement, guided by the Court's claim construction. *See Rambus Inc.*

8    *v. Hynix Semiconductor Inc.*, 628 F. Supp. 2d 1114, 1120 (N.D. Cal. 2008).

9

10          **3.    Publication and  public use**

11          Citrix presents the ReadMe files distributed with CU-SeeMe as an anticipating publication, and

12   the CU-SeeMe program itself as an anticipating device in public use. Pixion argues that the ReadMe

13   files distributed with the CU-SeeMe software are not sufficient to meet the prior publication standard

14   for anticipation because they do not provide sufficient detail to enable a person skilled in the art to make

15   and use the invention. *Id.* (*citing In re Donahue*, 766 F.2d 531 (Fed. Cir. 1985) ("[E]ven if the claimed

16   invention is disclosed in a printed publication, that disclosure will not suffice as prior art if it was not

17   enabling.")). The Court finds no need to reach the question of whether the ReadMe files are enabling

18   because the public use of the CU-SeeMe system is sufficient to address anticipation.[7]

19          The Federal Circuit has reaffirmed that "Section 102(b) may bar patentability by anticipation

20   if the device used in public includes every limitation of the later claimed invention." *Zenith Electronics*

21   *Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008) (citing *Netscape Commc'ns*

22   *Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002)). With respect to a prior art reference that is a

23   device rather than a publication, "public use itself need not be enabling." *Id.*, quoting *In re Epstein*, 32

24   F.3d 1559, 1568 (Fed. Cir. 1994) ("Beyond this 'in public use or on sale' finding, there is no requirement

25   for an enablement-type inquiry."). Rather, the court must determine "whether the public use related to

26

27          [7] However, courts have found software manuals to be sufficiently enabling. *See Microstrategy*
     *Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D. Del. 2006), aff'd, 238 F. App'x 605 (Fed.
28   Cir. 2007)("manuals are themselves prior art and provide clear and convincing evidence sufficient to
     support a conclusion of invalidity").

1    a device that embodied the invention." *Id; see also Taussig v. Jack & Jill One Hour Cleaners, No. 12,*

2    *Inc.*, 462 F. Supp. 1026, 1038 (N.D.Ohio 1978) (prior use or sale, to invalidate patent, must embody all

3    elements and principles of claimed invention, but is sufficient, to invalidate, if it embodies substantially

4    the principles and elements of the patent).[8]

5

6    **4.    Presumption of patent validity**

7        A patent is presumed valid after the PTO examination process, based on "the basic proposition

8    that a government agency such as the then Patent Office was presumed to do its job." *Am. Hoist &*

9    *Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (*abrogated on other grounds*

10   by *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)) (citing *Morgan v.*

11   *Daniels*, 153 U.S. 120 (1894)). The defendant carries a high burden on summary judgment of invalidity,

12   as the "moving party seeking to invalidate a patent at summary judgment must submit such clear and

13   convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v.*

14   *Barr. Labs*, 251 F. 3d 955, 962 (Fed. Cir. 2001). The presumption of validity can nonetheless be

15   overcome with sufficient evidence. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir.

16   1997) ("The validity of a patent is always subject to plenary challenge on its merits. A court may

17   invalidate a patent on any substantive ground, whether or not that ground was considered by the patent

18   examiner.").[9]

19       The moving party's burden is "especially difficult" when the prior art references presented were

20   considered by the patent examiner during prosecution. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339,

21   1348 (Fed. Cir. 2004). But when additional evidence is presented by the moving party, "the burden may

22   be more or less easily carried because of the additional evidence." *Applied Materials, Inc. v. Advanced*

23

24       [8] Because the Court will limit its analysis to prior public use, Pixion's reliance on cases
     concerned only with prior publication is unavailing. See e.g. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545

25   F.3d 1359, 1369 (Fed. Cir. 2008) (holding prior publication "must not only disclose all elements of the
     claim within the four corners of the document, but must also disclose those elements arranged as in the

26   claim." (internal citations omitted)).

27       [9] See also *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985) ("[t]he
     Examiner's decision, on an original or reissue application, is never binding on the court. It is, however,

28   evidence the court must consider in determining whether the party asserting invalidity has met its
     statutory burden by clear and convincing evidence.").

15

1   *Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996).  New evidence supporting an

2   invalidity contention may "carry more weight" in an infringement action than evidence previously

3   considered by the PTO.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2251 (2011).[10]  As the

4   Supreme Court has held, "simply put, if the PTO did not have all material facts before it, its considered

5   judgment may lose significant force. . . .  And, concomitantly, the challenger's burden to persuade the

6   jury of its invalidity defense by clear and convincing evidence may be easier to sustain."  *Id.* (internal

7   citations omitted).

8          The Court previously addressed CU-SeeMe in the context of Citrix's March 1, 2012 Motion for

9   Leave to Amend Answer and Counterclaims.  Doc. 132.  In that motion, Citrix sought to add claims of

10  inequitable conduct based on the disclosure by an inventor of the patents-in-suit that he used CU-SeeMe

11  prior to seeking the patents, but did not disclose CU-SeeMe to the USPTO in an Information Disclosure

12  Statement of the parent patents ('515 and '191).  The Court denied Citrix's motion on the grounds that

13  CU-SeeMe was disclosed to the USPTO during prosecution of the child patents ('304 and '331).  The

14  child patents issued despite the disclosure.  In disallowing the amendment, the Court noted that the

15  Federal Circuit had recently raised the requirement for finding inequitable conduct to "but for

16  materiality," in *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011)

17  (en banc).  The Court held that because the substantially similar child patents issued despite reference

18  to CU-SeeMe, Citrix did not meet its burden in showing the parent patents would not have issued had

19  CU-SeeMe been disclosed.  Doc. 132 at 4. Furthermore, for a finding of inequitable conduct, the specific

20  intent to deceive must be "the single most reasonable inference able to be drawn from the evidence."

21  *Therasense* at 1290. Citrix had not produced sufficient evidence of intent to deceive to justify amending

22  the counterclaims.

23          Citrix now moves to invalidate the patents despite the prior art disclosure to the USPTO.  Some

24  of the CU-SeeMe materials relied upon by Citrix appear in the file histories for the '331 and '489

25  patents, including the ReadMe files distributed with the software and the ORCA brochure  (Springer

26

27          [10] Citing *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-1356
28  (Fed.Cir. 2000) ("[T]he alleged infringer's burden may be more easily carried because of th[e] additional
    [evidence]"); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (similar).

16

Decl., Ex. 13, Excerpts from '331 and '489 File Histories). However, additional evidence has been presented in support of this motion: 1) the video segment of CBS "Up To The Minute" demonstrating use of CU-SeeMe (Martinson Decl. Ex. 23); 2) the KOCT-TV "Global Schoolhouse" video segment showing use of CU-SeeMe in schools (Martinson Decl. Ex. 24); 3) expert report of Dr. Jeffay, who had cited CU-SeeMe source code that was not available to the PTO (Martinson Decl. Ex. 29 at 13-14); 4) sworn testimony of Mr. Cogger, the original project manager for CU-SeeMe (Martinson Decl. Ex. 13, Ex. 35); 5) National Science Foundation (NSF) proposals indicating accomplishments (Martinson Decl. Ex. 20 and 21); 6) an oral history document produced by Cornell University documenting the work of Mr. Cogger on CU-SeeMe (Martinson Decl. Ex. 34, part 2); and 7) an article by Mr. Dorcey, a developer of CU-SeeMe, in the publication Connexions, Volume 3, March 1995, describing the functions of CU-SeeMe (Martinson Decl. Ex. 34, part 3). The Court, therefore, will consider the new evidence of invalidity on its merits, in light of the governing clear and convincing standard. See *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011) ("When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account"); *see also Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011) ("An added burden of deference to the PTO is not required, however, with respect to invalidity arguments based on evidence that the PTO did not consider").

### 5.    Corroborating evidence

Pixion argues that the operability and actual functions of CU-SeeMe cannot be verified with the evidence submitted. See Pl.'s Opp. at 19. Pixion contends that Citrix fails to establish that CU-SeeMe actually operated as described in the ReadMe files. Dr. Stevenson, Pixion's expert, personally used CU-SeeMe between June 1995 and 1998, and testified that CU-SeeMe "didn't work that well" and was "flaky"; that "whatever they were doing was not working." Springer Decl., Ex. 1 (Stevenson Dep.) 30:2-9, 19:21-20:6, 62:10-12. Pixion argues that because CU-SeeMe did not work as described in the ReadMe files, it could not have anticipated the asserted claims. Pl.'s Opp. at 25.

Citrix uses the ReadMe files to specifically describe CU-SeeMe functions as implemented at

17

a particular date, and submits the television segments, NSF grant reports, publications, and Dr. Cogger's testimony to corroborate the functions described therein. *See* Martinson Decl., Exs. 13, 23, 24, 29, 35. In *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc., 522 F.3d 1348 (Fed. Cir. 2008)*, the court properly considered "testimony from other witnesses, documentary evidence, and Zenith's own admissions" as well as "a product literature sheet describing features" in finding the patentee's claims invalid due to prior public use of an anticipating device. *Id.* at 1358. The Federal Circuit has also upheld the use of product manuals to corroborate testimony in claims of anticipation. *See Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D. Del. 2006) aff'd, 238 F. App'x 605 (Fed. Cir. 2007)("Mr. Wu testified from his personal knowledge. . . and his testimony is corroborated by the product manuals"). Additionally, the Circuit upheld the use of business letters, invoices, and employee affidavits as corroborating evidence of prior art. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001). Therefore, the evidence submitted by Citrix may be used to corroborate the functionality of CU-SeeMe.

Pixion further contends that reliance on testimony provided by Mr. Cogger, the CU-SeeMe project manager, is improper, because he is a "hybrid percipient-expert witness." Pixion also argues that the ReadMe files have not been corroborated and are therefore inadmissible hearsay, stating that "Cogger did not testify that each statement made in the CU-SeeMe ReadMe files is accurate and correct, nor could he," and therefore, "because the documents remain uncorroborated and verified, they are inadmissible to establish the truth of their content." Pl.'s Opp. at 19 (citing *Twentieth Century Fox Film Corp. v. Entm't. Dis*Dep., 429 F.3d 869, 880 n.3 (9th Cir. 2005) (affirming exclusion of published article as hearsay).

"Corroborating evidence is evaluated under a 'rule of reason' analysis." *Linear Tech. Corp. v. Impala Linear Corp*., 379 F.3d 1311, 1327 (Fed. Cir. 2004). The Court finds Mr. Cogger's testimony is admissible as percipient witness testimony. The Court need not address his alleged expert witness status at this stage, because the Court relies on Mr. Cogger's testimony only insofar as it relates to his percipient knowledge of CU-SeeMe. Mr. Cogger himself created the idea for CU-SeeMe and was its software development manager. Cogger Dep., 209:3-210:6. Mr. Cogger provided documents, electronic records, and the videos in response to a subpoena. *Id.* , 8:13-19. The ReadMe file lists Mr. Cogger as

United States District Court<br>For the Northern District of California

18

1    the author. Jan. 16, 1995 ReadMe File at 1. Mr. Cogger corroborated the accuracy of the ReadMe file.

2    Cogger Dep., 236:1-6. He further testified that at the time of writing the file, he tested CU-SeeMe to

3    ensure that it functioned in the manner described. *Id.*, 236:11-14. His testimony is further corroborated

4    by contemporaneous media presentations of the software, articles, and NSF grant reports. *See* Martinson

5    Decl. Ex. 20-24, 29, 34.

6        In addition, Citrix's expert Dr. Jeffay analyzed the source code and cited it in his invalidity

7    charts. Martinson Reply Decl., Exs. 29-31, 33. Dr. Jeffay also testified that the source code for CU-

8    SeeMe confirmed its functionality. *Id.*, Ex. 37 (Jeffay Dep.) 25:2-4 ("By reading the source code, I'm

9    able to determine what the system was programmed to do, and my review of the source code indicates

10   that what it was programmed to do is entirely consistent with the functions specified in the readme file

11   and Mr. Cogger's description of the operation of the system."). Moreover, the contemporaneous media

12   reports, including live demonstrations of CU-SeeMe, clearly show the software functioning. Martinson

13   Decl., Exs. 23, 24. The Court finds that Mr. Cogger's testimony and the ReadMe files were

14   authenticated by sworn affidavits and corroborated by evidence in the record, and are admissible.

15       The Court further finds that Pixion has not presented sufficient facts to challenge the operation

16   of CU-SeeMe as described in the ReadMe files, affidavits, and publications. *See TypeRight Keyboard*

17   *Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed .Cir. 2004) ("Summary judgment should not be

18   denied simply because the opposing party asserts that the movant's witnesses are not to be believed.").

19   Rather, the opposing party must offer "specific facts that call into question the credibility of the movant's

20   witnesses." *Id; see also Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 362-63 (D.

21   Del. 2006) *aff'd* 238 F. App'x 605 (Fed. Cir. 2007).("Here, no specific facts are offered, and the

22   testimony corroborated by the product manuals shows anticipation by clear and convincing

23   evidence.").[11]

24   _____

25       [11] *See also Zenith Electronics,* 522 F.3d at 1356 (Fed. Cir. 2008) ("Although Zenith contests
     much of PDI's evidence of public use, we find that Zenith's arguments do not establish a genuine issue

26   of material fact on that issue. . . . With respect to the product literature sheet, Zenith complains that Mr.
     Rockwood was unable to state with certainty whether the sheet described the capacitor version of the

27   205-E pillow speaker or Curbell's subsequently developed battery-powered version. . . Even so, the
     product literature sheet and Mr. Rockwood's testimony support the conclusion that the capacitor version

28   of the 205-E pillow speaker – a precursor to the battery version – was available for use with the J20525
     television at least as early as 1992.").

19

1    The Court finds that Citrix established the functionality of CU-SeeMe as described in the dated

2    materials by clear and convincing evidence.

3

4    **6.    Dates of the public use and versions of CU-SeeMe**

5    The parties agree that the patents-in-suit claim a priority date of March 26, 1996. Therefore,

6    Citrix must demonstrate that CU-SeeMe was in public use more than one year prior to that, i.e. before

7    March 26, 1995.  Pixion argues that Citrix fails to show that the version of CU-SeeMe available prior

8    to March 26, 1995 embodied all of the required claim elements, which may have been added in later

9    versions.  According to Citrix, one of the first uses of CU-SeeMe occurred in 1993 in connection with

10   "The Global Schoolhouse Project." Def.'s MSJ at 14.  The Global Schoolhouse Project used CU-SeeMe

11   to connect students from four geographically dispersed regions (Great Britain, California, Virginia and

12   Tennesee) over the internet. Cogger Dep., 26:2-29:14.  Oceanside Community Television (KOCT-TV)

13   in Oceanside, California produced a 30 minute program on CU-SeeMe and the Global Schoolhouse

14   Project dated March 16, 1994. Martinson Decl., Ex. 19.  The program demonstrates CU-SeeMe in use,

15   showing groups of students communicating with one another via video displays on their computers. *Id.*

16   The particular ReadMe files relied on by Citrix are (1) the text file labeled "CU-SeeMe ReadMe

17   file 1-16-95" (the "Jan. 16, 1995 ReadMe File"), Martinson Decl., Ex. 14; and (2) the text file labeled

18   "Cornell Reflector Version 3.00B1 1-16-95" (the "3.00B1 Reflector ReadMe File"), *id.*, Ex. 15.  Mr.

19   Cogger, the  CU-SeeMe project manager, also testified that Cornell hosted a public reflector, the server

20   used to connect a multiparty conference, as of January 1995. Cogger Dep. 141:11-142:6.  A report to

21   the NSF dated "November 1994" indicates widespread use of CU-SeeMe by that date:

22   Reflecting this growth in use, the CU-SeeMe discussion list on the Internet has grown
     sharply with releases of new Mac versions and the first release for Windows during
23   1994: from 25 members in early January, there are now about1100. CU-SeeMe received
     widespread media coverage in the last year with articles and/or mentions in Time,
24   Newsweek, the New York Times, and New Media, Board watch, (cover story) Syllabus,
     EdTelligence, Mac Week, Internet World, Cornell and MlT magazines. CU-SeeMe was
25   featured in the first issue of Internaut, a new Internet magazine designed to be read
     on-line through the Mosaic interface, and also mentioned with a color illustration in
26   WIRED magazine.  CU-SeeMe demonstrations enlivened the Information Industry
     Association (IIA) conference, the Net'94 conference, a keynote address to 4000
27   conferees at the Interop conference in May and again in October in Paris, and a recent
     conference of international educators at the American University in Moscow.

28

20

1   Springer Decl., Ex. 20 at 3.

2        Finally, Peter Madams, one of the inventors of the patents in suit, testified that he had used CU-

3   SeeMe "years before" August 1995. Martinson Decl., Ex. 20 (Madams Dep., 138:24-139:2). The Court

4   finds that Citrix has sufficiently established the public use of CU-SeeMe more that one year prior to

5   March 26, 1996, and the ReadMe files accurately describe CU-SeeMe functionality as of January 1995.

6

7        **7.      Disclosure of Each Claim Limitation**

8        In order to establish anticipation, Citrix must show that CU-SeeMe met each element of the

9   asserted claims.

10

11            **a.      Claim construction**

12        As noted above, in order to show that a patent claim is invalid as anticipated, "the accused

13   infringer must show by clear and convincing evidence that a single prior art reference discloses each and

14   every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784,

15   796 (Fed. Cir. 2010). Courts have characterized "a classic test of anticipation" as "[t]hat which would

16   literally infringe if later in time anticipates if earlier than the date of invention." *Marion Merrell Dow,*

17   *Inc. v. Geneva Pharmaceuticals, Inc.*, 877 F. Supp. 531, 535 (D. Colo. 1994) (quoting *Lewmar Marine,*

18   *Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987)). Moreover, claims "must be construed in the

19   identical way for both infringement and validity." *Jackson Jordan, Inc. v. Plasser Am. Corp.*, 824 F.2d

20   977 (Fed. Cir. 1987); *Kimberly-Clark Corp. v. Johnson & Johnson Co.*, 745 F.2d 1437, 1449 (Fed. Cir.

21   1984). The patentee may not simultaneously argue for a broad claim construction in asserting

22   infringement contentions, and then pursue a narrower construction during invalidity determination. *See*

23   *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001)

24   ("Moreover, Bristol would have us construe the claims as limited to those instances of practicing the

25   claimed method that achieve the stated result for purposes of validity, but as encompassing all instances

26   of carrying out the physical steps for purposes of infringement. Again, Bristol cannot have it both

27   ways."). Therefore, the parties are bound by the same claim construction adopted in the infringement

28   analysis above.

**United States District Court**
For the Northern District of California

21

**b.    The '515 and '304 Patents**

Citrix matches each of the elements in this claim to descriptions of CU-SeeMe provided in the ReadMe files.  The '515 and '304 claims are substantially the same, except that the child patent '304 adds the functionality that client capability validation is completed in "real time."  The disputed elements of Claim 1 are highlighted:

> **1.** A conferencing system comprising:
> a **conference server**;
> at least one client the at least one client including a web browser; and
> at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after the client-server connection is established, the client-server connection established via the **web browser** at the at least one client having been navigated to a **Universal Resource Locator** associated with a conference, and wherein **one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client** validated after establishing the client-server connection but prior to the at least one client joining the conference.  ('515 Patent, 36:8-24)

**i.    "Conferencing System"**

Pixion does not dispute that CU-SeeMe is a conferencing system.  The Jan. 16, 1995 ReadMe File describes CU-SeeMe as a "desktop video conferencing system" and states it provides "a one-to-one conference, or by use of a reflector, a one-to-many, a several-to-several, or a several-to-many conference depending on user needs and hardware capabilities . . . So far as we know, CU-SeeMe was the first software available for the Macintosh to support real-time multi-party videoconferencing on the Internet." Jan. 16, 1995 ReadMe File at 2. The Court finds this claim limitation is met.

**ii.    "Conference Server"**

Pixion disputes whether the application referred to as the CU-SeeMe reflector qualifies as a conference server.  Documents describing the reflector characterize it as follows: "You will need to use a reflector to have a multiparty conference on the Internet.  The CU-SeeMe reflector program is a Unix program which we have tested so far only on Sun Sparc workstations. . . .  As of January, 1995, Cornell regularly runs a reflector for testing at 132.236.91.204. . . ."  Def.'s MSJ at 18, citing Ex. 14, Cogger Depo. Ex. 10, page 13 (How to Test CU-SeeMe). *See also* Jeffay Invalidity Rep. (Martinson Decl. Ex.

22

21) ¶ 118 ("The reflector was a conference server.  The reflector program ran on at least a Unix based Sun Sparc workstation and delivered conference data it received from attendees of the conference to one another.").

At claim construction, the Court construed the term "conference server" as "a computer or several networked computers running conference software and providing conference data to a client computer." Pixion's proposed definition was "a computer or several networked computers running conference software and configured to provide conference data to at least one client."  Despite the fact that the Court adopted a nearly identical definition, Pixion now argues that the Court should limit the definition to a "smart" server that "must be capable of performing complex analyses and functions." Pl. Opp. at 20-21, citing Springer Decl., Ex. 17 (Klausner Rep.), ¶¶ 84-85.  Pixion does not dispute that the CU-SeeMe reflector application meets the adopted definition of "conference server" but argues that it was a "dumb" server that "merely reflected data without complex analysis or transformation." Klausner Rep., ¶¶ 84-85.

Pixion's proposed redefinition of a claim term is not only impermissibly vague, but also entirely unsupported by any specific references to the patents.  It is established that "[o]nce a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for the purposes of trial."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).  The Court finds insufficient grounds to alter the previously adopted definition. The Court wholly agrees with Pixion that "[c]laim terms are not construed in a vacuum divorced from specification." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010). However, Pixion does not show anything in the specification that requires a limitation to "smart" server advanced by Pixion in opposition to this motion over its original definition. The patent claims do not provide further limitations on "conference server," and the specification discloses:

> In a specific implementation of the desktop conferencing system, conferee client computers ("conferee clients") connect to the "conference server," a computer or several networked computers (any of which may also be used by a conferee as a client computer) running conferencing software, typically by navigating a World Wide Web ("WWW" or "Web") browser through a predetermined Universal Resource Locator ("URL") that indicates a Web page describing the conference. The conference can be set up any time earlier by anyone with access to this server function. '515, 2:24-33.

23

**United States District Court**
For the Northern District of California

1    A "presenter uses his or her computer to begin a conference presentation by connecting to the

2    conference server." '515, 2:54-55.  Some proposed embodiments contemplate potential features: "In

3    order to provide synchrony in the system, conference server 14 can issue time synchronization signals.

4    The conference server may also add time-stamps on receipt of blocks, and will need to update

5    time-stamps when a recorded or archived conference is, played back." '515, 8:19-23.  However, in the

6    absence of clear intent to limit claim scope, it would be improper to read limitations from a preferred

7    embodiments into the claim language.  *See Comark*, 156 F.3d at 1187;  *see also Decisioning.com, Inc.*

8    *v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *Howmedica Osteonics Corp. v.*

9    *Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008).

10        Recently, the Federal Circuit held that the district court improperly read a limitation into the

11   stand-alone phrase "registration server" when "distinctions in specification descriptions avoid any hint

12   that the inventors clearly disavowed claim scope" and the specification "does not even suggest that

13   every embodiment of the invention must contain all [of the] features."  *Digital-Vending Services Int'l,*

14   *LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012).  *See also In re Johnston*, 435 F.3d

15   1381, 1384 (Fed. Cir. 2006) (refusing to alter a broad claim construction originally sought by party: "in

16   this case Mr. Johnston himself gave 'pipe' the broad meaning he now criticizes.").  The Court therefore

17   declines to modify its original construction of "conference server," and finds that this claim limitation

18   is met by the reflector.

19

20

21            iii.    **"the client-server connection established via the web browser**
                       **at the at least one client having been navigated to a Universal**
22                     **Resource Locator associated with a conference"**

23        The parties agreed at claim construction that a "web browser" was defined as "an application

24   executed by a computer to navigate among network resources."  Similarly, the parties agreed that

25   "Uniform Resource Locator," or "URL" meant "an identifier that specifies where the conference is

26   located on a network."  According to Citrix, CU-SeeMe allowed the user to navigate among reflectors

27   using the reflector's IP address.  The Jan. 16, 1995 ReadMe files states that "As an alternative to

28   repeatedly typing in IP addresses, you may use Edit Nicknames from the Edit menu to set up Nicknames

24

1  for IP addresses.  Then use Connect To > from the Connection menu to make connections."  Jan. 16,

2  1995 ReadMe at 4.   Citrix argues that using the agreed-upon definition, CU-SeeMe met this claim

3  limitation because CU-SeeMe allowed the user to connect to servers available on the network via an

4  identifier that specified the server's location, i.e. the IP address or the associated nickname.  Pixion

5  argues that because the ReadMe file stated that ""[In] a further release . . . it should be possible to set

6  up web brousers [sic] to establish CU-SeeMe sessions," that phrase indicates that it was a future feature

7  that was not yet available.  Klausner Rep. ¶¶ 109-110.

8      However, the court finds that the CU-SeeMe software itself meets the definition of "web

9  browser" as  "an application executed by a computer to navigate among network resources," and an IP

10 address is an identifier under the adopted definition of "Uniform Resource Locator" as "an identifier

11 that specifies where the conference is located on a network."   The software allowed users to connect to

12 a server, in much the same manner as commercial web browsers which were in early stages of

13 development at the time. *See* Jeffay Invalidity Rep. at 11.  No other features of web browsers are

14 included in the definition adopted by the parties, nor does the definition require the use of separate

15 stand-alone web browser applications.  It is true that the statement Pixion points to evinces that stand-

16 alone web browser functionality was not yet available to CU-SeeMe by March 26, 1995.[12]  However,

17 in this infringement suit, the parties are bound by the definitions of the terms adopted during claim

18 construction, under which the CU-SeeMe application is itself a web browser.  It is well established that

19 the patentee is bound by the definition adopted in proceedings before the PTO.  *See Vitronics Corp. v.*

20 *Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("a patentee may choose to be his own

21 lexicographer and use terms in a manner other than their ordinary meaning"); *Teleflex, Inc. v. Ficosa*

22 *N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002)("the prosecution history may demonstrate that the

23 patentee intended to deviate from a term's ordinary and accustomed meaning").  The same reasoning

24 applies to the definition adopted by the patentee in an infringement suit.  Accordingly, the Court finds

25 that Pixion is bound by the definition of "web browser" it has explicitly adopted in prior proceedings

26

27 _____

   [12]CU-SeeMe appears to have implemented this functionality by the time of the CBS news report
28 on August 25, 1995. This airing date is after the critical anticipation date of March 26, 1995 and
   therefore not relied on by Citrix.

25

1   before this Court, which is met by the CU-SeeMe application itself.  Therefore, this claim limitation is

2   met.

3        In the alternative, the Court finds that adapting the CU-SeeMe conference system to work with

4   stand-alone web browsers would have been obvious to a person of ordinary skill in the art at the time.

5    Section 103 of Title 35 "forbids issuance of a patent when 'the differences between the subject matter

6   sought to be patented and the prior art are such that the subject matter as a whole would have been

7   obvious at the time the invention was made to a person having ordinary skill in the art to which said

8   subject matter pertains.' " *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1734 (2007) (quoting 35 U.S.C.

9   § 103).  The central  inquiry in this analysis is that "a court must ask whether the improvement is more

10  than the predictable use of prior art elements according to their established functions." *Id.* at 1740.  The

11  information provided in the ReadMe files is sufficient to teach one skilled in the art how to connect to

12  an IP address to initiate the conference, and suggests the use of conventional web browsers to implement

13  this step.  Morever, the  CBS news report on August 25, 1995 clearly shows a Netscape browser being

14  used to start a connection via CU-SeeMe with a conference participant when Mr. Cogger clicks on the

15  link for John Graham.  Martinson Decl., Ex. 18 (CBS "Up to the Minute" 8/25/95).  In *Muniauction,*

16  *Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), the Federal Circuit  held that modification of

17  a prior art electronic bidding system to incorporate conventional web browser functionality would have

18  been obvious to one of ordinary skill in the art in 1998.  *Id.* at 1327.  In the present case, the

19  incorporation of web browser functionality was clearly suggested by the ReadMe files and would have

20  been obvious to a person of ordinary skill in the art.

21

22                    iv.    **"one or more characteristics of the provided conferencing**
                           **data are based on current capabilities of the at least one client**
23                          **validated after establishing the client-server connection but**
                           **prior to the at least one client joining the conference**"

24       The most critical claim of the patents is the function that client capabilities are validated after

25  establishing the client-server connection but prior to joining the conference, and that the conferencing

26  data is  based on those capabilities. To demonstrate disclosure of this claim, Citrix's expert relies on

27  three features of CU-SeeMe: 1)  CU-SeeMe could be configured to require a conference ID in order to

28  join the conference; 2) the reflector also could enforce a requirement that clients use a minimum version

26

United States District Court
For the Northern District of California

1  number of the CU SeeMe client software; 3) the reflector included the ability to enforce transmission

2  rate "caps" for the clients, including the automatic adjustment of the cap based on packet loss rate.

3  Jeffay Invalidity Rep., ¶¶ 130-136.

4        First, Pixion argues that CU-SeeMe does not disclose validation of a client's capabilities "after

5  establishing the client-server connection but prior to the at least one client joining the conference," as

6  required by the '515 and '314 patents. *Id.* ¶ 65. Pixion's invalidity expert, Mr. Klausner contends that

7  the feature relied upon by Citrix to meet this element – the cap feature – is not active in the time between

8  establishing a network connection and joining the conference. Instead, Pixion argues that "the rate-

9  control limitation set by the conference participant using the cap feature takes place *before* establishing

10  the client-server connection," because the minimum and maximum values "were set by conference

11  participants prior to establishing a client server connection." Klausner Rep. ¶ 67. However, the feature

12  as described in the 3.00B1Reflector ReadMe File states that, "if a participant sets his maximum

13  transmission rate above the cap that you specified he will automatically be disconnected from the

14  reflector and prohibited to reconnect for the specified hold-down-time." 3.00B1 Reflector ReadMe File

15  at 4. Clearly, a participant cannot be disconnected without first establishing a connection. The

16  limitation is therefore disclosed.

17        Second, Pixion argues that CU-SeeMe did not disclose provision of data "based on the current

18  capabilities of the client." Klausner Rep. ¶ 71. At claim construction, the Court construed

19  "characteristics of the provided conferencing data" to mean "qualities, properties, or attributes . . .

20  including size, content, rate of transmission and reception." The Court construed the term "capabilities

21  of the at least one client" to mean "client parameters relating to resources available to the client,

22  including the client's display bit-depth, bandwidth of the connection between the client and the

23  conference server, processor speed of the client, and the amount of memory available to the client."

24  Klausner's expert report argues that neither the ability to configure a CU-SeeMe reflector to require a

25  particular conference ID in order to join the conference, nor the feature allowing a reflector to enforce

26  maximum transmission rate caps, results in conferencing data being provided based on current

27  capabilities. Instead, according to Klausner, these features function like "'on' or 'off' switches – all or

28  nothing, and are independent of current client capabilities" because they result in a user either gaining

United States District Court
For the Northern District of California

27

1   access to the conference or being unable to connect.   Klausner Rep. ¶ 72

2        The Court agrees with Pixion that "client capabilities" does not reach factors such as a

3   conference ID number, which is not related to resources available to the client, but is simply a number

4   chosen by the user managing the conference to control access.  *See* Cornell Reflector Version 3.00B1

5   ReadMe at 2.

6        The Court, however, finds that the cap feature does meet this claim limitation. The cap feature

7   includes both a user-set maximum cap and an automatic cap adjustment.  Pixion does not address the

8   automatic cap adjustment, which monitors the packet loss rate and adjusts the frame capture rate in

9   response.  The cap feature is described in the Jan. 16, 1995 ReadMe File as follows:

> RATES BAR When someone requests a connection (or you open a connection) and you start sending – you will also see, in addition to framerate, an indication of bandwidth in Kbits/sec.  On the right end of the rates bar under the local window is shown a "cap" which limits bandwidth used for sending and hence framerate, depending on amount of motion.  The minimum and maximum values for the cap can be adjusted by a control in the Transmission panel . . . If the receivers report packet loss in excess of 5%, the program assumes network congestion and automatically lowers the cap.  It will be adjusted back up toward the max value if loss reports agregate [sic] to less than 5%.
>
> Jan. 16, 1995 ReadMe File at 5.

It is also described in the June 1993 NSF proposal and progress report:

> 4.4.1. Traffic Shaping -- Currently CU-SeeMe provides a user-adjustable cap on maximum bandwidth to be used. The frame rate is simply adjusted downward by delaying frame capture as necessary to stay below the cap. The cap is also dynamically adjusted, according to loss reports from other conference participants.
>
> Springer Decl. Ex. 21 at 7.

Mr. Cogger described the adjustment process in his testimony:

> Well, that at the time [1993] of sending this in, we had already implemented loss reports from the receivers. Anybody receiving a stream would be sending a regular packet to keep the connection alive, and within that packet, I believe, the recent amount of lost packets, as seen by the receiver, would be reported so that a sender could – now let's for the moment talk about just a one-to-one transmission. The sender would be serializing the packets so the receiver could tell if packets were missing by virtue of having been dropped in the Internet. And the receiver would keep a count of that and periodically send that count back when it was sending its keep-alive packet, and then the receiver could make the intelligent adjustment by saying, Well, if only so many packets per so often or so many frames per so often are going to get to there, there's no use in me -- no use to anybody in me sending more than that. So it would reduce the cap.
>
> Cogger Dep. 49:6-19.

As noted, the Court's construction of "characteristics of the provided conferencing data" is

28

1  "qualities, properties, or attributes . . . including size, content, rate of transmission and reception." The

2  frame capture rate is a quality, property or attribute of conference data. "Client capabilities" was

3  construed as "client parameters relating to resources available to the client, including the client's display

4  bit-depth, bandwidth of the connection between the client and the conference server, processor speed

5  of the client, and the amount of memory available to the client." The packet loss rate is a parameter

6  relating to resources available to the client, specifically the quality of the network connection and the

7  presence of network congestion, which depends on the available bandwidth. *See* Jan. 16, 1995 ReadMe

8  File at 5. The cap feature therefore changes a characteristic of the provided conference data (the frame

9  capture rate) based on client capabilities (the packet loss rate). Moreover, the user-set maximum cap

10  can be validated before the participant joins the conference. *See* 3.00B1 Reflector ReadMe File at 4

11  ("[I]f a participant sets his maximum transmission rate above the cap that you specified he will

12  automatically be disconnected from the reflector and prohibited to reconnect for the specified hold-

13  down-time."). The Court therefore finds that this limitation is disclosed by CU-SeeMe.

14        In sum, the Court finds clear and convincing evidence that CU-SeeMe disclosed all of the

15  elements of the asserted claims of the '515 and '304 patents, and therefore the asserted claims are

16  invalid for anticipation by prior public use.

17

18        **c.    '191 and '331 Patents**

19        Citrix also argues that the '191 and '331 patents are invalidated by CU-SeeMe. The only

20  substantial difference between the '191 and '331 patents and the '515 and '304 patents is the time at

21  which information or capabilities about the computers participating in the conference are examined.

22  As noted above, while '515 and '304 dealt with validating client capabilities prior to clients joining the

23  conference, '191 and '331 examine client information during the conference. Claim 1 of '331 ends:

24        . . . and wherein one or more characteristics of the provided conferencing data
          are based on client or server information **examined subsequent** to both the
25        client-server connection having been established and the client joining the
          conference.

26

27  As with '515/'304, the only difference between '191 and '331 is that '331 adds the limitation that the

28  examination is done "in real time."

29

- 48 -

1    Because the language is otherwise the same, Citrix does not repeat its arguments with respect

2 to most of the elements of '191/'331. In addressing "client or server information" examined *during* the

3 conference, Citrix again points to the "cap" feature described above. Citrix argues that this

4 demonstrates examined "client or server information" (in this case, packet loss) during the conference

5 and based characteristics of the provided data on that information (by adjusting the cap). *See* Jan. 16,

6 1995 ReadMe File at 5 ("If the receivers report packet loss in excess of 5% , the program assumes

7 network congestion and automatically lowers the cap. It will be adjusted back up toward the max value

8 if loss reports agregate [sic] to less than 5%."). The Court agrees, and finds this limitation is disclosed

9 for the same reasons discussed above. *See supra*, Sec. B(7)(b)(iv).

10    Pixion further argues that Dr. Jeffay also fails to establish that CU-SeeMe operated in "real time"

11 because "CU-SeeMe operated with delay and with significant amounts of jitter and was not enabled for

12 real-time as taught in the Asserted Patents." Klausner Rep. ¶ 80. At claim construction, the parties

13 agreed that "real time" should be construed in accordance with its plain and ordinary meaning. Claim

14 Const. Order (Doc. 91) at 5. The KOCT-TV "Global Schoolhouse" video clearly shows conference

15 participants engaging in conversation that is in "real time" in the plain and ordinary sense. Martinson

16 Decl., Ex. 24. The Court finds that this claim limitation is met.

17    The Court finds clear and convincing evidence that CU-SeeMe disclosed all of the elements of

18 the asserted claims of the '191 and '331 patents, and therefore the asserted claims are invalid for

19 anticipation by prior public use.

20

21                **d.    '489 Patent**

22    The '489 patent addresses the methods for introducing a client to a conference. The claims at

23 issue are:

24    **1.** A method for introducing a client to a conference, the method comprising:
     **publishing a conference listing** corresponding to the conference, wherein the conference listing is
25    located by a client device seeking to enter into the corresponding conference;
     **receiving indicia from a client device** indicating that a web browser corresponding to the client
26    device has been pointed to the conference listing;
     **receiving information allowing for conference attendance** by the client device;
27    connecting the conference server and the client device; and
     allowing for entrance of the client into the conference.

28

30

**4.** The method of claim 1, wherein the conference listing is published for subsequent location using a uniform resource locator (URL).

**5.** The method of claim 1, wherein the receipt of information allowing for conference attendance occurs after a validation operation.

'489, 35:17-36:7, 16-21.

Citrix again addresses each element via the ReadMe files.

### i. "Publishing a conference listing corresponding to the conference"

In the Claim Construction Order, the Court construed "publishing" to mean "making/made known, findable, or locatable." The ReadMe file states that, "as of January, 1995, Cornell University regularly runs a reflector for testing at 132.236.91.204." Jan. 16, 1995 ReadMe File at 13. Dr. Jeffay also included a list of CU-SeeMe reflectors hosted by other universities and organizations, with names and email addresses of contact persons, that was posted on the Internet and dated January 3, 1994. ("Live Reflectors January 3, 1994") Jeffay Invalidity Rep. ¶ 424. Citrix argues that CU-SeeMe therefore published a conference listing (the IP address) that a person could join. Pixion argues that patent specification requires "publication of a URL, which is then located via a service such as ULS.TM or LDAP.TM." Klausner Rep. ¶ 119. However, as the Court discussed with respect to "conference server" above, the Court holds the parties to the claim definitions adopted during claim construction and will not permit a limitation from an embodiment to be imported into the claim term. *See supra* Section B(7)(b)(ii); *see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008). In this case, "publishing" simply means "making/made known, findable, or locatable." Therefore, the Court finds this claim limitation is met.

### ii. "Receiving indicia from a client device indicating that a web browser corresponding to the client device has been pointed to the conference listing"

The Court construed the term "receiving indicia from a client device" to mean "receiving a sign from the client device." The "web browser" limitation was addressed in Section B(7)(b)(iii), *supra*.

31

1   Again, the Court finds that CU-SeeMe itself acted as web browser pursuant to the definition of that term

2   adopted by the parties.  Citrix argues that the "conference ID" function (CONF-ID) of CU-SeeMe

3   constituted a sign from the client device indicating that a client has been pointed to the conference

4   listing, because the server receives the client's conference ID in order to allow or deny access to a

5   participant.  In addition, Citrix contends that two other parameters constituted a sign from the client: 1)

6   information about the client's software version that could be required by the conference manager to

7   ensure compliance with minimum version requirement, and 2) the client's setting of "cap" to ensure it

8   did not exceed the reflector's "cap" limit. Jeffay Invalidity Rep. ¶¶ 425-432.  The Court agrees that this

9   information would be received by the server when the client has been pointed to a conference.

10       Further, the 3.00B1 Reflector ReadMe file shows CU-SeeMe read in the participant's IP address

11   for the functions ADMIT and DENY.  3.00B1 Reflector ReadMe File at 4, 9.  These functions allowed

12   the conference manager to specify in advance IP addresses that would be admitted to the conference and

13   those that would be banned. In order to make that determination, CU-SeeMe would have to receive the

14   connecting participant's IP address, which is a sign that a client has been pointed to the conference.

15       The Court finds that this claim limitation is met.

16

17           iii.   "Receiving information allowing for conference attendance

18                  by the client device"

19       During claim construction, the Court construed this term according to the plain and ordinary

20   meaning of its constituent words, noting that one example of information allowing for conference

21   attendance is a key.  The embodiments contemplated a key function that can determine the attendee's

22   privileges, ranging from controlling a pointer to becoming a presenter. '489, 2:42-44.  In support of this

23   element, Citrix points to the three types of client information that could be used to allow or deny access

24   to a conference: 1) conference ID, 2) minimum software version, and  3) the "cap" set by the user.

25   Jeffay Invalidity Rep. ¶¶ 425-432.  The conference ID feature  allowed "for a measure of privacy on a

26   public reflector," by allowing a user to set a conference ID number that other users would have to match

27   in order to gain access. 3.00B1 Reflector ReadMe File at 2. Further, the 3.00B1 Reflector ReadMe File

28   shows that CU-SeeMe had a "conference manager" function that allowed certain IP addresses to be

32

1  labeled as a conference manager, which could change the conference ID for specified conferences.

2  3.00B1 Reflector ReadMe File at 3.   The Court finds that this claim limitation is met.

3

4                    **iv.     Dependent claims 4 and 5**

5          The limitations of dependent claims 4 and 5 are also disclosed by CU-SeeMe. The URL

6  limitation of claim 4 was discussed in Section B(7)(b)(iii), *supra*.  Again, the Court finds that the IP

7  addresses utilized by CU-SeeMe meet the definition of "Universal/Uniform Resource Locator" pursuant

8  to the definition of that term adopted by the parties.  Claim 5 addresses the timing sequence of allowing

9  access to the conference with respect to a "validation operation."  The parties did not seek construction

10 of "validation operation," nor does the specification offer additional clarity:

11          [T]he server offering this listing or an associated server validates the conferee and provides
            information that allows the attendee client conferencing software to start and to connect to
12          conference server 14 itself, possibly after further validation.

13 '489, 8:64-9:2.

14         When intrinsic evidence does not provide additional information about a claim term, the

15 court may turn to extrinsic evidence, such as dictionaries or treatises. *See Phillips v. AWH Corp.*, 415

16 F.3d 1303, 1318 (Fed. Cir. 2005).  The most relevant meaning of "validate" in the *Oxford English*

17 *Dictionary* is "to confirm or to check the correctness of." *OED Online*, June 2012, Oxford University

18 Press. The Court finds that ascertaining the IP address for the purposes of ADMIT and DENY functions,

19 conference ID, and minimum software version are examples of validation.  As discussed in Section

20 B(7)(b)(iv), supra, the packet loss rate for a client is monitored continuously to automatically adjust the

21 cap, which may also be set by the user and changed throughout the conference. Therefore, the rate "cap"

22 constitutes information allowing conference attendance that is received after the validation step. *See*

23 Martinson Decl. Ex. 35 at 19-25.  The Court finds this limitation was disclosed by CU-SeeMe.

24         Clear and convincing evidence shows CU-SeeMe disclosed all of the elements of the asserted

25 claims of the '489 patent, and therefore the asserted claims are invalid for anticipation by prior public

26 use.

27

28

United States District Court
For the Northern District of California

33

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Citrix's motion for summary judgment on non-infringement grounds.  In the alternative, the Court GRANTS Citrix's motion on invalidity grounds.

**IT IS SO ORDERED.**

Dated: August 13, 2012

SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California

34

**- 53 -**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PIXION, INC.,                                             No. C 09-03496 SI

        Plaintiff,                                    **JUDGMENT**

   v.

CITRIX SYSTEMS, INC., and CITRIX
ONLINE, LLC.

        Defendants.

_____/

     Defendants' motion for summary judgment has been granted.  Judgment is entered accordingly.

     **IT IS SO ORDERED AND ADJUDGED.**

Dated: August 15, 2012

                              SUSAN ILLSTON
                              United States District Judge

**United States District Court**
For the Northern District of California

- 54 -

US007877489B2

(12) **United States Patent**
Salesky et al.

(10) **Patent No.:** **US 7,877,489 B2**
(45) **Date of Patent:** **Jan. 25, 2011**

(54) **NEGOTIATION AND VALIDATION OF A CLIENT IN A VIDEO CONFERENCE**

(75) Inventors: **Joseph Salesky**, Cameron Park, CA (US); **Peter Madams**, Moraga, CA (US); **John Flower**, Walnut Creek, CA (US); **Clint Kaul**, San Mateo, CA (US); **Benjamin Wells**, Walnut Creek, CA (US); **Edward Arthur Ho-Ming Janne**, San Francisco, CA (US)

(73) Assignee: **Pixion, Inc.**, San Ramon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/925,960**

(22) Filed: **Oct. 28, 2007**

(65) **Prior Publication Data**

US 2008/0195703 A1    Aug. 14, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/753,702, filed on Jan. 7, 2004, now Pat. No. 7,310,675, which is a continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, which is a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, which is a continuation of application No. 08/823,744, filed on Mar. 25, 1997, now Pat. No. 6,343,313.

(60) Provisional application No. 60/014,242, filed on Mar. 26, 1996.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
(52) **U.S. Cl.** ...................... **709/227**; 709/204; 715/753; 370/260
(58) **Field of Classification Search** ................ 709/206, 709/207, 204, 227, 228; 379/88.22, 202.01; 715/753; 370/260
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,110,560 A    8/1978 Leary et al.

(Continued)

OTHER PUBLICATIONS

Stahl, S., "Conferencing Breakthrough," Distributed by CMF Publications, Jun. 26, 1995, http://www.informationweek.com/533/33iucon.htm, last visited Apr. 13, 2005.

(Continued)

*Primary Examiner*—Frantz B Jean
(74) *Attorney, Agent, or Firm*—Carr & Ferrell LLP

(57) **ABSTRACT**

An improved networked computer communications system handles arbitrary streams of data, and transports at varying speeds those steams where intermediate updates can be dropped if they are obsoleted by later arriving data updates, optimizing the utilization of network and node resources. Complex buffering by system server software allows distributed, parallel, or redundant processing, transmission, and storage for performance, reliability, and robustness. Various parameters of the system can be monitored, and the system can be reconfigured automatically based on the observations. Varied techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess. One conferencing system allows conference participants to share all or a portion of the display seen on their computer screens. The conferees may be at sites removed from each other, or may view a recorded presentation or archived conference at different times. Conference participants are either "presenters" who can modify the display or "attendees" who cannot modify the display. A pointer icon, which can be labeled to identify the conferee, is displayed on the shared image area. Each conferee can modify the position of his or her own pointer, even when not presenting, so that every participant can see what each conferee is pointing to, should a conferee choose to point to an element of the display. These and other features apply to other data streams shared in the conference or in meetings where there is no shared-image data stream.

5 Claims, 37 Drawing Sheets



**US 7,877,489 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,414,621 | A | 11/1983 | Bown et al. |
| 5,241,625 | A | 8/1993 | Epard et al. |
| 5,455,599 | A | 10/1995 | Cabral et al. |
| 5,485,212 | A | 1/1996 | Frederick |
| 5,506,832 | A | 4/1996 | Arshi et al. |
| 5,530,795 | A | 6/1996 | Wan |
| 5,548,324 | A | 8/1996 | Downs et al. |
| 5,550,982 | A | 8/1996 | Long et al. |
| 5,553,083 | A | 9/1996 | Miller |
| 5,563,649 | A | 10/1996 | Gould et al. |
| 5,600,646 | A | 2/1997 | Polomski |
| 5,617,539 | A | 4/1997 | Ludwig et al. |
| 5,649,104 | A | 7/1997 | Carleton et al. |
| 5,689,553 | A | 11/1997 | Ahuja et al. |
| 5,689,641 | A | 11/1997 | Ludwig et al. |
| 5,706,290 | A | 1/1998 | Shaw et al. |
| 5,727,002 | A | 3/1998 | Miller et al. |
| 5,737,448 | A | 4/1998 | Gardos |
| 5,740,371 | A | 4/1998 | Wallis |
| 5,764,235 | A | 6/1998 | Hunt et al. |
| 5,764,731 | A | 6/1998 | Yablon |
| 5,774,668 | A | 6/1998 | Choquier et al. |
| 5,790,818 | A | 8/1998 | Martin |
| 5,793,365 | A | 8/1998 | Tang et al. |
| 5,793,980 | A | 8/1998 | Glaser et al. |
| 5,802,322 | A * | 9/1998 | Niblett ........................ 709/251 |
| 5,822,523 | A | 10/1998 | Rothschild et al. |
| 5,826,025 | A | 10/1998 | Gramlich |
| 5,845,265 | A | 12/1998 | Woolston |
| 5,859,979 | A * | 1/1999 | Tung et al. .................. 709/228 |
| 5,877,762 | A | 3/1999 | Young |
| 5,909,543 | A | 6/1999 | Tanaka et al. |
| 5,926,208 | A | 7/1999 | Noonen et al. |
| 5,956,027 | A | 9/1999 | Krishnamurthy |
| 5,983,263 | A | 11/1999 | Rothrock et al. |
| 6,081,829 | A | 6/2000 | Sidana |
| 6,151,620 | A * | 11/2000 | Madsen et al. .............. 709/204 |
| 6,167,432 | A | 12/2000 | Jiang |
| 6,246,758 | B1 | 6/2001 | Low et al. |
| 6,249,291 | B1 | 6/2001 | Popp et al. |
| 6,313,863 | B1 | 11/2001 | Chida |
| 6,314,501 | B1 | 11/2001 | Gulick et al. |
| 6,343,313 | B1 | 1/2002 | Salesky et al. |
| 6,345,297 | B1 | 2/2002 | Grimm et al. |
| 6,560,707 | B2 | 5/2003 | Curtis et al. |
| 6,594,699 | B1 | 7/2003 | Sahai et al. |
| 6,772,335 | B2 | 8/2004 | Curtis et al. |
| 7,013,327 | B1 | 3/2006 | Hickman et al. |
| 2003/0140159 | A1 | 7/2003 | Campbell et al. |

## OTHER PUBLICATIONS

"Face Off," Distributed by BYTE, http://www.byte.com/art/9510/sec7/art3.htm., Oct. 1995.

"Transmission Control Protocol," Information Sciences Institute, University of Southern California, 1981, 83 pages.

Eleftheriadis, A. et al., "Meeting Arbitrary QoS Constraints Using Dynamic Rate Shaping of Coded Digital Video," Proceedings of the 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, pp. 1-12.

Frederick, R., "Experiences with Real-Time Software Video Compression," Xerox PARC, 1994, pp. 1-4.

Jeffay, K. et al., "Adaptive, Best-Effort Delivery of Digital Audio and Video Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 12 pages.

Jeffay, K. et al., "Transport and Display Mechanisms for Multimedia Conferencing Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 28 pages.

Macedonia, M. et al., "Mbone Provides Audio and Video Across the Internet," IEEE Computer, 1994, 12 pages.

McCanne, S. et al., "Receiver-Driven Layered Multicast," University of California, Berkeley and Lawrence Berkeley National Laboratory, 1996, 14 pages.

U.S. Appl. No. 11/925,999, Joseph Salesky, Presenter Client Operations, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,049, Joseph Salesky, Client Classification and Management, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,052, Joseph Salesky, Management of Stored Conference Data, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,055, Joseph Salesky, Conference Server Redundancy, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,058, Joseph Salesky, Load Reduction and Scalability, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,060, Joseph Salesky, Conference Server Operations, filed Oct. 28, 2007.

U.S. Appl. No. 12/012,767, Joseph Salesky, Providing Conferencing Data in a Network Communications System Based on Client Capabilities, filed Feb. 4, 2008.

U.S. Appl. No. 12/012,642, Joseph Salesky, Providing Conference Data in a Network Communications System Based on Client or Server Information Examined During a Conference, filed Feb. 4, 2008.

*Pixion, Inc.* v. *Citrix Systems, Inc. et al.* (N.D. Cal. C-09-03496 (SI)), "Defendant Citrix Systems, Inc.'s and Citrix Online, LLC's Answer to Complaint for Patent Infringement and Counterclaims for Declaratory Relief" (Nov. 6, 2009).

"Exhibit A, Uniform Resource Lacators (URL)," Request for Comments: 1738, Network Working Group, Berners-Lee et al., Dec. 1994, pp. 1-27.

"Exhibit C, World Wide Web Clients," http://www.w3.org/Clients.html, Oct. 5, 1994, pp. 1-4.

"Exhibit D, WWW—The Libwww Line Mode Browser," http://www.w3.org/LineMode/, May 4, 1998, pp. 1-2.

"Exhibit E, Command Line Syntax," http://www.w3.org/LineMode/User/CommandLine.html, Mar. 22, 1998, pp. 1-5.

"Exhibit F, Line mode Browser Commands," http://www.w3.org/LineMode/User/Commands.html, Dec. 9, 1996, pp. 1-4.

USPTO Patent Full-Text and Image Database, Results of Search, Hits 51 through 94 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF..., visited Nov. 6, 2009, pp. 1-2.

USPTO Patent Full-Text and Image Database, Results of Search, Hits 1 through 50 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF..., visited Nov. 6, 2009, pp. 1-3.

"Frequently Asked Questions (FAQ) on the Multicast Backbone (MBONE)," Steve Casner, Dec. 22, 1994, ftp://isi.edu/mbone/faq.txt, visited Nov. 6, 2009, pp. 1-12.

"Distance Education Using Linux and MBone," Kelly Davis, Linux Journal, Oct. 1, 2000, http://www.linuxjournal.com/print/4018, visited Nov. 6, 2009, pp. 1-10.

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr. 1996, http://www.savetz.com/mbone/, visited Nov. 6, 2009, 90 pages (part 1 of 2).

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr. 1996, http://www.savetz.com/mbone/, visited Jan. 14, 2010, 86 pages (part 2 of 2).

"MBone Provides Audio and Video Across the Internet," Michael R. Macedonia et al., IEEE Computer Magazine, Apr. 1994, pp. 1-12.

"Groupware: Video Papers," Usability First: Groupware: Video Papers, http://www.usabilityfirst.com/groupware/vbib.txl, visited Nov. 6, 2009, pp. 1-8.

"A Forum for Supporting Interactive Presentations to Distributed Audiences," Ellen A. Isaacs et al., Proceedings of Computer-Supported Cooperative Work, ACM, 1994, pp. 405-416.

"A Comparison of Face-to-Face and Distributed Presentations," Ellen A. Isaacs et al., Proceedings of Conference on Computer-Human Interaction (CHI), ACM Press, 1995, pp. 354-361.

"Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Case No. 3:09-cv-03496-

2

SI, *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-4.

"Exhibit A, List of Invalidating Prior Art," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-22.

"Exhibit B, U.S. Patent No. 7,369,515: Invalidity Contention Based on ORCA Video Conferencing System—Aug. 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit C, U.S. Patent No. 7,426,191: Invalidity Contention Based on ORCA Video Conferencing System—Aug. 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-12.

"Exhibit D, U.S. Patent No. 7,369,515: Invalidity Contention Based on INTERNET TV with CU-SeeMe—Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-32.

"Exhibit E, U.S. Patent No. 7,426,191: Invalidity Contention Based on INTERNET TV with CU-SeeMe—Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit F, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-19.

"Exhibit G, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-23.

"Exhibit H, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-26.

"Exhibit I, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-28.

"Exhibit J, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent Application Publication No. 2003/0140159," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-15.

"Exhibit K, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent Application Publication No. 2003/0140159," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit L, List of Potential Prior Art Not Presently Relied Upon," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc. v. Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-2.

"CU-SeeMe Reflectors World Wide," http://www.ludvigsen.hiof.no/webdoc/cu/cu-reflector_list.html, visited Dec. 11, 2009, p. 1 of 1.

Amazon.com, "MBONE: Multicasting Tomorrow's Internet," http://www.amazon.com/exec/obidos/ASIN/1568847238/ theunofficiinter..., visited Nov. 6, 2009, pp. 1-4.

"Appendix 1, The CUSeeMe System," http://www.agocg.ac.uk/reports/mmedia/apple/app1.htm, visited Dec. 11, 2009, pp. 1-4.

"Appendix D-3: Appendix D, *Realtime Data, LLC. v. Packeteer Inc.* et al., Invalidity of U.S. Patent No. 6,624,761 Pursuant to 35 U.S.C. 102(a) and 102(b) and/or 103 by CU-SeeMe, offered for sale, sold, and/or publicly used at least as early as Mar. 1, 1999," pp. 1-12.

"Beginner's Guide to the Session Directory Tool (Sdr)," Computing Sciences Berkeley Lab, http://acs.lbl.gov/OldMisc/mbone/sdr.begin.html, visited Nov. 6, 2009, pp. 1-3.

"Control Issues in Multimedia Conferencing," J.R. Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 133-143.

"Dick Cogger Recollections, 1968-2001," Oral And Personal Histories of Computing at Cornell, Cornell University Office of Information Technologies, http://www2.cit.cornell.edu/computer/history/Cogger.html, visited Dec. 11, 2009, pp. 1-20.

"Copyright Information, CU-SEEME," Copyright 1993, 1994, 1995, 1996 Cornell University, http://web.archive.org/web/19970702085029/cu-seeme.cornell.edu/Copy..., visited Dec. 4, 2009, pp. 1-3.

"Cornell University CU-SeeMe Page," Table of Contents, http://web.archive.org/web/19961219182241/http://cu-seeme.cornell.edu/, visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Desktop VideoConferencing Software," Tim Dorcey, Cornell University, http://myhome.hanafos.com/~soonjp/dorcey.html, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe in the press," http://web.archive.org/web/19970702085145/cu-seeme.cornell.edu/Press..., visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Reflector," http://sattlers.org/mickey/CU-SeeMe/faqs/reflectors.html, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe Resources for BaBar," updated Aug. 16, 1996, http://wwwpub.utdallas.edu/~joe/babar/cuseeme.html, visited Dec. 14, 2009, pp. 1-2.

"CU-SeeMe Site Map," http://sattlers.org/mickey/CU-SeeMe/outlineSite.html, visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Video," updated Dec. 21, 1995, http://web.archive.org/web/19980112072121/www.indstate.edu/msattler/..., visited Dec. 4, 2009, pp. 1-4.

"README file: Cornell Video 'CU-SeeMe0.60'," Richard Cogger, Feb. 2, 1994, http://p25ext.lanl.gov/e866/offline/CU-SeeMe0.60.README.2-2.txt, visited Dec. 11, 2009, pp. 1-8.

"Re: CU-SeeMe Web app for the MAC," Mark Lentczner, Jun. 28, 1995, http://baby.indstate.edu/CU-SeeMe/devl_archives/jun_95/0620.html, visited Dec. 14, 2009, pp. 1-2.

"Re: Anybody got 'Go CU-SeeMe Go!' working," Carol J. Qazi, Jun. 7, 1995, http://baby.indstate.edu/CU-SeeMe/devl_archives/jun_95/0188.html, visited Dec. 14, 2009, p. 1.

United States Copyright Office, Public Catalog search result, "Internet TV with CU-SeeMe/Michael Sattler," http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&SAB1=c..., visited Dec. 4, 2009, p. 1.

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 107 pages (part 1 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 110 pages (part 2 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 106 pages (part 3 of 3).

Connexions: The Interoperability Report, "Special Issue: NetWorld+Interop 95 Las Vegas Companion," vol. 9, No. 3, Mar. 1995, pp. 1-48.

"CU-SeeMe," Wikipedia, http://en.wikipedia.org/wiki/CUSeeMe, visited Jan. 18, 2010, pp. 1-3.

"Mbone Conferencing Applications," http://www-mice.cs.ucl.ac.uk/multimedia/software/main.html, visited Nov. 6, 2009, pp. 1-2.

"The UCL Transcoding Gateway (UTG)," http://www-mice.cs.ucl.ac.uk/multimedia/software/utg/, visited Nov. 6, 2009, pp. 1-2.

3

US 7,877,489 B2

Page 4

"The Human Factors of MBone Videoconferences: Recommendations for Improving Sessions and Software," Andrew S. Patrick, Mar. 3, 1999, Communications Research Centre, Ottawa, http://jcmc.indiana.edu/vol4/issue3/patrick.html, visited Nov. 6, 2009, pp. 1-35.

"The CU-SeeMe Project," http://myhome.hanafos.com/~soonjp/project,html, visited Dec. 4, 2009, pp. 1-8.

"CU-SeeMe README file" Dick Cogger, Sep. 8, 1995, http://ftp.zcu.cz/mirrors/mice/CU-SeeMe/Mac.CU-SeeMe0.83b3/READ..., visited Dec. 11, 2009, pp. 1-14.

"The Rapport Multimedia Conferencing System—A Software Overview," J. Robert Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 52-58.

"ORCA Video Conferencing System CU-SeeMe Software," U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Aug. 1995, pp. 1-26.

"User-Centred Design of an MBone Videoconference Polling Tool," Andrew Patrick, Ph.D., Communications Research Centre, Ottawa, Canada, Mar. 11, 1998, http://debra.dgbt.crc.ca/mbone/mpoll/development/, visited Jul. 10, 2002, pp. 1-10.

"MMConf: An Infrastructure for Building Shared Multimedia Applications," Terrence Crowley et al., Association for Computing Machinery CSCW '90 Proceedings, Oct. 1990, pp. 329-342.

Schulzrinne, H. et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Request for Comments, 1989, 66 pages.

Stallings, W., "Data and Computer Communications," Fourth Edition, Copyright 1985, 1988, 1991, and 1994, 12 pages.

Wakeman, I., "Packetized Video-Options for Interaction Between the User, the Network and the Codec," The Computer Journal, vol. 36, No. 1, 1993, pp. 55-67.

Wolf, K. et al., "Multimedia Application Sharing in a Heterogeneous Environment," ACM Multimedia 95—Electronic Proceedings, 1995, 14 pages.

United States District Court for the Northern District of California, Claim Construction Order re: U.S. Patent No. 6,343,313; Jul. 28, 2004.

Wikipedia, "Multipoint Control Unit," Dec. 20, 2005 (http://en.wikipedia.org/wiki/Multipoint_Control_Unit).

Networkworld, "MCU," Oct. 22, 2001 (http://www.networkworld.com/details/762.html?def).

Techweb, "MCU," 2003 (http://www.techweb.com/encyclopedia/shared/printArticlePageSrc.jhtml?term=MCU).

US 5,715,404, 02/1998, Katseff et al. (withdrawn)

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



Replacement Drawing  FIG. 4C



FIG. 4D



FIG. 4E



FIG. 5



Replacement Drawing  FIG. 6A



Replacement Drawing  FIG. 6B



Capture at presenter client

| Illustration of the effect of specifying consistency at the attendee client | | | |
|---|---|---|---|
| (other delays in displaying assumed to be caused by loading at client) | | | |
| | | Displayed by client | |
| Time order | Received at client | Consistency OFF | Consistency ON |
| 1 | Block 1 | | |
| 2 | Block 2 | Block 1 | |
| 3 | Block 3 | Block 2 | |
| 4 | Block 4 | Block 3 | |
| 5 | … | Block 4 | Blocks 1-4 |
| 6 | … | … | … |

FIG. 7A



**Illustration of the effect of specifying consistency at the server**
(other delays in sending assumed to be caused by loading at attendee client)

| Time order | Received by server | Sent by server | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1A | | |
| 2 | Block 2A | | |
| 3 | Block 3A | Block 1A | |
| 4 | Block 4A | | Block 1A |
| 5 | Block 1B | | |
| 6 | Block 2B | Block 2A | Block 2A |
| 7 | Block 3B | | Block 3A |
| 8 | Block 4B | Block 3B | |
| 9 | Block 1C | Block 4B | Block 4A |
| 10 | ⋮ | Block 1C | Block 1B |
| 11 | | ⋮ | ⋮ |

FIG. 7B

Capture rectangle

| Block 1C | Block 2C |
|---|---|
| Block 3C | Block 4C |

Capture C at presenter client

Capture rectangle

| Block 1B | Block 2B |
|---|---|
| Block 3B | Block 4B |

Capture B at presenter client

Capture rectangle

| Block 1A | Block 2A |
|---|---|
| Block 3A | Block 4A |

Capture A at presenter client



FIG. 8A



FIG. 8B



FIG. 9A



FIG. 9B



FIG. 9C



FIG. 9D



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 10A



FIG. 10B



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22



FIG. 23

US 7,877,489 B2

1

## NEGOTIATION AND VALIDATION OF A CLIENT IN A VIDEO CONFERENCE

This application is a continuation and claims the priority benefit of U.S. patent application Ser. No. 10/753,702 filed Jan. 7, 2004 and entitled "Providing Data Updates in a Network Communications System Based on Connection or Load Parameters," now U.S. Pat. No. 7,310,675, which is a continuation and claim the priority benefit of U.S. patent application Ser. No. 10/600,144 filed Jun. 19, 2003 and entitled "System and Method for Frame Image Capture," now U.S. Pat. No. 7,197,535, which is continuation and claims the priority benefit of U.S. patent application Ser. No. 09/523,315 filed Mar. 10, 2000 and now abandoned, which is a continuation and claims the priority benefit of U.S. patent application Ser. No. 08/823,744 filed Mar. 25, 1997 and entitled Reel-Time, Multi-Point, Multi-Speed, Multi- Stream Scalable Computer Network Communication System," and now U.S. Pat. No. 6,343,313, which claims the priority benefit of U.S. provisional patent application No. 60/014,242, filed Mar. 26, 1996, the disclosures of which are incorporated herein by reference.

This application is related to U.S. patent application Ser. No. 11/086,506 filed Mar. 21, 2005 and entitled "Providing Conference Data in a Network Communications System Based on Client or Server Information Examined During a Conference" and U.S. patent application Ser. No. 11/086,507 filed Mar. 21, 2005 and entitled "Providing Conferencing Data in a Network Communications System Based on Client Capabilities."

## BACKGROUND OF THE INVENTION

The present invention relates generally to the field of shared computer communications and computer conferencing. In particular, one embodiment of a conferencing system according to the present invention facilitates the conferencing of two or more persons, each with a computer at one or more locations with a shared visual display and additional communication capabilities such as video, shared drawing, audio, text chat, etc., and facilitates the recording and later playback of the communications.

Existing conferencing systems can be described as either video conferencing systems or "whiteboard" systems. In a video conferencing system, a snap-shot of the conference presentation is taken at regular intervals, such as thirty times per second. Given that the image on a computer display is not changing nearly that often, video conferencing wastes large amounts of bandwidth. In a whiteboard system, the presenter at the conference draws within a whiteboard application or imports the output of another program into the whiteboard program for manipulation. When the presenter is ready to present a snap-shot, the presenter presses a "send" button and the whiteboard program updates all the attendees' displays with the image created by the presenter. This type of system, while requiring less bandwidth than video conferencing, is clumsy to use, lacks real-time responses, and limits the presenter to the tools provided with the whiteboard program.

Existing shared-display or shared-image systems rely on interception and communication of display or graphics system commands or depend on conferees' having similar hardware and software platforms. These systems lack flexibility and performance if the network connections are unreliable or have narrow bandwidth, or they require uniform hardware or software installations.

Existing systems that provide single or multiple data stream handling of a nature different than shared-image con-

2

ferencing depend on wide bandwidth network connections or on all participants having similar platforms.

## SUMMARY OF THE INVENTION

An improved general purpose data-stream computer network transport system and, in particular, an improved desktop conferencing system is provided by virtue of the present invention. The desktop conferencing system is used to display a shared collaboration among conference participants ("conferees"), with one or more individuals located at each remote site connected to the conference. Typically, at any particular time some conferees are not able to modify the shared images, and thus they are "attendees," as opposed to "presenters." Preferably, only one conferee is the presenter at any one time. A pointer icon for each conferee can be displayed on the screen, and the conferee is able to modify the location of his or her pointer, even if the conferee is not one who can modify the shared display itself. Each of the pointers can be labeled to distinguish each of the conferees.

In a specific implementation of the desktop conferencing system, conferee client computers ("conferee clients") connect to the "conference server," a computer or several networked computers (any of which may also be used by a conferee as a client computer) running conferencing software, typically by navigating a World Wide Web ("WWW" or "Web") browser through a predetermined Universal Resource Locator ("URL") that indicates a Web page describing the conference. The conference can be set up any time earlier by anyone with access to this server function. At the time of setup, one or more password character strings ("keys") can be specified for the conference. The key that a conferee gives at the time of attempting to connect to the conference server determines whether that conferee will be allowed access to the conference and what the conferee's initial privileges will be for participating in the conference and for modifying the setup of the conference. These privileges include but are not are not limited to the following: entering the conference, being a presenter, having a pointer, seeing the icons or other identifying information of other attendees, hiding or sharing one's own icon or identifying information, changing descriptive information such as the name, time, and purpose of the conference, changing keys, and changing others' privileges. The privileges can be modified during the conference by conferees or others who are so authorized. In general terms, the privileges include those that conferees might enjoy in person at a conventional, physical meeting. In the description below, a conferencing or other communications session provided by the present invention will sometimes be called a "meeting."

A presenter uses his or her computer to begin a conference presentation by connecting to the conference server. Conferencing software on the presenter client computer captures a portion of the screen display of the presenter client and sends the captured region (after possibly compressing it or applying other transformations) to the conference server. The captured region can be anything the presenter client can have displayed on its screen or a portion thereof, whether or not the hardware or other software producing or managing any part of the display is aware of the conferencing system.

When the attendee selects a link from the Web page to begin the conferencing session for that attendee, this action initiates the attendee client conferencing software. The attendee client then obtains a current view of the captured region from the conference server. The position of a pointer icon on a conferee's view of the captured region and an icon specified by the conferee might be communicated to each of

US 7,877,489 B2

3

the other attendee and presenter clients, so that each of the participants can see what each conferee is pointing at should a conferee choose to point to an element of the shared captured region. A particular conference can include more than one presenter; all conferees may be presenters, or all conferees may be non-presenting attendees. The latter may happen if a conference is set up to review a previously recorded or archived conference.

In a simple embodiment, the entire screen of the presenter is shown to all of the attendees. In a more complex embodiment, multiple subsets of multiple presenters' screens might be made available to all attendees while other subsets of the displays of the presenters are viewable by a subset of the attendees, thus allowing private side "conversations." These side conversations can be flexibly reconfigured during the conference, according to the conferees' privileges; participants in side conversations can have separate pointers whose positions are independent of, and whose labeling icons are distinguished from, those appearing in the general conference.

As each conferee joins a conference, the client and the conference server agree on the capabilities of the client, such as display bit-depth, bandwidth of the connection between client and the conference server, processor speed of the client, and the amount of memory available to each client. These parameters may be modified by the conferee, the client, or the server: this can be done automatically or on demand. If the conference server determines that a client has sufficient computing resources, some of the tasks, such as image data compression (for presenter clients), decompression (for attendee clients), update scheduling (both types of clients), and other image transformations and server management functions can be assigned to the client computers. The client computers might be personal computers, workstations, X-terminals, cable or satellite TV set-top boxes ("STBs"), personal digital assistants ("PDAs"), game playing machines, WebTV™s, network computers ("NCs"), Infopads, visual telephones, and other existing or as yet undeveloped input and/or output devices. These clients might be connected to the server computer or computers (and the server computers might be interconnected) by high or low bandwidth electrical or optical connections, radio, infrared, microwave, telephone modem, or hybrid combinations of these, or other existing or as yet undeveloped data communication technologies.

The system can supply a range of coder-decoder ("codec") facilities for the compression and decompression of images (in order to reduce bandwidth requirements during network transmission) and for the matching of image representations to client display requirements including input or output format transcoding (in order that the shared image appear visually similar to presenter and attendee). In addition, codecs may be provided by the system for such purposes as error-correction, encryption, or audio and video noise reduction, or others. User-provided or proprietary codecs for these purposes and more can also be incorporated into the system. Any of these codecs may be in form of software or specialized hardware. Multiple codecs may be provided for the same function; should the system determine that one is better suited for that function, then it may be selected, and the codec can be changed dynamically when conditions change, such as client requirements, server needs, and network loading.

At least one embodiment of the present invention provides real-time, multi-point, multi-speed transport over a computer network for data streams other than the visual conference shared images described above, including but not limited to audio, video, shared paint and drawing spaces text chat, and other real-time object streams where intermediate updates

4

may be dropped; in particular, the data streams may combine any or all of these types of data, which may be produced by multiple presenters, and arbitrary data streams may be combined with these. The features of connecting to servers, setting up conferences, keying privileges, passing identifications, accommodating multiple dissimilar platforms and network connections, and configuring subsets of conferees apply equally to these other data streams. In the more general case, the "communications server" connects the "source" and "sink" client machines of the "communicants" during a communication session.

But the system is not limited to real-time; thus, for example, archiving is provided. It is not limited to multi-point; thus, for example, a single user can record for later playback; being scalable means it works well for a few users and provides a similar communications service and experience with many users. It is not limited to multi-speed; thus, for example, data streams where lost information cannot be easily updated by later versions can be accommodated. It is not limited to multi-stream; for the shared screen-image stream (frequently used here as an example) by itself offers great utility. Indeed, it does not require a network: for example, the same computer could be the recording and archiving server for a presenter using it as a client; or the same computer could run presenter client software, attendee client software, and the communication server software connecting them so that a presentation might be previewed from the attendee's point of view.

Although a simple embodiment uses a single computer as the communications server, a more complex embodiment connects several computers in performing the server functions. The server-to-server interconnections can optimize routing by using information provided in the data stream or measured on the network, optimize wide-area network (WAN) usage by connecting clients to nearby servers, provide backup reliability by migrating clients, provide scalability of conference size through splitting the data stream, improve performance and robustness through redundant routing, and distribute functions of the system's transport pipeline (such as compression, decompression, and update scheduling) over several server and client computers. These services can be provided automatically depending on resources of the computers and network (for example, measured net speed and central processing unit, or "CPU," load) and facilities available (for example, announced client characteristics, such as CPU speed, compression and/or decompression hardware, or display parameters). They can also be configured and constrained by the server computer administrators or others with appropriate privileges.

Existing systems do not provide one or more of the following, which are explained in greater detail below: multi-speed at server and client, multiple reconfigurable coder-decoder transformations and transcodings, storage services (for, e.g., caching, failure recovery, recording, archiving, and playback), keyed access and privilege granting, adaptable servers and clients, multiple servers, adaptive and redundant server-to-server routing, load sharing among clients and servers, adaptive server-to-client matching, client/server and server/server backup and reconnection, multiple protocols for client connections, dynamic reconfiguration of server functions, and scaling beyond single process, host, or network limitations automatically or upon request.

43

US 7,877,489 B2

5      6

A more complete understanding of the nature, features, and advantages of the invention will be realized by referring to the following description and claims together with the associated drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a desktop conferencing system based on the present invention.

FIG. 2 is a flowchart illustrating the connection of a conferee client computer to a conference server shown in FIG. 1.

FIG. 3 is a block diagram of the data flow in an architecture commonly supporting computer graphical user interfaces.

FIG. 4A is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when full images are compared, and the transmission of the changed information to the conference server.

FIG. 4B is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a new block is compared with the corresponding block in an old full image, and the transmission of the changed information to the conference server.

FIG. 4C is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a checksum of a new block is compared with the checksum of an old corresponding block, and the transmission of the changed information to the conference server.

FIG. 4D is a data flow diagram illustrating the updating of the stored old image with a new captured block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 4E is a logic diagram illustrating the updating of the stored old image in various formats with a new delta block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 5 is a state diagram illustrating the operation of the image capture process of the presenter client software.

FIG. 6A is a diagram showing attendee client block clipping.

FIG. 6B is a diagram showing presenter client block clipping.

FIG. 7A is a diagram illustrating the client consistency setting.

FIG. 7B is a diagram illustrating the server consistency setting.

FIG. 8A is a block data flow diagram illustrating the operation of server processes monitoring and filtering a single presenter data stream according to the present invention.

FIG. 8B is a block data flow diagram illustrating the operation of server processes monitoring and filtering multiple input and output data streams according to the present invention.

FIG. 9A is a block diagram illustrating interconnections of several communications servers and communicant clients in a single communications session according to the present invention.

FIG. 9B is a block diagram illustrating interconnections of several communications servers and communicant clients, including migrated and recruited connections, in a single communications session according to the present invention.

FIG. 9C is a block diagram illustrating interconnections of several communications servers and communicant clients, including backup connections for clients and servers, in a single communications session according to the present invention.

FIG. 9D is a block diagram illustrating interconnections of several communications servers and communicant clients,

including decomposition of transformation sequences and functional delegation, in a single communications session according to the present invention.

FIG. 9E is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queues and processing, in a single communications session according to the present invention.

FIG. 9F is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queue contents and processing, in a single communications session according to the present invention.

FIG. 9G is a block diagram illustrating interconnections of several communications servers and communicant clients, including multiple and redundant routing, in a single communications session according to the present invention.

FIG. 10A is a block diagram illustrating a multi-layered tree topology for connections of several communications servers with communicant clients in a single communications session according to the present invention.

FIG. 10B is a block diagram illustrating a single-layer tree topology for connections of several conference servers with communicant clients in a single communications session according to the present invention.

FIG. 11 is a diagram of the example architecture for a single server with a single meeting, according to the present invention.

FIG. 12 is a diagram of the example architecture for a server with several meetings running on a single CPU, according to the present invention.

FIG. 13 is a diagram of the example architecture for a single meeting manager directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 14 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 15 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on the same CPU, according to the present invention.

FIG. 16 is a diagram of the example architecture for a single server with a single meeting, but the meeting is controlled by several instances of a communications session server ("CSS") running on the same CPU, according to the present invention.

FIG. 17 is a diagram of the example architecture for a single meeting manager directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 18 is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 19 is a diagram of the example architecture, for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention.

FIG. 20 is a diagram of the example architecture for several meeting managers directing several servers with a single

US 7,877,489 B2

7

meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention. In this diagram, the propagation topology information is shown.

FIG. 21 is a diagram of the graph of the propagation topology information in FIG. 20.

FIG. 22 is a diagram of the graph of the propagation topology information in FIG. 20 together with the information for an additional propagation topology.

FIG. 23 is a time vs. space diagram showing some typical applications of the present invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows a desktop conferencing system 10 according to one embodiment of the present invention. Desktop conferencing system 10 is shown with three attendee clients 18 and one presenter client 12. Following the arrows, presenter client 12 is connected to attendee client 18 through a conference server 14 and data network 16. The presenter and attendees may also participate in an ordinary telephone call or a conventional conference call using telephones 20 connected through conference switch 22. The voice conferencing might also be carried out through an audio connection on a data network; indeed, telephone network 24 and data network 16 could be the same.

The group of users can comprise from as few as one user, who might record a presentation or lecture or video-mail onto a session archive 23 for later distribution; or two people who wish to share information or collaborate on some work product; or a small group of users, as in a typical business conference call; to many tens of thousands or hundreds of thousands of users using the network as a broadcast rather than interactive median. In the last case, the voice conferencing might also be broadcast, and could involve one-way telephone conference calls, radio, multicast network audio (such as MBone), or the like.

The presenter client conferencing software, which is usually distributed tightly bound with the attendee client software to facilitate presenter hand-offs from conferee to conferee, captures information (such as image, sound, or other output information) from a program or programs running on the presenter's machine and relays it to the server, as explained in more detail below. The server relays this information to all of the attendee client computers participating in the same session or conference, transforming (in manners and by methods described below) the data as required. A more detailed description of the operation of the system by way of the example of transporting a stream of shared-image data during a conferencing usage of the software now follows.

During a conferencing session, presenter client 12 takes periodic "snap-shots" of the application screen image contained within a rectangular boundary determined by the presenter, breaks the screen shot into smaller rectangular blocks, compares these blocks to information from a previous screen shot. A block that has changed is passed to conference server 14 after it has undergone possibly two transformations and received identification marking ("ID stamps"). The first transformation may form the difference, using a set difference, exclusive-or (XOR), or other difference method, of the new and old block in order to extract information on the changes only. The second transformation may compress the block using a publicly available compression algorithm such as JPEG (Joint Photographic Experts Group) or PNG (Portable Network Graphics), or licensed proprietary methods of compression. The need for the two transformations is deter-

8

mined by the system depending on such parameters as client characteristics, server and network loading, and user requests. The two transformations and possibly many others may be also performed by the server, another client, or another facility available on the network.

The presenter client identifies where the block is in the capture rectangle with a block-location ID stamp; it identifies the time with a time-stamp; it may also identify itself with an origin stamp, and provide other ID stamps as needed. In order to provide synchrony in the system, conference server 14 can issue time synchronization signals. The conference server may also add time-stamps on receipt of blocks, and will need to update time-stamps when a recorded or archived conference is played back.

The changed blocks, however transformed, with ID stamps, are held on the conference server until they have been sent to all attendee client computers 18, or it has been determined by flow control that there is no longer a need to hold them. Flow control between presenter client 12 and server 14 and between server 14 and attendee client 18 determines how often the attendee client receives information updating the image; this flow control, described in more detail below, depends on the characteristics and configurations of the clients, the server, and the network. Attendee client 18 can also send a command to conference server 14 to obtain the latest image change information.

Attendee client 18 uses whatever change information it receives to update its screen display of the shared image. The attendee client may need to decompress the changed block information and to composite differences with previously received image information. The reverse transformations of decompression and composition may instead be performed by other computers.

From time to time, attendee client 18 communicates the position of the attendee pointer (if the conferee has selected this option) to conference server 14, which distributes the pointer position and a chosen identifying icon to each of the other conferee clients, which may then add a representation of the icon or other identifying label at the position indicated by the pointer information to the shared image on the client's display. The purpose of these pointers and labels is to allow conferees to reference particular elements of the shared image, possibly while describing the elements to the other conferees over the audio conference session (via a telephone conference call or an Internet audio conferencing application, for example).

FIG. 2 is a flowchart showing the process of instructing a conferee client 17 (client 17 refers to a generic client which might also be a presenter client 12 or an attendee client 18) to a conference ongoing on server 14, assuming that the conference setup is performed via the WWW. First, the conferee locates a conference listing. This may be done by finding or being told a URL or using a locator service such as ULS™ or LDAP™. The conferee also specifies an icon to be used as a pointer label. Then the conferee points a WWW browser to the conference listing, where the server offering this listing or an associated server validates the conferee and provides information that allows the attendee client conferencing software to start and to connect to conference server 14 itself, possibly after further validation. Other information may be passed to the conferee client at this time as well. The connection to a server can also be accomplished in different ways, such as using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings. Once the attendee client software is running, it communicates commands and pointer icon position to conference server 14, and

45

US 7,877,489 B2

9

conference server **14** supplies an initial conference image and later screen updates to client **17** (which is initially an attendee client **18**).

An attendee can become a presenter by sending the appropriate attendee-to-presenter command to conference server **14**. In the simplest embodiment with a single presenter, a message is sent to the presenter's screen indicating that an attendee wishes to take the presenting role; if the current presenter approves, then the roles are exchanged. In more complex embodiments, there can be a presenter arbitration mechanism, or multiple presenters may be allowed. The ability for a presenter or an attendee to be involved in any particular conferencing session and the assignment of privileges in the conference can be controlled by requiring appropriate keys from the presenter and the attendees.

Referring back to FIG. **1**, data network **16** can be provided by dial-up connections, local area networks (LANs), wide area networks (WANs), internets, intranets, the global Internet, or a combination of these or any other computer data communications links. In a specific embodiment, the conferee client computers are personal computers, workstations, or other computing hardware systems, running operating systems such as MacOS™, Windows® 3.1 or 3.11, Windows® 95, Windows® NT™, Unix™, OS/2™, NExTStep™, BeOS™, JavaOS™, or the like. There is no requirement that the operating systems or hardware of the conferee clients all be the same.

Conference server **14** matches the form of the image to the attendee client computers before sending it. Most computer screen images are represented as a bitmap of pixels whose layout is device-dependent. To be able to send images from one device to another, a transformation or transcoding is often required. The captured image information may be transcoded into a device-independent format for transmission and transcoded back to a device-dependent format for each attendee's screen; if, however, the mix of attendee clients is such that a device-independent format is not needed no conversion is done. If these or other transcoding operations are needed, they can be carried out at the presenter client's side, the server side, or the attendee client's side, depending on where excess capacity or superior capability exists. The choice of device-dependent vs. device-independent bitmaps (DDB vs. DIB) is made automatically by the server, in response to the number and type of conferee clients. For example, a meeting with just two conferees, each running a Windows® PC with similar 256-color graphics configurations, may use DDBs and achieve high performance with low overhead. However, where differently configured clients are connected in a conference, server **14** transcodes the images to fit the attendee's screen capability.

Multiple codecs may be involved in the transcoding of screen formats as well as other image transformations described herein. It may even happen that different codecs will be used on different blocks in the same image, depending on availability of the codec's host computer, the transformation needs, the loading on client, server, and network, or other conditions relevant to the system's performance.

Server **14** also fits the images to the attendee's CPU capability. Server **14** can be a server operated by the presenter (who would then have full control over the server's resources), or it can be owned or operated by an unrelated third party or even an attendee who never presents. It is possible to have a third party whose involvement is solely as a facilitator of conferences. Operating server **14** is simpler than operating a videoconference hub, since the bandwidth is much lower. One aspect of the present invention is the realization that real-time conferencing can be had without resort to full-motion video transmission, as the item being moni-

10

tored, a portion of a computer display, does not change as fast as a full-motion video. A similar observation applies to many other data communications streams.

Instead of full-motion video, attendees' screens are updated as the presenter's screen is modified, or less frequently for attendees with slow machines. The screen is modified from left-to-right within a row of blocks, and rows are updated top-to-bottom to improve the perception of low latency.

In some cases, server **14** might be operating without attendees. Such a configuration is useful where the presenter wishes to "record" a session for later playback. Even a session with attendees can be recorded for later playback, possibly including a recording of the voice conferencing. These stored sessions might be stored in session archive **23** or elsewhere. The shared image session can be synchronized with the voice conference by using the time stamps on the block data. When the recorded session is played back, it is an example of conference server **14** operating with attendees but no presenter.

The blocks may be held at the server as full images, as differences ("deltas") from previously received full images, as deltas from previous delta blocks, or as some combination of these, depending on the capabilities of the presenter and attendee clients. Periodically, a server may "checkpoint" the image deltas. To do this, the server requests a full image of a block from the presenter client and uses the full image as a replacement for all the accumulated image deltas for that block. The server might also request the entire captured region from the presenter client, or send the entire region to an attendee client upon request.

The conference server acts as a software-controlled switch that connects the presenter client with the attendee clients, taking into account that the speed of information transfer from the presenter client can change and the speed of transfer to the attendee clients can change and be simultaneously different for different attendees. The workload of the entire system is shared and distributed among the client and server computers, and even other computers that do not perform client or server functions.

Presenter Client Capture Operation

The capture operation and transport technology improves over former approaches by reducing the amount of work required and so enhances performance. In addition, the technique can be tuned to best suit the workload on the hardware and software platforms and network connections involved, manually or automatically. In particular, this tuning dynamically matches the capture operation to the amount of computer power available (while running the other software the conferee may wish to use) and the speed of connection to the network. Existing systems that capture graphics display commands, transmit them, then use them to recreate the original display appear to have great compression, which entails economy of network transmission. But comparison with the description below of the present invention will reveal that the savings are not so great when the task is to communicate data streams which can be updated by later transmissions.

The presenter selects an area of his or her computer display to be shared ("capture region"); it need not be a rectangular area. More than one capture region may be selected at a time and multiple regions may overlap. The selection may be made on a screen display, in a memory representation of a display, or in an aliased representation of either; the selection can be changed at any time. If the client has multiple monitors or multiple displays on a single monitor, independent selection can be made for each. A window provided by the presenter client computer's operating system, or by an application or

46

11                                                    12

other program, may be designated as the capture region, and then the capture region can be adjusted automatically if the window is moved or resized. This may be a fixed window, or the capture operation can be set to follow the selection of the current ("top" or "focus") window automatically. In a simple embodiment, the presenter selects a rectangular region on the screen ("capture rectangle"). For efficient transmission, the capture rectangle is broken up into rectangular subregions (blocks) to give good perception of response time. For example, if the presenter has selected all of an 800-by-600-pixel screen display to be within the capture rectangle, then it might be broken up into twelve 200-by-200-pixel square blocks. If the capture rectangle is later adjusted smaller, the blocks are changed to be made up of smaller rectangles, or the capture rectangle is divided into fewer blocks, or both; correspondingly, if the capture rectangle is later adjusted larger, the blocks are changed to be larger rectangles or the capture rectangle is divided into more blocks, or both. For efficient handling of blocks, the blocks are preferably kept between 1000 and 4000 pixels in size. As the blocks are updated on the attendee's screen, they are presented from the top row to the bottom row and from left to right within a row.

The presenter defines the shape of the capture region and can change, control, reposition, and resize it. In some computer systems, when the region is rectangular, the capture rectangle may be marked by a transparent window that stays visible; in other systems, it is appropriate to use four graphical objects that move together to mark the boundary of the capture rectangle.

FIG. 3 shows the display architecture of a typical computer shown with application programs 60(a)-(c), and graphic display mechanisms 62(a)-(c) with graphics commands capture points 64(a)-(c). The graphics display mechanisms 62 send their output to a screen image storage area 66 which in turn presents an image to the user on a computer display 68. Existing techniques of image sharing depend on intercepting graphics display commands (graphic instructions, display commands, graphics subsystem calls, etc.) at graphics commands capture points 64 and sending these commands to another computer which can use them to affect its own display. This appears to have an advantage in that one high-level graphics drawing command (e.g., "draw a blue line from coordinates (0,0) to (0,100)") can be expressed in fewer bits of data than what would be required to express the resulting set of pixels on the screen. In this case, 100 blue pixels, say using 24-bit color depth, would require 300 bytes of data, compared with a graphics drawing command that might require only about 12 bytes of data.

If the task to be achieved is to send a copy of this image to another computer, using the smallest number of data bits, then sending the graphics drawing commands seems, at first sight, to be a very effective approach to adopt. However, two factors mitigate this apparent saving. One arises when the data stream is compressed before transmission, and the other arises from reflection on modern graphics drawing techniques.

Compression is very effective when there is a lot of redundancy in the data. In the example cited above, the 300 data bytes needed to represent the blue line on the image consists of a repeating set of 3 data bytes, each representing one blue pixel. This might be compress to as small as 5 data bytes total, one to indicate the code, three for the color, and one to indicate the binary number of pixels. Of course, the 12-byte graphics drawing command might also be compressible: nevertheless, the apparently huge savings ratio is not in fact realizable.

Modern graphics drawing commands include not only simple geometric drawing operations, but also text elements with full font and spacing specifications, and other complex constructions. This can be seen by comparing the size of, say, a word processing document (which contains the graphics drawing commands, font information and text) stored in a computer file with the size of an image of that same document, say, as a fax image stored as a file on the same device. A few years ago, the image file would always be larger than the document file; now, the reverse is often true.

Furthermore, as will be seen below, reducing the amount of data by using compact graphics drawing commands instead of direct image data is not always possible when applied to real-time systems where transmission of live, changing images is required. In this case, there are two ways to merge changes together, thus reducing the total amount of data that must be transmitted. The example used above applies to a single image; when changing images are required—as for example, with conferencing systems—further opportunities exist to reduce the total amount of data transmitted. This is an advantage of the present invention.

First, when graphic drawing commands update the same region of the image, we can capture just one resulting image containing the results of many commands. Second, successive changes to a particular region of the image, which will result in successive transmissions of that region, can be composited together. The several strategies for this updating under the present invention will now be described in more detail.

Updates for the capture rectangle may be requested by the server, or sent at fixed or variable times announced by the presenter client automatically or as determined by the presenter, or sent at the command of the presenter. The blocks sent out by the presenter client are just the blocks which have changed since the last update. From time to time, the presenter client might send the entire set of blocks. Depending on several factors detailed below, the presenter client might send the blocks as difference (delta) blocks as opposed to the full information base blocks. Base blocks are preferred where network bandwidth is freely available but computing power at the client is limited.

For efficiency, the presenter client might only send out delta blocks for areas that have changed, since delta blocks will often compress smaller than the corresponding base block because much of the base block may remain unchanged. Thus, the presenter client maintains a copy of the last capture to allow it to generate the delta blocks.

FIG. 4A illustrates this point. In that figure, the captured images used are divided into twelve subblocks so that unchanged portions of the captured image can be ignored. If the block labeled "B6" is the block being sent, block B6 of the current copy of the capatured image 69(a) is compared with block B6 of the most recently stored reference copy 69(b) of the captured image (the reference copy is a copy of who the captured image looked at some point in the past). The result of the comparison will determine whether block B6 has change. If it hasn't, then there is no need to transit the changes.

FIG. 4B illustrates a similar process, but there, only block is captured from the current image for comparison with the stored image. This reduces the storage required for the comparison by nearly one half, but it limits consistency, as described later.

In FIG. 4C, the images are replaced by checksums or digests, such as cyclic redundancy check ("CRC"), DFT (discrete Fourier transform) parameters, or the results of applying hashing functions appropriate for images, or the like. Although storage is greatly reduced, as only the much smaller

US 7,877,489 B2

13

checksums need to be saved, and comparison is quick, the digest procedure must be fast in order to provide any time economy. The main drawback is that two different blocks may have the same checksum, and then the comparison will fail to find the difference. This can be mitigated by the choice of checksum and by the unlikelihood that the comparison would fail twice in a row when the block changes again.

FIG. **4**D shows the transmission to the server of a base block when the comparison shows a change. The block is also sent to the stored image; this allows the stored image to be updated at the same time the changes are sent to the server.

FIG. **4**E shows the corresponding situation when a delta block is sent.

Obviously many combinations can occur that would provide additional savings under some load conditions. Thus the stored comparison may be a collection of base blocks, either from the same capture event or not, an array of checksums of base blocks or of delta blocks, a collection of delta blocks, results of compositing delta blocks, etc. or any combination of these.

It is possible to reduce the size of the stored comparison image to blocks which have changed recently and perhaps their neighbors, as long as the full image is stored every now and then.

Each of the modes of comparison and transmission can be altered dynamically; for example, one heuristic is to send a delta block when less than half the pixels in the capture rectangle change, and to send a base block when at least half change.

With techniques that rely on capturing graphics display commands, it is to very hard to identify commands that produce overlapping elements of the image. Because of this, it is hard to know when earlier commands can be discarded because their results have been superseded. Therefore, a system relying on capturing commands must send all commands over an error-free network. By contrast, in this system, deltas can be dropped without permanent ill effects.

The foregoing assumes that the capture rectangle is broken into a number of rectangular blocks. This decomposition can be changed dynamically to have more or fewer blocks to adapt to changes in the size of the capture rectangle by the presenter as described earlier, or to changing conditions in the loading and capabilities of clients, servers, and networks. Just as the capture rectangle is broken into blocks to improve perceived rate of change, so may the block be subdivided to further isolate just the changed portion of the image. One way to accomplish this is to identify the smallest bounding rectangle of the changed portion of the image, and then to intersect this with the current block pattern. Another is to adaptively redefine the block pattern to best fit the changed area of the image. Other adaptations arise if the geometric assumptions of rectangular capture region and rectangular blocks in this example are dropped.

In general, the system of the present invention is oriented to reduce buffering in order to improve the sense of "live performance." Thus, while the structure of the server and client software could allow a number of captured images to be in the process of traveling from presenter clients to attendee clients at one time, in fact having just two images in the "pipeline" from presenter to attendee at once takes advantage of processing capacity, defeats transient network breakdown, and does not overload end-to-end connection performance. This might be increased to three or four or more images in the pipeline if the network connections are fast, but the clients have slow CPUs.

FIG. **5** is a state diagram of the presenter client software. The state transitions are described here starting with the IDLE

14

state. The presenter client is in the IDLE state while it is doing other things, such as processing data unrelated to the conferencing software or running another application whose output is to be shared with the attendees. Periodically, the presenter client will check to see if an update to the capture rectangle needs to be sent out. In considering that need, the presenter client conferencing software considers the CPU loading on the presenter client computer, taking into account any limit the presenter might have placed on what percentage of his or her machine's computing resources can be occupied with block updates, the transmission rate of the presenter's network connection (no sense preparing a block update if the network can't handle it), commands concerning flow control from the server (server flow control is described below) and other relevant parameters.

If the presenter client decides to proceed, the state changes to the BLOCK-GRAB state, where the current capture rectangle or a portion of it is grabbed from display memory. A copy of the next most recent capture rectangle is maintained so that delta blocks can be easily generated. In this state, the delta blocks are generated if they are to be used. If the delta blocks indicate that nothing has changed, the computer transitions back to the IDLE state and does not send out the captured block or its delta (which would be blank). Otherwise, the client prepares the blocks which have changed for potential transmission. The capture rectangle is divided into blocks as described above. In the BLOCK-GRAB state, the presenter client estimates the amount of work required to prepare the grabbed blocks for transmission to the server, the attendee requirements, and local hardware capabilities. If the presenter client can perform work such as transcoding much faster than the attendee clients, or even the server, then the presenter client performs that step by transitioning to the COMPRESS/TRANSCODE state. The presenter client might skip this state altogether if no transcoding is to be done and compression is not used (such as where the network connection is much faster than the compression speed of the presenter client).

Either way, the presenter client then transitions to the NETWORK state, where it determine if the capture rectangle still needs to be sent and checks current network bandwidth. Then, the presenter client transitions to the OUTPUT state where the blocks are output, either as base blocks or as delta blocks, either compressed or uncompressed. The presenter client then returns to the IDLE state where the process repeats after a time.

In the case of displays that support multiple layers in applications or in the interface through multiple frame buffers or reserved areas of memory, the system can capture from one or more of the layers, in coordination or independently. If the client has multiple monitors, then the system can capture from some or all of the displays.

In general, the presenter client sends out a stream or streams, which can vary in format over time. The presenter client can also imbed command messages into a stream, such as a command indicating a changed color map, a pointer icon position, or a presentation hand-off command; such commands can also be sent in a separate communications channel. Capture can also occur in buffers for other purposes than screen display. Streams other than the shared-screen conferencing stream (outlined above and described in more detail below) can carry information to allow shared or broadcast text chat, audio, video, drawing, whiteboarding, and other communications. These streams are subject to and can enjoy the same or similar load/need analysis and balancing methods and mechanisms.

US 7,877,489 B2

15

16

Other Client Features and Behavior

When a new conferee joins a meeting or before, the conferee selects a personal icon and a characterizing sound (a "gong") which will be the icon and gong that other conferees will associate with the joining conferee. Icons and gongs can be created using well-known techniques for creating icons and audio data. When a new conferee joins a meeting, the conferee client sends his or her personal icon and gong to each other client, via the conference server. The new conferee is then "announced" by the gong. The personal icon of the joining conferee is also added to a conferee icon list maintained on the server or at each client. If another conferee chooses to have the icon list displayed at his or her client, the entrance of the joining conferee can be noted when the new icon appears on the icon list. Other personal information about the conferee, such as name and electronic mail ("email") address may be provided by the conferee and made available to other conferees via the server. As described earlier, the visibility of icons, audibility of gongs, access to personal information, and so on, may be based on the key the conferee used to enter the meeting, on the identity of the conferee (by network address or otherwise), or on a combination of these and other validators.

The presenter can "go off-air," i.e., suspend or pause the image capturing process and can "go on-air," i.e., resume the presentation at will. The network connections can be maintained during the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-air, and no changes will be sent or scheduled by the server during the off-air time.

If clients are so configured, conferees can be given lists or iconic representations of the participants in the conference, as mentioned above. Those conferees that are presenting, those who are off-air, and those who are requesting to present can be marked. Various subsets of conferees, for example those in side-conversations, those in other meetings, those connected to a particular server, and in general those selected by some property of the system's current configuration, can also be marked. The visibility of the lists and the presence of any markings may be controlled by users, administrators, or others, based on privileges or other criteria. In addition, graphical representations of a meeting or part of a meeting, or of several meetings, may be available for display, depending on privileges.

If the presenter client computer represents images with a varying color map or palette, then the presenter client will send out color map information when the color map changes, so that the attendees observe the same color scheme as the presenter. Color map changes can occur on the presenter client display system as the presenter opens, makes changes in, or closes a program, either in a window that overlaps the capture rectangle or in a window beyond the capture rectangle used for his or her own private work.

When a change in a block is detected, the resulting changed block (base or delta) may be compressed, making use of any special hardware (for example, a Digital Signal Processor (DSP), often found on MPEG boards or set-top boxes), if it is available on the client computer. The compression codec may be lossless, or some information may be lost in compressing and decompressing ("lossy" codec) if the particular application and users of the system can tolerate that and wish to take advantage of possibly better performance.

To ensure good usage of the network, the images are captured and compressed before the network is available to send them if possible. Without this, the network might be under-utilized. On the other hand, if an image is captured and compressed too early, the attendees will not see the most up-to-date information and this will reduce the efficacy of the visual component of the meeting. To achieve this good balance between system utilization and the perceived response time as seen (and possibly heard) by the meeting's attendees, the client software uses a pipeline to ensure a flow of information is always available at the network, with flow-controls to ensure that image capture and any transcoding (including compression) are never too far ahead or behind in order to balance the load among presenter client, attendee client, and conference server. Flow control is described in more detail below.

The number of blocks and the order of comparison and modification can be automatically determined by the server or set by the presenter. Thus, if conferees usually work with text reading from right to left, a right-to-left updating might be more appropriate.

The size of the window displaying the shared image on the attendee client need not match the size of the image sent from the presenter client in linear measure or in pixel measure. If the window is smaller than the image, the attendee can be given scrollbars to allow navigation around the shared image. It is also possible to configure the transcoding to scale the size of the image received by the attendee client.

The attendee client can also display the shared conference image automatically matched in size to the capture region set by the presenter, if the attendee desires and the attendee client computer is capable of such display. If the attendee client is displaying less than all of the image, the bounds of what is being shown at the attendee client can be communicated to the conference server so that the server can avoid sending blocks beyond the boundaries of the attendee's window. These blocks are not sent until scrolling requires them or they are otherwise demanded by the attendee. This point is illustrated in FIG. 6A, where an original image 50 as represented in the display coordinates of a screen 54 of attendee client 18 exceeds the size of a window 52 dedicated to its display. Scrollbars are included with window 52 to aid in navigation. Blocks 56 are not transmitted from server 14 to client 18 until the scrollbars are used or the window is resized to request the display of more of image 50.

This "clipping" of unneeded blocks can be propagated back to the presenter client by the server if appropriate (for example, if there is only one attendee), so that the presenter client does not have to process all blocks in the capture rectangle. This is illustrated in FIG. 6B, using the same attendee configuration as in FIG. 6A. In FIG. 6B, the presenter client 12 knows from conference server 14 that the shaded blocks 56 shown at the attendee screen 54 of attendee client 18 are not displayed in attendee window 52, so there is no need to capture or compare the corresponding blocks 57, marked as "do not process" in the representation 51 of the capture rectangle, which is displayed on presenter client screen 55 and shown with the an overlay 53 that corresponds to attendee window 52.

The shared conference image, text boxes, messages, control buttons and menus, and other graphical elements may be grouped in a single window or split among several windows on the client's display.

Consistency is a property of the display that can be chosen at the cost of somewhat reduced perception of image update speed at the attendee client. Both the server and client can be constrained to be consistent; server consistency is discussed below. FIG. 7A gives a simple example of client consistency. An entire capture rectangle with four blocks is sent by the system, and the client waits until all four blocks are received before displaying them. Thus, the entire screen represents the same picture to the attendee as that seen somewhat earlier by

49

US 7,877,489 B2

17                                                              18

the presenter. With consistency turned off each of the four blocks is displayed as soon as possible, which leads to blocks from a previous transmission being seen alongside newer blocks, so the screen picture, at least for a time, is not consistently one that has been viewed by the presenter.

When a presenter makes a change to the part of screen that is in the capture rectangle, a signal can be given to the presenter client via the server when all attendee clients have received the update that results from the change. The presenter is then assured that all other conferees have seen the change he or she has made. An example of how this can be accomplished is given by the following. The conference server is aware of the geometry of the capture rectangle and the blocks are constantly scanned from left to right, starting at the top and moving toward the bottom. Thus the block in the lowest rightmost position signals the end of data from a particular rectangular capture by the presenter client. Since this block may not have changed and may never arrive in the server's input queue, a flag may be set by the server to indicate which block is last when a certain new capture arrives before the last block has been sent to an attendee client. If neither of these two mechanisms works, the presenter client can add a message via the server to the attendee client stating that the rectangle has been finished. Thus the attendee client can respond when it has received the entire rectangle.

In addition, a signal can be generated by the presenter client when the presenter has made no change for some set period of time or number of capture cycles. This can be relayed by the server to attendee clients, so that attendees may know that after the appropriate captured image is received, what they see is also representative of what the presenter currently sees.

If the connection to the server is lost, the client can notify the conferee and may then attempt to reconnect to the conference session, using saved parameters. The reconnection may be to a different server, as described later.

In the above description, "client" has referred to a computer system comprising hardware, an operating system, and applications software, possibly or specifically including the software necessary to participate in a conference or communication session according to this invention. All of the described operations also apply to the case when one or more users are running two or more instances of the client conferencing software on the same computer platform. This might occur when a user wishes to be a conferee in several different conferences simultaneously, or even multiple conferees in the same conference. For example, he or she can be a presenter in one conference and an attendee in another. A single person can have different identities in each client instance, so that John Smith may be known as "John" in one client instance and "Mr. Smith" in another. Two people might be using the same computer hardware alternately, and both can be participating in different conferences, or in the same conference as different conferees. The capture region of a presenter in one conference may include attendee displays from another, or this "chaining" feature may be prohibited by the system.

Another example of several clients running on one CPU occurs when several users are connected through terminals (e.g., X-terminals) to a host computer which is running the client software for each user.

If a user has a multiprocessor platform with several CPUs, then the system's client software might be configured to use two or more CPUs for the functions of a single client during a communications session.

Server Operation

This example of operation of the invention is based on sharing computer screen images; other stream types may be handled in a similar manner with similar logic, methods, and mechanisms. This is but one possible method of making the server.

At the server, a queue of data packets is maintained and is filled from an input filter and drained by output filters, one for each attendee client. The input filter and each output filter can run at its own speed. An output filter feeding a client connected over a slow network will not send every packet from the queue, but will skip over old information. This filtering process is complex, especially when the data packets represent changes from one image to the next (delta) which must be composited together in order to skip over delta blocks. This is the technique that allows the server to work with any speed network and mixed sped clients in the same meeting. The server data handling processes are described in more detail below.

The server also handles control messages, such as a request to join a meeting or a message from a client signaling that it is attempting to reconnect to a meeting after losing its connection; reconnection requests can also come from other servers when multiple servers are involved (multiple server situations are described in more detail below). The server accepts connection requests and verifies that the user of the client software is authorized to join the meeting. For each client connection, an icon and gong characterizing the user are sent to the server and then to all conferees by the server. If a non-presenting attendee desires to become the presenter, the attendee client software signals the server and a message or signal passed to the presenter client is conveyed to the presenter to indicate the other conferee's desire.

The server accepts system information from each client connection and notes the client's requirements (e.g., all images must be 256-color images) and capabilities (e.g., CPU speed, available hardware-assist for graphics, compression, DSP, Windows® DDB available). From the system information, the server assigns the client connection to an appropriate "output filter class" as explained below. During network communication with a client, the server may measure the network response and update the system information. As required, the server can move a client connection from class to class in response to changing network characteristics so as to keep the clients in a class closely matched.

A special class of output filter sends data to another server instead of a client. This server-to-server capability allows conferences to scale to very large numbers of users. More importantly, it allows for intelligent distribution of work over a network of servers. Unlike low-level data transport layers, such as packet routing using the Internet Protocol ("IP"), servers know the meaning of the data elements they are routing, so the routing can change based on the meaning of the data in the message. For example, if the server knows that data is a delta of a display update and the computing effort required to receive and process each delta is more than a particular client has, the server can decide to not route the data packet to the client or to route the data to the client via another computer (or another process on the server) which will perform some of the necessary processing for the client, in essence to "predigest" the data for a client that needs it. As an additional example, the server can read the time stamps in the data messages, and based on the demands and resources of the clients, the network characteristics, and other information concerning the system, can decide to route the data by alternative or redundant routes through other servers.

50

**- 100D -**

19

Particulars of the Server Data Filtering Process

FIG. **8**A is a block diagram showing the flow of data in the server processes **100** used to intelligently filter and route one of the input data streams among those that the system may be transporting. As mentioned above, these data streams can be real-time shared-image conference data streams, other data streams which have similar transport and timing requirements, or arbitrary data streams. The example used here is the transport of a real-time shared-image conference data stream.

Generally, a data stream arrives at the server from a presenter client and is routed to each of the attendee clients. The complexity of the diagram is due to the fact that the server must accommodate many clients of differing capabilities. The data stream inputs from the presenter client are shown on the left in the form of a queue; four types of input stream for the example of the shared-image conference are shown, but in the preferred embodiment only one will be active at a time. Possible data stream outputs to attendee clients for the given input stream are shown on the right in the form of an editable queue.

The presenter client can dynamically change the format in which it provides data, based on the presenter client computer's capabilities, backlog, local network congestion, and information provided by the server. The data can arrive as uncompressed base blocks (raw data) on the stream labeled "ubase" if the presenter client decides not to send the differences and decides not to compress the data. If the presenter client decides, based on performance, network bandwidth, etc., to compress the data, it sends the data steam as compressed base blocks ("cbase"). The presenter client can also send the data stream as uncompressed difference (delta) blocks ("udiff") or as compressed delta blocks ("cdiff").

As each data block is received, it is time stamped by a time stamper **102** with either the true time of arrival or a later time of handling (used for when the conference is not a live conference, but is being played back). Time stamper **102** may also simply validate a time of sending stamped by the presenter client.

The data block is then fed to a server queue for that type of data block. The server queues are labeled "qubase" (for uncompressed base data), "qcbase" (for compressed base data), "qudiff" (for uncompressed delta data) and "qcdiff" (for compressed delta data). Since the presenter client provides data in only one data type (although it could provide all four data types, if the presenter had a fast machine, the server was a slow machine and the network between them had excess capacity), and the data type sent can change from time to time, filter **100** uses a queue filler **104** to fill all four queues using just the one data type provided by the presenter client. Of course, if filter **100** notes that none of the attendee clients need a particular data type, that data type can be ignored and its queue eliminated.

As shown in FIG. **8**A, the data type which is received can just be routed directly to the queue for that data type. If the received data type is uncompressed, the corresponding compressed queue is filled by running the received data blocks through a compressor **106**b (base data) or **106**d (delta data). If the received data type is compressed, the corresponding uncompressed queue is filled by running the received data blocks through a decompressor **108**b or **108**d. If the received data type is base data, delta blocks are generated by a delta block generator **110**, which records a previous base block and differences it with a current base block; it may also reference delta blocks that it creates and stores. Delta block generator **110** is coupled to the ubase stream after uncompressor **108**b so that delta block generator **110** receives the base data whether it is sent as ubase data or cbase data. Likewise, delta

20

block generator **110** is coupled to the udiff stream before compressor **106**d so that both qudiff and qcdiff receive the benefit of delta block generator **110**.

For processing in the other direction, i.e., filling the base data queues having only delta data, queue filler **104** includes a compositor **112**. Compositor **112** gets its inputs from a base image frame store **114** and the udiff stream and the cdiff steam (after being uncompressed by uncompressor **108**d or a separate uncompressor **116**). Base image frame store **114** maintains the equivalent of the previous full base frame. As delta frames are received, they are differenced (or, more precisely, "undifferenced") with the contents of base frame image store **114** to generate uncompressed base data. Because the output of compositor **112** is coupled to the ubase stream prior to compressor **106**b, the base frames output by compositor **112** can be used to fill the qcbase queue as well as the qubase queue. If the presenter client can switch from base data streaming to delta data steaming without sending an initial snapshot frame as delta data, compositor **112** should be coupled to the ubase stream and the cbase stream (or the output of uncompressor **108**b). Of course, the delta queues might contain base data from time to time, such as when a "checkpoint" is done to prevent an error in delta data from being propagated indefinitely.

The data blocks in the (up to) four queues are stored in time stamp order, so they may be viewed as a single complex queue of a data type comprising multiple parallel block entries compressed or uncompressed, differenced or base. The output of this complex queue can be sent to attendee clients as is, but filter **100** includes several other output mechanisms to accommodate disparate attendee client types. Base frame image store **114** might also be a source of server output, such as when a client requests a full capture rectangle image. This might occur when an attendee client has lost its place, lost its network connection and reconnected, or is joining a conference for the first time.

Although the four output queues can be viewed as a single queue, ordered by the time stamps, there could be up to four different queue entries for each time-stamp value. A queue synchronizer **130** uses arbitration or prioritization techniques to settle any discrepancy between presenter client time stamps and server receipt time stamps.

The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection. Reassignment can occur dynamically as the connection or client loading change, or when requested by the client. A monitor process (not shown) on the server monitors the activity of the output filters to shift attendee clients from class to class if the clients are either too fast or too slow for the class they are in. This is done dynamically, and the characteristics of all clients in a class as well as those in other classes are considered in balancing all classes.

Typically, Class 1 is used for fast attendee clients on a fast network. A Class 1 client receives all the data blocks, from one or more of the server queues. Because a Class 1 client receives all the blocks, the server need not track which blocks were sent to which clients. Some Class 1 clients will be able to decompress compressed base blocks as fast as they get them, and will take the blocks from the qcbase queue. Other Class 1 clients will be able to handle every data block, but only if they are delta blocks.

51

US 7,877,489 B2

Class 2 is used for fast network connections to slow machines, such as 386s connected to corporate LANs. A Class 2 client might not be able to process each block, even uncompressed blocks, in which case filter **100** will discard blocks. A block discarder **132** is provided in filter **100** to track which blocks have been discarded for which Class 2 clients. Class 2 clients are provided with base data types (ubase and cbase) and not the delta data types so that block discarder **132** can discard some blocks without any loss of critical information. There is a loss in frame rate when blocks are discarded, but that loss is not as critical as the lots of delta data blocks. In addition, the memory and time required to track dropping base blocks for each Class 2 client is much less than for tracking the discarding of delta blocks. To avoid slowing Class 2 service for all Class 2 clients to the speed of the slowest Class 2 client, one output of block discarder **132** is provided for each Class 2 client. Thus, a faster Class 2 client will experience a higher frame rate as it will receive more data blocks than a slower Class 2 client.

Class 3 is typically used for clients that cannot even handle delta data blocks on a regular basis because of network limitations or client processing limitations. Even though a client might be fast enough to handle uncompressing data blocks, if its network connection is not fast enough to send even the compressed data blocks, the client will be classed as a Class 3 client because not even every delta block can be sent to the client. So that the client can present a conference in substantially real-time if needed, delta blocks are composited by filter **100** so that multiple base and delta blocks can be, in effect, replaced by a single data block. To accommodate the differing needs of each Class 3 client, a separate queue is setup by filter **100** for each Class 3 client. As should be apparent, filter **100** has to do more work for a Class 3 client than for a Class 1 client, so it is to the server's benefit to upgrade clients as their speeds increase or their network connections improve.

Filter **100** maintains a "qmulti" queue for each Class 3 client. Three qmulti queues for three Class 3 clients are shown in FIG. **5A**. A qmulti queue receives inputs from the qubase and qudiff queues. Where those two queues are not used, the qcbase and qcdiff queues are used instead, but are first uncompressed using uncompressors **134***b*, **134***d*. The delta data blocks and a base block stored in a base image frame store **136** are composited by a base compositor **138** to form one composited base image from a base image and one or more delta images. A delta compositor **140** is used to form one composited delta image from a plurality of delta images. The output of base compositor **138** and delta compositor **140** are then fed through respective compressors **142***b*, **142***d*, resulting in four output data streams (ubase, cbase, udiff, cdiff) fed to a discarder **144** which discards data blocks which the attendee client for that qmulti queue cannot handle. If the particular attendee client does not need all four outputs (typically, any one client will use only one output), the processing for those unused queues within the qmulti queue can be skipped, since the queue only needs to service that client. As with base frame image store **114**, base frame image store **136** can supply Class 3 clients with full frames upon request or as needed.

Discarder **144** drops blocks based on parameters about the network and client known to the server and to filter **100** as well as parameters and requests (e.g., "slow down," "speed up," or frame rate specifications) received from the client. The dropping of blocks is preferably done on a block-by-block basis, but it can also involve discarding all the blocks in the presenter client's capture rectangle; the related issue of consistency is discussed below. If it turns out that more than one Class 3 client has the same requirements, all but one of the

qmulti queues might be virtual queues. In effect, the processing for all the qmulti queues for those similar clients is done once, with each getting a copy of the results of that processing. For example, one multi-client qmulti queue might be handling a plurality of 386-class client machines running over a corporate ISDN line. Other qmulti queues might then supply other similar machines which are connected to the server by modem (e.g., 14.4 or 28.8 kilobyte data rates), LANs, T1 lines, etc. If any of these lumped Class 3 clients deviates from the common requirement, then its virtual qmulti queue would then become a real qmulti queue and would perform processing separate from the other queues. Among all Class 3 output queues, the various separate compositors **138**, **140** may have different workloads from the fact that the number of delta blocks composited together and the number of blocks discarded will vary according to the capacity of the attendee clients serviced by the qmulti queue.

The use of more than one output class avoids a slow connection's retarding a fast connection. Filter **100** includes a buffer reclaimer **150** which examines the queues to determine if portions of the queue buffers have already been read by Class1, Class 2, and fast Class 3 clients, and are not going to be used by slow Class 3 clients (they will be discarded). If that is the case, then buffer reclaimer **150** marks those locations in the queue buffers as reusable, to save on memory space.

The different output classes and the monitor processes on each data stream allow the server to handle data streams at different speeds for clients of different capabilities and network connections of different bandwidths. The streaming of update information formed into blocks improves the perception of low latency, but it may be desirable for some applications to reduce the mixture of blocks from different capture events that show on the attendee's screen at one time. The system can be set to provide this consistency by delaying the updating until a whole rectangle can be shown. One form of this adaptation can occur at the server, as shown by the example of FIG. **7B**. There, a capture rectangle is broken into four blocks (**1**,**2**,**3**,**4**). The server maintains a consistency flag which can be either "off" or "on." If the consistency flag is off and the server receives data representing blocks **1A**, **2A**, **3A** and **4A** (taken at time A) from the presenter client and is able to send out blocks **1A** and **2A**, and in the meantime receives blocks **1B**, **2B**, **3B** and **4B**, the server will send out **3B** as the next block, reasoning that **3B** is more updated than **3A** so it is a better block to send out. However, if the consistency flag is on, the server sends the old blocks **3A** and **4A** anyway, so that the client can maintain a time-consistent display. Following **3A** and **4A**, the server sends blocks **1B**-**4B** and so on. Clearly, consistency requires additional memory and produces added latency. This trade-off is decided upon between the server and the receiving clients, based on a variety of factors described above. If the network, the server and the client can easily handle consistency, then the consistency flag might be turned on, but where display updating happens quickly and there are other constraints on the system, the consistency flag might be turned off.

As described above, the server provides control of information flow to keep fast attendee clients supplied with updates as often as possible, and to avoid sending slow clients updates they cannot use or that will overburden their network connections. The server also provides flow control for presenter clients, as needed, by determining the fastest rate of updating required by attendee clients, and then signaling the presenter client to grab blocks no faster than the fastest consumer can demand them, so that the presenter will not have to waste resources collecting and processing data that no client can use or no network can afford to carry.

52

23

Storage Services

FIG. **8**B illustrates a more complex conference server which handles the more general case. The server in the general case might maintain additional output and additional input queue components for transmitting information to other servers and for storage services, including caching, short-term storing, recording, and archiving, and for later playback. These purposes are distinguished as follows: caching provides fast memory hardware support in improving the performance of the server; short-term storage provides backup and refresh capability for extremely slow or temporarily disconnected clients, for newly connected servers that may need information older than that normally held in the output queue, for quick-turnaround failure recovery, and for other short-term needs; conference sessions are recorded when they are primarily intended for later viewing by users of the system who may or may not be participating in the session; an archival session captures all or part of a meeting as it occurs and is intended for users who typically were conferees in that session and have a reason to review the session later. Uses of recorded sessions, especially when they incorporate synchronized voice, include live online training sessions that also serve for future offline training, technical and marketing demonstrations, and formal presentations that can be broadcast or accessed remotely at will. Archived sessions have uses other than review, including briefing absentees, capturing interactions involving or aiding technical support, evaluating sales personnel, and the like. Of course, these needs and characterizations are not exclusive or exhaustive.

Possible features and methods for storage handling will now be listed. The emphasis will be on recording and archiving, but shorter term storage modes will share many of these characteristics.

During any session, there can be multiple "storage server" queues, or "storage streams," saving output to one or more media. These can be controlled by the server itself, by recorder-like interfaces (similar to a video cassette recorder, or "VCR") at the clients, or by other interfaces operated by conferees. Each stream can be independently controlled, or one controller can control multiple storage streams. The storage facility can operate concurrently in an ongoing meeting to record a live conference, or it can be used by itself to capture a recording for later replay.

It is possible to control who can record a meeting, how much data they can record (by time or by disk capacity, for example); the type of information they can record (by stream, by user sets, or the like), the storage medium (disk, tape, etc.), and when recording starts. Recording might be set to automatically start when a certain user connects, when the first connection is made, when a certain number of conferees are connected, when the first person presents, when a particular person presents, at a particular (real) time, after a particular duration from the beginning of the meeting, or because of some other triggering event. It is also possible to control the end of recording, based on similar triggering events or triggers related to capacity, elapsed time, etc. The controlling can be done by a conferee at a particular client, by a moderator, or the like.

Possible storage targets include local disk files, local database servers or back-ends, remote database servers or back-ends, remote storage engines relying on the data structures, controls, and methods of the system of the present invention (example system architectures are described below), and local or remote permanent storage media (optical, magnetic, magneto-optical, etc.). Permanent storage can also be used by the system to assist recovery from disaster. The storage

24

stream could also be directed to an email message or to another computer application within the system of the present invention or beyond it.

It is possible to control the quality of storage input and playback output. Each storage stream can have an associated quality parameter associated with it so that it behaves as though connected at a particular network speed. Thus a stream might be stored or a playback stream might be produced that was suitable only for replay at a given speed. Or several playback streams could be simultaneously produced from the same stored information for several different particular playback rates. If most or all of the original session data is stored, then replay might perform the same adaptive filtering described in FIG. **8**A for real-time "live" meetings, so that the single storage source could be played back at multiple, adaptive rates.

Since there would be added value in being able to access recorded information, it is appropriate to describe how billing controls might be incorporated. Billing could be performed when the original recording is made, or when a recording is played back. Billing might be based on units of time used or on units of storage consumed, at the time of recording or at the time of replay. Billing for recording and playing may be independent. Any tracking that needs to be made to implement the billing functions can be incorporated into the storage and playback services of the communications system.

It is possible to tailor the data stored. Since a conference typically involves multiple data streams, one or more may be chosen for storing. Some streams might go to one storage device or modality as described above, others might go to different ones. Synchronization between streams (e.g., voice and imagery) can be maintained, even when the streams are stored in different places and ways.

Stored information can be replayed through another communications session established by the system according to the present invention, or it can be sent through other communications channels, for example, email, file transfer protocol ("FTP"), or physical media transfer by postal or courier services, etc., and replayed by the recipient using the client software according to the present invention. Stored material might be replayed from a copy local to the user's computer, or it might be retrieved after WWW navigation to a replay-enabled Web site. Retrieval might involve streaming the data in the ways described above, or transferring the data by email, FTP, WWW download, or the like. With Web based retrieval, support could be provided for browsing by content, searching by user-defined keys, controlling access by user-provided keys, access lists, privilege levels, or user-provided payment options (e.g., credit card number on file).

Control modes on replay might include: control by server without user interaction for a single data stream (like a pay-per-view movie in which each attendee who joins gets to see the playback forward from the from the point of joining); control by the server, without interaction but with multiple streams (e.g., all attendees get to see the movie from the beginning regardless of when they join the show); by an external moderator; by VCR-style controls at one or more client computers. Each set of controls can affect either all the sets of streams or a particular grouping of streams. Replay can occur at the original real-time recording rate, at faster-than-realtime (like fast forward play on VCRs), in VCR-style single stepping modes, and in the various reverse modes as well. Random access and jump playback by index marking, by time codes, by presenter, or by other organization could be supported.

In addition to the stored meeting contents, any other document or data object might be uploaded and stored with the

53

US 7,877,489 B2

25

meeting (e.g., meeting agenda, minutes of a previous meeting, or supporting materials). Upload is another type of data stream that passes into the system server and is then relayed to a suitable storage entity residing on the same or a different host. Attachments can be retrieved either with specialized functions of the client software, by navigating Web pages and using a Web browser, or by other retrieval mechanism. Attachments are subject to all of the same controls as the recorded meeting contents with regard to access, billing, playback, etc.

The above-described elements of the more generalized conference server concepts are illustrated in FIG. 5B. In addition to the instances of the simple output filter processes 100, the more complex server functions shown in FIG. 8B includes inputs for different sources, such as other servers (where the complex server shown might be an intermediate server for a large broadcast), storage sites for replay and import channels, and outputs to other intermediate servers, storage sites, and export channels.

Multiple Servers

Up to this point, the conference server has generally been referred to as a single computer running conferencing software. The server functions described so far may be performed on several different computers running conference server software connected over a computer network. FIG. 9A shows a configuration with four conference servers 14(a)-(d), one presenter client 12, and eleven attendee clients 18 (some of which are separately identified with letters). Three conferee clients are connected to each server. The four servers are completely connected, that is, a connection is shown between each pair of servers. With many servers, this degree of interconnection would be unrealistically complex, expensive, unneeded, and performance degrading. One of many useful techniques, a "tree topology," for interconnecting numerous servers is described below.

There are three classes of advantages from having several servers active in a shared conference.

Static advantages result from a configuration and division of tasks that may persist throughout the conferencing session. The following are among these advantages.

(WAN economy and local performance) A conferee may find economy in being able to connect to a nearby server—where nearby may mean geographic closeness, or in the same network service area, or on the same local area network, or the like. Thus in FIG. 9A, attendee client 18(a) may find it cheaper to connect to server 14(a) than to server 14(c), while in turn client 18(c) may find it cheaper to connect to server 14(c) than to server 14(a). At the same time, there may be better performance of the system with these local connections compared with a longer path with many hops to a more distant server.

(Client migration and homogeneous concentration) The advantage of having all of a server's attendee clients be the same and additionally of having them be the same as the presenter client has been discussed. There can be an advantage then of assigning similar clients to a single server when several servers are available and performance is not otherwise degraded. For example, in FIG. 9B, attendee clients 18(c) and 18(d) are identically configured computers running the same operating systems with the same display configurations as the presenter client 12, so both have been moved from their original servers (indicated by dotted arrows) and reassigned to server 14(a), as designated by the dashed arrows. The same advantage may also be found when clients of a server are in the same output class (as discussed above under the single server); thus, reassignment of clients in a given class so that

26

one or more servers have all or most of their clients in that class can improve performance by making those servers' processing loads more uniform. Finally, as described under the discussion of WAN economy and FIG. 9A, homogeneity may also involve nearness, and for this reason client reassignment may achieve that goal as well. In addition to reassigning clients to servers already participating in the conferencing session as above, it is also possible for the system to recruit additional servers where these resources are provided but not yet assigned to the particular meeting. Thus, server 14(b) may be automatically connected to the server-server structure for the meeting pictured in FIG. 9B in order to provide connections for the three clients 18(b).

(Tree branching for load reduction and scalability) In FIG. 10A, a tree topological configuration can provide economy in traffic handling and improved performance. Information from presenter client 12 is communicated to server 14(a) and then to the other servers and on to attendee clients 18, following the solid arrows. In this configuration, each server is shown handling four data connections of a single stream type; a single server would have to handle twenty-eight data connections to connect the presenter client to all the attendee clients. If attendee client 18(a) issues a command or request to server 14(a), represented by the dotted arrow, the message will be responded to by server 14(c) or passed to server 14(b), and handled there or in turn passed to server 14(a), with these two paths also shown with dotted arrows. This means although some commands or requests may need to be seen by three servers, each server will see and process only a fraction of the total such messages. Just as the tree configuration allows a given number of conferees to hold a meeting more efficiently than with a single conference server, it also means that relatively few extra servers need to be added to expand the meeting and maintain the tree configuration. For example, if R+1 is the number of data connections per server, and ceiling(x) is the smallest integer greater than or equal to a real number x, then the number of servers S is required to hold a conference with C conferees, assuming one presenter and using the tree configuration, is $(R^{\cdot}\text{ceiling}(\log_R{(C-1)})-1)/(R-1)$. In particular, using R=3, which is the value in FIG. 10A, forty servers will suffice for eighty-two clients. More realistically, if R=100, then 10,101 servers will provide the advantages of the tree configuration to a presenter and one million attendees. This takes only 101 extra servers over what would be required if the presenter client were directly connected to 10,000 servers, each of which served 100 clients. But the latter configuration, exemplified by FIG. 10B with R=3 and C=28, is not realistic, since presenter client 12 would be deluged with independent commands or requests to update, or resend, or similar messages; in other words, the presenter client would have traffic in excess of the capacity of any server 14. Based on distributing the server functions over many machines, and employing this tree topology for propagating information among servers, server-to-server communications and management provided by the present invention allow the number of participants in a meeting to increase exponentially with only linear degradation of the performance. Similar analysis applies if server capacities are not uniform, that is, if different servers can handle different numbers of data connections.

Adaptive advantages result from reconfiguration and redistribution of tasks in response to relatively long-term changes in the system during the conference session.

(Backup server) If a server fails or becomes isolated from the network, then its clients may be connected over previously inactive backup links to other servers. Attempts can be made to reestablish communication with a server that has

54

US 7,877,489 B2

27                                                    28

dropped out If unsuccessful, its workload may be distributed to other servers. In FIG. 9C, attendee client $18(c)$ has conference server $14(c)$ as its principal server, but the dashed arrow indicates the assignment of server $14(a)$ as a backup server. Should the connection between client $18(c)$ and server $14(c)$ fail, as indicated by the "X" on the arrow between them, or should server $14(c)$ fail or become isolated from the net, then server $14(a)$ can respond to commands from and provide updates to client $18(c)$. Presenter clients and servers themselves can be assigned backup servers as well. Thus the dashed arrow between servers $14(a)$ and $14(d)$ indicates that each has been assigned as a backup for the other. Should the link between servers $14(a)$ and $14(b)$ fail, as indicated by the "X" on the arrow between them, or server $14(b)$ fail or become isolated from the net, then server $14(d)$ can take over traffic previously routed to server $14(a)$. It is also possible to have servers ready, but not active, as backups, or to have mirroring servers for even more secure redundancy. Since the state of the conference can be announced to all servers, the system may be configured so that a disrupted conference session can be robustly resumed with minimal loss of data and time.

(Transformation factoring) The transformations or transcodings that a block may undergo in transit from the presenter client to an attendee client may include differencing, error-correction encoding or decoding ("source coding"), compression or decompression (both for "channel coding", or just one for purposes of bandwidth matching; lossy or lossless), encryption or decryption ("privacy, security, or authentication coding"), compositing with other differences or with base blocks, conversion from DDB to DIB and back, storing, replaying, copying, or the like. Editing, mixing data from different sources or presenters, mixing data of different kinds, duplicating, changing the order, the format, the storage or playback quality, etc., are other examples of transformations, which are neither exclusive nor exhaustive. Some or all of these may be performed and the order of performing them may change. As previously discussed, some may be performed by a conferee client, some by a conference server. When several servers are available or when several clients have different capabilities and resources, these functions may be delegated or migrated to different machines. For example, in FIG. 9D presenter client 12 is differencing, conference server $14(a)$ is compressing, server $14(b)$ is distributing the decompression task to attendee client $18(b)$ (which has decompression hardware), server $14(d)$ is compositing the resulting delta block with a previous delta block, and attendee client $18(d)$ is compositing the result with an old base block. This advantage is viewed as adaptive, since the loading configuration that makes a particular distribution favorable may change slowly during the conference session, but it could be a static advantage when some machines have much greater capabilities than others (such as compression or decompression hardware).

(Distributed and redundant flow control) The architecture and logic of the filter process as described above and illustrated in FIGS. 8A,B may be distributed among several servers and even clients. Thus, like the functional transformations, portions of the queues themselves, as well as the internal operations of the filtering process, may be found on different platforms at different localities in the network, and at different times. Not only may the information and functionality be so distributed to improve memory economy or gain memory or processing speed, but the system can be made more robust by redundant storage, and more responsive by parallelizing the pipeline. The queues may also be segmented sequentially over several platforms. These different aspects

are shown in FIG. 9E. Here, qcdiff is stored redundantly on servers $14(a)$ and $14(b)$; on server $14(a)$, qcdiff uses the special compression facilities provided by an attached hardware device 15. One card of qmulti is stored on client $18(c)$ (perhaps a machine with very fast reliable surplus memory) while the rest are on server $14(c)$. While qcbase is housed on server $14(b)$ using a compression codec (possibly hardware based) on client $18(b)$, it operates in parallel with qubase on server $14(d)$, which uses a discarder on client $18(d)$ (there is additional undiagrammed parallelism implicit in having portions of the output queue on all four servers). Finally, qudiff is segmented sequentially with the first part (qudiff.beg) on server $14(a)$ and the last part (qdiff.end) on server $14(d)$. Note that in the last case, the two segments of qudiff are not even adjacent in the network linkage shown. Another type of distribution of the queues is given in FIG. 9F. Assuming the presenter client breaks the capture rectangle into four blocks B1, B2, B3, B4, it illustrates, using just qubase, how the stream data can be decomposed and distributed over all four conference servers $14(a\text{-}d)$, so that the subqueue qubase.B1 of uncompressed blocks B1 are on server $14(a)$, the subqueue qubase.B2 of uncompressed blocks B2 are on server $14(b)$, etc.; this represents another form of parallelism. These are simple examples; there are more complex analogues when there are more servers, and all of them may occur in various combinations. The various techniques of RAID (Redundant Array of Inexpensive Disks) striping with recovery from errors are also applicable. All of the distribution schemes mentioned here may also vary over time.

These are specifically adaptive advantages, but the static advantages also have parallels here, since a backup server may also be close, since a change in presenter may warrant a new tree configuration, and since an output class change may warrant a new homogeneous concentration reassignment.

Dynamic advantages result from reconfiguration and redistribution of tasks in response to relatively short term changes in the system during the conferencing session. The following are among the dynamic advantages.

(Content-based routing) Unlike IP routing for example, the system has access to the contents of the information being routed. Thus it can read the time stamps, type of data, and other information included in the base or delta block data or to other system data. It can use this together with measured properties of the network interconnections of the servers and clients to determine best-estimate optimal routing between and through its components. In FIG. 9G, one route from presenter client 12 to attendee client $18(d)$ (through server $14(b)$) is shown in double arrows, another (through server $14(d)$) in heavy arrows, to illustrate that one route may be preferable under some conditions, but as conditions change, the system may select a different route.

(Redundant routing) The system can send image or other data by several routes at once. This can improve performance, since the earliest to arrive at the destination may trigger the discard of later-arriving data. This can improve the resiliency and robustness of the system, since it is more likely some data will get to the destination. It can also improve reliability or accuracy, since several versions may be compared at the destination to see if they are identical. In case of discrepant data at the destination, retransmission or some arbitration method can be requested, depending on the purpose of the redundant attempts to insure delivery. For example, again in FIG. 9G, information from presenter client 12 may be sent by conference server $14(a)$ using both routes, indicated by the double arrows and the heavy arrows, to server $14(d)$ and then to attendee client $18(d)$.

55

US 7,877,489 B2

29

These are specifically dynamic advantages, but the static and adaptive advantages also have parallels here as well. This can be summarized in an additional dynamic advantage.

(Dynamic reconfiguration) Any of the configurations described above and the parameters determining them and the routing schemes can be altered depending on changes in client, server, and network capabilities, needs, resources, and loads as announced or demanded by clients, or as measured by the system, or as specified by conferees or system administrators, or other prevailing or desired conditions.

Any combination of advantages from these three groups may apply. There will in general be tradeoffs among these advantages. The system can be given specific configuration preferences, or it can automatically adjust during use according to preset optimization goals, or it can adaptively set optimization goals and adjust the configuration to approach them.

Example of Server Architecture

So far, a server or each of a set of servers operating together has been viewed as a computer performing the server functions described. An example of server architecture and use will now be given, without suggesting the necessity for, or the exclusiveness of, this architecture to accomplish the communications serving functions on single or multiple and interconnected servers described above. Also, the previous examples have dealt with a single conferencing meeting or other communications session; the method to be described below can also accommodate several meetings on the same underlying hardware and the conferencing software as provided by the present invention. Again, the description of this method is not intended to suggest that this is the only way in which the invention can accomplish multiple simultaneous communications sessions. Any references to the image-sharing example should be extended to arbitrary data steams.

FIG. 11 shows an architecture of a single server and a single meeting. The primary component of this architecture is a server manager 36 (identified in this diagram as "ServMgr 'InfoPass' "), which is directed by a meeting manager 32 (identified in this diagram as "MeetMgr 'TheCompany' "). Meeting manager 32 is an unowned, quiescent, resident, interrupt-driven process (similar to a "daemon" process used with Unix and other operating systems). It may or may not be running on the same CPU as WWW server 30(a); it may or may not be running on the same CPU 38 (called here "Beowulf") as server manager 36 "InfoPass." The server manager is also an unowned, quiescent, resident, interrupt-driven process. Each CPU that is involved in the system for providing server functions in meetings set up by a meeting manager has exactly one server manager running on it; that server manager can be viewed as the meeting manager's agent on that CPU. The meeting is directly supervised by communications session server("CSS") 40(a), called here "Meeting #1 'Product Support.'" When server manager 36 receives a command from meeting manager 32 that includes the information on a meeting and on the first conferee that wishes to connect, the server manager creates a CSS to handle the meeting. The CSS is an owned, evanescent, quiescent, interrupt-driven process. The CSS is owned by the server manager and is killed a period of time after all the conferee clients connected to its meeting disconnect or fail to respond.

In FIG. 11 there are three conferee clients 17(a)-(c) connected to the meeting. Clients 17(a),(b) use a client-server protocol provided by the system, which might be a combination of Transmission Control Protocol ("TCP") and User Datagram Protocol ("UDP"), for example. Client 17(c) uses another protocol, here exemplified as Hypertext Transfer Protocol ("HTTP"). The CSS 40(a) provides an included "gate-

30

way" layer 40(b) for each connection protocol other than the system protocol, and this layer translates the client's nonsystem protocol to the system protocol. The acceptance of different protocols may aid the system's operation across firewalls or adaptation to clients' restricted network connections, for example.

A potential conferee 17(a) has navigated his or her WWW browser to Web server 30(a), and has asked through the Web page presented to connect to the meeting (as described above in the discussion of FIG. 2). There may be alternative ways, indicated here as 30(b),(c), to connect to the meeting, including direct access to the meeting manager or its database 34 (called here "Meeting DB"). The meeting manager uses this database to hold information concerning the meeting (the database need not be on the same computer as the meeting manager). This information was created when the person who set up the meeting requested that the meeting be scheduled, gave descriptive information for the meeting, specified the keys and privileges, and provided other administrative information. The database is reconfigurable and easily extensible to include many and varied meeting attributes. It may be accessed by a programming interface. Potential new conferee client 17(a) sends a request to join the meeting, and then supplies the key for the meeting that the potential conferee has obtained previously. Potential client 17(a) may also send previously selected identification information such as icon, gong, etc., and this may be stored in Meeting DB or in some other sort of directory service. After the meeting manager has validated potential client 17(a), it sends a message that causes the client software to run on the potential client and then sends that client software the address information for the CSS, such as a URL and port number. At that time, the client software may also receive address information for backup CSSs in case the connection to the meeting fails and automatic or manual attempts to reconnect to the initial CSS fail as well. The client then connects to the meeting, and may pass to the CSS its identification information.

A CSS is created to supervise a single meeting. The monitoring-filtering-queueing structures and procedures of FIGS. 8A,B are performed by the CSS, so FIGS. 8A,B could be viewed as part of the internal working of each CSS in FIGS. 11-22 (in the case of distributed server functions described in FIGS. 9D-F, only part of FIGS. 8A,B might be descriptive of a particular CSS). Indeed, there will be a version of FIG. 8A applying to each data stream the CSS handles as multipoint real-time traffic from a presenter client. The structure of FIG. 8B shows schematically how these and other multiple input and output data streams are processed. The CSS also handles other input from and output to clients, such as information about attendee and presenter clients that helps with flow control, commands or requests from clients, labeled pointer icon positions, and other stream data and control traffic.

In FIG. 11, a dot-and-dash line 14 has been drawn around the structure that corresponds to the term "server" in the earlier parts of the description of the present invention; this may be a helpful analogy, but the description of the example here is only one possible explication of server functions.

FIG. 12 shows a slightly more complex situation than FIG. 11. Here, the server manager has created three CSSs to supervise three meetings. Conferee client 17(a) (labeled here "Jim") is simultaneously connected to two meetings. If Jim is permitted, he can share the information he receives from one meeting with the participants in the other.

Server managers are responsible for measuring network connection bandwidth, reliability, CPU load, and other parameters, and determining the configuration of any and all

56

31

CSSs they may own at any given time based on these measurements and other considerations.

FIG. 13 shows a more complex arrangement than FIG. 12. Now, there are two CPUs, 38(a) and 38(b); each has its own server manager, but both are directed by the same meeting manager. Server manager #1 36(a) has created two CSSs to handle two meetings, and server manager #2 36(b) has created a single CSS. Conferee client 17(a) is now connected to two meetings on two different CPUs, possibly distant from each other.

FIG. 14 exemplifies the situation when there are several meeting managers by showing two meeting managers 32(a), (b) active. Each has its own meeting database 34(a),(b). Each directs the server manager 36(a),(b) on a single CPU 38(a,b). Server manager 36(a) has created two CSSs 40(a),(b) to handle two meetings. The other server manager 36(b) has created a single CSS 40(c). The only connection pictured between these two instances of the system is the presence of client 17(a) "Jim" in two meetings, one in each instance of the system.

If a need arises to let a second meeting manager set up meetings on a CPU that already has a server manager managed by a meeting manager, then the currently running server manager forks or clones itself and the new server manager becomes the agent for the newly involved meeting manager. Thus, there is a one-to-one correspondence between server managers running on a given CPU and meeting managers that set up meetings on that CPU. As an illustration, in Panel 1 of FIG. 15, meeting manager 32(b) sends a message to server manager 36(a) on CPU 38 that causes server manager 36(b) to be created. Then afterward, in Panel 2, meeting manager 32(b) and server manager 36(b) start the meeting through the new CSS 40(b). Conferee "Jim" 17(a) has joined both meetings, but there need be no other relationship between the two meetings shown. In the situations below, there will be no difference if server managers for different meeting managers are on the same CPU or on different CPUs.

FIG. 16 shows a single server manager 36 that has created three CSSs 40(a)-(c) on one CPU 38, but now these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on the same CPU if process limitations were exceeded by a great number of client connections and their requirements, or the like. In order to coordinate their work, the three CSSs communicate using a system-provided server-server protocol. This protocol may use the same sort of blend of networking protocols as described for the client-server connection, or it may be quite different. For diagrammatic purposes, FIGS. 16-20 show interprocess communication links only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between CSSs 40(a) and 40(c) in FIG. 16. This interprocess communication allows one CSS to send presenter client output to another, for example; this was described above in the discussion of FIG. 8A. More detail on this is given below in the discussion of FIGS. 21 and 22. Conferee client 17(a) "Jim" is known to two CSSs 40(b),(c), but is actively connected only to CSS #3 40(c). The connection to CSS #2 40(b) is a backup assignment (as described above in the discussion of FIG. 9C). Should CSS #3 fail, then "Jim" can automatically be connected to the meeting through CSS #2.

FIG. 17 shows a single meeting manager that directs two server managers 36(a,b) that have created three CSSs 40(a, b,c) on two CPUs 38(a,b), and these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on additional CPUs if the CPUs were distant from each other, but closer to their respec-

32

tive sets of connected clients, or if process limitations were exceeded by a great number of client connections and their requirements, or the like. The advantages described in the discussion of FIGS. 9A-G, 10A, B provide numerous reasons for multiple servers (which in this context means multiple CSSs) that handle the same meeting and that may be distributed over a number of CPUs. As in FIG. 16, the three CSSs communicate using a system-provided server-server protocol. In addition, the two server managers communicate using this or a similar protocol in order to coordinate the full span of this meeting. They exchange the performance measurements they make in order to adaptively configure the CSSs. For example, conferee client 17(a) "Jim" begins the meeting connected to CSS #2. At some point, the server managers determine that it is likely that better service will be obtained by "migrating" this connection from CSS #2 40(b) to CSS #3 40(c) and so from CPU 38(a) to CPU 38(b) (as described above in the discussion of FIG. 9B). This reconnection may be performed automatically. Moreover, the creation of CSS #3 to handle this meeting and the interprocess communication channels between CSSs and between server managers may be established automatically to improve performance and balance loads (as further described above in the discussion of FIG. 9B). The creation of additional CSSs, on the same machine or on different machines, to handle the same meeting is the basis of the scalability of the present invention.

It is possible for several meeting managers to each direct a server manager that has created one or more CSSs, and these CSSs all handle the same meeting. This is pictured in FIG. 18 with two meeting managers 32(a),(b) and their respective databases 34(a),(b). This could be the situation if two different companies own the meeting managers and might wish to hold a joint meeting (here called "Meeting #4 'Joint Sales'"). The user or administrator that sets up such a multiply managed meeting may manually declare the organization of the management (e.g., the meeting managers involved, the CPUs, the number of CSSs, and other structural, organizational, managerial parameters), or the setup may be done automatically by the system, or it may be done interactively with automated support. Here meeting managers 32(a),(b) also communicate using the system-provided server-server protocol. They exchange the meeting information, so that their two databases 34(a),(b) are consistent. They also exchange messages that indicate that this is to be a joint meeting, and they inform their server managers of this. Potential conferees join through either meeting manager. The appearance of the meeting may be the same for all conferees, independent of the number of CSSs, server managers, CPUs, or meeting managers involved. Again, conferee client 17(a) "Jim" may be either backed up or migrated to another CSS (from 40(c) to 40(b)), even when the new CSS is on a CPU in the domain of a different meeting manager (from CPU 38(b) in the domain of meeting manager 32(b) to CPU 38(a) in the domain of meeting manager 32(a)).

FIG. 19 extends the situation of FIG. 18. The two meeting managers are shown directing their server managers in a joint meeting. This time, server manager 36(c) has created two CSSs 40(c),(d) for the meeting on the same CPU 38(c), and meeting manager 32(a) has directed two server managers 36(a),(b) to create CSSs 40(a),(b) for the meeting on two different CPUs 38(a),(b). Thus this is a combination of the situations pictured in FIGS. 16-18. Again, for diagrammatic purposes, FIGS. 19 and 20 show interprocess communication links among server managers only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between server managers 36(a) and 36(c) in FIG. 19. As before, conferee client 17(c) "Jim"

US 7,877,489 B2

33                                                        34

may be either backed up or migrated to another CSS **40**(*b*), even when the new CSS is in the domain of a different meeting manager.

If a CSS fails, the server manager process may create a new CSS, the clients may be migrated to other CSSs already active on the same CPU, or clients may be migrated to other CSSs newly created or already handling the meeting at other locations in the system, as indicated above. If a CPU fails or becomes isolated from the network or system, the meeting manager process can attempt to reestablish network connection with the CPU and send the server manager information to create a CSS to handle the meeting, or the meeting manager can communicate with one or more server managers on still accessible CPUs to create one or more CSSs to handle the meeting. In addition, clients that have backup connections beyond the failed CPU can be migrated to CSSs handling the meeting. If there are several meeting managers participating in the management of a meeting, and a meeting manager becomes disabled or isolated from the network, then another meeting manger may attempt to establish sufficiently many CSSs through server managers it can reach to carry the workload. These adaptations may occur automatically, or be initiated by a system administrator.

The diagrams in FIGS. **11-19** suggest the range of variability in coordinating meetings and server functions. Many other combinations can be formed from the situations pictured there or may be suggested by them. For example, if a global directory service for meetings is provided, then there could even be a layer of management above the meeting managers, which might be termed a Global Manager.

FIG. **20** illustrates a method for determining which CSSs pass output information to other CSSs that are handling the same meeting. The configuration of meeting managers, server managers and CSSs is the same as in FIG. **19**, except that one client **12** is presenting, the others **18** are attending, and no backup link is shown. From time to time, the server managers determine and agree on appropriate propagation topologies that resemble a tree or trees (trees and their advantages were described above in the discussion of FIGS. **10** A, B) and post a copy **42** of the current choice at each of their CSSs. These are directed acyclic graphs ("DAGs"), which contain no loops, so that the CSS can send out the information with no risk of endlessly cycling it. Each stream being handled has its own propagation DAG, and they may change independently among streams; as described below, each stream may have several propagation DAGs. In FIG. **20**, presenter client **12** is viewed as the root of the tree, and CSS #**1** delivers presenter output information to CSS #**2** and to CSS #**3**; in turn, CSS #**3** delivers that information to CSS #**4**; all CSSs also deliver the information to their connected attendee clients **18**.

FIG. **21** represents the situation of FIG. **20** with the topological information of the directed graph **42** emphasized by rearranging the CSSs to resemble the tree specified in the propagation DAG **42** of FIG. **20**.

FIG. **22** represents the situation of FIG. **20** with the same topological information **42**(*a*) emphasized in FIG. **21** and with the addition of another possible propagation topology **42**(*b*) for the same stream. Secondary and multiple propagation DAGs for the same data stream allow the system to reroute the information being sent or to send it redundantly (both as described above in the discussion of FIG. **9**G).

The foregoing suggests that minimal server platform needs for this example would be a network connection and an operating system providing an interrupt service and multitasking, with or without hardware support.

**System Extensions and Extendability**

Up to this point, there have been multiple servers dealing with multiple clients, where "client" has referred to an enduser's computer or an instance of the conferencing software running on it. But it may happen that the reconfigurations, transformations, and routings performed by a server or servers described above extend to assigning tasks to intermediate devices such as routers, bridges, gateways, modems, hardware codecs, and the like. There may be also be cases where a client lacks display capabilities, but provides other functions to the system or acts as a monitor or recorder of activity. There may be configurations where all server functions are performed on client computers, so there is no specified server node in the networked system. In the preferred embodiment, performance may require that there be one CSS per CPU.

Both the server and client software architectures are adaptable. Not only may features be added on that increase the variety of communication possible, such as text chat, audio, and shared drawing areas, but proprietary codecs, transformations, stream operators, and the like may be incorporated as plug-in modules. Addition of streams of abstract data types can be accommodated by the system and in turn allow the system to be expanded and reconfigured.

When operating with data streams that admit asynchronous unnotified updating (where intermediate updates can be dropped if they are obsoleted by later arriving data updates), which are those that are appropriate for multispeeding, the system is robust under occasional loss of information and can thus take advantage of high-speed networking protocols like User Datagram Protocol ("UDP") that do not provide reliable transmission but provide greater network throughput performance than reliable protocols. The system can also be configured to provide secure transport for a data stream, and so could be used to carry the display command streams on which are based other image-sharing systems, but then there would be advantage from multispeeding, although the scalability and other advantages of the present invention would be available.

Codecs, transformations, and transcodings described above for the image-sharing example may have analogues that play similar roles with similar advantages in the system's handling of other data streams. It is also recognized that there are other cases of transcoding from one type of data to another, such as text to page image via rasterization, page image to text via optical character recognition, text to speech via speech synthesis, and speech to text via speech recognition. Such tasks may involve transformations in different orders than described above, including decompression at the presenter client and compression at the attendee client. These possibilities are accommodated by the present invention.

The system contains no obstructions to operating across firewalls with permissions. The system is compatible with agents, network proxies, and other stand-in entities, with a variety of network context and content filters, with multiple network protocols for client connections, with bandwidth matching transcoders, with hybrid wireless and landbased networks, with assymetric networks, with clustered CPU networks, with streaming multimedia and signal processing systems, with serial, parallel, and vector processors, and with many other specialized technologies; properly configured and supplied with appropriate permissions, the system either operates transparently with them or enjoys increased performance by employing and extending their advantages. Faster processor speed and greater bandwidth do not obviate the utility of the present invention; instead, they improve its performance.

58

US 7,877,489 B2

35

As mentioned before, the described communications system not only applies to the transport of streams of image data, and to other examples mentioned, but also generally applies to the transport, storing, replaying, scheduling, multispeeding, and other handling and processing of other data streams as well.

One way of seeing the flexibility of the system is to refer to FIG. **23**, where several applications covering different separations in time and space for the communicants are listed.

The above description is illustrative and not restrictive. Many variations of the invention will become apparent to those of skill in the art upon review of this disclosure. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A method for introducing a client to a conference, the method comprising:

publishing a conference listing corresponding to the conference, wherein the conference listing is located by a client device seeking to enter into the corresponding conference;

36

receiving indicia from a client device indicating that a web browser corresponding to the client device has been pointed to the conference listing;

receiving information allowing for conference attendance by the client device;

connecting the conference server and the client device; and

allowing for entrance of the client into the conference.

**2**. The method of claim **1**, wherein the conference listing is published for subsequent location using a user location service (ULS).

**3**. The method of claim **1**, wherein the conference listing is published for subsequent location using a lightweight directory access protocol (LDAP).

**4**. The method of claim **1**, wherein the conference listing is published for subsequent location using a uniform resource locator (URL).

**5**. The method of claim **1**, wherein the receipt of information allowing for conference attendance occurs after a validation operation.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,877,489 B2                              Page 1 of 1
APPLICATION NO.   : 11/925960
DATED                  : January 25, 2011
INVENTOR(S)        : Joseph Salesky et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Cover Page: Item 63 replace with:

In Related U.S. Application Data: Continuation of application No. 10/753,702, filed on Jan. 7, 2004, now Pat. No. 7,310,675, which is a continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, which is a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, which is a divisional of application No. 08/823,744, filed on March 25, 1997, now Pat. No. 6,343,313. Provisional application No. 60/014,242, filed on Mar. 26, 1996.

Signed and Sealed this
Twenty-ninth Day of March, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*



US007369515B2

(12) **United States Patent**
Salesky et al.

(10) Patent No.: **US 7,369,515 B2**
(45) Date of Patent: **\*May 6, 2008**

(54) **PROVIDING CONFERENCING DATA IN A NETWORK COMMUNICATIONS SYSTEM BASED ON CLIENT CAPABILITIES**

(75) Inventors: **Joseph Salesky**, Cameron Park, CA (US); **Peter Madams**, Moraga, CA (US); **John Flower**, Walnut Creek, CA (US); **Clint Kaul**, San Mateo, CA (US); **Benjamin Wells**, Walnut Creek, CA (US); **Edward Arthur Ho-Ming Janne**, San Francisco, CA (US)

(73) Assignee: **Pixion, Inc.**, San Ramon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/086,507**

(22) Filed: **Mar. 21, 2005**

(65) **Prior Publication Data**

US 2005/0163062 A1    Jul. 28, 2005

**Related U.S. Application Data**

(60) Continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, which is a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, which is a division of application No. 08/823,744, filed on Mar. 25, 1997, now Pat. No. 6,343,313.

(60) Provisional application No. 60/014,242, filed on Mar. 26, 1996.

(51) **Int. Cl.**
*H04L 12/16* (2006.01)

(52) **U.S. Cl.** ........................ 370/260; 370/261; 709/203

(58) **Field of Classification Search** .................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,414,621 A    11/1983  Bown et al.

(Continued)

*Primary Examiner*—Robert W Wilson
(74) *Attorney, Agent, or Firm*—Carr & Ferrell LLP

(57) **ABSTRACT**

An improved networked computer communications system handles arbitrary streams of data, and transports at varying speeds those streams where intermediate updates can be dropped if they are obsoleted by later arriving data updates, optimizing the utilization of network and node resources. Complex buffering by system server software allows distributed, parallel, or redundant processing, transmission, and storage for performance, reliability, and robustness. Various parameters of the system can be monitored, and the system can be reconfigured automatically based on the observations. Varied techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess. One conferencing system allows conference participants to share all or a portion of the display seen on their computer screens. The conferees may be at sites removed from each other, or may view a recorded presentation or archived conference at different times. Conference participants are either "presenters" who can modify the display or "attendees" who cannot modify the display. A pointer icon, which can be labeled to identify the conferee, is displayed in the shared image area Each conferee can modify the position of his or her own pointer, even when not presenting, so that every participant can see what each conferee is pointing to, should a conferee choose to point to an element of the display. These and other features apply to other data streams shared in the conference or in meetings where there is no shared-image data stream.

**36 Claims, 37 Drawing Sheets**



**US 7,369,515 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,241,625 A | | 8/1993 | Epard et al. |
| 5,455,599 A | | 10/1995 | Cabral et al. |
| 5,485,212 A | | 1/1996 | Frederick |
| 5,530,795 A | | 6/1996 | Wan |
| 5,550,982 A | * | 8/1996 | Long et al. .................... 725/93 |
| 5,563,649 A | | 10/1996 | Gould et al. |
| 5,600,646 A | | 2/1997 | Polomski |
| 5,617,539 A | * | 4/1997 | Ludwig et al. ............. 709/205 |
| 5,649,104 A | | 7/1997 | Carleton et al. |
| 5,689,553 A | * | 11/1997 | Ahuja et al. ........... 379/202.01 |
| 5,689,641 A | | 11/1997 | Ludwig et al. |
| 5,706,290 A | | 1/1998 | Shaw et al. |
| 5,737,448 A | | 4/1998 | Gardos |
| 5,740,371 A | | 4/1998 | Wallis |
| 5,764,731 A | * | 6/1998 | Yablon .................... 379/88.15 |
| 5,774,668 A | | 6/1998 | Choquier et al. |
| 5,790,818 A | | 8/1998 | Martin |
| 5,793,365 A | | 8/1998 | Tang et al. |
| 5,793,980 A | * | 8/1998 | Glaser et al. ............... 709/231 |
| 5,802,322 A | | 9/1998 | Niblett |
| 5,822,523 A | | 10/1998 | Rothschild et al. |
| 5,859,979 A | | 1/1999 | Tung et al. |
| 5,877,762 A | | 3/1999 | Young |
| 5,983,263 A | * | 11/1999 | Rothrock et al. ........... 709/204 |
| 6,313,863 B1 | | 11/2001 | Chida |
| 6,343,313 B1 | | 1/2002 | Salesky et al. |
| 6,345,297 B1 | * | 2/2002 | Grimm et al. .............. 709/227 |
| 6,560,707 B2 | | 5/2003 | Curtis et al. |
| 6,594,699 B1 | * | 7/2003 | Sahai et al. ................. 709/228 |
| 6,772,335 B2 | | 8/2004 | Curtis et al. |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 4D



FIG. 4E



FIG. 5



FIG. 6A



FIG. 6B



Capture rectangle

| Block 1 | Block 2 |
| Block 3 | Block 4 |

Capture at presenter client

**Illustration of the effect of specifying consistency at the attendee client**
(other delays in displaying assumed to be caused by loading at client)

| Time order | Received at client | Displayed by client | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1 | | |
| 2 | Block 2 | Block 1 | |
| 3 | Block 3 | Block 2 | |
| 4 | Block 4 | Block 3 | |
| 5 | ... | Block 4 | Blocks 1-4 |
| 6 | | ... | ... |

FIG. 7A



Capture rectangle

| Block 1A | Block 2A |
| Block 3A | Block 4A |

Capture A at presenter client

Capture rectangle

| Block 1B | Block 2B |
| Block 3B | Block 4B |

Capture B at presenter client

Capture rectangle

| Block 1C | Block 2C |
| Block 3C | Block 4C |

Capture C at presenter client

**Illustration of the effect of specifying consistency at the server**
(other delays in sending assumed to be caused by loading at attendee client)

| Time order | Received by server | Sent by server | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1A | | |
| 2 | Block 2A | | |
| 3 | Block 3A | Block 1A | Block 1A |
| 4 | Block 4A | | |
| 5 | Block 1B | | |
| 6 | Block 2B | Block 2A | Block 2A |
| 7 | Block 3B | | Block 3A |
| 8 | Block 4B | Block 3B | Block 4A |
| 9 | Block 1C | Block 4B | Block 1B |
| 10 | ... | Block 1C | ... |
| 11 | | ... | |

**FIG. 7B**



FIG. 8A



FIG. 8B



FIG. 9A



FIG. 9B



FIG. 9C



FIG. 9D



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 10A



**FIG. 10B**



**FIG. 11**



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

**Time**

**Space**

| | Now | Later |
|---|---|---|
| **Here** | Recording and previewing a presentation | Reviewing an archived earlier conference as a participant. |
| **There** | Joining a real-time conference connecting participants at different, possibly quite distant, locations. | Viewing a prerecorded presentation or reviewing an archived conference as a nonparticipant. |

Time vs. Space diagram of some system applications

**FIG. 23**

US 7,369,515 B2

**1**

**PROVIDING CONFERENCING DATA IN A
NETWORK COMMUNICATIONS SYSTEM
BASED ON CLIENT CAPABILITIES**

The present application is a continuation application of
U.S. patent application Ser. No. 10/600,144, filed Jun. 19,
2003 now U.S. Pat. No. 7,197,535 and entitled "Real-Time,
Multi-Point, Multi-Speed, Multi-Stream Scalable Computer
Network Communications System "; U.S. patent application
Ser. No. 10/600,144 is a continuation application of U.S.
patent application Ser. No. 09/523,315, filed Mar. 10, 2000
and entitled "Real-Time, Multi-Point, Multi-Speed, Multi-
Stream Scalable Computer Network Communications Sys-
tem," now abandoned; U.S. patent application Ser. No.
09/523,315 is a divisional application of U.S. patent appli-
cation Ser. No. 08/823,744, filed Mar. 25, 1997, now U.S.
Pat. No. 6,343,313, issued Jan. 29, 2002 and entitled "Com-
puter Conferencing System with Real-Time Multipoint,
Multi-Speed, Multi-Stream Scalability "; U.S. Pat. No.
6,343,313 claims the benefit of U.S. provisional patent
application number 60/014,242 filed Mar. 26, 1996, all of
which the present application incorporates by reference. The
present application is also related to U.S. patent application
Ser. No. 10/753,702, filed on Jan. 7, 2004 and entitled
"Providing Data Updates in a Network Communications
System Based on Connection or Load Parameters" U.S.
patent application Ser. No. 11/086,506 filed on Mar. 21,
2005 and entitled "Providing Conference Data in a Network
Communications System Based on Client or Server Infor-
mation Examined During a Conference."

BACKGROUND OF THE INVENTION

The present invention relates generally to the field of
shared computer communications and computer conferenc-
ing. In particular, one embodiment of a conferencing system
according to the present invention facilitates the conferenc-
ing of two or more persons, each with a computer at one or
more locations with a shared visual display and additional
communication capabilities such as video, shared drawing,
audio, text chat, etc. and facilitates the recording and later
playback of the communications.

Existing conferencing systems can be described as either
video conferencing systems or "whiteboard" systems. In a
video conferencing system, a snap-shot of the conference
presentation is taken at regular intervals, such as thirty times
per second. Given that the image on a computer display is
not changing nearly that often, video conferencing wastes
large amounts of bandwidth. In a whiteboard system, the
presenter at the conference draws within a whiteboard
application and imports the output of another program into the
whiteboard program for manipulation. When the presenter is
ready to present a snap-shot, the presenter presses a "send"
button and the whiteboard program updates all the attend-
ees' displays with the image created by the presenter. This
type of system, while requiring less bandwidth than video
conferencing, is clumsy to use, lacks real-time responses,
and limits the presenter to the tools provided with the
whiteboard program.

Existing shared-display or shared-image systems rely on
interception and communication of display or graphics sys-
tem commands or depend on conferees' having similar
hardware and software platforms. These systems lack flex-
ibility and performance if the network connections are
unreliable or have narrow bandwidth, or they require uni-
form hardware or software installations.

**2**

Existing systems that provide single or multiple data
stream handling of a nature different than shared-image
conferencing depend on wide bandwidth network connec-
tions or on all participants having similar platforms.

SUMMARY OF THE INVENTION

An improved general purpose data-stream computer net-
work transport system and, in particular, an improved desk-
top conferencing system is provided by virtue of the present
invention. The desktop conferencing system is used to
display a shared collaboration among conference partici-
pants ("conferees"), with one or more individuals located at
each remote site connected to the conference. Typically, at
any particular time some conferees are not able to modify
the shared images, and thus they are "attendees," as opposed
to "presenters." Preferably, only one conferee is the pre-
senter at any one time. A pointer icon for each conferee can
be displayed on the screen, and the conferee is able to
modify the location of his or her pointer, even if the conferee
is not one who can modify the shared display itself. Each of
the pointers can be labeled to distinguish each of the
conferees.

In a specific implementation of the desktop conferencing
system, conferee client computers ("conferee clients") con-
nect to the "conference server," a computer or several
networked computers (any of which may also be used by a
conferee as a client computer) running conferencing soft-
ware, typically by navigating a World Wide Web ("WWW"
or "Web") browser through a predetermined Universal
Resource Locator ("URL") that indicates a Web page
describing the conference. The conference can be set up any
time earlier by anyone with access to this server function. At
the time of setup, one or more password character strings
("keys") can be specified for the conference. The key that a
conferee gives at the time of attempting to connect to the
conference server determines whether that conferee will be
allowed access to the conference and what the conferee's
initial privileges will be for participating in the conference
and for modifying the setup of the conference. These privi-
leges include but are not are not limited to the following:
entering the conference, being a presenter, having a pointer,
seeing the icons or other identifying information of other
attendees, hiding or sharing one's own icon or identifying
information, changing descriptive information such as the
name, time, and purpose of the conference, changing keys,
and changing others' privileges. The privileges can be
modified during the conference by conferees or others who
are so authorized. In general terms, the privileges include
those that conferees might enjoy in person at a conventional,
physical meeting. In the description below, a conferencing
or other communications session provided by the present
invention will sometimes be called a "meeting."

A presenter uses his or her computer to begin a conference
presentation by connecting to the conference server. Con-
ferencing software on the presenter client computer captures
a portion of the screen display of the presenter client and
sends the captured region (after possibly compressing it or
applying other transformations) to the conference server.
The captured region can be anything the presenter client can
have displayed on its screen or a portion thereof, whether or
not the hardware or other software producing or managing
any part of the display is aware of the conferencing system.

When the attendee selects a link from the Web page to
begin the conferencing session for that attendee, this action
initiates the attendee client conferencing software. The
attendee client then obtains a current view of the captured

US 7,369,515 B2

3

region from the conference server. The position of a pointer icon on a conferee's view of the captured region and an icon specified by the conferee might be communicated to each of the other attendee and presenter clients, so that each of the participants can see what each conferee is pointing at should a conferee choose to point to an element of the shared captured region. A particular conference can include more than one presenter; all conferees may be presenters, or all conferees may be non-presenting attendees. The latter may happen if a conference is set up to review a previously recorded or archived conference.

In a simple embodiment, the entire screen of the presenter is shown to all of the attendees. In a more complex embodiment, multiple subsets of multiple presenters' screens might be made available to all attendees while other subsets of the displays of the presenters are viewable by a subset of the attendees, thus allowing private side "conversations." These side conversations can be flexibly reconfigured during the conference, according to the conferees' privileges; participants in side conversations can have separate pointers whose positions are independent of, and whose labeling icons are distinguished from, those appearing in the general conference.

As each conferee joins a conference, the client and the conference server agree on the capabilities of the client, such as display bit-depth, bandwidth of the connection between client and the conference server, processor speed of the client, and the amount of memory available to each client. These parameters may be modified by the conferee, the client, or the server, this can be done automatically or on demand. If the conference server determines that a client has sufficient computing resources, some of the tasks, such as image data compression (for presenter clients), decompression (for attendee clients), update scheduling (both types of clients), and other image transformations and server management functions can be assigned to the client computers. The client computers might be personal computers, workstations, X-terminals, cable or satellite TV set-top boxes ("STBs"), personal digital assistants ("PDAs"), game playing machines, WebTV™s, network computers ("NCs"), Infopads, visual telephones, and other existing or as yet undeveloped input and/or output devices. These clients might be connected to the server computer or computers (and the server computers might be interconnected) by high or low bandwidth electrical or optical connections, radio, infrared, microwave, telephone modem, or hybrid combinations of these, or other existing or as yet undeveloped data communication technologies.

The system can supply a range of coder-decoder ("codec") facilities for the compression and decompression of images (in order to reduce bandwidth requirements during network transmission) and for the matching of image representations to client display requirements including input or output format transcoding (in order that the shared image appear visually similar to presenter and attendee). In addition, codecs may be provided by the system for such purposes as error-correction, encryption, or audio and video noise reduction, or others. User-provided or proprietary codecs for these purposes and more can also be incorporated into the system. Any of these codecs may be in form of software or specialized hardware. Multiple codecs may be provided for the same function; should the system determine that one is better suited for that function, then it may be selected, and the codec can be changed dynamically when conditions change, such as client requirements, server needs, and network loading.

4

At least one embodiment of the present invention provides real-time, multi-point, multi-speed transport over a computer network for data streams other than the visual conference shared images described above, including but not limited to audio, video, shared paint and drawing spaces, text chat, and other real-time object streams where intermediate updates may be dropped; in particular, the data streams may combine any or all of these types of data, which may be produced by multiple presenters, and arbitrary data streams may be combined with these. The features of connecting to servers, setting up conferences, keying privileges, passing identifications, accommodating multiple dissimilar platforms and network connections, and configuring subsets of conferees apply equally to these other data streams. In the more general case, the "communications server" connects the "source" and "sink" client machines of the "communicants" during a communication session.

But the system is not limited to real-time; thus, for example, archiving is provided. It is not limited to multipoint, thus, for example, a single user can record for later playback; being scalable means it works well for a few users and provides a similar communications service and experience with many users. It is not limited to multi-speed; thus, for example, data streams where lost information cannot be easily updated by later versions can be accommodated. It is not limited to multi-stream; for the shared screen-image stream (frequently used here as an example) by itself offers great utility. Indeed, it does not require a network: for example, the same computer could be the recording and archiving server for a presenter using it as a client; or the same computer could run presenter client software, attendee client software, and the communication server software connecting them so that a presentation might be previewed from the attendee's point of view.

Although a simple embodiment uses a single computer as the communications server, a more complex embodiment connects several computers in performing the server functions. The server-to-server interconnections can optimize routing by using information provided in the data stream or measured on the network, optimize wide-area network (WAN) usage by connecting clients to nearby servers, provide backup reliability by migrating clients, provide scalability of conference size through splitting the data stream, improve performance and robustness through redundant routing, and distribute functions of the system's transport pipeline (such as compression, decompression, and update scheduling) over several server and client computers. These services can be provided automatically depending on resources of the computers and network (for example, measured net speed and central processing unit, or "CPU," load) and facilities available (for example, announced client characteristics, such as CPU speed, compression and/or decompression hardware, or display parameters). They can also be configured and constrained by the server computer administrators or others with appropriate privileges.

Existing systems do not provide one or more of the following, which are explained in greater detail below: multi-speed at server and client, multiple reconfigurable coder-decoder transformations and transcodings, storage services (for, e.g., caching, failure recovery, recording, archiving, and playback), keyed access and privilege granting, adaptable servers and clients, multiple servers, adaptable and redundant server-to-server routing, load sharing among clients and servers, adaptive server-to-client matching, client/server and server/server backup and reconnection, multiple protocols for client connections, dynamic reconfigura-

5

tion of server functions, and scaling beyond single process, host, or network limitations automatically or upon request.

A more complete understanding of the nature, features, and advantages of the invention will be realized by referring to the following description and claims together with the associated drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a desktop conferencing system based on the present invention.

FIG. **2** is a flowchart illustrating the connection of a conferee client computer to a conference server shown in FIG. **1**.

FIG. **3** is a block diagram of the data flow in an architecture commonly supporting computer graphical user interfaces.

FIG. **4A** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when full images are compared, and the transmission of the changed information to the conference server.

FIG. **4B** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a new block is compared with the corresponding block in an old full image, and the transmission of the changed information to the conference server.

FIG. **4C** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a checksum of a new block is compared with the checksum of an old corresponding block, and the transmission of the changed information to the conference server.

FIG. **4D** is a data flow diagram illustrating the updating of the stored old image with a new captured block by the presenter client, and the transmission of the changed information to the conference server.

FIG. **4E** is a logic diagram illustrating the updating of the stored old image in various formats with a new delta block by the presenter client, and the transmission of the changed information to the conference server.

FIG. **5** is a state diagram illustrating the operation of the image capture process of the presenter client software.

FIG. **6A** is a diagram showing attendee client block clipping.

FIG. **6B** is a diagram showing presenter client block clipping.

FIG. **7A** is a diagram illustrating the client consistency setting.

FIG. **7B** is a diagram illustrating the server consistency setting.

FIG. **8A** is a block data flow diagram illustrating the operation of server processes monitoring and filtering a single presenter data stream according to the present invention.

FIG. **8B** is a block data flow diagram illustrating the operation of server processes monitoring and filtering multiple input and output data streams according to the present invention.

FIG. **9A** is a block diagram illustrating interconnections of several communications servers and communicant clients in a single communications session according to the present invention.

FIG. **9B** is a block diagram illustrating interconnections of several communications servers and communicant clients, including migrated and recruited connections, in a single communications session according to the present invention.

6

FIG. **9C** is a block diagram illustrating interconnections of several communications servers and communicant clients, including backup connections for clients and servers, in a single communications session according to the present invention.

FIG. **9D** is a block diagram illustrating interconnections of several communications servers and communicant clients, including decomposition of transformation sequences and functional delegation, in a single communications session according to the present invention.

FIG. **9E** is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queues and processing, in a single communications session according to the present invention.

FIG. **9F** is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queue contents and processing, in a single communications session according to the present invention.

FIG. **9G** is a block diagram illustrating interconnections of several communications servers and communicant clients, including multiple and redundant routing, in a single communications session according to the present invention.

FIG. **10A** is a block diagram illustrating a multi-layered tree topology for connections of several communications servers with communicant clients in a single communications session according to the present invention.

FIG. **10B** is a block diagram illustrating a single-layer tree topology for connections of several conference servers with communicant clients in a single communications session according to the present invention.

FIG. **11** is a diagram of the example architecture for a single server with a single meeting, according to the present invention.

FIG. **12** is a diagram of the example architecture for a server with several meetings running on a single CPU, according to the present invention.

FIG. **13** is a diagram of the example architecture for a single meeting manager directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. **14** is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. **15** is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on the same CPU, according to the present invention.

FIG. **16** is a diagram of the example architecture for a single server with a single meeting, but the meeting is controlled by several instances of a communications session server ("CSS") running on the same CPU, according to the present invention.

FIG. **17** is a diagram of the example architecture for a single meeting manager directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. **18** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

7

FIG. **19** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention.

FIG. **20** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention. In this diagram, the propagation topology information is shown.

FIG. **21** is a diagram of the graph of the propagation topology information in FIG. **20**.

FIG. **22** is a diagram of the graph of the propagation topology information in FIG. **20** together with the information for an additional propagation topology.

FIG. **23** is a time vs. space diagram showing some typical applications of the present invention.

DESCRIPTION OF THE PREFERRED
EMBODIMENT

FIG. **1** shows a desktop conferencing system **10** according to one embodiment of the present invention. Desktop conferencing system **10** is shown with three attendee clients **18** and one presenter client **12**. Following the arrows, presenter client **12** is connected to attendee client **18** through a conference server **14** and data network **16**. The presenter and attendees may also participate in an ordinary telephone call or a conventional conference call using telephones **20** connected through conference switch **22**. The voice conferencing might also be carried out through an audio connection on a data network; indeed, telephone network **24** and data network **16** could be the same.

The group of users can comprise from as few as one user, who might record a presentation or lecture or video-mail onto a session archive **23** for later distribution; or two people who wish to share information or collaborate on some work product; or a small group of users, as in a typical business conference call; to many tens of thousands or hundreds of thousands of users using the network as a broadcast rather than interactive medium. In the last case, the voice conferencing might also be broadcast, and could involve one-way telephone conference calls, radio, multicast network audio (such as MBone), or the like.

The presenter client conferencing software, which is usually distributed tightly, bound with the attendee client software to facilitate presenter hand-offs from conferee to conferee, captures information (such as image, sound, or other output information) from a program or programs running on the presenter's machine and relays it to the server, as explained in more detail below. The server relays this information to all of the attendee client computers participating in the same session or conference, transforming (in manners and by methods described below) the data as required. A more detailed description of the operation of the system by way of the example of transporting a stream of shared-image data during a conferencing usage of the software now follows.

During a conferencing session, presenter client **12** takes periodic "snap-shots" of the application screen image contained within a rectangular boundary determined by the presenter, breaks the screen shot into smaller rectangular blocks, compares these blocks to information from a previous screen shot. A block that has changed is passed to conference server **14** after it has undergone possibly two transformations and received identification marking ("ID

8

stamps"). The first transformation may form the difference, using a set difference, exclusive-or (XOR), or other difference method, of the new and old block in order to extract information on the changes only. The second transformation may compress the block using a publicly available compression algorithm such as JPEG (Joint Photographic Experts Group) or PNG (Portable Network Graphics), or licensed proprietary methods of compression. The need for the two transformations is determined by the system depending on such parameters as client characteristics, server and network loading, and user requests. The two transformations and possibly many others may be also performed by the server, another client, or another facility available on the network.

The presenter client identifies where the block is in the capture rectangle with a block-location ID stamp; it identifies the time with a time-stamp; it may also identify itself with an origin stamp, and provide other ID stamps as needed. In order to provide synchrony in the system, conference server **14** can issue time synchronization signals. The conference server may also add time-stamps on receipt of blocks, and will need to update time-stamps when a recorded or archived conference is, played back.

The changed blocks, however transformed, with ID stamps, are held on the conference server until they have been sent to all attendee client computers **18**, or it has been determined by flow control that there is no longer a need to hold them. Flow control between presenter client **12** and server **14** and between server **14** and attendee client **18** determines how often the attendee client receives information updating the image; this flow control, described in more detail below, depends on the characteristics and configurations of the clients, the server, and the network. Attendee client **18** can also send a command to conference server **14** to obtain the latest image capture information.

Attendee client **18** uses whatever change information it receives to update its screen display of the shared image. The attendee client may need to decompress the changed block information and to composite differences with previously received image information. The reverse transformations of decompression and composition may instead be performed by other computers.

From time to time, attendee client **18** communicates the position of the attendee pointer (if the conferee has selected this option) to conference server **14**, which distributes the pointer position and a chosen identifying icon to each of the other conferee clients, which may then add a representation of the icon or other identifying label at the position indicated by the pointer information to the shared image on the client's display. The purpose of these pointers and labels is to allow conferees to reference particular elements of the shared image, possibly while describing the elements to the other conferees over the audio conference session (via a telephone conference call or an Internet audio conferencing application, for example).

FIG. **2** is a flowchart showing the process of introducing a conferee client **17** (client **17** refers t a generic client which might also be a presenter client **12** or an attendee client **18**) to a conference ongoing on server **14**, assuming that the conference setup is performed via the WWW. First, the conferee locates a conference listing. This may be done by finding or being told a URL or using a locator service such as ULS™ or LDAP™. The conferee also specifies an icon to be used as a pointer label. Then the conferee points a WWW browser to the conference listing, where the server offering this listing or an associated server validates the conferee and provides information that allows the attendee

US 7,369,515 B2

9

client conferencing software to start and to connect to conference server **14** itself, possibly after further validation. Other information may be passed to the conferee client at this time as well. The connection to a server can also be accomplished in different ways, such as using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings. Once the attendee client software is running, it communicates commands and pointer icon position to conference server **14**, and conference server **14** supplies an initial conference image and later screen updates to client **17** (which is initially an attendee client **18**).

An attendee can become a presenter by sending the appropriate attendee-to-presenter command to conference server **14**. In the simplest embodiment with a single presenter, a message is sent to the presenter's screen indicating that an attendee wishes to take the presenting role; if the current presenter approves, then the roles are exchanged. In more complex embodiments, there can be a presenter arbitration mechanism, or multiple presenters may be allowed. The ability for a presenter or an attendee to be involved in any particular conferencing session and the assignment of privileges in the conference can be controlled by requiring appropriate keys from the presenter and the attendees.

Referring back to FIG. **1**, data network **16** can be provided by dial-up connections, local area networks (LANs), wide area networks (WANs), internets, intranets, the global Internet, or a combination of these or any other computer data communications links. In a specific embodiment, the conferee client computers are personal computers, workstations, or other computing hardware systems, running conferencing systems such as MacOS™, Windows® 3.1 or 3.11, Windows® 95, Windows® NT™, Unix™, OS/2™, NExT-Step™, BeOS™, JavaOS™, or the like. There is no requirement that the operating systems or hardware of the conferee clients all be the same.

Conference server **14** matches the form of the image to the attendee client before sending it. Most computer screen images are represented as a bitmap of pixels whose layout is device-dependent. To be able to send images from one device to another, a transformation or transcoding is often required. The captured image information may be transcoded into a device-independent format for transmission and transcoded back to a device-dependent format for each attendee's screen; if, however, the mix of attendee clients is such that a device-independent format is not needed, no conversion is done. If these or other transcoding operations are needed, they can be carried out at the presenter client's side, the server side, or the attendee client's side, depending on where excess capacity or superior capability exists. The choice of device-dependent vs. device-independent bitmaps (DDB vs. DIB) is made automatically by the server, in response to the number and type of conferee clients. For example, a meeting with just two conferees, each running a Windows® PC with similar 256-color graphics configurations, may use DDBs and achieve high performance with low overhead. However, where differently configured clients are connected in a conference, server **14** transcodes the images to fit the attendee's screen capability.

Mutiple codecs may be involved in the transcoding of screen formats as well as other image transformations described herein. It may even happen that different codecs will be used on different blocks in the same image, depending on availability of the codec's host computer, the transformation needs, the loading on client, server, and network, or other conditions relevant to the system's performance.

10

Server **14** also fits the images to the attendee's CPU capability. Server **14** can be a server operated by the presenter (who would then have full control over the server's resources), or it can be owned or operated by an unrelated third party or even an attendee who never presents. It is possible to have a third party whose involvement is solely as a facilitator of conferences. Operating server **14** is simpler than operating a videoconference hub, since the bandwidth is much lower. One aspect of the present invention is the realization that real-time conferencing can be had without resort to full-motion video transmission, as the item being monitored, a portion of a computer display, does not change as fast as a full-motion video. A similar observation applies to many other data communications streams.

Instead of full-motion video, attendees' screens are updated as the presenter's screen is modified, or less frequently for attendees with slow machines. The screen is modified from left-to-right within a row of blocks, and rows are updated top-to-bottom to improve the perception of low latency.

In some cases, server **14** might be operating without attendees. Such a configuration is useful where the presenter wishes to "record" a session for later playback. Even a session with attendees can be recorded for later playback, possibly including a recording of the voice conferencing. These stored sessions might be stored in session archive **23** or elsewhere. The shared image session can be synchronized with the voice conference by using the time stamps on the block data. When the recorded session is played back, it is an example of conference server **14** operating with attendees but no presenter.

The blocks may be held at the server as full images, as differences ("deltas") from previously received full images, as deltas from previous delta blocks, or as some combination of these, depending on the capabilities of the presenter and attendee clients. Periodically, a server may "checkpoint" the image deltas. To do this, the server requests a full image of a block from the presenter client and uses the full image as a replacement for all the accumulated image deltas for that block. The server might also request the entire captured region from the presenter client, or send the entire region to an attendee client upon request.

The conference server acts as a software-controlled switch that connects the presenter client with the attendee clients, taking into account that the speed of information transfer from the presenter client can change and the speed of transfer to the attendee clients can change and be simultaneously different for different attendees. The workload of the entire system is shared and distributed among the client and server computers, and even other computers that do not perform client or server functions.

Presenter Client Capture Operation

The capture operation and transport technology improves over former approaches by reducing the amount of work required and so enhances performance. In addition, the technique can be tuned to best suit the workload on the hardware and software platforms and network connections involved, manually or automatically. In particular, this tuning dynamically matches the capture operation to the amount of computer power available (while running the other software the conferee may wish to use) and the speed of connection to the network. Existing systems that capture graphics display commands, transmit them, then use them to recreate the original display appear to have great compression, which entails economy of network transmission. But comparison with the description below of the present inven-

US 7,369,515 B2

**11**

tion will reveal that the savings are not so great when the task is to communicate data streams which can be updated by later transmissions.

The presenter selects an area of his or her computer display to be shared ("capture region"); it need not be a rectangular area More than one capture region may be selected at a time and multiple regions may overlap. The selection may be made on a screen display, in a memory representation of a display, or in an aliased representation of either; the selection can be changed at any time. If the client has multiple monitors or multiple displays on a single monitor, independent selection can be made for each. A window provided by the presenter client computer's operating system, or by an application or other program, may be designated as the capture region, and then the capture region can be adjusted automatically if the window is moved or resized. This may be a fixed window, or the capture operation can be set to follow the selection of the current ("top" or "focus") window automatically. In a simple embodiment, the presenter selects a rectangular region on the screen ("capture rectangle"). For efficient transmission, the capture rectangle is broken up into rectangular subregions (blocks) to give good perception of response time. For example, if the presenter has selected all of an 800-by-600-pixel screen display to be within the capture rectangle, then it might be broken up into twelve 200-by-200-pixel square blocks. If the capture rectangle is later adjusted smaller, the blocks are changed to be made up of smaller rectangles, or the capture rectangle is divided into fewer blocks, or both; correspondingly, if the capture rectangle is later adjusted larger, the blocks are changed to be larger rectangles or the capture rectangle is divided into more blocks, or both. For efficient handling of blocks, the blocks are preferably kept between 1000 and 4000 pixels in size. As the blocks are updated on the attendee's screen, they are presented from the top row to the bottom row and from left to right within a row.

The presenter defines the shape of the capture region and can change, control, reposition, and resize it. In some computer systems, when the region is rectangular, the capture rectangle may be marked by a transparent window that stays visible; in other systems, it is appropriate to use four graphical objects that move together to mark the boundary of the capture rectangle.

FIG. **3** shows the display architecture of a typical computer shown with application programs **60**(*a*)-(*c*), and graphic display mechanisms **62**(*a*)-(*c*) with graphics commands capture points **64**(*a*)-(*c*). The graphics display mechanisms **62** send their output to a screen image storage area **66** which in turn presents an image to the user on a computer display **68**. Existing techniques of image sharing depend on intercepting graphics display commands (graphic instructions, display commands, graphics subsystem calls, etc.) at graphics commands capture points **64** and sending these commands to another computer which can use them to affect its own display. This appears to have an advantage in that one high-level graphics drawing command (e.g., "draw a blue line from co-ordinates (0,0) to (0,100)") can be expressed in fewer bits of data than what would be required to express the resulting set of pixels on the screen. In this case, 100 blue pixels, say using 24-bit color depth, would require 300 bytes of data, compared with a graphics drawing command that might require only about 12 bytes of data.

If the task to be achieved is to send a copy of this image to another computer, using the smallest number of data bits, then sending the graphics drawing commands seems, at first sight, to be a very effective approach to adopt. However, two factors mitigate this apparent saving. One arises when the

**12**

data stream is compressed before transmission, and the other arises from reflection on modern graphics drawing techniques.

Compression is very effective when there is a lot of redundancy in the data. In the example cited above, the 300 data bytes needed to represent the blue line on the image consists of a repeating set of 3 data bytes, each representing one blue pixel. This might be compress to as small as 5 data bytes total, one to indicate the code, three for the color, and one to indicate the binary number of pixels. Of course, the 12-byte graphics drawing command might also be compressible: nevertheless, the apparently huge savings ratio is not in fact realizable.

Modern graphics drawing commands include not only simple geometric drawing operations, but also text elements with full font and spacing specifications, and other complex constructions. This can be seen by comparing the size of, say, a word processing document (which contains the graphics drawing commands, font information and text) stored in a computer file with the size of an image of that same document, say, as a fax image stored as a file on the same device. A few years ago, the image file would always be larger than the document file; now, the reverse is often true.

Furthermore, as will be seen below, reducing the amount of data by using compact graphics drawing commands instead of direct image data is not always possible when applied to real-time systems where transmission of live, changing images is required. In this case, there are two ways to merge changes together, thus reducing the total amount of data that must be transmitted. The example used above applies to a single image; when changing images are required—as for example, with conferencing systems— further opportunities exist to reduce the total amount of data transmitted. This is an advantage of the present invention.

First, when graphic drawing commands update the same region of the image, we can capture just one resulting image containing the results of many commands. Second, successive changes to a particular region of the image, which will result in successive transmissions of that region, can be composited together. The several strategies for this updating under the present invention will now be described in more detail.

Updates for the capture rectangle may be requested by the server, or sent at fixed or variable times announced by the presenter client automatically or as determined by the presenter, or sent at the command of the presenter. The blocks sent out by the presenter client are just the blocks which have changed since the last update. From time to time, the presenter client might send the entire set of blocks. Depending on several factors detailed below, the presenter client might send the blocks as difference (delta) blocks as opposed to the full information base blocks. Base blocks are preferred where network bandwidth is freely available but computing power at the client is limited.

For efficiency, the presenter client might only send out delta blocks for areas that have changed, since delta blocks will often compress smaller than the corresponding base block because much of the base block may remain unchanged. Thus, the presenter client maintains a copy of the last capture to allow it to generate the delta blocks.

FIG. **4**A illustrates this point. In that figure, the captured images used are divided into twelve subblocks so that unchanged portions of the captured image can be ignored. If the block labeled "B6" is the block being sent, block B6 of the current copy of the captured image **69**(*a*) is compared with block B6 of the most recently stored reference copy **69**(*b*) of the captured image (the reference copy is a copy of

US 7,369,515 B2

| 13 | 14 |

who the captured image looked at some point in the past). The result of the comparison will determine whether block B**6** has changed. If it hasn't, then there is no need to transmit the changes.

FIG. **4**B illustrates a similar process, but there, only block is captured from the current image for comparison with the stored image. This reduces the storage required for the comparison by nearly one half, but it limits consistency, as described later.

In FIG. **4**C, the images are replaced by checksums or digests, such as cyclic redundancy check ("CRC"), DFT (discrete Fourier transform) parameters, or the results of applying hashing functions appropriate for images, or the like. Although storage is greatly reduced, as only the much smaller checksums need to be saved, and comparison is quick, the digest procedure must be fast in order to provide any time economy. The main drawback is that two different blocks may have the same checksum, and then the comparison will fail to find the difference. This can be mitigated by the choice of checksum and by the unlikelihood that the comparison would fail twice in a row when the block changes again.

FIG. **4**D shows the transmission to the server of a base block when the comparison shows a change. The block is also sent to the stored image; this allows the stored image to be updated at the same time the changes are sent to the server.

FIG. **4**E shows the corresponding situation when a delta block is sent.

Obviously many combinations can occur that would provide additional savings under some load conditions. Thus the stored comparison may be a collection of base blocks, either from the same capture event or not, an array of checksums of base blocks or of delta blocks, a collection of delta blocks, results of compositing delta blocks. etc. or any combination of these.

It is possible to reduce the size of the stored comparison image to blocks which have changed recently and perhaps their neighbors, as long as the full image is stored every now and then.

Each of the modes of comparison and transmission can be altered dynamically; for example, one heuristic is to send a delta block when less than half the pixels in the capture rectangle change, and to send a base block when at least half change.

With techniques that rely on capturing graphics display commands, it is very hard to identify commands that produce overlapping elements of the image. Because of this, it is hard to know when earlier commands can be discarded because their results have been superseded. Therefore, a system relying on capturing commands must send all commands over an error-free network. By contrast, in this system, deltas can be dropped without permanent ill effects.

The foregoing assumes that the capture rectangle is broken into a number of rectangular blocks. This decomposition can be changed dynamically to have more or fewer blocks to adapt to changes in the size of the capture rectangle by the presenter as described earlier, or to changing conditions in the loading and capabilities of clients, servers, and networks. Just as the capture rectangle is broken into blocks to improve perceived rate of change, so may the block be subdivided to further isolate just the changed portion of the image. One way to accomplish this is to identify the smallest bounding rectangle of the changed portion of the image, and then to intersect this with the current block pattern. Another is to adaptively redefine the block pattern to best fit the changed area of the image. Other adaptations arise if the geometric assumptions of rectangular capture region and rectangular blocks in this example are dropped.

In general, the system of the present invention is oriented to reduce buffering in order to improve the sense of "live performance." Thus, while the structure of the server and client software could allow a number of captured images to be in the process of traveling from presenter clients to attendee clients at one time, in fact having just two images in the "pipeline" from presenter to attendee at once takes advantage of processing capacity, defeats transient network breakdown, and does not overload end-to-end connection performance. This might be increased to three or four or more images in the pipeline if the network connections are fast, but the clients have slow CPUs.

FIG. **5** is a state diagram of the presenter client software. The state transitions are described here starting with the IDLE state. The presenter client is in the IDLE state while it is doing other things, such as processing data unrelated to the conferencing software or running another application whose output is to be shared with the attendees. Periodically, the presenter client will check to see if an update to the capture rectangle needs to be sent out. In considering that need, the presenter client conferencing software considers the CPU loading on the presenter client computer, taking into account any limit the presenter might have placed on what percentage of his or her machine's computing resources can be occupied with block updates, the transmission rate of the presenter's network connection (no sense preparing a block update if the network can't handle it), commands concerning flow control from the server (server flow control is described below) and other relevant parameters.

If the presenter client decides to proceed, the state changes to the BLOCK-GRAB state, where the current capture rectangle or a portion of it is grabbed from display memory. A copy of the next most recent capture rectangle is maintained so that delta blocks can be easily generated. In this state, the delta blocks are generated if they are to be used. If the delta blocks indicate that nothing has changed, the computer transitions back to the IDLE state and does not send out the captured block or its delta (which would be blank). Otherwise, the client prepares the blocks which have changed for potential transmission. The capture rectangle is divided into blocks as described above. In the BLOCK-GRAB state, the presenter client estimates the amount of work required to prepare the grabbed blocks for transmission to the server, the attendee requirements, and local hardware capabilities. If the presenter client can perform work such as transcoding much faster than the attendee clients, or even the server, then the presenter client performs that step by transitioning to the COMPRESS/TRANSCODE state. The presenter client might skip this state altogether if no transcoding is to be done and compression is not used (such as where the network connection between the presenter client and the server is much faster than the compression speed of the presenter client).

Either way, the presenter client then transitions to the NETWORK state, where it determines if the capture rectangle still needs to be sent and checks current network bandwidth. Then, the presenter client transitions to the OUTPUT state where the blocks are output, either as base blocks or as delta blocks, either compressed or uncompressed. The presenter client then returns to the IDLE state where the process repeats after a time.

In the case of displays that support multiple layers in applications or in the interface through multiple frame buffers or reserved areas of memory, the system can capture

15

from one or more of the layers, in coordination or independently. If the client has multiple monitors, then the system can capture from some or all of the displays.

In general, the presenter client sends out a stream or streams, which can vary in format over time. The presenter client can also imbed command messages into a stream, such as a command indicating a changed color map, a pointer icon position, or a presentation hand-off command; such commands can also be sent in a separate communications channel. Capture can also occur in buffers for other purposes than screen display. Streams other than the shared-screen conferencing stream (outlined above and described in more detail below) can carry information to allow shared or broadcast text chat, audio, video, drawing, whiteboarding, and other communications. These streams are subject to and can enjoy the same or similar load/need analysis and balancing methods and mechanisms.

Other Client Features and Behavior

When a conferee joins a meeting or before, the conferee selects a personal icon and a characterizing sound (a "gong") which will be the icon and gong that other conferees will associate with the joining conferee. Icons and gongs can be created using well-known techniques for creating icons and audio data. When a new conferee joins a meeting, the conferee client sends his or her personal icon and gong to each other client, via the conference server. The new conferee is then "announced" by the gong. The personal icon of the joining conferee is also added to a conferee icon list maintained on the server or at each client. If another conferee chooses to have the icon list displayed at his or her client, the entrance of the joining conferee can be noted when the new icon appears on the icon list. Other personal information about the conferee, such as name and electronic mail ("email") address may be provided by the conferee and made available to other conferees via the server. As described earlier, the visibility of icons, audibility of gongs, access to personal information, and so on, may be based on the key the conferee used to enter the meeting, on the identity of the conferee (by network address or otherwise), or on a combination of these and other validators.

The presenter can "go off-air," i.e., suspend or pause the image capturing process and can "go on-air," i.e., resume the presentation at will. The network connections can be maintained during the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-air, and no changes will be sent or scheduled by the server during the off-air time.

If clients are so configured, conferees can be given lists or iconic representations of the participants in the conference, as mentioned above. Those conferees that are presenting, those who are off-air, and those who are requesting to present can be marked. Various subsets of conferees, for example those in side-conversations, those in other meetings, those connected to a particular server, and in general those selected by some property of the system's current configuration, can also be marked. The visibility of the lists and the presence of any markings may be controlled by users, administrators, or others, based on privileges or other criteria In addition, graphical representations of a meeting or part of a meeting, or of several meetings, may be available for display, depending on privileges.

If the presenter client computer represents images with a varying color map or palette, then the presenter client will send out color map information when the color map changes, so that the attendees observe the same color scheme as the presenter. Color map changes can occur on the

16

presenter client display system as the presenter opens, makes changes in, or closes a program, either in a window that overlaps the capture rectangle or in a window beyond the capture rectangle used for his or her own private work.

When a change in a block is detected, the resulting changed block (base or delta) can be compressed, making use of any special hardware (for example, a Digital Signal Processor (DSP), often found on MPEG boards or set-top boxes), if it is available on the client computer. The compression codec may be lossless, or some information may be lost in compressing and decompressing ("lossy" codec) if the particular application and users of the system can tolerate that and wish to take advantage of possibly better performance.

To ensure good usage of the network, the images are captured and compressed before the network is available to send them, if possible. Without this, the network might be under-utilized. On the other hand, if an image is captured and compressed too early, the attendees will not see the most up-to-date information and this will reduce the efficacy of the visual component of the meeting. To achieve this good balance between system utilization and the perceived response time as seen (and possibly heard) by the meeting's attendees, the client software uses a pipeline to ensure a flow of information is always available at the network, with flow-controls to ensure that image capture and any transcoding (including compression) are never too far ahead or behind in order to balance the load among presenter client, attendee client, and conference server. Flow control is described in more detail below.

The number of blocks and the order of comparison and modification can be automatically determined by the server or set by the presenter. Thus, if conferees usually work with text reading from right to left, a right-to-left updating might be more appropriate.

The size of the window displaying the shared image on the attendee client need not match the size of the image sent from the presenter client in linear measure or in pixel measure. If the window is smaller than the image, the attendee can be given scrollbars to allow navigation around the shared image. It is also possible to configure the transcoding to scale the size of the image received by the attendee client.

The attendee client can also display the shared conference image automatically matched in size to the capture region set by the presenter, if the attendee desires and the attendee client computer is capable of such display. If the attendee client is displaying less than all of the image, the bounds of what is being shown at the attendee client can be communicated to the conference server so that the server can avoid sending blocks beyond the boundaries of the attendee's window. These blocks are not sent until scrolling requires them or they are otherwise demanded by the attendee. This point is illustrated in FIG. 6A, where an original image 50 as represented in the display coordinates of a screen 54 of attendee client 18 exceeds the size of a window 52 dedicated to its display. Scrollbars are included with window 52 to aid in navigation. Blocks 56 are not transmitted from server 14 to client 18 until the scrollbars are used or the window is resized to request the display of more of image 50.

This "clipping" of unneeded blocks can be propagated back to the presenter client by the server if appropriate (for example, if there is only one attendee), so that the presenter client does not have to process all blocks in the capture rectangle. This is illustrated in FIG. 6B, using the same attendee configuration as in FIG. 6A. In FIG. 6B, the presenter client 12 knows from conference server 14 that the

US 7,369,515 B2

**17**

shaded blocks **56** shown at the attendee screen **54** of attendee client **18** are not displayed in attendee window **52**, so there is no need to capture or compare the corresponding blocks **57**, marked as "do not process" in the representation **51** of the capture rectangle, which is displayed on presenter client screen **55** and shown with the an overlay **53** that corresponds to attendee window **52**.

The shared conference image, text boxes, messages, control buttons and menus, and other graphical elements may be grouped in a single window or split among several windows on the client's display.

Consistency is a property of the display that can be chosen at the cost of somewhat reduced perception of image update speed at the attendee client. Both the server and client can be constrained to be consistent; server consistency is discussed below. FIG. **7**A gives a simple example of client consistency. An entire capture rectangle with four blocks is sent by the system, and the client waits until all four blocks are received before displaying them. Thus, the entire screen represents the same picture to the attendee as that seen somewhat earlier by the presenter. With consistency turned off, each of the four blocks is displayed as soon as possible, which leads to blocks from a previous transmission being seen alongside newer blocks, so the screen picture, at least for a time, is not consistently one that has been viewed by the presenter.

When a presenter makes a change to the part of screen that is in the capture rectangle, a signal can be given to the presenter client via the server when all attendee clients have received the update that results from the change. The presenter is then assured that all other conferees have seen the change he or she has made. An example of how this can be accomplished is given by the following. The conference server is aware of the geometry of the capture rectangle and the blocks are constantly scanned from left to right, starting at the top and moving toward the bottom. Thus the block in the lowest rightmost position signals the end of data from a particular rectangular capture by the presenter client. Since this block may not have changed and may never arrive in the server's input queue, a flag may be set by the server to indicate which block is last when a block from a new capture arrives before the last block has been sent to an attendee client If neither of these two mechanisms work, the presenter client can add a message via the server to the attendee client stating that the rectangle has been finished. Thus the attendee client can respond when it has received the entire rectangle.

In addition, a signal can be generated by the presenter client when the presenter has made no change for some set period of time or number of capture cycles. This can be relayed by the server to attendee clients, so that attendees may know that after the appropriate captured image is received, that they see is also representative of what the presenter currently sees.

If the connection to the server is lost, the client can notify the conferee and may then attempt to reconnect to the conference session, using saved parameters. The reconnection may be to a different server, as described later.

In the above description, "client" has referred to a computer system comprising hardware, an operating system, and applications software, possibly or specifically including the software necessary to participate in a conference or communication session according to this invention. All of the described operations also apply to the case when one or more users are running two or more instances of the client conferencing software on the same computer platform. This might occur when a user wishes to be a conferee in several

**18**

different conferences simultaneously, or even multiple conferees in the same conference. For example, he or she can be a presenter in one conference and an attendee in another. A single person can have different identities in each client instance, so that John Smith may be known as "John" in one client instance and "Mr. Smith" in another. Two people might be using the same computer hardware alternately, and both can be participating in different conferences, or in the same conference as different conferees. The capture region of a presenter in one conference may include attendee displays from another, or this "chaining" feature may be prohibited by the system.

Another example of several clients running on one CPU occurs when several users are connected through terminals (e.g., X-terminals) to a host computer which is running the client software for each user.

If a user has a multiprocessor platform with several CPUs, then the system's client software might be configured to use two or more CPUs for the functions of a single client during a communications session.

Server Operation

This example of operation of the invention is based on sharing computer screen images; other stream types may be handled in a similar manner with similar logic, methods, and mechanisms. This is but one possible method of making the server.

At the server, a queue of data packets is maintained and is filled from an input filter and drained by output filters, one for each attendee client. The input filter and each output filter can run at its own speed. An output filter feeding a client connected over a slow network will not send every packet from the queue, but will skip over old information. This filtering process is complex, especially when the data packets represent changes from one image to the next (delta) which must be composited together in order to skip over delta blocks. This is the technique that allows the server to work with any speed network and mixed speed clients in the same meeting. The server data handling processes are described in more detail below.

The server also handles control messages, such as a request to join a meeting or a message from a client signaling that it is attempting to reconnect to a meeting after losing its connection; reconnection requests can also come from other servers when multiple servers are involved (multiple server situations are described in more detail below). The server accepts connection requests and verifies that the user of the client software is authorized to join the meeting. For each client connection, an icon and gong characterizing the user are sent to the server and then to all conferees by the server. If a non-presenting attendee desires to become the presenter, the attendee client software signals the server and a message or signal passed to the presenter client is conveyed to the presenter to indicate the other conferee's desire.

The server accepts system information from each client connection and notes the client's requirements (e.g., all images must be 256-color images) and capabilities (e.g., CPU speed, available hardware-assist for graphics, compression, DSP, Windows® DDB available). From the system information, the server assigns the client connection to an appropriate "output filter class" as explained below. During network communication with a client, the server may measure the network response and update the system information. As required, the server can move a client connection

US 7,369,515 B2

19                                                                          20

from class to class in response to changing network characteristics so as to keep the clients in a class closely matched.

A special class of output filter sends data to another server instead of a client. This server-to-server capability allows conferences to scale to very large numbers of users. More importantly, it allows for intelligent distribution of work over a network of servers. Unlike low-level data transport layers, such as packet routing using the Internet Protocol ("IP"), servers know the meaning of the data elements they are routing, so the routing can change based on the meaning of the data in the message. For example, if the server knows that data is a delta of a display update and the computing effort required to receive and process each delta is more than a particular client has, the server can decide to not route the data packet to the client or to route the data to the client via another computer (or another process on the server) which will perform some of the necessary processing for the client, in essence to "predigest" the data for a client that needs it. As an additional example, the server can read the time stamps in the data messages, and based on the demands and resources of the clients, the network characteristics, and other information concerning the system, can decide to route the data by alternative or redundant routes through other servers.

Particulars of the Server Data Filtering Process

FIG. **8**A is a block diagram showing the flow of data in the server processes **100** used to intelligently filter and route one of the input data streams among those that the system may be transporting. As mentioned above, these data streams can be real-time shared-image conference data streams, other data streams which have similar transport and timing requirements, or arbitrary data streams. The example used here is the transport of a real-time shared-image conference data stream.

Generally, a data stream arrives at the server from a presenter client and is routed to each of the attendee clients. The complexity of the diagram is due to the fact that the server must accommodate many clients of differing capabilities. The data stream inputs from the presenter client are shown on the left in the form of a queue; four types of input stream for the example of the shared-image conference are shown, but in the preferred embodiment only one will be active at a time. Possible data stream outputs to attendee clients for the given input stream are shown on the right in the form of an editable queue.

The presenter client can dynamically change the format in which it provides data, based on the presenter client computer's capabilities, backlog, local network congestion, and information provided by the server. The data can arrive as uncompressed base data blocks (raw data) on the stream labeled "ubase" if the presenter client decides not to send the differences and decides not to compress the data. If the presenter client decides, based on performance, network bandwidth, etc., to compress the data, it sends the data stream as compressed base data blocks ("cbase"). The presenter client can also send the data stream as uncompressed difference (delta) blocks ("udiff") or as compressed delta blocks ("cdiff").

As each data block is received, it is time stamped by a time stamper **102** with either the true time of arrival or a later time of handling (used for when the conference is not a live conference, but is being played back). Time stamper **102** may also simply validate a time of sending stamped by the presenter client.

The data block is then fed to a server queue for that type of data block. The server queues are labeled "qubase" (for uncompressed base data), "qcbase" (for compressed base data), "qudiff" (for uncompressed delta data) and "qcdiff" (for compressed delta data). Since the presenter client provides data in only one data type (although it could provide all four data types, if the presenter had a fast machine, the server was a slow machine and the network between them had excess capacity), and the data type sent can change from time to time, filter **100** uses a queue filler **104** to fill all four queues using just the one data type provided by the presenter client. Of course, if filter **100** notes that none of the attendee clients need a particular data type, that data type can be ignored and its queue eliminated.

As shown in FIG. **8**A, the data type which is received can just be routed to the queue for that data type. If the received data type is uncompressed, the corresponding compressed queue is filled by running the received data blocks through a compressor **106**b (base data) or **106**d (delta data). If the received data type is compressed, the corresponding uncompressed queue is filled by running the received data blocks through a decompressor **108**b or **108**d. If the received data type is base data, delta blocks are generated by a delta block generator **110**, which records a previous base block and differences it with a current base block; it may also reference delta blocks that it creates and stores. Delta block generator **110** is coupled to the ubase stream after uncompressor **108**b so that delta block generator **110** receives the base data whether it is sent as ubase data or cbase data. Likewise, delta block generator **110** is coupled to the udiff stream before compressor **106**d so that both qudiff and qcdiff receive the benefit of delta block generator **110**.

For processing in the other direction, i.e., filling the base data queues having only delta data, queue filler **104** includes a compositor **112**. Compositor **112** gets its inputs from a base image frame store **114**, the udiff stream and the cdiff stream (after being uncompressed by uncompressor **108**d or a separate uncompressor **116**). Base image frame store **114** maintains the equivalent of the previous full base frame. As delta frames are received, they are differenced (or, more precisely, "undifferenced") with the contents of base frame image store **114** to generate uncompressed base data. Because the output of compositor **112** is coupled to the ubase stream prior to compressor **106**b, the base frames output by compositor **112** can be used to fill the qcbase queue as well as the qubase queue. If the presenter client can switch from base data streaming to delta data streaming without sending an initial snapshot frame as delta data, compositor **112** should be coupled to the ubase stream and the cbase stream (or the output of uncompressor **108**b). Of course, the delta queues might contain base data from time to time, such as when a "checkpoint" is done to prevent an error in delta data from being propagated indefinitely.

The data blocks in the (up to) four queues are stored in time stamp order, so they may be viewed as a single complex queue of a data type comprising multiple parallel block entries compressed or uncompressed, differenced or base. The output of this complex queue can be sent to attendee clients as is, but filter **100** includes several other output mechanisms to accommodate disparate attendee client types. Base frame image store **114** might also be a source of server output, such as when a client requests a full capture rectangle image. This might occur when an attendee client has lost its place, lost its network connection and reconnected, or is joining a conference for the first time.

Although the four output queues can be viewed as a single queue, ordered by the time stamps, there could be up to four

US 7,369,515 B2

21                                                                    22

different queue entries for each time-stamp value. A queue synchronizer **130** uses arbitration or prioritization techniques to settle any discrepancy between presenter client time stamps and server receipt time stamps.

The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection. Reassignment can occur dynamically as the connection or client loading change, or when requested by the client. A monitor process (not shown) on the server monitors the activity of the output filters to shift attendee clients from class to class if the clients are either too fast or too slow for the class they are in. This is done dynamically, and the characteristics of all clients in a class as well as those in other classes are considered in balancing all classes.

Typically, Class 1 is used for fast attendee clients on a network. A Class 1 client receives all the data blocks, from one or more of the server queues. Because a Class 1 client receives all the blocks, the server need not track which blocks were sent to which clients. Some Class 1 clients will be able to decompress compressed base blocks as fast as they get them, and will take the blocks from the qcbase queue. Other Class 1 clients will be able to handle every data block, but only if they are delta blocks.

Class 2 is used for fast network connections to slow machines, such as **386**s connected to corporate LANs. A Class 2 client might not be able to process each block, even uncompressed blocks, in which case filter **100** will discard blocks. A block discarder **132** is provided in filter **100** to track which blocks have been discarded for which Class 2 clients. Class 2 clients are provided with base data types (ubase and cbase) and not the delta data types so that block discarder **132** can discard some blocks without any loss of critical information. There is a loss in frame rate when blocks are discarded, but that loss is not as critical as the loss of delta data blocks. In addition, the memory and time required to track dropping base blocks for each Class 2 client is much less than for tracking the discarding of delta blocks. To avoid slowing Class 2 service for all Class 2 clients to the speed of the slowest Class 2 client, one output of block **45** discarder **132** is provided for each Class 2 client. Thus, a faster Class 2 client will experience a higher frame rate as it will receive more data blocks than a slower Class 2 client.

Class 3 is typically used for clients that cannot even handle delta data blocks on a regular basis because of network limitations or client processing limitations. Even though a client might be fast enough to handle uncompressing data blocks, if its network connection is not fast enough to send even the compressed data blocks, the client will be classed as a Class 3 client because not even every delta block can be sent to the client. So that the client can present a conference in substantially real-time if needed, delta blocks are composited by filter **100** so that multiple base and delta blocks can be, in effect, replaced by a single data block. To accommodate the differing needs of each Class 3 client, a separate queue is set up by filter **100** for each Class 3 client. As should be apparent, filter **100** has to do more work for a Class 3 client than for a Class 1 client, so it is to the server's benefit to upgrade clients as their speeds increase or their network connections improve.

Filter **100** maintains a "qmulti" queue for each Class 3 client. Three qmulti queues for three Class 3 clients are shown in FIG. **8**A. A qmulti queue receives inputs from the qubase and qudiff queues. Where those two queues are not used, the qcbase and qcdiff queues are used instead, but are first uncompressed using uncompressors **134***b*, **134***d*. The delta data blocks and a base block stored in a base image frame store **136** are composited by a base compositor **138** to form one composited base image from a base image and one or more delta images. A delta compositor **140** is used to form one composited delta image from a plurality of delta images. The output of base compositor **138** and delta compositor **140** are then fed through respective compressors **142***b*, **142***d*, resulting in four output data streams (ubase, cbase, udiff, cdiff) fed to a discarder **144** which discards data blocks which the attendee client for that qmulti queue cannot handle. If the particular attendee client does not need all four outputs (typically, any one client will use only one output), the processing for those unused queues within the qmulti queue can be skipped, since the queue only needs to service that client. As with base frame image store **114**, base frame image store **136** can supply Class 3 clients with full frames upon request or as needed.

Discarder **144** drops blocks based on parameters about the network and client known to the server and to filter **100** as well as parameters and requests (e.g., "slow down," "speed up," or frame rate specifications) received from the client. The dropping of blocks is preferably done on a block-by-block basis, but it can also involve discarding all the blocks in the presenter client's capture stream; the related issue of consistency is discussed below. If it turns out that more than one Class 3 client has the same requirements, all but one of the qmulti queues might be virtual queues. In effect, the processing for all the qmulti queues for those similar clients is done once, with each getting a copy of the results of that processing. For example, one multi-client qmulti queue might be handling a plurality of 386-class client machines running over a corporate ISDN line. Other qmulti queues might then supply other similar machines which are connected to the server by modem (e.g., 14.4 or 28.8 kilobyte data rates), LANs, T1 lines, etc. If any of these lumped Class 3 clients deviates from the common requirement, then its virtual qmulti queue would then become a real qmulti queue and would perform processing separate from the other queues. Among all Class 3 output queues, the various separate compositors **138**, **140** may have different workloads from the fact that the number of delta blocks composited together and the number of blocks discarded will vary according to the capacity of the attendee clients serviced by the qmulti queue.

The use of more than one output class avoids a slow connection's retarding a fast connection. Filter **100** includes a buffer reclaimer **150** which examines the queues to determine if portions of the queue buffers have already been read by Class1, Class 2, and fast Class 3 clients, and are not going to be used by slow Class 3 clients (they will be discarded). If that is the case, then buffer reclaimer **150** marks those locations in the queue buffers as reusable, to save on memory space.

The different output classes and the monitor processes on each data stream allow the server to handle data streams at different speeds for clients of different capabilities and network connections of different bandwidths. The streaming of update information formed into blocks improves the perception of low latency, but it may be desirable for some applications to reduce the mixture of blocks from different capture events that show on the attendee's screen at one time. The system can be set to provide this consistency by delaying the updating until a whole rectangle can be shown.

US 7,369,515 B2

23

One form of this adaptation can occur at the server, as shown by the example of FIG. **7**B. There, a capture rectangle is broken into four blocks (**1**,**2**,**3**,**4**). The server maintains a consistency flag which can be either "off" or "on." If the consistency flag is off and the server receives data representing blocks **1**A, **2**A, **3**A and **4**A (taken at time A) from the presenter client and is able to send out blocks **1**A and **2**A, and in the meantime receives blocks **1**B, **2**B, **3**B and **4**B, the server will send out **3**B as the next block, reasoning that **3**B is more updated than **3**A so it is a better block to send out. However, if the consistency flag is on, the server sends the old blocks **3**A and **4**A anyway, so that the client can maintain a time-consistent display. Following **3**A and **4**A, the server sends blocks **1**B-**4**B and so on. Clearly, consistency requires additional memory and produces added latency. This trade-off is decided upon between the server and the receiving clients, based on a variety of factors described above. If the network, the server and the client can easily handle consistency, then the consistency flag might be turned on, but where display updating happens quickly and there are other constraints on the system, the consistency flag might be turned off.

As described above, the server provides control of information flow to keep fast attendee clients supplied with updates as often as possible, and to avoid sending slow clients updates they cannot use or that will overburden their network connections. The server also provides flow control for presenter clients, as needed, by determining the fastest rate of updating required by attendee clients, and then signaling the presenter client to grab blocks no faster than the fastest consumer can demand them, so that the presenter will not have to waste resources collecting and processing data that no client can use or no network can afford to carry.

Storage Services

FIG. **8**B illustrates a more complex conference server which handles the more general case. The server in the general case might maintain additional output and additional input queue components for transmitting information to other servers and for storage services, including caching, short-term storing, recording, and archiving, and for later playback. These purposes are distinguished as follows: caching provides fast memory hardware support in improving the performance of the server; short-term storage provides backup and refresh capability for extremely slow or temporarily disconnected clients, for newly connected servers that may need information older than that normally held in the output queue, for quick-turnaround failure recovery, and for other short-term needs; conference sessions are recorded when they are primarily intended for later viewing by users of the system who may or may not be participating in the session; an archival session captures all or part of a meeting as it occurs and is intended for users who typically were conferees in that session and have a reason to review the session later. Uses of recorded sessions, especially when they incorporate synchronized voice, include live online training sessions that also serve for future offline training, technical and marketing demonstrations, and formal presentations that can be broadcast or accessed remotely at will. Archived sessions have uses other than review, including briefing absentees, capturing interactions involving or aiding technical support, evaluating sales personnel, and the like. Of course, these needs and characterizations are not exclusive or exhaustive.

24

Possible features and methods for storage handling will now be listed. The emphasis will be on recording and archiving, but shorter term storage modes will share many of these characteristics.

During any session, there can be multiple "storage server" queues, or "storage streams," saving output to one or more media. These can be controlled by the server itself, by recorder-like interfaces (similar to a video cassette recorder, or "VCR") at the clients, or by other interfaces operated by conferees. Each stream can be independently controlled, or one controller can control multiple storage streams. The storage facility can operate concurrently in an ongoing meeting to record a live conference, or it can be used by itself to capture a recording for later replay.

It is possible to control who can record a meeting, how much data they can record (by time or by disk capacity, for example); the type of information they can record (by stream, by user sets, or the like), the storage medium (disk, tape, etc.), and when recording starts. Recording might be set to automatically start when a certain user connects, when the first connection is made, when a certain number of conferees are connected, when the first person presents, when a particular person presents, at a particular (real) time, after a particular duration from the beginning of the meeting, or because of some other triggering event. It is also possible to control the end of recording, based on similar triggering events or triggers related to capacity, elapsed time, etc. The controlling can be done by a conferee at a particular client, by a moderator, or the like.

Possible storage targets include local disk files, local database servers or back-ends, remote database servers or back-ends, remote storage engines relying on the data structures, controls, and methods of the system of the present invention (example system architectures are described below), and local or remote permanent storage media (optical, magnetic, magneto-optical, etc.). Permanent storage can also be used by the system to assist recovery from disaster. The storage stream could also be directed to an email message or to another computer application within the system of the present invention or beyond it.

It is possible to control the quality of storage input and playback output. Each storage stream can have an associated quality parameter associated with it so that it behaves as though connected at a particular network speed. Thus a stream might be stored or a playback stream might be produced that was suitable only for replay at a given speed. Or several playback streams could be simultaneously produced from the same stored information for several different particular playback rates. If most or all of the original session data is stored, then replay might perform the same adaptive filtering described in FIG. **8**A for real-time "live" meetings, so that the single storage source could be played back at multiple, adaptive rates.

Since there would be added value in being able to access recorded information, it is appropriate to describe how billing controls might be incorporated. Billing could be performed when the original recording is made, or when a recording is played back. Billing might be based on units of time used or on units of storage consumed, at the time of recording or at the time of replay. Billing for recording and playing may be independent. Any tracking that needs to be made to implement the billing functions can be incorporated into the storage and playback services of the communications system.

It is possible to tailor the data stored. Since a conference typically involves multiple data streams, one or more may be chosen for storing. Some streams might go to one storage

US 7,369,515 B2

25                                      26

device or modality as described above, others might go to different ones. Synchronization between streams (e.g., voice and imagery) can be maintained, even when the streams are stored in different places and ways.

Stored information can be replayed through another communications session established by the system according to the present invention, or it can be sent through other communications channels, for example, email, file transfer protocol ("FTP"), or physical media transfer by postal or courier services, etc., and replayed by the recipient using the client software according to the present invention. Stored material might be replayed from a copy local to the user's computer, or it might be retrieved after WWW navigation to a replay-enabled Web site. Retrieval might involve streaming the data in the ways described above, or transferring the data by email, FTP, WWW download, or the like. With Web based retrieval, support could be provided for browsing by content, searching by user-defined keys, controlling access by user-provided keys, access lists, privilege levels, or user-provided payment options (e.g., credit card number on file).

Control modes on replay might include: control by server without user interaction for a single data stream (like a pay-per-view movie in which each copy local to that attendee who joins gets to see the playback forward from the from the point of joining); control by the server, without interaction but with multiple streams (e.g., all attendees get to see the movie from the beginning regardless of when they join the show); by an external moderator; by VCR-style controls at one or more client computers. Each set of controls can affect either all the sets of streams or a particular grouping of streams. Replay can occur at the original real-time recording rate, at faster-than-realtime (like fast forward play on VCRs), in VCR-style single stepping modes, and in the various reverse modes as well. Random access and jump playback by index marking, by time codes, by presenter, or by other organization could be supported.

In addition to the stored meeting contents, any other document or data object might be uploaded and stored with the meeting (e.g., meeting agenda, minutes of a previous meeting, or supporting materials). Upload is another type of data stream that passes into the system server and is then relayed to a suitable storage entity residing on the same or a different host. Attachments can be retrieved either with specialized functions of the client software, by navigating Web pages and using a Web browser, or by other retrieval mechanism. Attachments are subject to all of the same controls as the recorded meeting contents with regard to access, billing, playback, etc.

The above-described elements of the more generalized conference server concepts are illustrated in FIG. **8**B. In addition to the instances of the simple output filter processes **100**, the more complex server functions shown in FIG. **8**B includes inputs for different sources, such as other servers (where the complex server shown might be an intermediate server for a large broadcast), storage sites for replay and import channels, and outputs to other intermediate servers, storage sites, and export channels.

Multiple Servers

Up to this point, the conference server has generally been referred to as a single computer running conferencing software. The server functions described so far may be performed on several different computers running conference server software connected over a computer network. FIG. **9**A shows a configuration with four conference servers **14**(a)-(d), one presenter client **12**, and eleven attendee

clients **18** (some of which are separately identified with letters). Three conferee clients are connected to each server. The four servers are completely connected, that is, a connection is shown between each pair of servers. With many servers, this degree of interconnection would be unrealistically complex, expensive, unneeded, and performance degrading. One of many useful techniques, a "tree topology," for interconnecting numerous servers is described below.

There are three classes of advantages from having several servers active in a given conference.

Static advantages result from a configuration and division of tasks that may persist throughout the conferencing session. The following are among these advantages.

(WAN economy and local performance) A conferee may find economy in being able to connect to a nearby server— where nearby may mean geographic closeness, or in the same network service area, or on the same local area network, or the like. Thus in FIG. **9**A, attendee client **18**(a) may find it cheaper to connect to server **14**(a) than to server **14**(c), while in turn client **18**(c) may find it cheaper to connect to server **14**(c) than to server **14**(a). At the same time, there may be better performance of the system with these local connections compared with a longer path with many hops to a more distant server.

(Client migration and homogeneous concentration) The advantage of having all of a server's attendee clients be the same and additionally of having them be the same as the presenter client has been discussed. There can be an advantage then of assigning similar clients to a single server when several servers are available and performance is not otherwise degraded. For example, in FIG. **9**B, attendee clients **18**(c) and **18**(d) are identically configured computers running the same operating systems with the same display configurations as the presenter client **12**, so both have been moved from their original servers (indicated by dotted arrows) and reassigned to server **14**(a), as designated by the dashed arrows. The same advantage may also be found when clients of a server are in the same output class (as discussed above under the single server); thus, reassignment of clients in a given class so that one or more servers have all or most of their clients in that class can improve performance by making those servers' processing loads more uniform. Finally, as described under the discussion of WAN economy and FIG. **9**A, homogeneity may also involve nearness, and for this reason client reassignment may achieve that goal as well. In addition to reassigning clients to servers already participating in the conferencing session as above, it is also possible for the system to recruit additional servers where these resources are provided but not yet assigned to the particular meeting. Thus, server **14**(b) may be automatically connected to the server-server structure for the meeting pictured in FIG. **9**B in order to provide connections for the three clients **18**(b).

(Tree branching for load reduction and scalability) In FIG. **10**A, a tree topological configuration can provide economy in traffic handling and improved performance. Information from presenter client **12** is communicated to server **14**(a) and then to the other servers and on to attendee clients **18**, following the solid arrows. In this configuration, each server is shown handling four data connections of a single stream type; a single server would have to handle twenty-eight data connections to connect the presenter client to all the attendee clients. If attendee client **18**(a) issues a command or request to server **14**(a), represented by the dotted arrow, the message will be responded to by server **14**(c) or passed to server **14**(b), and handled there or in turn passed to server **14**(a),

US 7,369,515 B2

**27**

with these two paths also shown with dotted arrows. This means although some commands or requests may need to be seen by three servers, each server will see and process only a fraction of the total such messages: Just as the tree configuration allows a given number of conferees to hold a meeting more efficiently than with a single conference server, it also means that relatively few extra servers need to be added to expand the meeting and maintain the tree configuration. For example, if R+1 is the number of data connections per server, and ceiling(x) is the smallest integer greater than or equal to a real number x, then the number of servers S is required to hold a conference with C conferees, assuming one presenter and using the tree configuration, is (R˄ceiling(log_R (C−1))−1)/(R−1). In particular, using R=3, which is the value in FIG. **10**A, forty servers will suffice for eighty-two clients. More realistically, if R=100, then 10,101 servers will provide the advantages of the tree configuration to a presenter and one million attendees. This takes only 101 extra servers over what would be required if the presenter client were directly connected to 10,000 servers, each of which served 100 clients. But the latter configuration, exemplified by FIG. **10**B with R=3 and C=28, is not realistic, since presenter client **12** would be deluged with independent commands or requests to update, or resend, or similar messages; in other words, the presenter client would have traffic in excess of the capacity of any server **14**. Based on distributing the server functions over many machines, and employing this tree topology for propagating information among servers, server-to-server communications and management provided by the present invention allow the number of participants in a meeting to increase exponentially with only linear degradation of the performance. Similar analysis applies if server capacities are not uniform, that is, if different servers can handle different numbers of data connections.

Adaptive advantages result from reconfiguration and redistribution of tasks in response to relatively long-term changes in the system during the conference session.

(Backup server) If a server fails or becomes isolated from the network, then its clients may be connected over previously inactive backup links to other servers. Attempts can be made to reestablish communication with a server that has dropped out. If unsuccessful, its workload may be distributed to other servers. In FIG. **9**C, attendee client **18**(c) has conference server **14**(c) as its principal server, but the dashed arrow indicates the assignment of server **14**(a) as a backup server. Should the connection between client **18**(c) and server **14**(c) fail, as indicated by the "X" on the arrow between them, or should server **14**(c) fail or become isolated from the net, then server **14**(a) can respond to commands from and provide updates to client **18**(c). Presenter clients and servers themselves can be assigned backup servers as well. Thus the dashed arrow between servers **14**(a) and **14**(d) indicates that each has been assigned as a backup for the other. Should the link between servers **14**(a) and **14**(d) fail, as indicated by the "X" on the arrow between them, or server **14**(b) fail or become isolated from the net, then server **14**(d) can take over traffic previously routed to server **14**(a). It is also possible to have servers ready, but not active, as backups, or to have mirroring servers for even more secure redundancy. Since the state of the conference can be announced to all servers, the system may be configured so that a disrupted conference session can be robustly resumed with minimal loss of data and time.

(Transformation factoring) The transformations or transcodings that a block may undergo in transit from the presenter client to an attendee client may include differenc-

**28**

ing, error-correction encoding or decoding ("source coding"), compression or decompression (both for "channel coding", or just one for purposes of bandwidth matching; lossy or lossless), encryption or decryption ("privacy, security, or authentication coding"), compositing with other differences or with base blocks, conversion from DDB to DIB and back, storing, replaying, copying, or the like. Editing, mixing data from different sources or presenters, mixing data of different kinds, duplicating, changing the order, the format, the storage or playback quality, etc., are other examples of transformations, which are neither exclusive nor exhaustive. Some or all of these may be performed and the order of performing them may change. As previously discussed, some may be performed by a conferee client, some by a conference server. When several servers are available or when several clients have different capabilities and resources, these functions may be delegated or migrated to different machines. For example, in FIG. **9**D presenter client **12** is differencing, conference server **14**(a) is compressing, server **14**(b) is distributing the decompression task to attendee client **18**(b) (which has decompression hardware), server **14**(d) is compositing the resulting delta block with a previous delta block, and attendee client **18**(d) is compositing the result with an old base block. This advantage is viewed as adaptive, since the loading configuration that makes a particular distribution favorable may change slowly during the conference session, but it could be a static advantage when some machines have much greater capabilities than others (such as compression or decompression hardware).

(Distributed and redundant flow control) The architecture and logic of the filter process as described above and illustrated in FIGS. **8**A,B may be distributed among several servers and even clients. Thus, like the functional transformations, portions of the queues themselves, as well as the internal operations of the filtering process, may be found on different platforms at different localities in the network, and at different times. Not only may the information and functionality be so distributed to improve memory economy or gain memory or processing speed, but the system can be made more robust by redundant storage, and more responsive by parallelizing the pipeline. The queues may also be segmented sequentially over several platforms. These different aspects are shown in FIG. **9**E. Here, qcdiff is stored redundantly on servers **14**(a) and **14**(b); on server **14**(a), qcdiff uses the special compression facilities provided by an attached hardware device **15**. One card of qmulti is stored on client **18**(c) (perhaps a machine with very fast reliable surplus memory) while the rest are on server **14**(c). While qcbase is housed on server **14**(b) using a compression codec (possibly hardware based) on client **18**(b), it operates in parallel with qubase on server **14**(d), which uses a discarder on client **18**(d) (there is additional undiagrammed parallellism implicit in having portions of the output queue on all four servers). Finally, qudiff is segmented sequentially with the first part (qudiff.beg) on server **14**(a) and the last part (qudiff.end) on server **14**(d). Note that in the last case, the two segments of qudiff are not even adjacent in the network linkage shown. Another type of distribution of the queues is given in FIG. **9**F. Assuming the presenter client breaks the capture rectangle into four blocks B1, B2, B3, B4, it illustrates, using just qubase, how the stream data can be decomposed and distributed over all four conference servers **14**(a–d), so that the subqueue qubase.B1 of uncompressed blocks B1 are on server **14**(a), the subqueue qubase.B2 of uncompressed blocks B2 are on server **14**(b), etc.; this represents another form of parallellism. These are simple

29

examples; there are more complex analogues when there are more servers, and all of them may occur in various combinations. The various techniques of RAID (Redundant Array of Inexpensive Disks) striping with recovery from errors are also applicable. All of the distribution schemes mentioned here may also vary over time.

These are specifically adaptive advantages, but the static advantages also have parallels here, since a backup server may also be close, since a change in presenter may warrant a new tree configuration, and since an output class change may warrant a new homogeneous concentration reassignment.

Dynamic advantages result from reconfiguration and redistribution of tasks in response to relatively short term changes in the system during the conferencing session. The following are among the dynamic advantages.

(Content-based routing) Unlike IP routing for example, the system has access to the contents of the information being routed. Thus it can read the time stamps, type of data, and other information included in the base or delta block data or other system data. It can use this together with measured properties of the network interconnections of the servers and clients to determine best-estimate optimal routing between and through its components. In FIG. 9G, one route from presenter client 12 to attendee client 18(d) (through server 14(b)) is shown in double arrows, another (through server 14(d)) in heavy arrows, to illustrate that one route may be preferable under some conditions, but as conditions change, the system may select a different route.

(Redundant routing) The system can send image or other data by several routes at once. This can improve performance, since the earliest to arrive at the destination may trigger the discard of later-arriving data. This can improve the resiliency and robustness of the system, since it is more likely some data will get to the destination. It can also improve reliability or accuracy, since several versions may be compared at the destination to see if they are identical. In case of discrepant data at the destination, retransmission or some arbitration method can be requested, depending on the purpose of the redundant attempts to insure delivery. For example, again in FIG. 9G, information from presenter client 12 may be sent by conference server 14(a) using both routes, indicated by the double arrows and the heavy arrows, to server 14(d) and then to attendee client 18(d).

These are specifically dynamic advantages, but the static and adaptive advantages have parallels here as well. This can be summarized in an additional dynamic advantage.

(Dynamic reconfiguration) Any of the configurations described above and the parameters determining them and the routing schemes can be altered depending on changes in client, server, and network capabilities, needs, resources, and loads as announced or demanded by clients, or as measured by the system, or as specified by conferees or system administrators, or other prevailing or desired conditions.

Any combination of advantages from these three groups may apply. There will in general be tradeoffs among these advantages. The system can be given specific configuration preferences, or it can automatically adjust during use according to preset optimization goals, or it can adaptively set optimization goals and adjust the configuration to approach them.

Example of Server Architecture

So far, a server or each of a set of servers operating together has been viewed as a computer performing the

30

server functions described. An example of server architecture and use will now be given, without suggesting the necessity for, or the exclusiveness of, this architecture to accomplish the communications serving functions on single or multiple and interconnected servers described above. Also, the previous examples have dealt with a single conferencing meeting or other communications session; the method to be described below can also accommodate several meetings on the same underlying hardware and the conferencing software as provided by the present invention. Again, the description of this method is not intended to suggest that this is the only way in which the invention can accomplish multiple simultaneous communications sessions. Any references to the image-sharing example should be extended to arbitrary data steams.

FIG. 11 shows an architecture of a single server and a single meeting. The primary component of this architecture is a server manager 36 (identified in this diagram as "ServMgr 'InfoPass'"), which is directed by a meeting manager 32 (identified in this diagram as "MeetMgr 'TheCompany'"). Meeting manager 32 is an unowned, quiescent, resident, interrupt-driven process (similar to a "daemon" process used with Unix and other operating systems). It may or may not be running on the same CPU as WWW server 30(a); it may or may not be running on the same CPU 38 (called here "Beowulf") as server manager 36 "InfoPass." The server manager is also an unowned, quiescent, resident, interrupt-driven process. Each CPU that is involved in the system for providing server functions in meetings set up by a meeting manager has exactly one server manager running on it; that server manager can be viewed as the meeting manager's agent on that CPU. The meeting is directly supervised by communications session server ("CSS") 40(a), called here "Meeting #1 'Product Support.'" When server manager 36 receives a command from meeting manager 32 that includes the information on a meeting and on the first conferee that wishes to connect, the server manager creates a CSS to handle the meeting. The CSS is an owned, evanescent, quiescent, interrupt-driven process. The CSS is owned by the server manager and is killed a period of time after all the conferee clients connected to its meeting disconnect or fail to respond.

In FIG. 11 there are three conferee clients 17(a)-(c) connected to the meeting. Clients 17(a),(b) use a client-server protocol provided by the system, which might be a combination of Transmission Control Protocol ("TCP") and User Datagram Protocol ("UDP"), for example. Client 17(c) uses another protocol, here exemplified as Hypertext Transfer Protocol ("HTTP"). The CSS 40(a) provides an included "gateway" layer 40(b) for each connection protocol other than the system protocol, and this layer translates the client's nonsystem protocol to the system protocol. The acceptance of different protocols may aid the system's operation across firewalls or adaptation to clients' restricted network connections, for example.

A potential conferee 17(a) has navigated his or her WWW browser to Web server 30(a), and has asked through the Web page presented to connect to the meeting (as described above in the discussion of FIG. 2). There may be alternative ways, indicated here as 30(b),(c), to connect to the meeting, including direct access to the meeting manager or its database 34 (called here "Meeting DB"). The meeting manager uses this database to hold information concerning the meeting (the database need not be on the same computer as the meeting manager). This information was created when the person who set up the meeting requested that the meeting be scheduled, gave descriptive information for the meeting,

US 7,369,515 B2

31

specified the keys and privileges, and provided other administrative information. The database is reconfigurable and easily extensible to include many and varied meeting attributes. It may be accessed by a programming interface. Potential new conferee client 17(a) sends a request to join the meeting, and then supplies the key for the meeting that the potential conferee has obtained previously. Potential client 17(a) may also send previously selected identification information such as icon, gong, etc., and this may be stored in Meeting DB or in some other sort of directory service. After the meeting manager has validated potential client 17(a), it sends a message that causes the client software to run on the potential client and then sends that client software the address information for the CSS, such as a URL and port number. At that time, the client software may also receive address information for backup CSSs in case the connection to the meeting fails and automatic or manual attempts to reconnect to the initial CSS fail as well. The client then connects to the meeting, and may pass to the CSS its identification information.

A CSS is created to supervise a single meeting. The monitoring-filtering-queueing structures and procedures of FIGS. 8A,B are performed by the CSS, so FIGS. 8A,B could be viewed as part of the internal working of each CSS in FIGS. 11-22 (in the case of distributed server functions described in FIGS. 9D-F, only part of FIGS. 8A,B might be descriptive of a particular CSS). Indeed, there will be a version of FIG. 8A applying to each data stream the CSS handles as multipoint real-time traffic from a presenter client. The structure of FIG. 8B shows schematically how these and other multiple input and output data streams are processed. The CSS also handles other input from and output to clients, such as information about attendee and presenter clients that helps with flow control, commands or requests from clients, labeled pointer icon positions, and other stream data and control traffic.

In FIG. 11, a dot-and-dash line 14 has been drawn around the structure that corresponds to the term "server" in the earlier parts of the description of the present invention; this may be a helpful analogy, but the description of the example here is only one possible explication of server functions.

FIG. 12 shows a slightly more complex situation than FIG. 11. Here, the server manager has created three CSSs to supervise three meetings. Conferee client 17(a) (labeled here "Jim") is simultaneously connected to two meetings. If Jim is permitted, he can share the information he receives from one meeting with the participants in the other.

Server managers are responsible for measuring network connection bandwidth, reliability, CPU load, and other parameters, and determining the configuration of any and all CSSs they may own at any given time based on these measurements and other considerations.

FIG. 13 shows a more complex arrangement than FIG. 12. Now, there are two CPUs, 38(a) and 38(b); each has its own server manager, but both are directed by the same meeting manager. Server manager #1 36(a) has created two CSSs to handle two meetings, and server manager #2 36(b) has created a single CSS. Conferee client 17(a) is now connected to two meetings on two different CPUs, possibly distant from each other.

FIG. 14 exemplifies the situation when there are several meeting managers by showing two meeting managers 32(a), (b) active. Each has its own meeting database 34(a),(b). Each directs the server manager 36(a),(b) on a single CPU 38(a,b). Server manager 36(a) has created two CSSs 40(a), (b) to handle two meetings. The other server manager 36(b) has created a single CSS 40(c). The only connection pictured

32

between these two instances of the system is the presence of client 17(a) "Jim" in two meetings, one in each instance of the system.

If a need arises to let a second meeting manager set up meetings on a CPU that already has a server manager managed by a meeting manager, then the currently running server manager forks or clones itself and the new server manager becomes the agent for the newly involved meeting manager. Thus, there is a one-to-one correspondence between server managers running on a given CPU and meeting managers that set up meetings on that CPU. As an illustration, in Panel 1 of FIG. 15, meeting manager 32(b) sends a message to server manager 36(a) on CPU 38 that causes server manager 36(b) to be created. Then afterward, in Panel 2, meeting manager 32(b) and server manager 36(b) start the meeting through the new CSS 40(b). Conferee "Jim" 17(a) has joined both meetings, but there need be no other relationship between the two meetings shown. In the situations below, there will be no difference if server managers for different meeting managers are on the same CPU or on different CPUs.

FIG. 16 shows a single server manager 36 that has created three CSSs 40(a)-(c) on one CPU 38, but now these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on the same CPU if process limitations were exceeded by a great number of client connections and their requirements, or the like. In order to coordinate their work, the three CSSs communicate using a system-provided server-server protocol. This protocol may use the same sort of blend of networking protocols as described for the client-server connection, or it may be quite different. For diagrammatic purposes, FIGS. 16-20 show interprocess communication links only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between CSSs 40(a) and 40(c) in FIG. 16. This interprocess communication allows one CSS to send presenter client output to another, for example; this was described above in the discussion of FIG. 8A. More detail on this is given below in the discussion of FIGS. 21 and 22. Conferee client 17(a) "Jim" is known to two CSSs 40(b),(c), but is actively connected only to CSS #3 40(c). The connection to CSS #2 40(b) is a backup assignment (as described above in the discussion of FIG. 9C). Should CSS #3 fail, then "Jim" can automatically be connected to the meeting through CSS #2.

FIG. 17 shows a single meeting manager that directs two server managers 36(a,b) that have created three CSSs 40(a, b,c) on two CPUs 38(a,b), and these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on additional CPUs if the CPUs were distant from each other, but closer to their respective sets of connected clients, or if process limitations were exceeded by a great number of client connections and their requirements, or the like. The advantages described in the discussion of FIGS. 9A-G, 10A, B provide numerous reasons for multiple servers (which in this context means multiple CSSs) that handle the same meeting and that may be distributed over a number of CPUs. As in FIG. 16, the three CSSs communicate using a system-provided server-server protocol. In addition, the two server managers communicate using this or a similar protocol in order to coordinate the full span of this meeting. They exchange the performance measurements they make in order to adaptively configure the CSSs. For example, conferee client 17(a) "Jim" begins the meeting connected to CSS #2. At some point, the server managers determine that it is likely that better service will be obtained by "migrating" this connec-

tion from CSS #2 **40**(*b*) to CSS #3 **40**(*c*) and so from CPU **38**(*a*) to CPU **38**(*b*) (as described above in the discussion of FIG. **9**B). This reconnection may be performed automatically. Moreover, the creation of CSS #3 to handle this meeting and the interprocess communication channels between CSSs and between server managers may be established automatically to improve performance and balance loads (as further described above in the discussion of FIG. **9**B). The creation of additional CSSs, on the same machine or on different machines, to handle the same meeting is the basis of the scalability of the present invention.

It is possible for several meeting managers to each direct a server manager that has created one or more CSSs, and these CSSs all handle the same meeting. This is pictured in FIG. **18** with two meeting managers **32**(*a*),(*b*) and their respective databases **34**(*a*),(*b*). This could be the situation if two different companies own the meeting managers and might wish to hold a joint meeting (here called "Meeting #4 'Joint Sales'"). The user or administrator that sets up such a multiply managed meeting may manually declare the organization of the management (e.g., the meeting managers involved, the CPUs, the number of CSSs, and other structural, organizational, managerial parameters), or the setup may be done automatically by the system, or it may be done interactively with automated support. Here meeting managers **32**(*a*),(*b*) also communicate using the system-provided server-server protocol. They exchange the meeting information, so that their two databases **34**(*a*),(*b*) are consistent. They also exchange messages that indicate that this is to be a joint meeting, and they inform their server managers of this. Potential conferees join through either meeting manager. The appearance of the meeting may be the same for all conferees, independent of the number of CSSs, server managers, CPUs, or meeting managers involved. Again, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another CSS (from **40**(*c*) to **40**(*b*)), even when the new CSS is on a CPU in the domain of a different meeting manager (from CPU **38**(*b*) in the domain of meeting manager **32**(*b*) to CPU **38**(*a*) in the domain of meeting manager **32**(*a*)).

FIG. **19** extends the situation of FIG. **18**. The two meeting managers are shown directing their server managers in a joint meeting. This time, server manager **36**(*c*) has created two CSSs **40**(*c*),(*d*) for the meeting on the same CPU **38**(*c*), and meeting manager **32**(*a*) has directed two server managers **36**(*a*),(*b*) to create CSSs **40**(*a*),(*b*) for the meeting on two different CPUs **38**(*a*),(*b*). Thus this is a combination of the situations pictured in FIGS. **16-18**. Again, for diagrammatic purposes, FIGS. **19** and **20** show interprocess communication links among server managers only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between server managers **36**(*a*) and **36**(*c*) in FIG. **19**. As before, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another CSS **40**(*b*), even when the new CSS is in the domain of a different meeting manager.

If a CSS fails, the server manager process may create a new CSS, the clients may be migrated to other CSSs already active on the same CPU, or clients may be migrated to other CSSs newly created or already handling the meeting at other locations in the system, as indicated above. If a CPU fails or becomes isolated from the network or system, the meeting manager process can attempt to reestablish network connection with the CPU and send the server manager information to create a CSS to handle the meeting, or the meeting manager can communicate with one or more server managers on still accessible CPUs to create one or more CSSs to

handle the meeting. In addition, clients that have backup connections beyond the failed CPU can be migrated to CSSs handling the meeting. If there are several meeting managers participating in the management of a meeting, and a meeting manager becomes disabled or isolated from the network, then another meeting manger may attempt to establish sufficiently many CSSs through server managers it can reach to carry the workload. These adaptations may occur automatically, or be initiated by a system administrator.

The diagrams in FIGS. **11-19** suggest the range of variability in coordinating meetings and server functions. Many other combinations can be formed from the situations pictured there or may be suggested by them. For example, if a global directory service for meetings is provided, then there could even be a layer of management above the meeting managers, which might be termed a Global Manager.

FIG. **20** illustrates a method for determining which CSSs pass output information to other CSSs that are handling the same meeting. The configuration of meeting managers, server managers and CSSs is the same as in FIG. **19**, except that one client **12** is presenting, the others **18** are attending, and no backup link is shown. From time to time, the server managers determine and agree on appropriate propagation topologies that resemble a tree or trees (trees and their advantages were described above in the discussion of FIGS. **10**A, B) and post a copy **42** of the current choice at each of their CSSs. These are directed acyclic graphs ("DAGs"), which contain no loops, so that the CSS can send out the information with no risk of endlessly cycling it. Each stream being handled has its own propagation DAG, and they may change independently among streams; as described below, each stream may have several propagation DAGs. In FIG. **20**, presenter client **12** is viewed as the root of the tree, and CSS #1 delivers presenter output information to CSS #2 and to CSS #3; in turn, CSS #3 delivers that information to CSS #4; all CSSs also deliver the information to their connected attendee clients **18**.

FIG. **21** represents the situation of FIG. **20** with the topological information of the directed graph **42** emphasized by rearranging the CSSs to resemble the tree specified in the propagation DAG **42** of FIG. **20**.

FIG. **22** represents the situation of FIG. **20** with the same topological information **42**(*a*) emphasized in FIG. **21** and with the addition of another possible propagation topology **42**(*b*) for the same stream. Secondary and multiple propagation DAGs for the same data stream allow the system to reroute the information being sent or to send it redundantly (both as described above in the discussion of FIG. **9**G).

The foregoing suggests that minimal server platform needs for this example would be a network connection and an operating system providing an interrupt service and multitasking, with or without hardware support.

System Extensions and Extendability

Up to this point, there have been multiple servers dealing with multiple clients, where "client" has referred to an enduser's computer or an instance of the conferencing software running on it. But it may happen that the reconfigurations, transformations, and routings performed by a server or servers described above extend to assigning tasks to intermediate devices such as routers, bridges, gateways, modems, hardware codecs, and the like. There may be also be cases where a client lacks display capabilities, but provides other functions to the system or acts as a monitor or recorder of activity. There may be configurations where all server functions are performed on client computers, so there

US 7,369,515 B2

35

is no specified server node in the networked system. In the preferred embodiment, performance may require that there be one CSS per CPU.

Both the server and client software architectures are adaptable. Not only may features be added on that increase the variety of communication possible, such as text chat, audio, and shared drawing areas, but proprietary codecs, transformations, stream operators, and the like may be incorporated as plug-in modules. Addition of streams of abstract data types can be accommodated by the system and in turn allow the system to be expanded and reconfigured.

When operating with data streams that admit asynchronous unnotified updating (where intermediate updates can be dropped if they are obsoleted by later arriving data updates), which are those that are appropriate for multispeeding, the system is robust under occasional loss of information and can thus take advantage of high-speed networking protocols like User Datagram Protocol ("UDP") that do not provide reliable transmission but provide greater network throughput performance than reliable protocols. The system can also be configured to provide secure transport for a data stream, and so could be used to carry the display command streams on which are based other image-sharing systems, but then there would be advantage from multispeeding, although the scalability and other advantages of the present invention would be available.

Codecs, transformations and transcodings described above for the image-sharing example may have analogues that play similar roles with similar advantages in the system's handling of other data streams. It is also recognized that there are other cases of transcoding from one type of data to another, such as text to page image via rasterization, page image to text via optical character recognition, text to speech via speech synthesis, and speech to text via speech recognition. Such tasks may involve transformations in different orders than described above, including decompression at the presenter client and compression at the attendee client. These possibilities are accommodated by the present invention.

The system contains no obstructions to operating across firewalls with permissions. The system is compatible with agents, network proxies, and other stand-in entities, with a variety of network context and content filters, with multiple network protocols for client connections, with bandwidth matching transcoders, with hybrid wireless and landbased networks, with assymetric networks, with clustered CPU networks, with streaming multimedia and signal processing systems, with serial, parallel, and vector processors, and with many other specialized technologies; properly configured and supplied with appropriate permissions, the system either operates transparently with them or enjoys increased performance by employing and extending their advantages. Faster processor speed and greater bandwidth do not obviate the utility of the present invention; instead, they improve its performance.

As mentioned before, the described communications system not only applies to the transport of streams of image data, and to other examples mentioned, but also generally applies to the transport, storing, replaying, scheduling, multispeeding, and other handling and processing of other data streams as well.

One way of seeing the flexibility of the system is to refer to FIG. 23, where several applications covering different separations in time and space for the communicants are listed.

The above description is illustrative and not restrictive. Many variations of the invention will become apparent to

36

those of skill in the art upon review of this disclosure. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A conferencing system comprising:

a conference server;

at least one client the at least one client including a web browser; and

at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after the client-server connection is established, the client-server connection established via the web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference, and wherein one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client validated after establishing the client-server connection but prior to the at least one client joining the conference.

**2**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises a size of at least part of the conferencing data.

**3**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least some contents within the conferencing data.

**4**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least some information about at least part of the conferencing data.

**5**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least one source of at least part of the conferencing data.

**6**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least one destination of at least part of the conferencing data.

**7**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises a rate of reception of at least part of the conferencing data.

**8**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises a rate of transmission of at least part of the conferencing data.

**9**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises hardware involved in processing at least part of the conferencing data.

**10**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises software involved in processing at least part of the conferencing data.

**11**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least one protocol used in processing at least part of the conferencing data.

**12**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least one modification to a conference environment originated by the server.

**13**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises at least one modification to a conference environment originated by at least one client.

US 7,369,515 B2

37

**14**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises a quantity of reception of at least part of the conferencing data.

**15**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data comprises a quantity of transmission of at least part of the conferencing data.

**16**. The system of claim **1**, wherein the at least one client is configured to negotiate with the conference server as to the current capabilities of the at least one client after establishing the client-server connection but prior to the at least one client joining the conference.

**17**. A method for conferencing between a server and at least one client in a conferencing system, the method comprising:

  establishing a network connection between the server and the at least one client, the network connection established via a web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference;

  determining one or more characteristics of conferencing data for delivery during the conference, the determination based on current capabilities of the at least one client validated after establishing the client-server connection but prior to the at least one client joining the conference; and

  providing the conferencing data from the server to the at least one client after establishing the network connection between the server and the at least one client and validating the current capabilities of the at least one client, the provided conference data based on the current capabilities of the at least one client.

**18**. The method of claim **17**, wherein one characteristic comprises a size of at least part of the conferencing data.

**19**. The method of claim **17**, wherein one characteristic comprises at least some contents within the conferencing data.

**20**. The method of claim **17**, wherein one characteristic comprises at least some information about at least part of the conferencing data.

**21**. The method of claim **17**, wherein one characteristic comprises at least one source of at least part of the conferencing data.

**22**. The method of claim **17**, wherein one characteristic comprises at least one destination of at least part of the conferencing data.

38

**23**. The method of claim **17**, wherein one characteristic comprises a rate of reception of at least part of the conferencing data.

**24**. The method of claim **17**, wherein one characteristic comprises a rate of transmission of at least part of the conferencing data.

**25**. The method of claim **17**, wherein one characteristic comprises hardware involved in processing at least part of the conferencing data.

**26**. The method of claim **17**, wherein one characteristic comprises software involved in processing at least part of the conferencing data.

**27**. The method of claim **17**, wherein one characteristic comprises at least one protocol used in processing at least part of the conferencing data.

**28**. The method of claim **17**, wherein one characteristic comprises at least one modification to a conference environment originated by the server.

**29**. The method of claim **17**, wherein one characteristic comprises at least one modification to a conference environment originated by at least one client.

**30**. The method of claim **17**, wherein one characteristic comprises a quantity of reception of at least part of the conferencing data.

**31**. The method of claim **17**, wherein one characteristic comprises a quantity of transmission of at least part of the conferencing data.

**32**. The system of claim **1**, wherein the at least one client is configured to provide the conference server with a key prior to joining the conference, the key identifying one or more privileges of the at least one client during the conference.

**33**. The system of claim **32**, wherein the one or more privileges includes entering the conference.

**34**. The system of claim **32**, wherein the one or more privileges includes being a presented during the conference.

**35**. The system of claim **32**, wherein the one or more privileges includes access to information about another attendee in the conference.

**36**. The system of claim **32**, wherein the one or more privileges includes changing a conference setting.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,369,515 B2                                      Page 1 of 3
APPLICATION NO. : 11/086507
DATED               : May 6, 2008
INVENTOR(S)         : Joseph Salesky et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, item [56] enter references cited

STAHL, S., "Conferencing Breakthrough," Distributed by CMF Publications, June 26, 1995, http://www.informationweek.com/533/33iucon.htm, last visited April 13, 2005.

"Face Off," Distributed by BYTE, http://www.byte.com/art/9510/sec7/art3.htm., October 1995.

"Transmission Control Protocol," Information Sciences Institute, University of Southern California, 1991, 83 pages.

ELEFTHERIADIS, A. et al., "Meeting Arbitrary QoS Constraints Using Dynamic Rate Shaping of Coded Digital Video," Proceedings of the 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, pp. 1-12.

FREDERICK, R., "Experiences with Real-Time Software Video Compression," Xerox PARC, 1994, pp. 1-4.

GAJEWSKA, H. et al., "Argo: A System for Distributed Collaboration," Systems Research Center, Digital Equipment Corporation, 8 pages.

JEFFAY, K. et al., "Adaptive, Best-Effort Delivery of Digital Audio and Video Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 12 pages.

JEFFAY, K. et al., "Transport and Display Mechanisms for Multimedia Conferencing Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 28 pages.

MACEDONIA, M. et al., "Mbone Provides Audio and Video Across the Internet," IEEE Computer, 1994, 12 pages.

McCANNE, S. et al., "Receiver-Driven Layered Multicast," University of California, Berkeley and Lawrence Berkeley National Laboratory, 1996, 14 pages.

SCHULZRINNE, H. et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Request for Comments, 1989, 66 pages.

STALLINGS, W., "Data and Computer Communications," Fourth Edition, Copyright 1985, 1988, 1991, and 1994, 12 pages.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,369,515 B2                                      Page 2 of  3
APPLICATION NO. : 11/086507
DATED               : May 6, 2008
INVENTOR(S)     : Joseph Salesky et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

TURLETTI, T. et al., "Issues with Multicast Video Distribution in Heterogeneous
Packet Networks," Sophia-Antipolis Codex, France, 4 pages.

WAKEMAN, I., "Packetized Video-Options for Interaction Between the User, the
Network and the Codec," The Computer Journal, Vol. 36, No. 1, 1993, pp. 55-67.

WOLF, K. et al., "Multimedia Application Sharing in a Heterogeneous Environment,"
ACM Multimedia 95 - Electronic Proceedings, 1995, 14 pages.

WOOD, K. et al., "Global Teleporting with Java: Towards Ubiquitous Personalized
Computing," The Olivetti & Oracle Research Laboratory, University of Cambridge
Computer Laboratory, pp. 1-13.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, Claim Construction Order re: U.S. Patent No. 6,343,313; July 28, 2004

Co-Pending Applications should read as follows:

10/600,144 Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer
Network Communications System

10/753,702 Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer
Network Communications System

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,369,515 B2                          Page 3 of 3
APPLICATION NO. : 11/086507
DATED               : May 6, 2008
INVENTOR(S)        : Joseph Salesky et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

11/086,506 Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer
Network Communications System

Signed and Sealed this

Nineteenth Day of August, 2008

JON W. DUDAS
*Director of the United States Patent and Trademark Office*



US007426191B2

(12) **United States Patent**
Salesky et al.

(10) Patent No.: **US 7,426,191 B2**
(45) Date of Patent: ***Sep. 16, 2008**

(54) **PROVIDING CONFERENCE DATA IN A NETWORK COMMUNICATIONS SYSTEM BASED ON CLIENT OR SERVER INFORMATION EXAMINED DURING A CONFERENCE**

(75) Inventors: **Joseph Salesky**, Cameron Park, CA (US); **Peter Madams**, Moraga, CA (US); **John Flower**, Walnut Creek, CA (US); **Clint Kaul**, San Mateo, CA (US); **Benjamin Wells**, Walnut Creek, CA (US); **Edward Arthur Ho-Ming Janne**, San Francisco, CA (US)

(73) Assignee: **Pixion, Inc.**, San Ramon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/086,506**

(22) Filed: **Mar. 21, 2005**

(65) **Prior Publication Data**

US 2005/0169197 A1    Aug. 4, 2005

**Related U.S. Application Data**

(60) Continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, and a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, and a division of application No. 08/823,744, filed on Mar. 25, 1997, now Pat. No. 6,343,313.

(60) Provisional application No. 60/014,242, filed on Mar. 26, 1996.

(51) Int. Cl.
*H04L 12/16* (2006.01)

(52) **U.S. Cl.** ........................ 370/260; 370/261; 709/203

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,414,621 A    11/1983    Bown et al.

(Continued)

OTHER PUBLICATIONS

Co-Pending U.S. Appl. No. 10/600,144, Joseph Salesky, Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System, filed Jun. 19, 2003.

(Continued)

*Primary Examiner*—Robert W. Wilson
(74) *Attorney, Agent, or Firm*—Carr & Ferrell LLP

(57) **ABSTRACT**

An improved networked computer communications system handles arbitrary streams of data, and transports at varying speeds those streams where intermediate updates can be dropped if they are obsoleted by later arriving data updates, optimizing the utilization of network and node resources. Complex buffering by system server software allows distributed, parallel, or redundant processing, transmission, and storage for performance, reliability, and robustness. Various parameters of the system can be monitored, and the system can be reconfigured automatically based on the observations. Varied techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess. One conferencing system allows conference participants to share all or a portion of the display seen on their computer screens. The conferees may be at sites removed from each other, or may view a recorded presentation or archived conference at different times. Conference participants are either "presenters" who can modify the display or "attendees" who cannot modify the display. A pointer icon, which can be labeled to identify the conferee, is displayed in the shared image area. Each conferee can modify the position of his or her own pointer, even when not presenting, so that every participant can see what each conferee is pointing to, should a conferee choose to point to an element of the display. These and other features apply to other data streams shared in the conference or in meetings where there is no shared-image data stream.

**42 Claims, 37 Drawing Sheets**



**US 7,426,191 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,241,625 | A | | 8/1993 | Epard et al. |
| 5,455,599 | A | | 10/1995 | Cabral et al. |
| 5,485,212 | A | | 1/1996 | Frederick |
| 5,530,795 | A | | 6/1996 | Wan |
| 5,550,982 | A | * | 8/1996 | Long et al. ..................... 725/93 |
| 5,563,649 | A | | 10/1996 | Gould et al. |
| 5,600,646 | A | | 2/1997 | Polomski |
| 5,617,539 | A | * | 4/1997 | Ludwig et al. ............... 709/205 |
| 5,649,104 | A | | 7/1997 | Carleton et al. |
| 5,689,553 | A | * | 11/1997 | Ahuja et al. ........... 379/202.01 |
| 5,689,641 | A | | 11/1997 | Ludwig et al. |
| 5,706,290 | A | | 1/1998 | Shaw et al. |
| 5,737,448 | A | | 4/1998 | Gardos |
| 5,740,371 | A | * | 4/1998 | Wallis ........................ 709/229 |
| 5,764,731 | A | * | 6/1998 | Yablon ..................... 379/88.15 |
| 5,774,668 | A | | 6/1998 | Choquier et al. |
| 5,790,818 | A | | 8/1998 | Martin |
| 5,793,365 | A | | 8/1998 | Tang et al. |
| 5,793,980 | A | * | 8/1998 | Glaser et al. ................ 709/231 |
| 5,802,322 | A | | 9/1998 | Niblett |
| 5,822,523 | A | | 10/1998 | Rothschild et al. |
| 5,859,979 | A | | 1/1999 | Tung et al. |
| 5,877,762 | A | | 3/1999 | Young |
| 5,983,263 | A | * | 11/1999 | Rothrock et al. ............ 709/204 |
| 6,313,863 | B1 | | 11/2001 | Chida |
| 6,343,313 | B1 | | 1/2002 | Salesky et al. |
| 6,345,297 | B1 | * | 2/2002 | Grimm et al. ............... 709/227 |
| 6,560,707 | B2 | | 5/2003 | Curtis et al. |
| 6,594,699 | B1 | * | 7/2003 | Sahai et al. ................. 709/228 |
| 6,772,335 | B2 | | 8/2004 | Curtis et al. |

### OTHER PUBLICATIONS

Co-Pending U.S. Appl. No. 10/753,702, Joseph Salesky, Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System, filed Jan. 7, 2004.

Co-Pending U.S. Appl. No. 11/086,507, Joseph Salesky, Real-Time, Multi-Point, Multi-Stream Scalable Computer Network Communications System, filed Mar. 21, 2005.

Stahl, S., "Conferencing Breakthrough," Distributed by CMF Publications, Jun. 26, 1995, http://www.informationweek.com/533/33iucon.htm, last visited Apr. 13, 2005.

"Face Off," Distributed by Byte, http://www.byte.com/art/9510/sec7/art3.htm., Oct 1995.

"Transmission Control Protocol," Information Sciences Institute, University of Southern California, 1991, 83 pages.

Eleftheriadis, A. et al., "Meeting Arbitrary QoS Constraints Using Dynamic Rate Shaping of Coded Digital Video," Proceedings of the 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, pp. 1-12.

Frederick, R., "Experiences with Real-Time Software Video Compression," Xerox PARC, 1994, pp. 1-4.

Gajewska, H. et al., "Argo: A System for Distributed Collaboration," Systems Research Center, Digital Equipment Corporation, 8 pages.

Jeffay, K. et al., "Adaptive, Best-Effort Delivery of Digital Audio and Video Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 12 pages.

Jeffay, K. et al., "Transport and Display Mechanisms for Multimedia Conferencing Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 28 pages.

Macedonia, M. et al., "Mbone Provides Audio and Video Across the Internet," IEEE Computer, 1994, 12 pages.

McCanne, S. et al., "Receiver-Driven Layered Multicast," University of California, Berkeley and Lawrence Berkeley National Laboratory, 1996, 14 pages.

Schulzrinne, H. et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Request for Comments, 1989, 66 pages.

Stallings, W., "Data and Computer Communications," Fourth Edition, Copyright 1985, 1988, 1991, and 1994, 12 pages.

Turletti, T. et al., "Issues with Multicast Video Distribution in Heterogeneous Packet Networks," Sophia-Antipolis Codex, France, 4 pages.

Wakeman, I., "Packetized Video-Options for Interaction Between the User, the Network and the Codec," The Computer Journal, vol. 36, No. 1, 1993, pp. 55-67.

Wolf, K. et al., "Multimedia Application Sharing in a Heterogeneous Environment," ACM Multimedia 95—Electronic Proceedings, 1995, 14 pages.

Wood, K. et al., "Global Teleporting with Java: Towards Ubiquitous Personalized Computing," The Olivetti & Oracle Research Laboratory, University of Cambridge Computer Laboratory, pp. 1-13.

United States District Court for the Northern District of California, Claim Construction Order re: U.S. Patent No. 6,343,313; Jul. 28, 2004.

Wikipedia, "Multipoint Control Unit," Dec. 20, 2005 (http://en.wikipedia.org/wiki/Multipoint_Control_Unit).

Networkworld, "MCU," Oct. 22, 2001 (http://www.networkworld.com/details/762.html?def).

Techweb, "MCU," 2003 (http://www.techweb.com/encyclopedia/shared/printArticlePageSrc.jhtml?term=MCU).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

FIG. 4A



FIG. 4B



**FIG. 4C**



FIG. 4D



FIG. 4E



FIG. 5



FIG. 6A



FIG. 6B



Capture rectangle

| Block 1 | Block 2 |
| Block 3 | Block 4 |

Capture at presenter client

| Illustration of the effect of specifying consistency at the attendee client | | | |
| (other delays in displaying assumed to be caused by loading at client) | | | |
| Time order | Received at client | Displayed by client | |
| | | Consistency OFF | Consistency ON |
| 1 | Block 1 | | |
| 2 | Block 2 | Block 1 | |
| 3 | Block 3 | Block 2 | |
| 4 | Block 4 | Block 3 | |
| 5 | ... | Block 4 | Blocks 1-4 |
| 6 | ... | ... | ... |

FIG. 7A

Capture rectangle

| Block 1A | Block 2A |
|----------|----------|
| Block 3A | Block 4A |

Capture A at presenter client

Capture rectangle

| Block 1B | Block 2B |
|----------|----------|
| Block 3B | Block 4B |

Capture B at presenter client

Capture rectangle

| Block 1C | Block 2C |
|----------|----------|
| Block 3C | Block 4C |

Capture C at presenter client

**Illustration of the effect of specifying consistency at the server**
(other delays in sending assumed to be caused by loading at attendee client)

| Time order | Received by server | Sent by server | |
|------------|--------------------|----------------|----------------|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1A | | |
| 2 | Block 2A | | |
| 3 | Block 3A | Block 1A | Block 1A |
| 4 | Block 4A | | |
| 5 | Block 1B | | |
| 6 | Block 2B | Block 2A | Block 2A |
| 7 | Block 3B | | Block 3A |
| 8 | Block 4B | Block 3B | Block 4A |
| 9 | Block 1C | Block 4B | Block 1B |
| 10 | ... | Block 1C | ... |
| 11 | ... | ... | ... |

FIG. 7B

- 176 -



FIG. 8A



FIG. 8B



FIG. 9A



FIG. 9B



FIG. 9C



**FIG. 9D**



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 10A



FIG. 10B



**FIG. 11**



**FIG. 12**



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

Time

| Space | Now | Later |
|---|---|---|
| Here | Recording and previewing a presentation | Reviewing an archived earlier conference as a participant. |
| There | Joining a real-time conference connecting participants at different, possibly quite distant, locations. | Viewing a prerecorded presentation or reviewing an archived conference as a nonparticipant. |

Time vs. Space diagram of some system applications

FIG. 23

US 7,426,191 B2

**1**

PROVIDING CONFERENCE DATA IN A
NETWORK COMMUNICATIONS SYSTEM
BASED ON CLIENT OR SERVER
INFORMATION EXAMINED DURING A
CONFERENCE

The present application is a continuation application of U.S. patent application Ser. No. 10/600,144, filed Jun. 19, 2003 and entitled "Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System"; U.S. patent application Ser. No. 10/600,144 is a continuation application of U.S. patent application Ser. No. 09/523,315, filed Mar. 10, 2000 and entitled "Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System," now abandoned; U.S. patent application Ser. No. 09/523,315 is a divisional application of U.S. patent application Ser. No. 08/823,744, filed Mar. 25, 1997, now U.S. Pat. No. 6,343,313, issued Jan. 29, 2002 and entitled "Computer Conferencing System with Real-Time Multipoint, Multi-Speed, Multi-Stream Scalability"; U.S. Pat. No. 6,343,313 claims the benefit of U.S. provisional patent application No. 60/014,242, filed Mar. 26, 1996 all of which the present application incorporates by reference. The present application is also related to U.S. patent application Ser. No. 10/753,702, filed on Jan. 7, 2004 and entitled "Providing Data Updates in a Network Communications System Based on Connection or Load Parameters" and U.S. patent application Ser. No. 11/086,507 filed on Mar. 21, 2005 and entitled "Providing Conferencing Data in a Network Communications System Based on Client Capabilities."

BACKGROUND OF THE INVENTION

The present invention relates generally to the field of shared computer communications and computer conferencing. In particular, one embodiment of a conferencing system according to the present invention facilitates the conferencing of two or more persons, each with a computer at one or more locations with a shared visual display and additional communication capabilities such as video, shared drawing, audio, text chat, etc. and facilitates the recording and later playback of the communications.

Existing conferencing systems can be described as either video conferencing systems or "whiteboard" systems. In a video conferencing system, a snap-shot of the conference presentation is taken at regular intervals, such as thirty times per second. Given that the image on a computer display is not changing nearly that often, video conferencing wastes large amounts of bandwidth. In a whiteboard system, the presenter at the conference draws within a whiteboard application or imports the output of another program into the whiteboard program for manipulation. When the presenter is ready to present a snap-shot, the presenter presses a "send" button and the whiteboard program updates all the attendees' displays with the image created by the presenter. This type of system, while requiring less bandwidth than video conferencing, is clumsy to use, lacks real-time responses, and limits the presenter to the tools provided with the whiteboard program.

Existing shared-display or shared-image systems rely on interception and communication of display or graphics system commands or depend on conferees' having similar hardware and software platforms. These systems lack flexibility and performance if the network connections are unreliable or have narrow bandwidth, or they require uniform hardware or software installations.

**2**

Existing systems that provide single or multiple data stream handling of a nature different than shared-image conferencing depend on wide bandwidth network connections or on all participants having similar platforms.

SUMMARY OF THE INVENTION

An improved general purpose data-stream computer network transport system and, in particular, an improved desktop conferencing system is provided by virtue of the present invention. The desktop conferencing system is used to display a shared collaboration among conference participants ("conferees"), with one or more individuals located at each remote site connected to the conference. Typically, at any particular time some conferees are not able to modify the shared images, and thus they are "attendees," as opposed to "presenters." Preferably, only one conferee is the presenter at any one time. A pointer icon for each conferee can be displayed on the screen, and the conferee is able to modify the location of his or her pointer, even if the conferee is not one who can modify the shared display itself. Each of the pointers can be labeled to distinguish each of the conferees.

In a specific implementation of the desktop conferencing system, conferee client computers ("conferee clients") connect to the "conference server," a computer or several networked computers (any of which may also be used by a conferee as a client computer) running conferencing software, typically by navigating a World Wide Web ("WWW" or "Web") browser through a predetermined Universal Resource Locator ("URL") that indicates a Web page describing the conference. The conference can be set up any time earlier by anyone with access to this server function. At the time of setup, one or more password character strings ("keys") can be specified for the conference. The key that a conferee gives at the time of attempting to connect to the conference server determines whether that conferee will be allowed access to the conference and what the conferee's initial privileges will be for participating in the conference and for modifying the setup of the conference. These privileges include but are not are not limited to the following: entering the conference, being a presenter, having a pointer, seeing the icons or other identifying information of other attendees, hiding or sharing one's own icon or identifying information, changing descriptive information such as the name, time, and purpose of the conference, changing keys, and changing others' privileges. The privileges can be modified during the conference by conferees or others who are so authorized. In general terms, the privileges include those that conferees might enjoy in person at a conventional, physical meeting. In the description below, a conferencing or other communications session provided by the present invention will sometimes be called a "meeting."

A presenter uses his or her computer to begin a conference presentation by connecting to the conference server. Conferencing software on the presenter client computer captures a portion of the screen display of the presenter client and sends the captured region (after possibly compressing it or applying other transformations) to the conference server. The captured region can be anything the presenter client can have displayed on its screen or a portion thereof, whether or not the hardware or other software producing or managing any part of the display is aware of the conferencing system.

When the attendee selects a link from the Web page to begin the conferencing session for that attendee, this action initiates the attendee client conferencing software. The attendee client then obtains a current view of the captured region from the conference server. The position of a pointer

US 7,426,191 B2

3

icon on a conferee's view of the captured region and an icon specified by the conferee might be communicated to each of the other attendee and presenter clients, so that each of the participants can see what each conferee is pointing at should a conferee choose to point to an element of the shared captured region. A particular conference can include more than one presenter; all conferees may be presenters, or all conferees may be non-presenting attendees. The latter may happen if a conference is set up to review a previously recorded or archived conference.

In a simple embodiment, the entire screen of the presenter is shown to all of the attendees. In a more complex embodiment, multiple subsets of multiple presenters' screens might be made available to all attendees while other subsets of the displays of the presenters are viewable by a subset of the attendees, thus allowing private side "conversations." These side conversations can be flexibly reconfigured during the conference, according to the conferees' privileges; participants in side conversations can have separate pointers whose positions are independent of, and whose labeling icons are distinguished from, those appearing in the general conference.

As each conferee joins a conference, the client and the conference server agree on the capabilities of the client, such as display bit-depth, bandwidth of the connection between client and the conference server, processor speed of the client, and the amount of memory available to each client. These parameters may be modified by the conferee, the client, or the server: this can be done automatically or on demand. If the conference server determines that a client has sufficient computing resources, some of the tasks, such as image data compression (for presenter clients), decompression (for attendee clients), update scheduling (both types of clients), and other image transformations and server management functions can be assigned to the client computers. The client computers might be personal computers, workstations, X-terminals, cable or satellite TV set-top boxes ("STBs"), personal digital assistants ("PDAs"), game playing machines, WebTV™s, network computers ("NCs"), Infopads, virtual telephones, and other existing or as yet undeveloped input and/or output devices. These clients might be connected to the server computer or computers (and the server computers might be interconnected) by high or low bandwidth electrical or optical connections, radio, infrared, microwave, telephone modem, or hybrid combinations of these, or other existing or as yet undeveloped data communication technologies.

The system can supply a range of coder-decoder ("codec") facilities for the compression and decompression of images (in order to reduce bandwidth requirements during network transmission) and for the matching of image representations to client display requirements including input or output format transcoding (in order that the shared image appear visually similar to presenter and attendee). In addition, codecs may be provided by the system for such purposes as error-correction, encryption, or audio and video noise reduction, or others. User-provided or proprietary codecs for these purposes and more can also be incorporated into the system. Any of these codecs may be in form of software or specialized hardware. Multiple codecs may be provided for the same function; should the system determine that one is better suited for that function, then it may be selected, and the codec can be changed dynamically when conditions change, such as client requirements, server needs, and network loading.

At least one embodiment of the present invention provides real-time, multi-point, multi-speed transport over a computer network for data streams other than the visual conference shared images described above, including but not limited to

4

audio, video, shared paint and drawing spaces, text chat, and other real-time object streams where intermediate updates may be dropped; in particular, the data streams may combine any or all of these types of data, which may be produced by multiple presenters, and arbitrary data streams may be combined with these. The features of connecting to servers, setting up conferences, keying privileges, passing identifications, accommodating multiple dissimilar platforms and network connections, and configuring subsets of conferees apply equally to these other data streams. In the more general case, the "communications server" connects the "source" and "sink" client machines of the "communicants" during a communication session.

But the system is not limited to real-time; thus, for example, archiving is provided. It is not limited to multipoint; thus, for example, a single user can record for later playback; being scalable means it works well for a few users and provides a similar communications service and experience with many users. It is not limited to multi-speed; thus, for example, data streams where lost information cannot be easily updated by later versions can be accommodated. It is not limited to multi-stream; for the shared screen-image stream (frequently used here as an example) by itself offers great utility. Indeed, it does not require a network: for example, the same computer could be the recording and archiving server for a presenter using it as a client; or the same computer could run presenter client software, attendee client software, and the communication server software connecting them so that a presentation might be previewed from the attendee's point of view.

Although a simple embodiment uses a single computer as the communications server, a more complex embodiment connects several computers in performing the server functions. The server-to-server interconnections can optimize routing by using information provided in the data stream or measured on the network, optimize wide-area network (WAN) usage by connecting clients to nearby servers, provide backup reliability by migrating clients, provide scalability of conference size through splitting the data stream, improve performance and robustness through redundant routing, and distribute functions of the system's transport pipeline (such as compression, decompression, and update scheduling) over several server and client computers. These services can be provided automatically depending on resources of the computers and network (for example, measured net speed and central processing unit, or "CPU," load) and facilities available (for example, announced client characteristics, such as CPU speed, compression and/or decompression hardware, or display parameters). They can also be configured and constrained by the server computer administrators or others with appropriate privileges.

Existing systems do not provide one or more of the following, which are explained in greater detail below: multi-speed at server and client, multiple reconfigurable coder-decoder tranformations and transcodings, storage services (for, e.g., caching, failure recovery, recording, archiving, and playback), keyed access and privilege granting, adaptable servers and clients, multiple servers, adaptive and redundant server-to-server routing, load sharing among clients and servers, adaptive server-to-client matching, client/server and server/server backup and reconnection, multiple protocols for client connections, dynamic reconfiguration of server functions, and scaling beyond single process, host, or network limitations automatically or upon request.

US 7,426,191 B2

A more complete understanding of the nature, features, and advantages of the invention will be realized by referring to the following description and claims together with the associated drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a desktop conferencing system based on the present invention.

FIG. 2 is a flowchart illustrating the connection of a conferee client computer to a conference server shown in FIG. 1.

FIG. 3 is a block diagram of the data flow in an architecture commonly supporting computer graphical user interfaces.

FIG. 4A is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when full images are compared, and the transmission of the changed information to the conference server.

FIG. 4B is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a new block is compared with the corresponding block in an old full image, and the transmission of the changed information to the conference server.

FIG. 4C is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a checksum of a new block is compared with the checksum of an old corresponding block, and the transmission of the changed information to the conference server.

FIG. 4D is a data flow diagram illustrating the updating of the stored old image with a new captured block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 4E is a logic diagram illustrating the updating of the stored old image in various formats with a new delta block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 5 is a state diagram illustrating the operation of the image capture process of the presenter client software.

FIG. 6A is a diagram showing attendee client block clipping.

FIG. 6B is a diagram showing presenter client block clipping.

FIG. 7A is a diagram illustrating the client consistency setting.

FIG. 7B is a diagram illustrating the server consistency setting.

FIG. 8A is a block data flow diagram illustrating the operation of server processes monitoring and filtering a single presenter data stream according to the present invention.

FIG. 8B is a block data flow diagram illustrating the operation of server processes monitoring and filtering multiple input and output data streams according to the present invention.

FIG. 9A is a block diagram illustrating interconnections of several communications servers and communicant clients in a single communications session according to the present invention.

FIG. 9B is a block diagram illustrating interconnections of several communications servers and communicant clients, including migrated and recruited connections, in a single communications session according to the present invention.

FIG. 9C is a block diagram illustrating interconnections of several communications servers and communicant clients, including backup connections for clients and servers, in a single communications session according to the present invention.

FIG. 9D is a block diagram illustrating interconnections of several communications servers and communicant clients,

including decomposition of transformation sequences and functional delegation, in a single communications session according to the present invention.

FIG. 9E is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queues and processing, in a single communications session according to the present invention.

FIG. 9F is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queue contents and processing, in a single communications session according to the present invention.

FIG. 9G is a block diagram illustrating interconnections of several communications servers and communicant clients, including multiple and redundant routing, in a single communications session according to the present invention.

FIG. 10A is a block diagram illustrating a multi-layered tree topology for connections of several communications servers with communicant clients in a single communications session according to the present invention.

FIG. 10B is a block diagram illustrating a single-layer tree topology for connections of several conference servers with communicant clients in a single communications session according to the present invention.

FIG. 11 is a diagram of the example architecture for a single server with a single meeting, according to the present invention.

FIG. 12 is a diagram of the example architecture for a server with several meetings running on a single CPU, according to the present invention.

FIG. 13 is a diagram of the example architecture for a single meeting manager directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 14 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 15 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on the same CPU, according to the present invention.

FIG. 16 is a diagram of the example architecture for a single server with a single meeting, but the meeting is controlled by several instances of a communications session server ("CSS") running on the same CPU, according to the present invention.

FIG. 17 is a diagram of the example architecture for a single meeting manager directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 18 is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 19 is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention.

FIG. 20 is a diagram of the example architecture for several meeting managers directing several servers with a single

US 7,426,191 B2

7                                                    8

meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention. In this diagram, the propagation topology information is shown.

FIG. **21** is a diagram of the graph of the propagation topology information in FIG. **20**.

FIG. **22** is a diagram of the graph of the propagation topology information in FIG. **20** together with the information for an additional propagation topology.

FIG. **23** is a time vs. space diagram showing some typical applications of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** shows a desktop conferencing system **10** according to one embodiment of the present invention. Desktop conferencing system **10** is shown with three attendee clients **18** and one presenter client **12**. Following the arrows, presenter client **12** is connected to attendee client **18** through a conference server **14** and data network **16**. The presenter and attendees may also participate in an ordinary telephone call or a conventional conference call using telephones **20** connected through conference switch **22**. The voice conferencing might also be carried out through an audio connection on a data network; indeed, telephone network **24** and data network **16** could be the same.

The group of users can comprise from as few as one user, who might record a presentation or lecture or video-mail onto a session archive **23** for later distribution; or two people who wish to share information or collaborate on some work product; or a small group of users, as in a typical business conference call; to many tens of thousands or hundreds of thousands of users using the network as a broadcast rather than interactive medium. In the last case, the voice conferencing might also be broadcast, and could involve one-way telephone conference calls, radio, multicast network audio (such as MBone), or the like.

The presenter client conferencing software, which is usually distributed tightly bound with the attendee client software to facilitate presenter hand-offs from conferee to conferee, captures information (such as image, sound, or other output information) from a program or programs running on the presenter's machine and relays it to the server, as explained in more detail below. The server relays this information to all of the attendee client computers participating in the same session or conference, transforming (in manners and by methods described below) the data as required. A more detailed description of the operation of the system by way of the example of transporting a stream of shared-image data during a conferencing usage of the software now follows.

During a conferencing session, presenter client **12** takes periodic "snap-shots" of the application screen image contained within a rectangular boundary determined by the presenter, breaks the screen shot into smaller rectangular blocks, compares these blocks to information from a previous screen shot. A block that has changed is passed to conference server **14** after it has undergone possibly two transformations and received identification marking ("ID stamps"). The first transformation may form the difference, using a set difference, exclusive-or (XOR), or other difference method, of the new and old block in order to extract information on the changes only. The second transformation may compress the block using a publicly available compression algorithm such as JPEG (Joint Photographic Experts Group) or PNG (Portable Network Graphics), or licensed proprietary methods of compression. The need for the two transformations is deter-

mined by the system depending on such parameters as client characteristics, server and network loading, and user requests. The two transformations and possibly many others may be also performed by the server, another client, or another facility available on the network.

The presenter client identifies where the block is in the capture rectangle with a block-location ID stamp; it identifies the time with a time-stamp; it may also identify itself with an origin stamp, and provide other ID stamps as needed. In order to provide synchrony in the system, conference server **14** can issue time synchronization signals. The conference server may also add time-stamps on receipt of blocks, and will need to update time-stamps when a recorded or archived conference is played back.

The changed blocks, however transformed, with ID stamps, are held on the conference server until they have been sent to all attendee client computers **18**, or it has been determined by flow control that there is no longer a need to hold them. Flow control between presenter client **12** and server **14** and between server **14** and attendee client **18** determines how often the attendee client receives information updating the image; this flow control, described in more detail below, depends on the characteristics and configurations of the clients, the server, and the network. Attendee client **18** can also send a command to conference server **14** to obtain the latest image change information.

Attendee client **18** uses whatever change information it receives to update its screen display of the shared image. The attendee client may need to decompress the changed block information and to composite differences with previously received image information. The reverse transformations of decompression and composition may instead be performed by other computers.

From time to time, attendee client **18** communicates the position of the attendee pointer (if the conferee has selected this option) to conference server **14**, which distributes the pointer position and a chosen identifying icon to each of the other conferee clients, which may then add a representation of the icon or other identifying label at the position indicated by the pointer information to the shared image on the client's display. The purpose of these pointers and labels is to allow conferees to reference particular elements of the shared image, possibly while describing the elements to the other conferees over the audio conference session (via a telephone conference call or an Internet audio conferencing application, for example).

FIG. **2** is a flowchart showing the process of introducing a conferee client **17** (client **17** refers t a generic client which might also be a presenter client **12** or an attendee client **18**) to a conference ongoing on server **14**, assuming that the conference setup is performed via the WWW. First, the conferee locates a conference listing. This may be done by finding or being told a URL or using a locator service such as ULS™ or LDAP™. The conferee also specifies an icon to be used as a pointer label. Then the conferee points a WWW browser to the conference listing, where the server offering this listing or an associated server validates the conferee and provides information that allows the attendee client conferencing software to start and to connect to conference server **14** itself, possibly after further validation. Other information may be passed to the conferee client at this time as well. The connection to a server can also be accomplished in different ways, such as using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings. Once the attendee client software is running, it communicates commands and pointer icon position to conference server **14**, and

9

conference server **14** supplies an initial conference image and later screen updates to client **17** (which is initially an attendee client **18**).

An attendee can become a presenter by sending the appropriate attendee-to-presenter command to conference server **14**. In the simplest embodiment with a single presenter, a message is sent to the presenter's screen indicating that an attendee wishes to take the presenting role; if the current presenter approves, then the roles are exchanged. In more complex embodiments, there can be a presenter arbitration mechanism, or multiple presenters may be allowed. The ability for a presenter or an attendee to be involved in any particular conferencing session and the assignment of privileges in the conference can be controlled by requiring appropriate keys from the presenter and the attendees.

Referring back to FIG. **1**, data network **16** can be provided by dial-up connections, local area networks (LANs), wide area networks (WANs), internets, intranets, the global Internet, or a combination of these or any other computer data communications links. In a specific embodiment, the conferee client computers are personal computers, workstations, or other computing hardware systems, running operating systems such as MacOS™, Windows® 3.1 or 3.11, Windows® 95, Windows® NT™, Unix™, OS/2™, NEXTStep™, BeOS™, JavaOS™, or the like. There is no requirement that the operating systems or hardware of the conferee clients all be the same.

Conference server **14** matches the form of the image to the attendee clients before sending it. Most computer screen images are represented as a bitmap of pixels whose layout is device-dependent. To be able to send images from one device to another, a transformation or transcoding is often required. The captured image information may be transcoded into a device-independent format for transmission and transcoded back to a device-dependent format for each attendee's screen; if, however, the mix of attendee clients is such that a device-independent format is not needed, no conversion is done. If these or other transcoding operations are needed, they can be carried out at the presenter client's side, the server side, or the attendee client's side, depending on where excess capacity or superior capability exists. The choice of device-dependent vs. device-independent bitmaps (DDB vs. DIB) is made automatically by the server, in response to the number and type of conferee clients. For example, a meeting with just two conferees, each running a Windows® PC with similar 256-color graphics configurations, may use DDBs and achieve high performance with low overhead However, where differently configured clients are connected in a conference, server **14** transcodes the images to fit the attendee's screen capability.

Multiple codecs may be involved in the transcoding of screen formats as well as other image transformations described herein. It may even happen that different codecs will be used on different blocks in the same image, depending on availability of the codec's host computer, the transformation needs, the loading on client, server, and network, or other conditions relevant to the system's performance.

Server **14** also fits the images to the attendee's CPU capability. Server **14** can be a server operated by the presenter (who would have full control over the server's resources), or it can be owned or operated by an unrelated third party or even an attendee who never presents. It is possible to have a third party whose involvement is solely as a facilitator of conferencing. Operating server **14** is simpler than operating a videoconference hub, since the bandwidth is much lower. One aspect of the present invention is the realization that real-time conferencing can be had without resort to full-motion video transmission, as the item being moni-

10

tored, a portion of a computer display, does not change as fast as a full-motion video. A similar observation applies to many other data communications streams.

Instead of full-motion video, attendees' screens are updated as the presenter's screen is modified, or less frequently for attendees with slow machines. The screen is modified from left-to-right within a row of blocks, and rows are updated top-to-bottom to improve the perception of low latency.

In some cases, server **14** might be operating without attendees. Such a configuration is useful where the presenter wishes to "record" a session for later playback. Even a session with attendees can be recorded for later playback, possibly including a recording of the voice conferencing. These stored sessions might be stored in session archive **23** or elsewhere. The shared image session can be synchronized with the voice conference by using the time stamps on the block data. When the recorded session is played back, it is an example of conference server **14** operating with attendees but no presenter.

The blocks may be held at the server as full images, as differences ("deltas") from previously received full images, as deltas from previous delta blocks, or as some combination of these, depending on the capabilities of the presenter and attendee clients. Periodically, a server may "checkpoint" the image deltas. To do this, the server requests a full image of a block from the presenter client and uses the full image as a replacement for all the accumulated image deltas for that block. The server might also request the entire captured region from the presenter client, or send the entire region to an attendee client upon request.

The conference server acts as a software-controlled switch that connects the presenter client with the attendee clients, taking into account that the speed of information transfer from the presenter client can change and the speed of transfer to the attendee clients can change and be simultaneously different for different attendees. The workload of the entire system is shared and distributed among the client and server computers, and even other computers that do not perform client or server functions.

Presenter Client Capture Operation

The capture operation and transport technology improves over former approaches by reducing the amount of work required and so enhances performance. In addition, the technique can be tuned to best suit the workload on the hardware and software platforms and network connections involved, manually or automatically. In particular, this tuning dynamically matches the capture operation to the amount of computer power available (while running the other software the conferee may wish to use) and the speed of connection to the network. Existing systems that capture graphics display commands, transmit them, then use them to recreate the original display appear to have great compression, which entails economy of network transmission. But comparison with the description below of the present invention will reveal that the savings are not so great when the task is to communicate data streams which can be generated by later transmissions.

The presenter selects an area of his or her computer display to be shared ("capture region"); it need not be a rectangular area. More than one capture region may be selected at a time and multiple regions may overlap. The selection may be made on a screen display, in a memory representation of a display, or in an aliased representation of either; the selection can be changed at any time. If the client has multiple monitors or multiple displays on a single monitor, independent selection can be made for each. A window provided by the presenter client computer's operating system, or by an application or

US 7,426,191 B2

11

other program, may be designated as the capture region, and then the capture region can be adjusted automatically if the window is moved or resized. This may be a fixed window, or the capture operation can be set to follow the selection of the current ("top" or "focus") window automatically. In a simple embodiment, the presenter selects a rectangular region on the screen ("capture rectangle"). For efficient transmission, the capture rectangle is broken up into rectangular subregions (blocks) to give good perception of response time. For example, if the presenter has selected all of an 800-by-600-pixel screen display to be within the capture rectangle, then it might be broken up into twelve 200-by-200-pixel square blocks. If the capture rectangle is later adjusted smaller, the blocks are changed to be made up of smaller rectangles, or the capture rectangle is divided into fewer blocks, or both; correspondingly, if the capture rectangle is later adjusted larger, the blocks are changed to be larger rectangles or the capture rectangle is divided into more blocks, or both. For efficient handling of blocks, the blocks are preferably kept between 1000 and 4000 pixels in size. As the blocks are updated on the attendee's screen, they are presented from the top row to the bottom row and from left to right within a row.

The presenter defines the shape of the capture region and can change, control, reposition, and resize it. In some computer systems, when the region is rectangular, the capture rectangle may be marked by a transparent window that stays visible; in other systems, it is appropriate to use four graphical objects that move together to mark the boundary of the capture rectangle.

FIG. **3** shows the display architecture of a typical computer shown with application programs **60**(*a*)-(*c*), and graphic display mechanisms **62**(*a*)-(*c*) with graphics commands capture points **64**(*a*)-(*c*). The graphics display mechanisms **62** send their output to a screen image storage area **66** which in turn presents an image to the user on a computer display **68**. Existing techniques of image sharing depend on intercepting graphics display commands (graphic instructions, display commands, graphics subsystem calls, etc.) at graphics commands capture points **64** and sending these commands to another computer which can use them to affect its own display. This appears to have an advantage in that one high-level graphics drawing command (e.g., "draw a blue line from co-ordinates (**0,0**) to (**0,100**)") can be expressed in fewer bits of data than what would be required to express the resulting set of pixels on the screen. In this case, 100 blue pixels, say using 24-bit color depth, would require 300 bytes of data, compared with a graphics drawing command that might require only about 12 bytes of data.

If the task to be achieved is to send a copy of this image to another computer, using the smallest number of data bits, then sending the graphics drawing commands seems, at first sight, to be a very effective approach to adopt. However, two factors mitigate this apparent saving. One arises when the data stream is compressed before transmission, and the other arises from reflection on modern graphics drawing techniques.

Compression is very effective when there is a lot of redundancy in the data. In the example cited above, the 300 data bytes needed to represent the blue line on the image consists of a repeating set of 3 data bytes, each representing one blue pixel. This might be compress to as small as 5 data bytes total, one to indicate the code, three for the color, and one to indicate the binary number of pixels. Of course, the 12-byte graphics drawing command might also be compressible: nevertheless, the apparently huge savings ratio is not in fact realizable.

12

Modern graphics drawing commands include not only simple geometric drawing operations, but also text elements with full font and spacing specifications, and other complex constructions. This can be seen by comparing the size of, say, a word processing document (which contains the graphics drawing commands, font information and text) stored in a computer file with the size of an image of that same document, say, as a fax image stored as a file on the same device. A few years ago, the image file would always be larger than the document file; now, the reverse is often true.

Furthermore, as will be seen below, reducing the amount of data by using compact graphics drawing commands instead of direct image data is not always possible when applied to real-time systems where transmission of live, changing images is required. In this case, there are two ways to merge changes together, thus reducing the total amount of data that must be transmitted. The example used above applies to a single image; when changing images are required—as for example, with conferencing systems—further opportunities exist to reduce the total amount of data transmitted. This is an advantage of the present invention.

First, when graphic drawing commands update the same region of the image, we can capture just one resulting image containing the results of many commands. Second, successive changes to a particular region of the image, which will result in successive transmissions of that region, can be composited together. The several strategies for this updating under the present invention will now be described in more detail.

Updates for the capture rectangle may be requested by the server, or sent at fixed or variable times announced by the presenter client automatically or as determined by the presenter, or sent at the command of the presenter. The blocks sent out by the presenter client are just the blocks which have changed since the last update. From time to time, the presenter client might send the entire set of blocks. Depending on several factors detailed below, the presenter client might send the blocks as difference (delta) blocks as opposed to the full information base blocks. Base blocks are preferred where network bandwidth is freely available but computing power at the client is limited.

For efficiency, the presenter client might only send out delta blocks for areas that have changed, since delta blocks will often compress smaller than the corresponding base block because much of the base block may remain unchanged. Thus, the presenter client maintains a copy of the last capture to allow it to generate the delta blocks.

FIG. **4**A illustrates this point. In that figure, the captured images used are divided into twelve subblocks so that unchanged portions of the captured image can be ignored. If the block labeled "B6" is the block being sent, block B6 of the current copy of the captured image **69**(*a*) is compared with block B6 of the most recently stored reference copy **69**(*b*) of the captured image (the reference copy is a copy of who the captured image looked at some point in the past). The result of the comparison will determine whether block B6 has changed. If it hasn't, then there is no need to transmit the changes.

FIG. **4**B illustrates a similar process, but there, only block is captured from the current image for comparison with the stored image. This reduces the storage required for the comparison by nearly one half, but it limits consistency, as described later.

In FIG. **4**C, the images are replaced by checksums or digests, such as cyclic redundancy check ("CRC"), DFT (discrete Fourier transform) parameters, or the results of applying hashing functions appropriate for images, or the like.

US 7,426,191 B2

**13**

Although storage is greatly reduced, as only the much smaller checksums need to be saved, and comparison is quick, the digest procedure must be fast in order to provide any time economy. The main drawback is that two different blocks may have the same checksum, and then the comparison will fail to find the difference. This can be mitigated by the choice of checksum and by the unlikelihood that the comparison would fail twice in a row when the block changes again.

FIG. **4**D shows the transmission to the server of a base block when the comparison shows a change. The block is also sent to the stored image; this allows the stored image to be updated at the same time the changes are sent to the server.

FIG. **4**E shows the corresponding situation when a delta block is sent.

Obviously many combinations can occur that would provide additional savings under some load conditions. Thus the stored comparison may be a collection of base blocks, either from the same capture event or not, an array of checksums of base blocks or of delta blocks, a collection of delta blocks, results of compositing delta blocks, etc. or any combination of these.

It is possible to reduce the size of the stored comparison image to blocks which have changed recently and perhaps their neighbors, as long as the full image is stored every now and then.

Each of the modes of comparison and transmission can be altered dynamically; for example, one heuristic is to send a delta block when less than half the pixels in the capture rectangle change, and to send a base block when at least half change.

With techniques that rely on capturing graphics display commands, it is very hard to identify commands that produce overlapping elements of the image. Because of this, it is hard to know when earlier commands can be discarded because their results have been superseded. Therefore, a system relying on capturing commands must send all commands over an error-free network. By contrast, in this system, deltas can be dropped without permanent ill effects.

The foregoing assumes that the capture rectangle is broken into a number of rectangular blocks. This decomposition can be changed dynamically to have more or fewer blocks to adapt to changes in the size of the capture rectangle by the presenter as described earlier, or to changing conditions in the loading and capabilities of clients, servers, and networks. Just as as the capture rectangle is broken into blocks to improve perceived rate of change, so may the block be subdivided to further isolate just the changed portion of the image. One way to accomplish this is to identify the smallest bounding rectangle of the changed portion of the image, and then to intersect this with the current block pattern. Another is to adaptively redefine the block pattern to best fit the changed area of the image. Other adaptations arise if the geometric assumptions of rectangular capture region and rectangular blocks in this example are dropped.

In general, the system of the present invention is oriented to reduce buffering in order to improve the sense of "live performance." Thus, while the structure of the server and client software could allow a number of captured images to be in the process of traveling from presenter clients to attendee clients at one time, in fact having just two images in the "pipeline" from presenter to attendee at once takes advantage of processing capacity, defeats transient network breakdown, and does not overload end-to-end connection performance. This might be increased to three or four or more images in the pipeline if the network connections are fast, but the clients have slow CPUs.

**14**

FIG. **5** is a state diagram of the presenter client software. The state transitions are described here starting with the IDLE state. The presenter client is in the IDLE state while it is doing other things, such as processing data unrelated to the conferencing software or running another application whose output is to be shared with the attendees. Periodically, the presenter client will check to see if an update to the capture rectangle needs to be sent out. In considering that need, the presenter client conferencing software considers the CPU loading on the presenter client computer, taking into account any limit the presenter might have placed on what percentage of his or her machine's computing resources can be occupied with block updates, the transmission rate of the presenter's network connection (no sense preparing a block update if the network can't handle it), commands concerning flow control from the server (server flow control is described below) and other relevant parameters.

If the presenter client decides to proceed, the state changes to the BLOCK-GRAB state, where the current capture rectangle or a portion of it is grabbed from display memory. A copy of the next most recent capture rectangle is maintained so that delta blocks can be easily generated. In this state, the delta blocks are generated if they are to be used. If the delta blocks indicate that nothing has changed, the computer transitions back to the IDLE state and does not send out the captured block or its delta (which would be blank). Otherwise, the client prepares the blocks which have changed for potential transmission. The capture rectangle is divided into blocks as described above. In the BLOCK-GRAB state, the presenter client estimates the amount of work required to prepare the grabbed blocks for transmission to the server, the attendee requirements, and local hardware capabilities. If the presenter client can perform work such as transcoding much faster than the attendee clients, or even the server, then the presenter client performs that step by transitioning to the COMPRESS/TRANSCODE state. The presenter client might skip this state altogether if no transcoding is to be done and compression is not used (such as where the network connection between the presenter client and the server is much faster than the compression speed of the presenter client).

Either way, the presenter client then transitions to the NET-WORK state, where it determines if the capture rectangle still needs to be sent and checks current network bandwidth. Then, the presenter client transitions to the OUTPUT state where the blocks are output, either as base blocks or as delta blocks, either compressed or uncompressed. The presenter client then returns to the IDLE state where the process repeats after a time.

In the case of displays that support multiple layers in applications or in the interface through multiple frame buffers or reserved areas of memory, the system can capture from one or more of the layers, in coordination or independently. If the client has multiple monitors, then the system can capture from some or all of the displays.

In general, the presenter client sends out a stream or streams, which can vary in format over time. The presenter client can also imbed command messages into a stream, such as a command indicating a changed color map, a pointer icon position, or a presentation hand-off command; such commands can also be sent in a separate communications channel. Capture can also occur in buffers for other purposes than screen display. Streams other than the shared-screen conferencing stream (outlined above and described in more detail below) can carry information to allow shared or broadcast text chat, audio, video, drawing, whiteboarding, and other com-

US 7,426,191 B2

15

munications. These streams are subject to and can enjoy the same or similar load/need analysis and balancing methods and mechanisms.

Other Client Features and Behavior

When a new conferee joins a meeting or before, the conferee selects a personal icon and a characterizing sound (a "gong") which will be the icon and gong that other conferees will associate with the joining conferee. Icons and gongs can be created using well-known techniques for creating icons and audio data. When a new conferee joins a meeting, the conferee client sends his or her personal icon and gong to each other client, via the conference server. The new conferee is then "announced" by the gong. The personal icon of the joining conferee is also added to a conferee icon list maintained on the server or at each client. If another conferee chooses to have the icon list displayed at his or her client, the entrance of the joining conferee can be noted when the new icon appears on the icon list. Other personal information about the conferee, such as name and electronic mail ("email") address may be provided by the conferee and made available to other conferees via the server. As described earlier, the visibility of icons, audibility of gongs, access to personal information, and so on, may be based on the key the conferee used to enter the meeting, on the identity of the conferee (by network address or otherwise), or on a combination of these and other validators.

The presenter can "go off-air," i.e., suspend or pause the image capturing process and can "go on-air," i.e., resume the presentation at will. The network connections can be maintained during the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-air, and no changes will be sent or scheduled by the server during the off-air time.

If clients are so configured, conferees can be given lists or iconic representations of the participants in the conference, as mentioned above. Those conferees that are presenting, those who are off-air, and those who are requesting to present can be marked. Various subsets of conferees, for example those in side-conversations, those in other meetings, those connected to a particular server, or in general those selected by some property of the system's current configuration, can also be marked. The visibility of the lists and the presence of any markings may be controlled by users, administrators, or others, based on privileges or other criteria. In addition, graphical representations of a meeting or part of a meeting, or of several meetings, may be available for display, depending on privileges.

If the presenter client computer represents images with a varying color map or palette, then the presenter client will send out color map information when the color map changes, so that the attendees observe the same color scheme as the presenter. Color map changes can occur on the presenter client display system as the presenter opens, makes changes in, or closes a program, either in a window that overlaps the capture rectangle or in a window beyond the capture rectangle used for his or her own private work.

When a change in a block is detected, the resulting changed block (base or delta) may be compressed, making use of any special hardware (for example, a Digital Signal Processor (DSP), often found on MPEG boards or set-top boxes), if it is available on the client computer. The compression codec may be lossless, or some information may be lost in compressing and decompressing ("lossy" codec) if the particular application and users of the system can tolerate that and wish to take advantage of possibly better performance.

16

To ensure good usage of the network, the images are captured and compressed before the network is available to send them, if possible. Without this, the network might be under-utilized. On the other hand, if an image is captured and compressed too early, the attendees will not see the most up-to-date information and this will reduce the efficacy of the visual component of the meeting. To achieve this good balance between system utilization and the perceived response time as seen (and possibly heard) by the meeting's attendees, the client software uses a pipeline to ensure a flow of information is always available at the network, with flow-controls to ensure that image capture and any transcoding (including compression) are never too far ahead or behind in order to balance the load among presenter client, attendee client, and conference server. Flow control is described in more detail below.

The number of blocks and the order of comparison and modification can be automatically determined by the server or set by the presenter. Thus, if conferees usually work with text reading from right to left, a right-to-left updating might be more appropriate.

The size of the window displaying the shared image on the attendee client need not match the size of the image sent from the presenter client in linear measure or in pixel measure. If the window is smaller than the image, the attendee can be given scrollbars to allow navigation around the shared image. It is also possible to configure the transcoding to scale the size of the image received by the attendee client.

The attendee client can also display the shared conference image automatically matched in size to the capture region set by the presenter, if the attendee desires and the attendee client computer is capable of such display. If the attendee client is displaying less than all of the image, the bounds of what is being shown at the attendee client can be communicated to the conference server so that the server can avoid sending blocks beyond the boundaries of the attendee's window. These blocks are not sent until scrolling requires them or they are otherwise demanded by the attendee. This point is illustrated in FIG. 6A, where an original image 50 as represented in the display coordinates of a screen 54 of attendee client 18 exceeds the size of a window 52 dedicated to its display. Scrollbars are included with window 52 to aid in navigation. Blocks 56 are not transmitted from server 14 to client 18 until the scrollbars are used or the window is resized to request the display of more of image 50.

This "clipping" of unneeded blocks can be propagated back to the presenter client by the server if appropriate (for example, if there is only one attendee), so that the presenter client does not have to process all blocks in the capture rectangle. This is illustrated in FIG. 6B, using the same attendee configuration as in FIG. 6A. In FIG. 6B, the presenter client 12 knows from conference server 14 that the shaded blocks 56 shown at the attendee screen 54 of attendee client 18 are not displayed in attendee window 52, so there is no need to capture or compare the corresponding blocks 57, marked as "do not process" in the representation 51 of the capture rectangle, which is displayed on presenter client screen 55 and shown with the an overlay 53 that corresponds to attendee window 52.

The shared conference image, text boxes, messages, control buttons and menus, and other graphical elements may be grouped in a single window or split among several windows on the client's display.

Consistency is a property of the display that can be chosen at the cost of somewhat reduced perception of image update speed at the attendee client. Both the server and client can be constrained to be consistent; server consistency is discussed

17

below. FIG. **7**A gives a simple example of client consistency. An entire capture rectangle with four blocks is sent by the system, and the client waits until all four blocks are received before displaying them. Thus, the entire screen represents the same picture to the attendee as that seen somewhat earlier by the presenter. With consistency turned off, each of the four blocks is displayed as soon as possible, which leads to blocks from a previous transmission being seen alongside newer blocks, so the screen picture, at least for a time, is not consistently one that has been viewed by the presenter.

When a presenter makes a change to the part of screen that is in the capture rectangle, a signal can be given to the presenter client via the server when all attendee clients have received the update that results from the change. The presenter is then assured that all other conferees have seen the change he or she has made. An example of how this can be accomplished is given by the following. The conference server is aware of the geometry of the capture rectangle and the blocks are constantly scanned from left to right, starting at the top and moving toward the bottom. Thus the block in the lowest rightmost position signals the end of data from a particular rectangular capture by the presenter client. Since this block may not have changed and may never arrive in the server's input queue, a flag may be set by the server to indicate which block is last when a block from a new capture arrives before the last block has been sent to an attendee client If neither of these two mechanisms works, the presenter client can add a message via the server to the attendee client stating that the rectangle has been finished. Thus the attendee client can respond when it has received the entire rectangle.

In addition, a signal can be generated by the presenter client when the presenter has made no change for some set period of time or number of capture cycles. This can be relayed by the server to attendee clients, so that attendees may know that after the appropriate captured image is received, what they see is also representative of what the presenter currently sees.

If the connection to the server is lost, the client can notify the conferee and may then attempt to reconnect to the conference session, using saved parameters. The reconnection may be to a different server, as described later.

In the above description, "client" has referred to a computer system comprising hardware, an operating system, and applications software, possibly or specifically including the software necessary to participate in a conference or communication session according to this invention. All of the described operations also apply to the case when one or more users are running two or more instances of the client conferencing software on the same computer platform. This might occur when a user wishes to be a conferee in several different conferences simultaneously, or even multiple conferees in the same conference. For example, he or she can be a presenter in one conference and an attendee in another. A single person can have different identities in each client instance, so that John Smith may be known as "John" in one client instance and "Mr. Smith" in another. Two people might be using the same computer hardware alternately, and both can be participating in different conferences, or in the same conference as different conferees. The capture region of a presenter in one conference may include attendee displays from another, or this "chaining" feature may be prohibited by the system.

Another example of several clients running on one CPU occurs when several users are connected through terminals (e.g., X-terminals) to a host computer which is running the client software for each user.

18

If a user has a multiprocessor platform with several CPUs, then the system's client software might be configured to use two or more CPUs for the functions of a single client during a communications session.

Server Operation

This example of operation of the invention is based on sharing computer screen images; other stream types may be handled in a similar manner with similar logic, methods, and mechanisms. This is but one possible method of making the server.

At the server, a queue of data packets is maintained and is filled from an input filter and drained by output filters, one for each attendee client. The input filter and each output filter can run at its own speed. An output filter feeding a client connected over a slow network will not send every packet from the queue, but will skip over old information. This filtering process is complex, especially when the data packets represent changes from one image to the next (delta) which must be composited together in order to skip over delta blocks. This is the technique that allows the server to work with any speed network and mixed speed clients in the same meeting. The server data handling processes are described in more detail below.

The server also handles control messages, such as a request to join a meeting or a message from a client signaling that it is attempting to reconnect to a meeting after losing its connection; reconnection requests can also come from other servers when multiple servers are involved (multiple server situations are described in more detail below). The server accepts connection requests and verifies that the user of the client software is authorized to join the meeting. For each client connection, an icon and gong characterizing the user are sent to the server and then to all conferees by the server. If a non-presenting attendee desires to become the presenter, the attendee client software signals the server and a message or signal passed to the presenter client is conveyed to the presenter to indicate the other conferee's desire.

The server accepts system information from each client connection and notes the client's requirements (e.g., all images must be 256-color images) and capabilities (e.g., CPU speed, available hardware-assist for graphics, compression, DSP, Windows® DDB available). From the system information, the server assigns the client connection to an appropriate "output filter class" as explained below. During network communication with a client, the server may measure the network response and update the system information. As required, the server can move a client connection from class to class in response to changing network characteristics so as to keep the clients in a class closely matched.

A special class of output filters sends data to another server instead of a client. This server-to-server capability allows conferences to scale to very large numbers of users. More importantly, it allows for intelligent distribution of work over a network of servers. Unlike low-level data transport layers, such as packet routing using the Internet Protocol ("IP"), servers know the meaning of the data elements they are routing, so the routing can change based on the meaning of the data in the message. For example, if the server knows that data is a delta of a display update and the computing effort required to receive and process each delta is more than a particular client has, the server can decide to not route the data packet to the client or to route the data to the client via another computer (or another process on the server) which will perform some of the necessary processing for the client, in essence to "predigest" the data for a client that needs it. As an additional example, the server can read the time stamps in the

19

data messages, and based on the demands and resources of the clients, the network characteristics, and other information concerning the system, can decide to route the data by alternative or redundant routes through other servers.

Particulars of the Server Data Filtering Process

FIG. **8**A is a block diagram showing the flow of data in the server processes **100** used to intelligently filter and route one of the input data streams among those that the system may be transporting. As mentioned above, these data streams can be real-time shared-image conference data streams, other data streams which have similar transport and timing requirements, or arbitrary data streams. The example used here is the transport of a real-time shared-image conference data stream.

Generally, a data stream arrives at the server from a presenter client and is routed to each of the attendee clients. The complexity of the diagram is due to the fact that the server must accommodate many clients of differing capabilities. The data stream inputs from the presenter client are shown on the left in the form of a queue; four types of input stream for the example of the shared-image conference are shown, but in the preferred embodiment only one will be active at a time. Possible data stream outputs to attendee clients for the given input stream are shown on the right in the form of an editable queue.

The presenter client can dynamically change the format in which it provides data, based on the presenter client computer's capabilities, backlog, local network congestion, and information provided by the server. The data can arrive as uncompressed base blocks (raw data) on the stream labeled "ubase" if the presenter client decides not to send the differences and decides not to compress the data. If the presenter client decides, based on performance, network bandwidth, etc., to compress the data, it sends the data stream as compressed base blocks ("cbase"). The presenter client can also send the data stream as uncompressed difference (delta) blocks ("udiff") or as compressed delta blocks ("cdiff").

As each data block is received, it is time stamped by a time stamper **102** with either the true time of arrival or a later time of handling (used for when the conference is not a live conference, but is being played back). Time stamper **102** may also simply validate a time of sending stamped by the presenter client.

The data block is then fed to a server queue for that type of data block. The server queues are labeled "ubase" (for uncompressed base data), "qcbase" (for compressed base data), "qudiff" (for uncompressed delta data) and "qcdiff" (for compressed delta data). Since the presenter client provides data in only one data type (although it could provide all four data types, if the presenter had a fast machine, the server was a slow machine and the network between them had excess capacity), and the data type sent can change from time to time, filter **100** uses a queue filler **104** to fill all four queues using just the one data type provided by the presenter client. Of course, if filter **100** notes that none of the attendee clients need a particular data type, that data type can be ignored and its queue eliminated.

As shown in FIG. **8**A, the data type which is received can just be routed directly to the queue for that data type. If the received data type is uncompressed, the corresponding compressed queue is filled by running the received data blocks through a compressor **106***b* (base data) or **106***d* (delta data). If the received data type is compressed, the corresponding uncompressed queue is filled by running the received data blocks through a decompressor **108***b* or **108***d*. If the received data type is base data, delta blocks are generated by a delta block generator **110**, which records a previous base block and

20

differences it with a current base block; it may also reference delta blocks that it creates and stores. Delta block generator **110** is coupled to the ubase stream after uncompressor **108***b* so that delta block generator **110** receives the base data whether it is sent as ubase data or cbase data. Likewise, delta block generator **110** is coupled to the udiff stream before compressor **106***d* so that both qudiff and qcdiff receive the benefit of delta block generator **110**.

For processing in the other direction, i.e., filling the base data queues having only delta data, queue filler **104** includes a compositor **112**. Compositor **112** gets its inputs from a base image frame store **114**, the udiff stream and the cdiff stream (after being uncompressed by uncompressor **108***d* or a separate uncompressor **116**). Base image frame store **114** maintains the equivalent of the previous full base frame. As delta frames are received, they are differenced (or, more precisely, "undifferenced") with the contents of base frame image store **114** to generate uncompressed base data Because the output of compositor **112** is coupled to the ubase stream prior to compressor **106***b*, the base frames output by compositor **112** can be used to fill the qcbase queue as well as the qubase queue. If the presenter client can switch from base data streaming to delta data streaming without sending an initial snapshot frame as delta data, compositor **112** should be coupled to the ubase stream and the cbase stream (or the output of uncompressor **108***b*). Of course, the delta queues might contain base data from time to time, such as when a "checkpoint" is done to prevent an error in delta data from being propagated indefinitely.

The data blocks in the (up to) four queues are stored in time stamp order, so they may be viewed as a single complex queue of a data type comprising multiple parallel block entries compressed or uncompressed, differenced or base. The output of this complex queue can be sent to attendee clients as is, but filter **100** includes several other output mechanisms to accommodate disparate attendee client types. Base frame image store **114** might also be a source of server output, such as when a client requests a full capture rectangle image. This might occur when an attendee client has lost its place, lost its network connection and reconnected, or is joining a conference for the first time.

Although the four output queues can be viewed as a single queue, ordered by the time stamps, there could be up to four different queue entries for each time-stamp value. A queue synchronizer **130** uses arbitration or prioritization techniques to settle any discrepancy between presenter client time stamps and server receipt time stamps.

The attendee clients are classified into one of three classes: Class **1** clients are fast clients on a fast network; Class **2** clients are slow clients on a fast network; Class **3** clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class **2** clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection. Reassignment can occur dynamically, as the connection or client loading change, or when requested by the client. A monitor process (not shown) on the server monitors the activity of the output filters to shift attendee clients from class to class if the clients are either too fast or too slow for the class they are in. This is done dynamically, and the characteristics of all clients in a class as well as those in other classes are considered in balancing all classes.

Typically, Class **1** is used for fast attendee clients on a fast network. A Class **1** client receives all the data blocks, from one or more of the server queues. Because a Class **1** client receives all the blocks, the server need not track which blocks were sent to which clients. Some Class **1** clients will be able

US 7,426,191 B2

21

to decompress compressed base blocks as fast as they get them, and will take the blocks from the qcbase queue. Other Class 1 clients will be able to handle every data block, but only if they are delta blocks.

Class 2 is used for fast network connections to slow machines, such as 386s connected to corporate LANs. A Class 2 client might not be able to process each block, even uncompressed blocks, in which case filter 100 will discard blocks. A block discarder 132 is provided in filter 100 to track which blocks have been discarded for which Class 2 clients. Class 2 clients are provided with base data types (ubase and cbase) and not the delta data types so that block discarder 132 can discard some blocks without any loss of critical information. There is a loss in frame rate when blocks are discarded, but that loss is not as critical as the loss of delta data blocks. In addition, the memory and time required to track discarding base blocks for each Class 2 client is much less than for tracking the discarding of delta blocks. To avoid slowing Class 2 service for all Class 2l clients to the speed of the slowest Class 2 client, one output of block discarder 132 is provided for each Class 2 client. Thus, a faster Class 2 client will experience a higher frame rate as it will receive more data blocks than a slower Class 2 client.

Class 3 is typically used for clients that cannot even handle delta data blocks on a regular basis because of network limitations or client processing limitations. Even though a client might be fast enough to handle uncompressing data blocks, if its network connection is not fast enough to send even the compressed data blocks, the client will be classed as a Class 3 client because not even every delta block can be sent to the client. So that the client can present a conference in substantially real-time if needed, delta blocks are composited by filter 100 so that multiple base and delta blocks can be, in effect, replaced by a single data block. To accommodate the differing needs of each Class 3 client, a separate queue is set up by filter 100 for each Class 3 client. As should be apparent, filter 100 has to do more work for a Class 3 client than for a Class 1 client, so it is to the server's benefit to upgrade clients as their speeds increase or their network connections improve.

Filter 100 maintains a "qmulti" queue for each Class 3 client. Three qmulti queues for three Class 3 clients are shown in FIG. 8A. A qmulti queue receives inputs from the qubase and qudiff queues. Where those two queues are not used, the qcbase and qcdiff queues are used instead, but are first uncompressed using uncompressors 134b, 134d. The delta data blocks and a base block stored in a base image frame store 136 are composited by a base compositor 138 to form one composited base image from a base image and one or more delta images. A delta compositor 140 is used to form one composited delta image from a plurality of delta images. The output of base compositor 138 and delta compositor 140 are then fed through respective compressors 142b. 142d, resulting in four output data streams (ubase, cbase, cdiff, cdiff) fed to a discarder 144 which discards data blocks which the attendee client for that qmulti queue cannot handle. If the particular attendee client does not need all four outputs (typically, any one client will use only one output), the processing for those unused queues within the qmulti queue can be skipped, since the queue only needs to service that client. As with base frame image store 114, base frame image store 136 can supply Class 3 clients with full frames upon request or as needed.

Discarder 144 drops blocks based on parameters about the network and client known to the server and to filter 100 as well as parameters and requests (e.g., "slow down," "speed up," or frame rate specifications) received from the client. The dropping of blocks is preferably done on a block-by-block

22

basis, but it can also involve discarding all the blocks in the presenter client's capture rectangle; the related issue of consistency is discussed below. If it turns out that more than one Class 3 client has the same requirements, all but one of the qmulti queues might be virtual queues. In effect, the processing for all the qmulti queues for those similar clients is done once, with each getting a copy of the results of that processing. For example, one multi-client qmulti queue might be handling a plurality of 386-class client machines running over a corporate ISDN line. Other qmulti queues might then supply other similar machines which are connected to the server by modem (e.g., 14.4 or 28.8 kilobyte data rates), LANs, T1 lines, etc. If any of these lumped Class 3 clients deviates from the common requirement, then its virtual qmulti queue would then become a real qmulti queue and would perform processing separate from the other queues. Among all Class 3 output queues, the various separate compositors 138, 140 may have different workloads from the fact that the number of delta blocks composited together and the number of blocks discarded will vary according to the capacity of the attendee clients serviced by the qmulti queue.

The use of more than one output class avoids a slow connection's retarding a fast connection. Filter 100 includes a buffer reclaimer 150 which examines the queues to determine if portions of the queue buffers have already been read by Class 1, Class 2, and fast Class 3 clients, and are not going to be used by slow Class 3 clients (they will be discarded). If that is the case, then buffer reclaimer 150 marks those locations in the queue buffers as reusable, to save on memory space.

The different output classes and the monitor processes on each data stream allow the server to handle data streams at different speeds for clients of different capabilities and network connections of different bandwidths. The streaming of update information formed into blocks improves the perception of low latency, but it may be desirable for some applications to reduce the mixture of blocks from different capture events that show on the attendee's screen at one time. The system can be set to provide this consistency by delaying the updating until a whole rectangle can be shown. One form of this adaptation can occur at the server, as shown by the example of FIG. 7B. There, a capture rectangle is broken into four blocks (1,2,3,4). The server maintains a consistency flag which can be either "off" or "on." If the consistency flag is off and the server receives data representing blocks 1A, 2A, 3A and 4A (taken at time A) from the presenter client and is able to send out blocks 1A and 2A, and in the meantime receives blocks 1B, 2B, 3B and 4B, the server will send out 3B as the next block, reasoning that 3B is more updated than 3A so it is a better block to send out. However, if the consistency flag is on, the server sends the old blocks 3A and 4A anyway, so that the client can maintain a time-consistent display. Following 3A and 4A, the server sends blocks 1B-4B and so on. Clearly, consistency requires additional memory and produces added latency. This trade-off is decided upon between the server and the receiving clients, based on a variety of factors described above. If the network, the server and the client can easily handle consistency, then the consistency flag might be turned on, but where display updating happens quickly and there are other constraints on the system, the consistency flag might be turned off.

As described above, the server provides control of information flow to keep fast attendee clients supplied with updates as often as possible, and to avoid sending slow clients updates they cannot use or that will overburden their network connections. The server also provides flow control for presenter clients, as needed, by determining the fastest rate of updating required by attendee clients, and then signaling the

presenter client to grab blocks no faster than the fastest consumer can demand them, so that the presenter will not have to waste resources collecting and processing data that no client can use or no network can afford to carry.

Storage Services

FIG. **8**B illustrates a more complex conference server which handles the more general case. The server in the general case might maintain additional output and additional input queue components for transmitting information to other servers or for storage services, including caching, short-term storing, recording, and archiving, and for later playback. These purposes are distinguished as follows: caching provides fast memory hardware support in improving the performance of the server; short-term storage provides backup and refresh capability for extremely slow or temporarily disconnected clients, for newly connected servers that may need information older than that normally held in the output queue, for quick-turnaround failure recovery, and for other short-term needs; conference sessions are recorded when they are primarily intended for later viewing by users of the system who may or may not be participating in the session; an archival session captures all or part of a meeting as it occurs and is intended for users who typically were conferees in that session and have a reason to review the session later. Uses of recorded sessions, especially when they incorporate synchronized voice, include live online training sessions that also serve for future offline training, technical and marketing demonstrations, and formal presentations that can be broadcast or accessed remotely at will. Archived sessions have uses other than review, including briefing absentees, capturing interactions involving or aiding technical support, evaluating sales personnel, and the like. Of course, these needs and characterizations are not exclusive or exhaustive.

Possible features and methods for storage handling will now be listed. The emphasis will be on recording and archiving, but shorter term storage modes will share many of these characteristics.

During any session, there can be multiple "storage server" queues, or "storage streams," saving output to one or more media. These can be controlled by the server itself, by recorder-like interfaces (similar to a video cassette recorder, or "VCR") at the clients, or by other interfaces operated by conferees. Each stream can be independently controlled, or one controller can control multiple storage streams. The storage facility can operate concurrently in an ongoing meeting to record a live conference, or it can be used by itself to capture a recording for later replay.

It is possible to control who can record a meeting, how much data they can record (by time or by disk capacity, for example); the type of information they can record (by stream, by user sets, or the like), the storage medium (disk, tape, etc.), and when recording starts. Recording might be set to automatically start when a certain user corrects, when the first connection is made, when a certain number of conferees are connected, when the first person presents, when a particular person presents, at a particular (real) time, after a particular duration from the beginning of the meeting, or because of some other triggering event. It is also possible to control the end of recording, based on similar triggering events or triggers related to capacity, elapsed time, etc. The controlling can be done by a conferee at a particular client, by a moderator, or the like.

Possible storage targets include local disk files, local database servers or back-ends, remote database servers or back-ends, remote storage engines relying on the data structures, controls, and methods of the system of the present invention

(example system architectures are described below), and local or remote permanent storage media (optical, magnetic, magneto-optical, etc.). Permanent storage can also be used by the system to assist recovery from disaster. The storage stream could also be directed to an email message or to another computer application within the system of the present invention or beyond it.

It is possible to control the quality of storage input and playback output. Each storage stream can have an associated quality parameter associated with it so that it behaves as though connected at a particular network speed. Thus a stream might be stored or a playback stream might be produced that was suitable only for replay at a given speed. Or several playback streams could be simultaneously produced from the same stored information for several different particular playback rates. If most or all of the original session data is stored, then replay might perform the same adaptive filtering described in FIG. **8**A for real-time "live" meetings, so that the single storage source could be played back at multiple, adaptive rates.

Since there would be added value in being able to access recorded information, it is appropriate to describe how billing controls might be incorporated. Billing could be performed when the original recording is made, or when a recording is played back. Billing might be based on units of time used or on units of storage consumed, at the time of recording or at the time of replay. Billing for recording and playing may be independent. Any tracking that needs to be made to implement the billing functions can be incorporated into the storage and playback services of the communications system.

It is possible to tailor the data stored. Since a conference typically involves multiple data streams, one or more may be chosen for storing. Some streams might go to one storage device or modality as described above, others might go to different ones. Synchronization between streams (e.g., voice and imagery) can be maintained, even when the streams are stored in different places and ways.

Stored information can be replayed through another communications session established by the system according to the present invention, or it can be sent through other communications channels, for example, email, file transfer protocol ("FTP"), or physical media transfer by postal or courier services, etc., and replayed by the recipient using the client software according to the present invention. Stored material might be replayed from a copy local to the user's computer, or it might be retrieved after WWW navigation to a replay-enabled Web site. Retrieval might involve streaming the data in the ways described above, or transfering the data by email, FTP, WWW download, or the like. With Web based retrieval, support could be provided for browsing by content, searching by user-defined keys, controlling access by user-provided keys, access lists, privilege levels, or user-provided payment options (e.g., credit card number on file).

Control modes on replay might include: control by server without user interaction for a single data stream (like a pay-per-view movie in which each attendee who joins gets to see the playback forward from the point of joining); control by the server, without interaction but with multiple streams (e.g., all attendees get to see the movie from the beginning regardless of when they join the show); by an external moderator; by VCR-style controls at one or more client computers. Each set of controls can affect either all the sets of streams or a particular grouping of streams. Replay can occur at the original real-time recording rate, at faster-than-realtime (like fast forward play on VCRs), in VCR-style single stepping modes, and in the various reverse modes as

**25**

well. Random access and jump playback by index marking, by time codes, by presenter, or by other organization could be supported.

In addition to the stored meeting contents, any other document or data object might be uploaded and stored with the meeting (e.g., meeting agenda, minutes of a previous meeting, or supporting materials). Upload is another type of data stream that passes into the system server and is then relayed to a suitable storage entity residing on the same or a different host. Attachments can be retrieved either with specialized functions of the client software, by navigating Web pages and using a Web browser, or by other retrieval mechanism. Attachments are subject to all of the same controls as the recorded meeting contents with regard to access, billing, playback, etc.

The above-described elements of the more generalized conference server concepts are illustrated in FIG. **8**B. In addition to the instances of the single output filter processes **100**, the more complex server functions shown in FIG. **8**B includes inputs for different sources, such as other servers (where the complex server shown might be an intermediate server for a large broadcast), storage sites for replay and import channels, and outputs to other intermediate servers, storage sites, and export channels.

Multiple Servers

Up to this point, the conference server has generally been referred to as a single server running conferencing software. The server functions described so far may be performed on several different computers running conference server software connected over a computer network. FIG. **9**A shows a configuration with four conference servers **14**(a)-(d), one presenter client **12**, and eleven attendee clients **18** (some of which are separately identified with letters). Three conferee clients are connected to each server. The four servers are completely connected, that is, a connection is shown between each pair of servers. With many servers, this degree of interconnection would be unrealistically complex, expensive, unneeded, and performance degrading. One of many useful techniques, a "tree topology," for interconnecting numerous servers is described below.

There are three classes of advantages from having several servers active in a conference.

Static advantages result from a configuration and division of tasks that may persist throughout the conferencing session. The following are among these advantages.

(WAN economy and local performance) A conferee may find economy in being able to connect to a nearby server—where nearby may mean geographic closeness, or in the same network service area, or on the same local area network, or the like. Thus in FIG. **9**A, attendee client **18**(a) may find it cheaper to connect to server **14**(a) than to server **14**(c), while in turn client **18**(c) may find it cheaper to connect to server **14**(c) than to server **14**(a). At the same time, there may be better performance of the system with these local connections compared with a longer path with many hops to a more distant server.

(Client migration and homogeneous concentration) The advantage of having all of a server's attendee clients be the same and additionally of having them be the same as the presenter client has been discussed. There can be an advantage then of assigning similar clients to a single server when several servers are available and performance is not otherwise degraded. For example, in FIG. **9**B, attendee clients **18**(c) and **18**(d) are identically configured computers running the same operating systems with the same display configurations as the presenter client **12**, so both have been moved from their

**26**

original servers (indicated by dotted arrows) and reassigned to server **14**(a), as designated by the dashed arrows. The same advantage may also be found when clients of a server are in the same output class (as discussed above under the single server); thus, reassignment of clients in a given class so that one or more servers have all or most of their clients in that class can improve performance by making those servers' processing loads more uniform. Finally, as described under the discussion of WAN economy and FIG. **9**A, homogeneity may also involve nearness, and for this reason client reassignment may achieve that goal as well. In addition to reassigning clients to servers already participating in the conferencing session as above, it is also possible for the system to recruit additional servers where these resources are provided but not yet assigned to the particular meeting. Thus, server **14**(b) may be automatically connected to the server-server structure for the meeting pictured in FIG. **9**B in order to provide connections for the three clients **18**(b).

(Tree branching for load reduction and scalability) In FIG. **10**A, a tree topological configuration can provide economy in traffic handling and improved performance. Information from presenter client **12** is communicated to server **14**(a) and then to the other servers and on to attendee clients **18**, following the solid arrows. In this configuration, each server is shown handling four data connections of a single stream type; a single server would have to handle twenty-eight data connections to connect the presenter client to all the attendee clients. If attendee client **18**(a) issues a command or request to server **14**(a), represented by the dotted arrow, the message will be responded to by server **14**(c) or passed to server **14**(b), and handled there or in turn passed to server **14**(a), with these two paths also shown with dotted arrows. This means although some commands or requests may need to be seen by three servers, each server will see and process only a fraction of the total such messages. Just as the tree configuration allows a given number of conferees to hold a meeting more efficiently than with a single conference server, it also means that relatively few extra servers need to be added to expand the meeting and maintain the tree configuration. For example, if R+1 is the number of data connections per server, and ceiling(x) is the smallest integer greater than or equal to a real number x, then the number of servers S is required to hold a conference with C conferees, assuming one presenter and using the tree configuration, is (R·ceiling(log$_R$(C−1))−1)/(R−1). In particular, using R=3, which is the value in FIG. **10**A, forty servers will suffice for eighty-two clients. More realistically, if R=100, then 10,101 servers win provide the advantages of the tree configuration to a presenter and one million attendees. This takes only 101 extra servers over what would be required if the presenter client were directly connected to 10,000 servers, each of which served **100** clients. But the latter configuration, exemplified by FIG. **10**B with R=3 and C=28, is not realistic, since presenter client **12** would be deluged with independent commands or requests to update, or resend, or similar messages; in other words, the presenter client would have traffic in excess of the capacity of any server **14**. Based on distributing the server functions over many machines, and employing this tree topology for propagating information among servers, server-to-server communications and management provided by the present invention allow the number of participants in a meeting to increase exponentially with only linear degradation of the performance. Similar analysis applies if server capacities are not uniform, that is, if different servers can handle different numbers of data connections.

US 7,426,191 B2

27

Adaptive advantages result from reconfiguration and redistribution of tasks in response to relatively long-term changes in the system during the conference session.

(Backup server) If a server fails or becomes isolated from the network, then its clients may be connected over previously inactive backup links to other servers. Attempts can be made to reestablish communication with a server that has dropped out. If unsuccessful, its workload may be distributed to other servers. In FIG. 9C, attendee client $18(c)$ has conference server $14(c)$ as its principal server, and the dashed arrow indicates the assignment of server $14(a)$ as a backup server. Should the connection between client $18(c)$ and server $14(c)$ fail, as indicated by the "X" on the arrow between them, or should server $14(c)$ fail or become isolated from the net, then server $14(a)$ can respond to commands from and provide updates to client $18(c)$. Presenter clients and servers themselves can be assigned backup servers as well. Thus the dashed arrow between servers $14(a)$ and $14(d)$ indicates that each has been assigned as a backup for the other. Should the link between servers $14(a)$ and $14(b)$ fail, as indicated by the "X" on the arrow between them, or server $14(b)$ fail or become isolated from the net, then server $14(d)$ can take over traffic previously routed to server $14(a)$. It is also possible to have servers ready, but not active, as backups, or to have mirroring servers for even more secure redundancy. Since the state of the conference can be announced to all servers, the system may be configured so that a disrupted conference session can be robustly resumed with minimal loss of data and time.

(Transformation factoring) The transformations or transcodings that a block may undergo in transit from the presenter client to an attendee client may include differencing, error-correction encoding or decoding ("source coding"), compression or decompression (both for "channel coding", or just one for purposes of bandwidth matching; lossy or lossless), encryption or decryption ("privacy, security, or authentication coding"), compositing with other differences or with base blocks, conversion from DDB to DIB and back, storing, replaying, copying, or the like. Editing, mixing, data from different sources or presenters, mixing data of different kinds, duplicating, changing the order, the format, the storage or playback quality, etc., are other examples of transformations, which are neither exclusive nor exhaustive. Some or all of these may be performed and the order of performing them may change. As previously discussed, some may be performed by a conferee client, some by a conference server. When several clients are available or when several clients have different capabilities and resources, these functions may be delegated or migrated to different machines. For example, in FIG. 9D presenter client 12 is differencing, conference server $14(a)$ is compressing, server $14(b)$ is distributing the decompression task to attendee client $18(b)$ (which has decompression hardware), server $14(d)$ is compositing the resulting delta block with a previous delta block, and attendee client $18(d)$ is compositing the result with an old base block. This advantage is viewed as adaptive, since the loading configuration that makes a particular distribution favorable may change slowly during the conference session, but it could be a static advantage when some machines have much greater capabilities than others (such as compression or decompression hardware).

(Distributed and redundant flow control) The architecture and logic of the filter process as described above and illustrated in FIGS. 8A,B may be distributed among several servers and even clients. Thus, like the functional transformations, portions of the queues themselves, as well as the internal operations of the filtering process, may be found on

28

different platforms at different localities in the network, and at different times. Not only may the information and functionality be so distributed to improve memory economy or gain memory or processing speed, but the system can be made more robust by redundant storage, and more responsive by parallelizing the pipeline. The queues may also be segmented sequentially over several platforms. These different aspects are shown in FIG. 9E. Here, qcdiff is stored redundantly on servers $14(a)$ and $14(b)$; on server $14(a)$, qcdiff uses the special compression facilities provided by an attached hardware device 15. One card of qmulti is stored on client $18(c)$ (perhaps a machine with very fast reliable surplus memory) while the rest are on server $14(c)$. While qcbase is housed on server $14(b)$ using a compression codec (possibly hardware based) on client $18(b)$, it operates in parallel with qubase on server $14(d)$, which uses a discarder on client $18(d)$ (there is additional undiagrammed parallellism implicit in having portions of the output queue on all four servers). Finally, qudiff is segmented sequentially with the first part (qudiff.beg) on server $14(a)$ and the last part (qudiff.end) on server $14(d)$. Note that in the last case, the two segments of qudiff are not even adjacent in the network linkage shown. Another type of distribution of the queues is given in FIG. 9F. Assuming the presenter client breaks the capture rectangle into four blocks B1, B2, B3, B4, it illustrates, using just qubase, how the stream data can be decomposed and distributed over all four conference servers $14(a$-$d)$, so that the subqueue qubase.B1 of uncompressed blocks B1 are on server $14(a)$, the subqueue qubase.B2 of uncompressed blocks B2 are on server $14(b)$, etc.; this represents another form of parallellism. These are simple examples; there are more complex analogues when there are more servers, and all of them may occur in various combinations. The various techniques of RAID (Redundant Array of Inexpensive Disks) striping with recovery from errors are also applicable. All of the distribution schemes mentioned here may also vary over time.

These are specifically adaptive advantages, but the static advantages also have parallels here, since a backup server may also be close, since a change in presenter may warrant a new tree configuration, and since an output class change may warrant a new homogeneous concentration reassignment.

Dynamic advantages result from reconfiguration and redistribution of tasks in response to relatively short term changes in the system during the conferencing session. The following are among the dynamic advantages.

(Content-based routing) Unlike IP routing for example, the system has access to the contents of the information being routed. Thus it can read the time stamps, type of data, and other information included in the base or delta block data or other system data. It can use this together with measured properties of the network interconnections of the servers and clients to determine best-estimate optimal routing between and through its components. In FIG. 9G, one route from presenter client 12 to attendee client $18(d)$ (through server $14(b)$) is shown in double arrows, another (through server $14(d)$) in heavy arrows, to illustrate that one route may be preferable under some conditions, but as conditions change, the system may select a different route.

(Redundant routing) The system can send image or other data by several routes at once. This can improve performance, since the earliest to arrive at the destination may trigger the discard of later-arriving data This can improve the resiliency and robustness of the system, since it is more likely some data will get to the destination. It can also improve reliability or accuracy, since several versions may be compared at the destination to see if they are identical. In case of discrepant data at the destination, retransmission or some arbitration

US 7,426,191 B2

method can be requested, depending on the purpose of the redundant attempts to insure delivery. For example, again in FIG. 9G, information from presenter client 12 may be sent by conference server 14(a) using both routes, indicated by the double arrows and the heavy arrows, to server 14(d) and then to attendee client 18(d).

These are specifically dynamic advantages, but the static and adaptive advantages also have parallels here as well. This can be summarized in an additional dynamic advantage.

(Dynamic reconfiguration) Any of the configurations described above and the parameters determining them and the routing schemes can be altered depending on changes in client, server, and network capabilities, needs, resources, and loads as announced or demanded by clients, or as measured by the system, or as specified by conferees or system administrators, or other prevailing or desired conditions.

Any combination of advantages from these three groups may apply. There will in general be tradeoffs among these advantages. The system can be given specific configuration preferences, or it can automatically adjust during use according to preset optimization goals, or it can adaptively set optimization goals and adjust the configuration to approach them.

Example of Server Architecture

So far, a server or each of a set of servers operating together has been viewed as a computer performing the server functions described. An example of server architecture and use will now be given, without suggesting the necessity for, or the exclusiveness of, this architecture to accomplish the communications serving functions on single or multiple and interconnected servers described above. Also, the previous examples have dealt with a single conferencing meeting or other communications session; the method to be described below can also accommodate several meetings on the same underlying hardware and the conferencing software as provided by the present invention. Again, the description of this method is not intended to suggest that this is the only way in which the invention can accomplish multiple simultaneous communications sessions. Any references to the image-sharing example should be extended to arbitrary data steams.

FIG. 11 shows an architecture of a single server and a single meeting. The primary component of this architecture is a server manager 36 (identified in this diagram as "ServMgr 'InfoPass'"), which is directed by a meeting manager 32 (identified in this diagram as "MeetMgr 'TheCompany'"). Meeting manager 32 is an unowned, quiescent, resident, interrupt-driven process (similar to a "daemon" process used with Unix and other operating systems). It may or may not be running on the same CPU as WWW server 30(a); it may or may not be running on the same CPU 38 (called here "Beowulf") as server manager 36 "InfoPass." The server manager is also an unowned, quiescent, resident, interrupt-driven process. Each CPU that is involved in the system for providing server functions in meetings set up by a meeting manager has exactly one server manager running on it; that server manager can be viewed as the meeting manager's agent on that CPU. The meeting is directly supervised by communications session server ("CSS") 40(a), called here "Meeting #1 'Product Support.'" When server manager 36 receives a command from meeting manager 32 that includes the information on a meeting and on the first conferee that wishes to connect, the server manager creates a CSS to handle the meeting. The CSS is an owned, evanescent, quiescent, interrupt-driven process. The CSS is owned by the server manager and is killed a period of time after all the conferee clients connected to its meeting disconnect or fail to respond.

In FIG. 11 there are three conferee clients 17(a)-(c) connected to the meeting. Indeed, Clients 17(a),(b) use a client-server protocol provided by the system, which might be a combination of Transmission Control Protocol ("TCP") and User Datagram Protocol ("UDP"), for example. Client 17(c) uses another protocol, here exemplified as Hypertext Transfer Protocol ("HTTP"). The CSS 40(a) provides an included "gateway" layer 40(b) for each connection protocol other than the system protocol, and this layer translates the client's nonsystem protocol to the system protocol. The acceptance of different protocols may aid the system's operation across firewalls or adaptation to clients' restricted network connections, for example.

A potential conferee 17(a) has navigated his or her WWW browser to Web server 30(a), and has asked through the Web page presented to connect to the meeting (as described above in the discussion of FIG. 2). There may be alternative ways, indicated here as 30(b),(c), to connect to the meeting, including direct access to the meeting manager or its database 34 (called here "Meeting DB"). The meeting manager uses this database to hold information concerning the meeting (the database need not be on the same computer as the meeting manager). This information was created when the person who set up the meeting requested that the meeting be scheduled, gave descriptive information for the meeting, specified the keys and privileges, and provided other administrative information. The database is reconfigurable and easily extensible to include many and varied meeting attributes. It may be accessed by a programming interface. Potential new conferee client 17(a) sends a request to join the meeting, and then supplies the key for the meeting that the potential conferee has obtained previously. Potential client 17(a) may also send previously selected identification information such as icon, gong, etc., and this may be stored in Meeting DB or in some other sort of directory service. After the meeting manager has validated potential client 17(a), it sends a message that causes the client software to run on the potential client and then sends that client software the address information for the CSS, such as a URL and port number. At that time, the client software may also receive address information for backup CSSs in case the connection to the meeting fails and automatic or manual attempts to reconnect to the initial CSS fail as well. The client then connects to the meeting, and may pass to the CSS its identification information.

A CSS is created to supervise a single meeting. The monitoring-filtering-queuing structures and procedures of FIGS. 8A,B are performed by the CSS, so FIGS. 8A,B could be viewed as part of the internal working of each CSS in FIGS. 11-22 (in the case of distributed server functions described in FIGS. 9D-F, only part of FIGS. 8A,B might be descriptive of a particular CSS). Indeed, there will be a version of FIG. 8A applying to each data stream the CSS handles as multipoint real-time traffic from a presenter client. The structure of FIG. 8B shows schematically how these and other multiple input and output data streams are processed. The CSS also handles other input from and output to clients, such as information about attendee and presenter clients that helps with flow control, commands or requests from clients, labeled pointer icon positions, and other stream data and control traffic.

In FIG. 11, a dot-and-dash line 14 has been drawn around the structure that corresponds to the term "server" in the earlier parts of the description of the present invention; this may be a helpful analogy, but the description of the example here is only one possible explication of server functions.

FIG. 12 shows a slightly more complex situation than FIG. 11. Here, the server manager has created three CSSs to supervise three meetings. Conferee client 17(a) (labeled here

US 7,426,191 B2

31                                                    32

"Jim") is simultaneously connected to two meetings. If Jim is permitted, he can share the information he receives from one meeting with the participants in the other.

Server managers are responsible for measuring network connection bandwidth, reliability, CPU load, and other parameters, and determining the configuration of any and all CSSs they may own at any given time based on these measurements and other considerations.

FIG. **13** shows a more complex arrangement than FIG. **12**. Now, there are two CPUs, **38**(*a*) and **38**(*b*); each has its own server manager, but both are directed by the same meeting manager. Server manager #**1** **36**(*a*) has created two CSSs to handle two meetings, and server manager #**2** **36**(*b*) has created a single CSS. Conferee client **17**(*a*) is now connected to two meetings on two different CPUs, possibly distant from each other.

FIG. **14** exemplifies the situation when there are several meeting managers by showing two meeting managers **32**(*a*), (*b*) active. Each has its own meeting database **34**(*a*),(*b*). Each directs the server manager **36**(*a*),(*b*) on a single CPU **38**(*a*,*b*). Server manager **36**(*a*) has created two CSSs **40**(*a*),(*b*) to handle two meetings. The other server manager **36**(*b*) has created a single CSS **40**(*c*). The only connection pictured between these two instances of the system is the presence of client **17**(*a*) "Jim" in two meetings, one in each instance of the system.

If a need arises to let a second meeting manager set up meetings on a CPU that already has a server manager managed by a meeting manager, then the currently running server manager forks or clones itself and the new server manager becomes the agent for the newly involved meeting manager. Thus, there is a one-to-one correspondence between server managers running on a given CPU and meeting managers that set up meetings on that CPU. As an illustration, in Panel **1** of FIG. **15**, meeting manager **32**(*b*) sends a message to server manager **36**(*a*) on CPU **38** that causes server manager **36**(*b*) to be created. Then afterward, in Panel **2**, meeting manager **32**(*b*) and server manager **36**(*b*) start the meeting through the new CSS **40**(*b*). Conferee "Jim" **17**(*a*) has joined both meetings, but there need be no other relationship between the two meetings shown. In the situations below, there will be no difference if server managers for different meeting managers are on the same CPU or on different CPUs.

FIG. **16** shows a single server manager **36** that has created three CSSs **40**(*a*)-(*c*) on one CPU **38**, but now these CSSs all handle the same meeting (called "Meeting #**3** 'Sales'"). The same meeting might require additional CSSs on the same CPU if process limitations were exceeded by a great number of client connections and their requirements, or the like. In order to coordinate their work, the three CSSs communicate using a system-provided server-server protocol. This protocol may use the same sort of blend of networking protocols as described for the client-server connection, or it may be quite different. For diagrammatic purposes, FIGS. **16-20** show interprocess communication links only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between CSSs **40**(*a*) and **40**(*c*) in FIG. **16**. This interprocess communication allows one CSS to send presenter client output to another, for example; this was described above in the discussion of FIG. **8**A. More detail on this is given below in the discussion of FIGS. **21** and **22**. Conferee client **17**(*a*) "Jim" is known to two CSSs **40**(*b*),(*c*), but is actively connected only to CSS #**3** **40**(*c*). The connection to CSS #**2** **40**(*b*) is a backup assignment (as described above in the discussion of FIG. **9**C). Should CSS #**3** fail, then "Jim" can automatically be connected to the meeting through CSS #**2**.

FIG. **17** shows a single meeting manager that directs two server managers **36**(*a,b*) that have created three CSSs **40**(*a, b,c*) on two CPUs **38**(*a,b*), and these CSSs all handle the same meeting (called "Meeting #**3** 'Sales'"). The same meeting might require additional CSSs on additional CPUs if the CPUs were distant from each other, but closer to their respective sets of connected clients, or if process limitations were exceeded by a great number of client connections and their requirements, or the like. The advantages described in the discussion of FIGS. **9**A-G, **10**A, B provide numerous reasons for multiple servers (which in this context means multiple CSSs) that handle the same meeting and that may be distributed over a number of CPUs. As in FIG. **16**, the three CSSs communicate using a system-provided server-server protocol. In addition, the two server managers communicate using this or a similar protocol in order to coordinate the full span of this meeting. They exchange the performance measurements they make in order to adaptively configure the CSSs. For example, conferee client **17**(*a*) "Jim" begins the meeting connected to CSS #**2**. At some point, the server managers determine that it is likely that better service will be obtained by "migrating" this connection from CSS #**2** **40**(*b*) to CSS #**3** **40**(*c*) and so from CPU **38**(*a*) to CPU **38**(*b*) (as described above in the discussion of FIG. **9**B). This reconnection may be performed automatically. Moreover, the creation of CSS #**3** to handle this meeting and the interprocess communication channels between CSSs and between server managers may be established automatically to improve performance and balance loads (as further described above in the discussion of FIG. **9**B). The creation of additional CSSs, on the same machine or on different machines, to handle the same meeting is the basis of the scalability of the present invention.

It is possible for several meeting managers to each direct a server manager that has created one or more CSSs, and these CSSs all handle the same meeting. This is pictured in FIG. **18** with two meeting managers **32**(*a*),(*b*) and their respective databases **34**(*a*),(*b*). This could be the situation if two different companies own the meeting managers and might wish to hold a joint meeting (here called "Meeting #**4** 'Joint Sales'"). The user or administrator that sets up such a multiply managed meeting may manually declare the organization of the management (e.g., the meeting managers involved, the CPUs, the number of CSSs, and other structural, organizational, managerial parameters), or the setup may be done automatically by the system, or it may be done interactively with automated support. Here meeting managers **32**(*a*),(*b*) also communicate using the system-provided server-server protocol. They exchange the meeting information, so that their two databases **34**(*a*),(*b*) are consistent. They also exchange messages that indicate that this is to be a joint meeting, and they inform their server managers of this. Potential conferees join through either meeting manager. The appearance of the meeting may be the same for all conferees, independent of the number of CSSs, server managers, CPUs, or meeting managers involved. Again, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another CSS (from **40**(*c*) to **40**(*b*)), even when the new CSS is on a CPU in the domain of a different meeting manager (from CPU **38**(*b*) in the domain of meeting manager **32**(*b*) to CPU **38**(*a*) in the domain of meeting manager **32**(*a*)).

FIG. **19** extends the situation of FIG. **18**. The two meeting managers are shown directing their server managers in a joint meeting. This time, server manager **36**(*c*) has created two CSSs **40**(*c*),(*d*) for the meeting on the same CPU **38**(*c*), and meeting manager **32**(*a*) has directed two server managers **36**(*a*),(*b*) to create CSSs **40**(*a*),(*b*) for the meeting on two different CPUs **38**(*a*),(*b*). Thus this is a combination of the

US 7,426,191 B2

33

situations pictured in FIGS. **16-18**. Again, for diagrammatic purposes, FIGS. **19** and **20** show interprocess communication links among server managers only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between server managers **36**(*a*) and **36**(*c*) in FIG. **19**. As before, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another. CSS **40**(*b*), even when the new CSS is in the domain of a different meeting manager.

If a CSS fails, the server manager process may create a new CSS, the clients may be migrated to other CSSs already active on the same CPU, or clients may be migrated to other CSSs newly created or already handling the meeting at other locations in the system, as indicated above. If a CPU fails or becomes isolated from the network or system, the meeting manager process can attempt to reestablish network connection with the CPU and send the server manager information to create a CSS to handle the meeting, or the meeting manager can communicate with one or more server managers on still accessible CPUs to create one or more CSSs to handle the meeting. In addition clients that have backup connections beyond the failed CPU can be migrated to CSSs handling the meeting. If there are several meeting managers participating in the management of a meeting, and a meeting manager becomes disabled or isolated from the network, then another meeting manger may attempt to establish sufficiently many CSSs through server managers it can reach to carry the workload. These adaptations may occur automatically, or be initiated by a system administrator.

The diagrams in FIGS. **11-19** suggest the range of variability in coordinating meetings and server functions. Many other combinations can be formed from the situations pictured there or may be suggested by them. For example, if a global directory service for meetings is provided, then there could even be a layer of management above the meeting managers, which might be termed a Global Manager.

FIG. **20** illustrates a method for determining which CSSs pass output information to other CSSs that are handling the same meeting. The configuration of meeting managers, server managers and CSSs is the same as in FIG. **19**, except that one client **12** is presenting, the others **18** are attending, and no backup link is shown. From time to time, the server managers determine and agree on appropriate propagation topologies that resemble a tree or trees (trees and their advantages were described above in the discussion of FIGS. **10**A, B) and post a copy **42** of the current choice at each of their CSSs. These are directed acyclic graphs ("DAGs"), which contain no loops, so that the CSS can send out the information with no risk of endlessly cycling it. Each stream being handled has its own propagation DAG, and they may change independently among streams; as described below, each stream may have several propagation DAGs. In FIG. **20**, presenter client **12** is viewed as the root of the tree, and CSS #**1** delivers presenter output information to CSS #**3** and CSS #**3**; in turn, CSS #**3** delivers that information to CSS #**4**; all CSSs also deliver the information to their connected attendee clients **18**.

FIG. **21** represents the situation of FIG. **20** with the topological information of the directed graph **42** emphasized by rearranging the CSSs to resemble the tree specified in the propagation DAG **42** of FIG. **20**.

FIG. **22** represents the situation of FIG. **20** with the same topological information **42**(*a*) emphasized in FIG. **21** and with the addition of another possible propagation topology **42**(*b*) for the same stream. Secondary and multiple propagation DAGs for the same data stream allow the system to

34

reroute the information being sent or to send it redundantly (both as described above in the discussion of FIG. **9**G).

The foregoing suggests that minimal server platform needs for this example would be a network connection and an operating system providing an interrupt service and multitasking, with or without hardware support.

System Extensions and Extendability

Up to this point, there have been multiple servers dealing with multiple clients, where "client" has referred to an enduser's computer or an instance of the conferencing software running on it. But it may happen that the reconfigurations, transformations, and routings performed by a server or servers described above extend to assigning tasks to intermediate devices such as routers, bridges, gateways, modems, hardware codecs, and the like. There may be also be cases where a client lacks display capabilities, but provides other functions to the system or acts as a monitor or recorder of activity. There may be configurations where all server functions are performed on client computers, so there is no specified server node in the networked system. In the preferred embodiment, performance may require that there be one CSS per CPU.

Both the server and client software architectures are adaptable. Not only may features be added on that increase the variety of communication possible, such as text chat, audio, and shared drawing areas, but proprietary codecs, transformations, stream operators, and the like may be incorporated as plug-in modules. Addition of streams of abstract data types can be accommodated by the system and in turn allow the system to be expanded and reconfigured.

When operating with data streams that admit asynchronous unnotified updating (where intermediate updates can be dropped if they are obsoleted by later arriving data updates), which are those that are appropriate for multispeeding, the system is robust under occasional loss of information and can thus take advantage of high-speed networking protocols like User Datagram Protocol ("UDP") that do not provide reliable transmission but provide greater network throughput performance than reliable protocols. The system can also be configured to provide secure transport for a data stream, and so could be used to carry the display command streams on which are based other image-sharing systems, but then there would be advantage from multispeeding, although the scalability and other advantages of the present invention would be available.

Codecs, transformations, and transcodings described above for the image-sharing example may have analogues that play similar roles with similar advantages in the system's handling of other data streams. It is also recognized that there are other cases of transcoding from one type of data to another, such as text to page image via rasterization, page image to text via optical character recognition, text to speech via speech synthesis, and speech to text via speech recognition. Such tasks may involve transformations in different orders than described above, including decompression at the presenter client and compression at the attendee client. These possibilities are accommodated by the present invention.

The system contains no obstructions to operating across firewalls with permissions. The system is compatible with agents, network proxies, and other stand-in entities, with a variety of network context and content filters, with multiple network protocols for client connections, with bandwidth matching transcoders, with hybrid wireless and landbased networks, with assymetric networks, with clustered CPU networks, with streaming multimedia and signal processing systems, with serial, parallel, and vector processors, and with many other specialized technologies; properly configured

US 7,426,191 B2

35

36

and supplied with appropriate permissions, the system either operates transparently with them or enjoys increased performance by employing and extending their advantages. Faster processor speed and greater bandwidth do not obviate the utility of the present invention; instead, they improve its performance.

As mentioned before, the described communications system not only applies to the transport of streams of image data, and to other examples mentioned, but also generally applies to the transport, storing, replaying, scheduling, multispeeding, and other handling and processing of other data streams as well.

One way of seeing the flexibility of the system is to refer to FIG. 23, where different applications covering different separations in time and space for the communicants are listed.

The above description is illustrative and not restrictive. Many variations of the invention will become apparent to those of skill in the art upon review of this disclosure. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A conferencing system comprising:

a conference server;

at least one client the at least one client including a web browser; and

at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after establishing a client-server connection, the client-server connection established via the web browser the at least one client having been navigated to a Universal Resource Locator associated with a conference, and wherein one or more characteristics of the provided conferencing data are based on client or server information examined subsequent to both the client-server connection having been established and the client joining the conference.

**2**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a size of at least part of the conferencing data.

**3**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least some contents within the conferencing data.

**4**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least some information related to at least part of the conferencing data.

**5**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one source of at least part of the conferencing data.

**6**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one destination of at least part of the conferencing data.

**7**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a rate of reception of at least part of the conferencing data.

**8**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a rate of transmission of at least part of the conferencing data.

**9**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises hardware involved in processing at least part of the conferencing data.

**10**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises software involved in processing at least part of the conferencing data.

**11**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one protocol used in processing at least part of the conferencing data.

**12**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least a size of at least part of the conferencing data.

**13**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least a calculation of a size of at least part of the conferencing data.

**14**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least some content within the conferencing data.

**15**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least some information related to at least part of the conferencing data.

**16**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one source of at least part of the conferencing data.

**17**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one destination of at least part of the conferencing data.

**18**. The conferencing system of claim **1**, wherein the client or server information examined is related to a rate of reception of at least a part of the conferencing data.

**19**. The conferencing system of claim **1**, wherein the client or server information examined is related to a rate of transmission of at least a part of the conferencing data.

**20**. The conferencing system of claim **1**, wherein the client or saver information examined is related to hardware involved in processing at least part of the conferencing data.

**21**. The conferencing system of claim **1**, wherein the client or server information examined is related to software involved in processing at least part of the conferencing data.

**22**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one protocol used in processing at least part of the conferencing data.

**23**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of the server.

**24**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of at least one of the clients.

**25**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of at least one of the network connections.

**26**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of the server.

**27**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of at least one of the clients.

**28**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of at least one of the network connections.

US 7,426,191 B2

37
38

**29**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics is based on at least one modification to a conference environment originated by the server.

**30**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics is based at least one modification to a conference environment originated by at least one client.

**31**. The conferencing system of claim **1**, wherein the client or server information comprises at least one modification to a conference environment originated by the server.

**32**. The conferencing system of claim **1**, wherein the client or server information comprises at Least one modification to a conference environment originated by at least one client.

**33**. The system of claim **1**, wherein the at least one client is configured to provide the conference server with a key prior to joining the conference, the key identifying one or more privileges of the at least one client during the conference.

**34**. The system of claim **33**, wherein the one or more privileges includes entering the conference.

**35**. The system of claim **33**, wherein the one or more privileges includes being a presented during the conference.

**36**. The system of claim **33**, wherein the one or more privileges includes access to information about another attendee in the conference.

**37**. The system of claim **33**, wherein the one or more privileges includes changing a conference setting.

**38**. The system of claim **1**, wherein the client or server information is examined at various points during the conference.

**39**. A method for conferencing between a server and at least one client in a conferencing system, comprising:

establishing a network connection between the server and the at least one client, the network connection established via a web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference;

examining client or server information subsequent to both the client-server connection having been established and the client joining the conference; and

providing conferencing data from the server to the at least one client alter establishing a client-server connection and the at least one client having joined the conference, wherein one or more characteristics of the conferencing data are based on the examined client or server information.

**40**. The method of claim **39**, further comprising determining one or more characteristics of conferencing data for delivery during a first portion of the conference, the determination based on current capabilities of the at least one client validated after establishing the client-server connection but prior to the at least one client joining the conference.

**41**. The method of claim **40**, wherein the one or more characteristics of conferencing data for delivery during the first portion of the conference are changed in favor of the one or more characteristics of the conferencing data based on the client or server information examined subsequent to both the client-server connection having been established and the client joining the conference.

**42**. The method of claim **39**, wherein the client or server information is examined at multiple points during the conference thereby resulting in an adjustment of the one or more characteristics of the conferencing data provided during the conference.

\*    \*    \*    \*    \*



US007715331B2

(12) **United States Patent**
Salesky et al.

(10) Patent No.: **US 7,715,331 B2**
(45) Date of Patent: ***May 11, 2010**

(54) **PROVIDING CONFERENCE DATA IN A NETWORK COMMUNICATIONS SYSTEM BASED ON CLIENT OR SERVER INFORMATION EXAMINED DURING A CONFERENCE**

(75) Inventors: **Joseph Salesky**, Cameron Park, CA (US); **Peter Madams**, Moraga, CA (US); **John Flower**, Walnut Creek, CA (US); **Clint Kaul**, San Mateo, CA (US); **Benjamin Wells**, Walnut Creek, CA (US); **Edward Arthur Ho-Ming Janne**, San Francisco, CA (US)

(73) Assignee: **Pixion, Inc.**, San Ramon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/012,642**

(22) Filed: **Feb. 5, 2008**

(65) **Prior Publication Data**

US 2008/0183807 A1    Jul. 31, 2008

**Related U.S. Application Data**

(60) Continuation of application No. 11/086,506, filed on Mar. 21, 2005, now Pat. No. 7,426,191, which is a continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, which is a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, which is a division of application No. 08/823,744, filed on Mar. 25, 1997, now Pat. No. 6,343,313.

(60) Provisional application No. 60/014,242, filed on Mar. 26, 1996.

(51) **Int. Cl.**
*H04L 12/16* (2006.01)
(52) **U.S. Cl.** ........................ 370/260; 370/261; 709/203
(58) **Field of Classification Search** ...................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,110,560 A * 8/1978 Leary et al. ................. 379/339

(Continued)

OTHER PUBLICATIONS

"Transmission Control Protocol," Information Sciences Institute, University of Southern California, 1981, 83 pages.

(Continued)

*Primary Examiner*—Robert W Wilson
(74) *Attorney, Agent, or Firm*—Carr & Ferrell LLP

(57) **ABSTRACT**

An improved networked computer communications system handles arbitrary streams of data, and transports at varying speeds those streams where intermediate updates can be dropped if they are made obsolete by later arriving data updates, optimizing the utilization of network and node resources. Complex buffering by system server software allows distributed, parallel, or redundant processing, transmission, and storage for performance, reliability, and robustness. Various parameters of the system can be monitored, and the system can be reconfigured automatically based on the observations. Varied techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess. One conferencing system allows conference participants to share all or a portion of the display seen on their computer screens. The conferees may be at sites removed from each other, or may view a recorded presentation or archived conference at different times. Conference participants are either "presenters" who can modify the display or "attendees" who cannot modify the display. A pointer icon, which can be labeled to identify the conferee, is displayed on the shared image area. Each conferee can modify the position of his or her own pointer, even when not presenting, so that every participant can see what each conferee is pointing to, should a conferee choose to point to an element of the display. These and other features apply to other data streams shared in the conference or in meetings where there is no shared-image data stream.

**42 Claims, 37 Drawing Sheets**



## US 7,715,331 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,414,621 | A | 11/1983 | Bown et al. |
| 5,241,625 | A | 8/1993 | Epard et al. |
| 5,455,599 | A | 10/1995 | Cabral et al. |
| 5,485,212 | A | 1/1996 | Frederick |
| 5,506,832 | A | 4/1996 | Arshi et al. |
| 5,530,795 | A | 6/1996 | Wan |
| 5,550,982 | A | 8/1996 | Long et al. |
| 5,553,083 | A | 9/1996 | Miller |
| 5,563,649 | A | 10/1996 | Gould et al. |
| 5,600,646 | A | 2/1997 | Polomski |
| 5,617,539 | A | 4/1997 | Ludwig et al. |
| 5,649,104 | A | 7/1997 | Carleton et al. |
| 5,689,553 | A | 11/1997 | Ahuja et al. |
| 5,689,641 | A | 11/1997 | Ludwig et al. |
| 5,706,290 | A | 1/1998 | Shaw et al. |
| 5,727,002 | A | 3/1998 | Miller et al. |
| 5,737,448 | A | 4/1998 | Gardos |
| 5,740,371 | A | 4/1998 | Wallis |
| 5,764,235 | A | 6/1998 | Hunt et al. |
| 5,764,731 | A | 6/1998 | Yablon |
| 5,774,668 | A | 6/1998 | Choquier et al. |
| 5,790,818 | A | 8/1998 | Martin |
| 5,793,365 | A | 8/1998 | Tang et al. |
| 5,793,980 | A | 8/1998 | Glaser et al. |
| 5,802,322 | A | 9/1998 | Niblett |
| 5,822,523 | A | 10/1998 | Rothschild et al. |
| 5,826,025 | A | 10/1998 | Gramlich |
| 5,845,265 | A | 12/1998 | Woolston |
| 5,859,979 | A | 1/1999 | Tung et al. |
| 5,877,762 | A | 3/1999 | Young |
| 5,909,543 | A | 6/1999 | Tanaka et al. |
| 5,956,027 | A | 9/1999 | Krishnamurthy |
| 5,983,263 | A | 11/1999 | Rothrock et al. |
| 6,081,829 | A | 6/2000 | Sidana |
| 6,167,432 | A | 12/2000 | Jiang |
| 6,246,758 | B1 | 6/2001 | Low et al. |
| 6,249,291 | B1 | 6/2001 | Popp et al. |
| 6,313,863 | B1 | 11/2001 | Chida |
| 6,314,501 | B1 | 11/2001 | Gulick et al. |
| 6,343,313 | B1 | 1/2002 | Salesky et al. |
| 6,345,297 | B1 | 2/2002 | Grimm et al. |
| 6,560,707 | B2 | 5/2003 | Curtis et al. |
| 6,594,699 | B1 | 7/2003 | Sahai et al. |
| 6,772,335 | B2 | 8/2004 | Curtis et al. |
| 7,013,327 | B1 | 3/2006 | Hickman et al. |
| 2003/0140159 | A1 | 7/2003 | Campbell et al. |

### OTHER PUBLICATIONS

Eleftheriadis, A. et al., "Meeting Arbitrary QoS Constraints Using Dynamic Rate Shaping of Coded Digital Video," Proceedings of the 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, pp. 1-12.

Jeffay, K. et al., "Adaptive, Best-Effort Delivery of Digital Audio and Video Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 12 pages.

Jeffay, K. et al., "Transport and Display Mechanisms for Multimedia Conferencing Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 28 pages.

Macedonia, M. et al., "Mbone Provides Audio and Video Across the Internet," IEEE Computer, 1994, 12 pages.

McCanne, S. et al., "Receiver-Driven Layered Multicast," University of California, Berkeley and Lawrence Berkeley National Laboratory, 1996, 14 pages.

Schulzrinne, H. et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Request for Comments, 1989, 66 pages.

Stallings, W., "Data and Computer Communications," Fourth Edition, Copyright 1985, 1988, 1991, and 1994, 12 pages.

Wakeman, I., "Packetized Video-Options for Interaction Between the User, the Network and the Codec," The Computer Journal, vol. 36, No. 1, 1993, pp. 55-67.

Wolf, K. et al., "Multimedia Application Sharing in a Heterogeneous Environment," ACM Multimedia 95—Electronic Proceedings, 1995, 14 pages.

United States District Court for the Northern District of California, Claim Construction Order re: U.S. Patent No. 6,343,313; Jul. 28, 2004.

Stahl, S., "Conferencing Breakthrough," distributed by CMF Publications, Jun. 26, 1995, http://informationweek.com/533/33iucon.htm, last visited Apr. 13, 2005.

"Face Off," distributed by BYTE, http://www.byte.com/art/9510/sec7/art3.htm, Oct.,1995.

Gajewska, H. et al., "Argo: A System for Distributed Collaboration," Systems Research Center, Digital Equipment Corporation, 8 pages.

Turletti, T. et al., "Issues with Multicast Video Distribution in Heterogeneous Packet Networks," Sophia-Antipolis Codex, France, 4 pages.

Wood, K. et al., "Global Teleporting with Java: Toward Ubiquitous Personalized Computing." The Olivetti & Oracle Research Laboratory, University of Cambridge Computer Laboratory, pp. 1-13.

Wikipedia, "Multipoint Control Unit," Dec. 20, 2005, http://en.wikipedia.org/wiki/Multipoint_Control_Unit.

Networkworld, "MCU," Oct. 22, 2001, http://www.networkworld.com/details/762.html?def.

Techweb, "MCU," 2003, http://www.techweb.com/encyclopedia/shared/printArticlePageSrc.jhtml?term=MCU.

"Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Case No. 3:09-cv-03496-Si, Pixion, Inc. v. Citrix Systems, Inc., United States District Court Northern District of California, Jan. 19, 2010, pp. 1-4.

"Exhibit A, List of Invalidating Prior Art," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Pixion, Inc. v. Citrix Systems, Inc., United States District Court Northern District of California, Jan. 19, 2010, pp. 1-22.

"Exhibit B, U.S. Appl. No. 7,369,515: Invalidity Contention Based on ORCA Video Conferencing System - Aug., 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Pixion, Inc. v. Citrix Systems, Inc., United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit C, U.S. Appl. No. 7,426,191: Invalidity Contention Based on ORCA Video Conferencing System - Aug., 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Pixion, Inc. v. Citrix Systems, Inc., United States District Court Northern District of California, Jan. 19, 2010, pp. 1-12.

"Exhibit D, U.S. Appl. No. 7,369,515: Invalidity Contention Based on INTERNET TV with CU-SeeMe - Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Pixion, Inc. v. Citrix Systems, Inc., United States District Court Northern District of California, Jan. 19, 2010, pp. 1-32.

"Exhibit E, U.S. Appl. No. 7,426,191: Invalidity Contention Based on INTERNET TV with CU-SeeMe - Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit F, U.S. Appl. No. 7,369,515: Invalidity Contention Based on U.S. Appl. No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-19.

"Exhibit G, U.S. Appl. No. 7,426,191: Invalidity Contention Based on U.S. Appl. No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-23.

"Exhibit H, U.S. Appl. No. 7,369,515: Invalidity Contention Based on U.S. Appl. No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-26.

"Exhibit I, U.S. Appl. No. 7,426,191: Invalidity Contention Based on U.S. Appl. No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-28.

"Exhibit J, U.S. Appl. No. 7,369,515: Invalidity Contention Based on U.S. Appl. No. 2003/0140159," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-15.

"Exhibit K, U.S. Appl. No. 7,426,191: Invalidity Contention Based on United States Patent Application Publication No. 2003/0140159," Case No. 3:09-cv-03496-Si, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14. .

"Exhibit L, List of Potential Prior Art Not Presently Relied Upon," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.,* United States District Court Northern District of California, Jan. 19, 2010, pp. 1-2.

"CU-SeeMe Reflectors World Wide," http://www.ludvigsen.hiof.no/webdoc/cu/cu-reflector_list.html, visited Dec. 1, 2009, p. 1 of 1.

Amazon.com, "MBONE: Multicasting Tomorrow's Internet," http://www.amazon.com/exec/obidos/ASIN/1568847238/theunoffi-ciinter. . . , visited Nov. 6, 2009, pp. 1-4.

"Appendix 1, The CUSeeMe System," http://www.agocg.ac.uk/reports/mmedia/apple/appl.htm, visited Dec. 11, 2009, pp. 1-4.

"Appendix D-3: Appendix D, Realtime Data, LLC. v. Packeteer Inc. et al., Invalidity of U.S. Patent No. 6,624,761 Pursuant to 35 U.S.C. 102(a) and/or 102(b) and/or 103 by CU-SeeMe, offered for sale, sold, and/or publicly used at least as early as Mar., 1, 1999," pp. 1-12.

"Beginner's Guide to the Session Directory Tool (Sdr)," Computing Sciences Berkeley Lab, http://acs.lbl.gov/OldMisc/mbone/sdr.begin.html, visited Nov. 6, 2009, pp. 1-3.

"Control Issues in Multimedia Conferencing," J.R. Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 133-143.

"Dick Cogger Recollections, 1968-2001," Oral and Personal Histories of Computing at Cornell, Cornell University Office of Information Technologies, http://www2.cit.cornell.edu/computer/history/Cogger.html, visited Dec. 11, 2009, pp. 1-20.

"Copyright Information, CU-SEEME," Copyright 1993, 1994, 1995, 1996 Cornell University, http://web.archive.org/web/19970702085029/cu-seeme.cornell.edu/Copy. . . , visited Dec. 4, 2009, pp. 1-3.

"Cornell University CU-SeeMe p.," Table of Contents, http://web.archive.org/web/19961219182241/http://cu-seeme.cornell.edu/, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe Desktop VideoConferencing Software," Tim Dorcey, Cornell University, http://myhome.hanafos.com/~soonjp/dorcey.html, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe in the press," http://web.archive.org/web/19970702085145/cu-seeme.cornell.edu/Press. . . , visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Reflector," http://sattlers.org/mickey/CU-SeeMe/faqs/reflectors.html, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe Resources for BaBar," updated Aug. 16, 1996, http://wwwpub.utdallas.edu/~joe/babar/cuseeme.html, visited Dec. 14, 2009, pp. 1-2.

"CU-SeeMe Site Map," http://sattlers.org/mickey/CU-SeeMe/outlineSite.html, visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Video," updated Dec. 21, 1995, http://web.archive.org/web/19980112072121/www.indstate.edu/msattler/. . . , visited Dec. 4, 2009, pp. 1-4.

"README file: Cornell Video 'CU-SeeMe0.60'," Richard Cogger, Feb. 2, 1994, http://p25ext.lanl.gov/e866/offline/CU-SeeMe0.60.README.2-2.txt, visited Dec. 11, 2009, pp. 1-8.

"Re: CU-SeeMe Web app for the MAC," Mark Lentczner, Jun. 28, 1995, http://baby.indstate.edu/CU-SeeMe/dev1_archives/jun_95/0620.html, visited Dec. 14, 2009, pp. 1-2.

"Re: Anybody got 'Go CU-SeeMe Go!' working," Carol J. Qazi, Jun. 7, 1995, http://baby.indstate.edu/CU-SeeMe/dev1_archives/jun_95/0188.html, visited Dec. 14, 2009, p. 1.

United States Copyright Office, Public Catalog search result, "Internet Tv with CU-SeeMe/Michael Sattler," http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&SAB1=c. . . , visited Dec. 4, 2009, p. 1.

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 107 pp. (part 1 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 110 pages (part 2 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 106 pages (part 3 of 3).

Connexions: The Interoperability Report, "Special Issue: NetWorld+Interop 95 Las Vegas Companion," vol. 9, No. 3, Mar., 1995, pp. 1-48.

"CU-SeeMe," Wikipedia, http://en.wikipedia.org/wiki/CUSeeMe, visited Jan. 18, 2010, pp. 1-3.

US 7,715,331 B2

Page 4

"XTV: A Framework for Sharing X Window Clients in Remote Synchronous Collaboration," Abdel-Wahab et al., Old Dominion University, Department of Computer Science, pp. 1-15.

Automatome, Newsletter of the Automation & Scientific Development SIS, American Association of Law Libraries, pp. 1-10.

"A generic, distributed Whiteboard overlay using Java and the MBone," Mattias Mattsson et al., Luleå University, Sweden, Department of Computer Science/Centre for Distance-spanning Technology, pp. 1-4.

"Mbone Conferencing Applications," http://www–mice.cs. ucl.ac.uk/multimedia/software/main.html, visited Nov. 6, 2009, pp. 1-2.

"Mosaic+XTV = CoReview," K.J. Maly et al., Old Dominion University Computer Science Department and H. Syed et al., Innovative Aerodynamic Technologies, pp. 0-18.

"The UCL Transcoding Gateway (UTG)," http://www–mice. cs.ucl.ac.uk/multimedia/software/utg/, visited Nov. 6, 2009, pp. 1-2.

"The Human Factors of MBone Videoconferences: Recommendations for Improving Sessions and Software," Andrew S. Patrick, Mar. 3, 1999, Communications Research Centre, Ottawa, http://jcmc.indiana.edu/vol4/issue3/patrick.html, visited Nov. 6, 2009, pp. 1-35.

"The CU SeeMe Project, " http://myhome.hanafos.com/~soonjp/project.html, visited Dec. 4, 2009, pp. 1-8.

"CU-SeeMe README file, " Dick Cogger, Sep. 8, 1995, http://ftp.zcu.cz/mirrors/mice/CU-SeeMe/Mac.CU-SeeMe0.83b3/READ. . . ,visited Dec. 11, 2009, pp. 1-14.

"The Rapport Multimedia Conferencing System – A Software Overview," J. Robert Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 52-58.

"ORCA Video Conferencing System CU-SeeMe Software," U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Aug. 1995, pp.1-26.

"User-Centred Design of an MBone Videoconference Polling Tool," Andrew Patrick, Ph.D., Communications Research Centre, Ottawa, Canada, Mar. 11, 1998, http://debra.dgbt.crc. ca/mbone/mpoll/development/, visited Jul. 10, 2002, pp. 1-10.

"MMConf: An Infrastructure for Building Shared Multimedia Applications, " Terrence Crowley et al., Association for Computing Machinery CSCW '90 Proceedings, Oct., 1990, pp. 329-342.

USPTO Patent Full-Text and Image Database, Results of Search, Hits 51 through 94 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PT02&Sect2=Hitoff. . . , visited Nov. 6, 2009, pp. 1-2.

USPTO Patent Full-Text and Image Database, Results of Search, Hits 1 through 50 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PT02&Sect2=Hitoff. . . , visited Nov. 6, 2009, pp. 1-3.

"Frequently Asked Questions (FAQ) on the Multicast Backbone (MBONE)," Steve Casner, Dec. 22, 1994, ftp://isi. edu/mbone/faq.txt, visited Nov. 6, 2009, pp. 1-12.

"MBone Virtual Classroom for Engineering Distance Education," Tom Miller et al., pp. 1-6.

"Distance Education Using Linux and MBone," Kelly Davis, Linux Journal, Oct. 1, 2000, http://www.linuxjournal.com/print/4018, visited Nov. 6, 2009, pp. 1-10.

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr., 1996, http://www.savetz.com/mbone/, visited Nov. 6, 2009, 90 pp. (part 1 of 2).

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr., 1996, http://www.savetz.com/mbone/, visited Jan. 14, 2010, 86 pp. (part 2 of 2).

"MBone Provides Audio and Video Across the Internet," Michael R. Macedonia et al., IEEE Computer Magazine, Apr., 1994, pp. 1-12.

"Groupware: Video Papers," Usability First: Groupware: Video Papers, http://www.usabilityfirst.com/groupware/vbib.txt, visited Nov. 6, 2009, pp. 1-8.

"A Forum for Supporting Interactive Presentations to Distributed Audiences," Ellen A. Isaacs et al., Proceedings of Computer-Supported Cooperative Work, ACM, 1994, pp. 405-416.

"A Comparison of Face-to-Face and Distributed Presentations," Ellen A. Isaacs et al., Proceedings of Conference on Computer-Human Interaction (CHI), ACM Press, 1995, pp. 354-361.

US 5,715,404, 02/1998, Katseff et al. (withdrawn)

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 4D



FIG. 4E



FIG. 5



FIG. 6A



FIG. 6B

Capture rectangle

| Block 1 | Block 2 |
|---------|---------|
| Block 3 | Block 4 |

Capture at presenter client

**Illustration of the effect of specifying consistency at the attendee client**
(other delays in displaying assumed to be caused by loading at client)

| Time order | Received at client | Displayed by client | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1 | Block 1 | |
| 2 | Block 2 | Block 2 | |
| 3 | Block 3 | Block 3 | |
| 4 | Block 4 | Block 4 | Blocks 1-4 |
| 5 | ... | ... | ... |
| 6 | | | |

FIG. 7A



Capture rectangle

| Block 1A | Block 2A |
|---|---|
| Block 3A | Block 4A |

Capture A at presenter client

Capture rectangle

| Block 1B | Block 2B |
|---|---|
| Block 3B | Block 4B |

Capture B at presenter client

Capture rectangle

| Block 1C | Block 2C |
|---|---|
| Block 3C | Block 4C |

Capture C at presenter client

**Illustration of the effect of specifying consistency at the server**
(other delays in sending assumed to be caused by loading at attendee client)

| Time order | Received by server | Sent by server | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1A | | |
| 2 | Block 2A | | |
| 3 | Block 3A | Block 1A | Block 1A |
| 4 | Block 4A | | |
| 5 | Block 1B | | |
| 6 | Block 2B | Block 2A | Block 2A |
| 7 | Block 3B | Block 3B | Block 3A |
| 8 | Block 4B | Block 4B | Block 4A |
| 9 | Block 1C | Block 1C | Block 4A |
| 10 | ... | Block 1B | Block 1B |
| 11 | ... | ... | ... |

FIG. 7B



FIG. 8A



FIG. 8B



FIG. 9A



FIG. 9B



FIG. 9C



FIG. 9D



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 10A



FIG. 10B



FIG. 11



**FIG. 12**



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

|  | Now | Later |
|---|---|---|
| **Here** | Recording and previewing a presentation | Reviewing an archived earlier conference as a participant. |
| **There** | Joining a real-time conference connecting participants at different, possibly quite distant, locations. | Viewing a prerecorded presentation or reviewing an archived conference as a nonparticipant. |

**Time**

**Space**

Time vs. Space diagram of some system applications

FIG. 23

US 7,715,331 B2

**1**

PROVIDING CONFERENCE DATA IN A
NETWORK COMMUNICATIONS SYSTEM
BASED ON CLIENT OR SERVER
INFORMATION EXAMINED DURING A
CONFERENCE

CROSS-REFERENCE TO RELATED
APPLICATIONS

The present application is a continuation application of
U.S. patent application Ser. No. 11/086,506 filed Mar. 21,
2005 now U.S. Pat. No. 7,426,191 and entitled "Providing
Conference Data in a Network Communications System
Based on Client or Server Information Examined During a
Conference"; U.S. patent application Ser. No. 11/086,506 is a
continuation of U.S. patent application Ser. No. 10/600,144,
filed Jun. 19, 2003 now U.S. Pat. No. 7,197,535 and entitled
"Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable
Computer Network Communications System"; U.S.
patent application Ser. No. 10/600,144 is a continuation
application of U.S. patent application Ser. No. 09/523,315,
filed Mar. 10, 2000 now abandoned and entitled "Real-Time,
Multi-Point, Multi-Speed, Multi-Stream Scalable Computer
Network Communications System," now abandoned; U.S.
patent application Ser. No. 09/523,315 is a divisional appli-
cation of U.S. patent application Ser. No. 08/823,744, filed
Mar. 25, 1997, now U.S. Pat. No. 6,343,313, issued Jan. 29,
2002 and entitled "Computer Conferencing System with
Real-Time Multipoint, Multi-Speed, Multi-Stream Scalabil-
ity"; U.S. Pat. No. 6,343,313 claims the benefit of U.S. pro-
visional patent application No. 60/014,242, filed Mar. 26,
1996, all of which the present application incorporates by
reference. The present application is also related to U.S.
patent application Ser. No. 10/753,702, filed on Jan. 7, 2004
and entitled "Providing Data Updates in a Network Commu-
nications System Based on Connection or Load Parameters"
and U.S. patent application Ser. No. 11/086,507, filed on Mar.
21, 2005 and entitled "Providing Conferencing Data in a
Network Communications System Based on Client Capabili-
ties."

BACKGROUND OF THE INVENTION

The present invention relates generally to the field of
shared computer communications and computer conferenc-
ing. In particular, one embodiment of a conferencing system
according to the present invention facilitates the conferencing
of two or more persons, each with a computer at one or more
locations with a shared visual display and additional commu-
nication capabilities such as video, shared drawing, audio,
text chat, etc. and facilitates the recording and later playback
of the communications.

Existing conferencing systems can be described as either
video conferencing systems or "whiteboard" systems. In a
video conferencing system, a snap-shot of the conference
presentation is taken at regular intervals, such as thirty times
per second. Given that the image on a computer display is not
changing nearly that often, video conferencing wastes large
amounts of bandwidth. In a whiteboard system, the presenter
at the conference draws within a whiteboard application or
imports the output of another program into the whiteboard
program for manipulation. When the presenter is ready to
present a snap-shot, the presenter presses a "send" button and
the whiteboard program updates all the attendees' displays
with the image created by the presenter. This type of system,
while requiring less bandwidth than video conferencing, is

**2**

clumsy to use, lacks real-time responses, and limits the pre-
senter to the tools provided with the whiteboard program.

Existing shared-display or shared-image systems rely on
interception and communication of display or graphics sys-
tem commands or depend on conferees' having similar hard-
ware and software platforms. These systems lack flexibility
and performance if the network connections are unreliable or
have narrow bandwidth, or they require uniform hardware or
software installations.

Existing systems that provide single or multiple data
stream handling of a nature different than shared-image con-
ferencing depend on wide bandwidth network connections or
on all participants having similar platforms.

SUMMARY OF THE INVENTION

An improved general purpose data-stream computer net-
work transport system and, in particular, an improved desktop
conferencing system is provided by virtue of the present
invention. The desktop conferencing system is used to display
a shared collaboration among conference participants ("con-
ferees"), with one or more individuals located at each remote
site connected to the conference. Typically, at any particular
time some conferees are not able to modify the shared images,
and thus they are "attendees," as opposed to "presenters."
Preferably, only one conferee is the presenter at any one time.
A pointer icon for each conferee can be displayed on the
screen, and the conferee is able to modify the location of his
or her pointer, even if the conferee is not one who can modify
the shared display itself. Each of the pointers can be labeled to
distinguish each of the conferees.

In a specific implementation of the desktop conferencing
system, conferee client computers ("conferee clients") con-
nect to the "conference server," a computer or several net-
worked computers (any of which may also be used by a
conferee as a client computer) running conferencing soft-
ware, typically by navigating a World Wide Web ("WWW" or
"Web") browser through a predetermined Universal
Resource Locator ("URL") that indicates a Web page describ-
ing the conference. The conference can be set up any time
earlier by anyone with access to this server function. At the
time of setup, one or more password character strings
("keys") can be specified for the conference. The key that a
conferee gives at the time of attempting to connect to the
conference server determines whether that conferee will be
allowed access to the conference and what the conferee's
initial privileges will be for participating in the conference
and for modifying the setup of the conference. These privi-
leges include but are not limited to the following:
entering the conference, being a presenter, having a pointer,
seeing the icons or other identifying information of other
attendees, hiding or sharing one's own icon or identifying
information, changing descriptive information such as the
name, time, and purpose of the conference, changing keys,
and changing others' privileges. The privileges can be modi-
fied during the conference by conferees or others who are so
authorized. In general terms, the privileges include those that
conferees might enjoy in person at a conventional, physical
meeting. In the description below, a conferencing or other
communications session provided by the present invention
will sometimes be called a "meeting."

A presenter uses his or her computer to begin a conference
presentation by connecting to the conference server. Confer-
encing software on the presenter client computer captures a
portion of the screen display of the presenter client and sends
the captured region (after possibly compressing it or applying
other transformations) to the conference server. The captured

US 7,715,331 B2

3

region can be anything the presenter client can have displayed on its screen or a portion thereof, whether or not the hardware or other software producing or managing any part of the display is aware of the conferencing system.

When the attendee selects a link from the Web page to begin the conferencing session for that attendee, this action initiates the attendee client conferencing software. The attendee client then obtains a current view of the captured region from the conference server. The position of a pointer icon on a conferee's view of the captured region and an icon specified by the conferee might be communicated to each of the other attendee and presenter clients, so that each of the participants can see what each conferee is pointing at should a conferee choose to point to an element of the shared captured region. A particular conference can include more than one presenter; all conferees may be presenters, or all conferees may be non-presenting attendees. The latter may happen if a conference is set up to review a previously recorded or archived conference.

In a simple embodiment, the entire screen of the presenter is shown to all of the attendees. In a more complex embodiment, multiple subsets of multiple presenters' screens might be made available to all attendees while other subsets of the displays of the presenters are viewable by a subset of the attendees, thus allowing private side "conversations." These side conversations can be flexibly reconfigured during the conference, according to the conferees' privileges; participants in side conversations can have separate pointers whose positions are independent of, and whose labeling icons are distinguished from, those appearing in the general conference.

As each conferee joins a conference, the client and the conference server agree on the capabilities of the client, such as display bit-depth, bandwidth of the connection between client and the conference server, processor speed of the client, and the amount of memory available to each client. These parameters may be modified by the conferee, the client, or the server: this can be done automatically or on demand. If the conference server determines that a client has sufficient computing resources, some of the tasks, such as image data compression (for presenter clients), decompression (for attendee clients), update scheduling (both types of clients), and other image transformations and server management functions can be assigned to the client computers. The client computers might be personal computers, workstations, X-terminals, cable or satellite TV set-top boxes ("STBs"), personal digital assistants ("PDAs"), game playing machines, WebTV™s, network computers ("NCs"), Infopads, visual telephones, and other existing or as yet undeveloped input and/or output devices. These clients might be connected to the server computer or computers (and the server computers might be interconnected) by high or low bandwidth electrical or optical connections, radio, infrared, microwave, telephone modem, or hybrid combinations of these, or other existing or as yet undeveloped data communication technologies.

The system can supply a range of coder-decoder ("codec") facilities for the compression and decompression of images (in order to reduce bandwidth requirements during network transmission) and for the matching of image representations to client display requirements including input or output format transcoding (in order that the shared image appear visually similar to presenter and attendee). In addition, codecs may be provided by the system for such purposes as error-correction, encryption, or audio and video noise reduction, or others. User-provided or proprietary codecs for these purposes and more can also be incorporated into the system. Any of these codecs may be in form of software or specialized

4

hardware. Multiple codecs may be provided for the same function; should the system determine that one is better suited for that function, then it may be selected, and the codec can be changed dynamically when conditions change, such as client requirements, server needs, and network loading.

At least one embodiment of the present invention provides real-time, multi-point, multi-speed transport over a computer network for data streams other than the visual conference shared images described above, including but not limited to audio, video, shared paint and drawing spaces, text chat, and other real-time object streams where intermediate updates may be dropped; in particular, the data streams may combine any or all of these types of data, which may be produced by multiple presenters, and arbitrary data streams may be combined with these. The features of connecting to servers, setting up conferences, keying privileges, passing identifications, accommodating multiple dissimilar platforms and network connections, and configuring subsets of conferees apply equally to these other data streams. In the more general case, the "communications server" connects the "source" and "sink" client machines of the "communicants" during a communication session.

But the system is not limited to real-time; thus, for example, archiving is provided. It is not limited to multi-point; thus, for example, a single user can record for later playback; being scalable means it works well for a few users and provides a similar communications service and experience with many users. It is not limited to multi-speed; thus, for example, data streams where lost information cannot be easily updated by later versions can be accommodated. It is not limited to multi-stream; for the shared screen-image stream (frequently used here as an example) by itself offers great utility. Indeed, it does not require a network: for example, the same computer could be the recording and archiving server for a presenter using it as a client; or the same computer could run presenter client software, attendee client software, and the communication server software connecting them so that a presentation might be previewed from the attendee's point of view.

Although a simple embodiment uses a single computer as the communications server, a more complex embodiment connects several computers in performing the server functions. The server-to-server interconnections can optimize routing by using information provided in the data stream or measured on the network, optimize wide-area network (WAN) usage by connecting clients to nearby servers, provide backup reliability by migrating clients, provide scalability of conference size through splitting the data stream, improve performance and robustness through redundant routing, and distribute functions of the system's transport pipeline (such as compression, decompression, and update scheduling) over several server and client computers. These services can be provided automatically depending on resources of the computers and network (for example, measured net speed and central processing unit, or "CPU," load) and facilities available (for example, announced client characteristics, such as CPU speed, compression and/or decompression hardware, or display parameters). They can also be configured and constrained by the server computer administrators or others with appropriate privileges.

Existing systems do not provide one or more of the following, which are explained in greater detail below: multi-speed at server and client, multiple reconfigurable coder-decoder transformations and transcodings, storage services (for, e.g., caching, failure recovery, recording, archiving, and playback), keyed access and privilege granting, adaptable servers and clients, multiple servers, adaptive and redundant server-

US 7,715,331 B2

5                                                              6

to-server routing, load sharing among clients and servers, adaptive server-to-client matching, client/server and server/server backup and reconnection, multiple protocols for client connections, dynamic reconfiguration of server functions, and scaling beyond single process, host, or network limitations automatically or upon request.

A more complete understanding of the nature, features, and advantages of the invention will be realized by referring to the following description and claims together with the associated drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a desktop conferencing system based on the present invention.

FIG. **2** is a flowchart illustrating the connection of a conferee client computer to a conference server shown in FIG. **1**.

FIG. **3** is a block diagram of the data flow in an architecture commonly supporting computer graphical user interfaces.

FIG. **4A** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when full images are compared, and the transmission of the changed information to the conference server.

FIG. **4B** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a new block is compared with the corresponding block in an old full image, and the transmission of the changed information to the conference server.

FIG. **4C** is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a checksum of a new block is compared with the checksum of an old corresponding block, and the transmission of the changed information to the conference server.

FIG. **4D** is a data flow diagram illustrating the updating of the stored old image with a new captured block by the presenter client, and the transmission of the changed information to the conference server.

FIG. **4E** is a logic diagram illustrating the updating of the stored old image in various formats with a new delta block by the presenter client, and the transmission of the changed information to the conference server.

FIG. **5** is a state diagram illustrating the operation of the image capture process of the presenter client software.

FIG. **6A** is a diagram showing attendee client block clipping.

FIG. **6B** is a diagram showing presenter client block clipping.

FIG. **7A** is a diagram illustrating the client consistency setting.

FIG. **7B** is a diagram illustrating the server consistency setting.

FIG. **8A** is a block data flow diagram illustrating the operation of server processes monitoring and filtering a single presenter data stream according to the present invention.

FIG. **8B** is a block data flow diagram illustrating the operation of server processes monitoring and filtering multiple input and output data streams according to the present invention.

FIG. **9A** is a block diagram illustrating interconnections of several communications servers and communicant clients in a single communications session according to the present invention.

FIG. **9B** is a block diagram illustrating interconnections of several communications servers and communicant clients, including migrated and recruited connections, in a single communications session according to the present invention.

FIG. **9C** is a block diagram illustrating interconnections of several communications servers and communicant clients, including backup connections for clients and servers, in a single communications session according to the present invention.

FIG. **9D** is a block diagram illustrating interconnections of several communications servers and communicant clients, including decomposition of transformation sequences and functional delegation, in a single communications session according to the present invention.

FIG. **9E** is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queues and processing, in a single communications session according to the present invention.

FIG. **9F** is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queue contents and processing, in a single communications session according to the present invention.

FIG. **9G** is a block diagram illustrating interconnections of several communications servers and communicant clients, including multiple and redundant routing, in a single communications session according to the present invention.

FIG. **10A** is a block diagram illustrating a multi-layered tree topology for connections of several communications servers with communicant clients in a single communications session according to the present invention.

FIG. **10B** is a block diagram illustrating a single-layer tree topology for connections of several conference servers with communicant clients in a single communications session according to the present invention.

FIG. **11** is a diagram of the example architecture for a single server with a single meeting, according to the present invention.

FIG. **12** is a diagram of the example architecture for a server with several meetings running on a single CPU, according to the present invention.

FIG. **13** is a diagram of the example architecture for a single meeting manager directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. **14** is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. **15** is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on the same CPU, according to the present invention.

FIG. **16** is a diagram of the example architecture for a single server with a single meeting, but the meeting is controlled by several instances of a communications session server ("CSS") running on the same CPU, according to the present invention.

FIG. **17** is a diagram of the example architecture for a single meeting manager directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. **18** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

US 7,715,331 B2

7          8

FIG. **19** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention.

FIG. **20** is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention. In this diagram, the propagation topology information is shown.

FIG. **21** is a diagram of the graph of the example propagation topology information in FIG. **20**.

FIG. **22** is a diagram of the graph of the propagation topology information in FIG. **20** together with the information for an additional propagation topology.

FIG. **23** is a time vs. space diagram showing some typical applications of the present invention.

DESCRIPTION OF THE PREFERRED
EMBODIMENT

FIG. **1** shows a desktop conferencing system **10** according to one embodiment of the present invention. Desktop conferencing system **10** is shown with three attendee clients **18** and one presenter client **12**. Following the arrows, presenter client **12** is connected to attendee client **18** through a conference server **14** and data network **16**. The presenter and attendees may also participate in an ordinary telephone call or a conventional conference call using telephones **20** connected through conference switch **22**. The voice conferencing might also be carried out through an audio connection on a data network; indeed, telephone network **24** and data network **16** could be the same.

The group of users can comprise from as few as one user, who might record a presentation or lecture or video-mail onto a session archive **23** for later distribution; or two people who wish to share information or collaborate on some work product; or a small group of users, as in a typical business conference call; to many tens of thousands or hundreds of thousands of users using the network as a broadcast rather than interactive medium. In the last case, the voice conferencing might also be broadcast, and could involve one-way telephone conference calls, radio, multicast network audio (such as MBone), or the like.

The presenter client conferencing software, which is usually distributed tightly bound with the attendee client software to facilitate presenter hand-offs from conferee to conferee, captures information (such as image, sound, or other output information) from a program or programs running on the presenter's machine and relays it to the server, as explained in more detail below. The server relays this information to all of the attendee client computers participating in the same session or conference, transforming (in manners and by methods described below) the data as required. A more detailed description of the operation of the system by way of the example of transporting a stream of shared-image data during a conferencing usage of the software now follows.

During a conferencing session, presenter client **12** takes periodic "snap-shots" of the application screen image contained within a rectangular boundary determined by the presenter, breaks the screen shot into smaller rectangular blocks, compares these blocks to information from a previous screen shot. A block that has changed is passed to conference server **14** after it has undergone possibly two transformations and received identification marking ("ID stamps"). The first transformation may form the difference, using a set differ-

ence, exclusive-or (XOR), or other difference method, of the new and old block in order to extract information on the changes only. The second transformation may compress the block using a publicly available compression algorithm such as JPEG (Joint Photographic Experts Group) or PNG (Portable Network Graphics), or licensed proprietary methods of compression. The need for the two transformations is determined by the system depending on such parameters as client characteristics, server and network loading, and user requests. The two transformations and possibly many others may be also performed by the server, another client, or another facility available on the network.

The presenter client identifies where the block is in the capture rectangle with a block-location ID stamp; it identifies the time with a time-stamp; it may also identify itself with an origin stamp, and provide other ID stamps as needed. In order to provide synchrony in the system, conference server **14** can issue time synchronization signals. The conference server may also add time-stamps on receipt of blocks, and will need to update time-stamps when a recorded or archived conference is played back.

The changed blocks, however transformed, with ID stamps, are held on the conference server until they have been sent to all attendee client computers **18**, or it has been determined by flow control that there is no longer a need to hold them. Flow control between presenter client **12** and server **14** and between server **14** and attendee client **18** determines how often the attendee client receives information updating the image; this flow control, described in more detail below, depends on the characteristics and configurations of the clients, the server, and the network. Attendee client **18** can also send a command to conference server **14** to obtain the latest image change information.

Attendee client **18** uses whatever change information it receives to update its screen display of the shared image. The attendee client may need to decompress the changed block information and to composite differences with previously received image information. The reverse transformations of decompression and composition may instead be performed by other computers.

From time to time, attendee client **18** communicates the position of the attendee pointer (if the conferee has selected this option) to conference server **14**, which distributes the pointer position and a chosen identifying icon to each of the other conferee clients, which may then add a representation of the icon or other identifying label at the position indicated by the pointer information to the shared image on the client's display. The purpose of these pointers and labels is to allow conferees to reference particular elements of the shared image, possibly while describing the elements to the other conferees over the audio conference session (via a telephone conference call or an Internet audio conferencing application, for example).

FIG. **2** is a flowchart showing the process of introducing a conferee client **17** (client **17** refers to a generic client which might also be a presenter client **12** or an attendee client **18**) to a conference ongoing on server **14**, assuming that the conference setup is performed via the WWW. First, the conferee locates a conference listing. This may be done by finding or being told a URL or using a locator service such as ULS™ or LDAP™. The conferee also specifies an icon to be used as a pointer label. Then the conferee points a WWW browser to the conference listing, where the server offering this listing or an associated server validates the conferee and provides information that allows the attendee client conferencing software to start and to connect to conference server **14** itself, possibly after further validation. Other information may be passed to

US 7,715,331 B2

9

the conferee client at this time as well. The connection to a server can also be accomplished in different ways, such as using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings. Once the attendee client software is running, it communicates commands and pointer icon position to conference server 14, and conference server 14 supplies an initial conference image and later screen updates to client 17 (which is initially an attendee client 18).

An attendee can become a presenter by sending the appropriate attendee-to-presenter command to conference server 14. In the simplest embodiment with a single presenter, a message is sent to the presenter's screen indicating that an attendee wishes to take the presenting role; if the current presenter approves, then the roles are exchanged. In more complex embodiments, there can be a presenter arbitration mechanism, or multiple presenters may be allowed. The ability for a presenter or an attendee to be involved in any particular conferencing session and the assignment of privileges in the conference can be controlled by requiring appropriate keys from the presenter and the attendees.

Referring back to FIG. 1, data network 16 can be provided by dial-up connections, local area networks (LANs), wide area networks (WANs), internets, intranets, the global Internet, or a combination of these or any other computer data communications links. In a specific embodiment, the conferee client computers are personal computers, workstations, or other computing hardware systems, running operating systems such as MacOS™, Windows™ 3.1 or 3.11, Windows™ 95, Windows™ NT™, Unix™, OS/2™, NEXTStep™, BeOS™, JavaOS™, or the like. There is no requirement that the operating systems or hardware of the conferee clients all be the same.

Conference server 14 matches the form of the image to the attendee clients before sending it. Most computer screen images are represented as a bitmap of pixels whose layout is device-dependent. To be able to send images from one device to another, a transformation or transcoding is often required. The captured image information may be transcoded into a device-independent format for transmission and transcoded back to a device-dependent format for each attendee's screen; if, however, the mix of attendee clients is such that a device-independent format is not needed, no conversion is done. If these or other transcoding operations are needed, they can be carried out at the presenter client's side, the server side, or the attendee client's side, depending on where excess capacity or superior capability exists. The choice of device-dependent vs. device-independent bitmaps (DDB vs. DIB) is made automatically by the server, in response to the number and type of conferee clients. For example, a meeting with just two conferees, each running a Windows™ PC with similar 256-color graphics configurations, may use DDBs and achieve high performance with low overhead However, where differently configured clients are connected in a conference, server 14 transcodes the images to fit the attendee's screen capability.

Multiple codecs may be involved in the transcoding of screen formats as well as other image transformations described herein. It may even happen that different codecs will be used on different blocks in the same image, depending on availability of the codec's host computer, the transformation needs, the loading on client, server, and network, or other conditions relevant to the system's performance.

Server 14 also fits the images to the attendee's CPU capability. Server 14 can be a server operated by the presenter (who would then have full control over the server's resources), or it can be owned or operated by an unrelated

10

third party or even an attendee who never presents. It is possible to have a third party whose involvement is solely as a facilitator of conferences. Operating server 14 is simpler than operating a videoconference hub, since the bandwidth is much lower. One aspect of the present invention is the realization that real-time conferencing can be had without resort to full-motion video transmission, as the item being monitored, a portion of a computer display, does not change as fast as a full-motion video. A similar observation applies to many other data communications streams.

Instead of full-motion video, attendees' screens are updated as the presenter's screen is modified, or less frequently for attendees with slow machines. The screen is modified from left-to-right within a row of blocks, and rows are updated top-to-bottom to improve the perception of low latency.

In some cases, server 14 might be operating without attendees. Such a configuration is useful where the presenter wishes to "record" a session for later playback. Even a session with attendees can be recorded for later playback, possibly including a recording of the voice conferencing. These stored sessions might be stored in session archive 23 or elsewhere. The shared image session can be synchronized with the voice conference by using the time stamps on the block data. When the recorded session is played back, it is an example of conference server 14 operating with attendees but no presenter.

The blocks may be held at the server as full images, as differences ("deltas") from previously received full images, as deltas from previous delta blocks, or as some combination of these, depending on the capabilities of the presenter and attendee clients. Periodically, a server may "checkpoint" the image deltas. To do this, the server requests a full image of a block from the presenter client and uses the full image as a replacement for all the accumulated image deltas for that block. The server might also request the entire captured region from the presenter client, or send the entire region to an attendee client upon request.

The conference server acts as a software-controlled switch that connects the presenter client with the attendee clients, taking into account that the speed of information transfer from the presenter client can change and the speed of transfer to the attendee clients can change and be simultaneously different for different attendees. The workload of the entire system is shared and distributed among the client and server computers, and even other computers that do not perform client or server functions.

Presenter Client Capture Operation

The capture operation and transport technology improves over former approaches by reducing the amount of work required and so enhances performance. In addition, the technique can be tuned to best suit the workload on the hardware and software platforms and network connections involved, manually or automatically. In particular, this tuning dynamically matches the capture operation to the amount of computer power available (while running the other software the conferee may wish to use) and the speed of connection to the network. Existing systems that capture graphics display commands, transmit them, and then use them to recreate the original display appear to have great compression, which entails economy of network transmission. But comparison with the description below of the present invention will reveal that the savings are not so great when the task is to communicate data streams which can be updated by later transmissions.

The presenter selects an area of his or her computer display to be shared ("capture region"); it need not be a rectangular area. More than one capture region may be selected at a time

US 7,715,331 B2

**11**

and multiple regions may overlap. The selection may be made on a screen display, in a memory representation of a display, or in an aliased representation of either; the selection can be changed at any time. If the client has multiple monitors or multiple displays on a single monitor, independent selection can be made for each. A window provided by the presenter client computer's operating system, or by an application or other program, may be designated as the capture region, and then the capture region can be adjusted automatically if the window is moved or resized. This may be a fixed window, or the capture operation can be set to follow the selection of the current ("top" or "focus") window automatically. In a simple embodiment, the presenter selects a rectangular region on the screen ("capture rectangle"). For efficient transmission, the capture rectangle is broken up into rectangular subregions (blocks) to give good perception of response time. For example, if the presenter has selected all of an 800-by-600-pixel screen display to be within the capture rectangle, then it might be broken up into twelve 200-by-200-pixel square blocks. If the capture rectangle is later adjusted smaller, the blocks are changed to be made up of smaller rectangles, or the capture rectangle is divided into fewer blocks, or both; correspondingly, if the capture rectangle is later adjusted larger, the blocks are changed to be larger rectangles or the capture rectangle is divided into more blocks, or both. For efficient handling of blocks, they are preferably kept between 1000 and 4000 pixels in size. As the blocks are updated on the attendee's screen, they are presented from the top row to the bottom row and from left to right within a row.

The presenter defines the shape of the capture region and can change, control, reposition, and resize it. In some computer systems, when the region is rectangular, the capture rectangle may be marked by a transparent window that stays visible; in other systems, it is appropriate to use four graphical objects that move together to mark the boundary of the capture rectangle.

FIG. **3** shows the display architecture of a typical computer shown with application programs **60**(*a*)-(*c*), and graphic display mechanisms **62**(*a*)-(*c*) with graphics commands capture points **64**(*a*)-(*c*). The graphics display mechanisms **62** send their output to a screen image storage area **66** which in turn presents an image to the user on a computer display **68**. Existing techniques of image sharing depend on intercepting graphics display commands (graphic instructions, display commands, graphics subsystem calls, etc.) at graphics commands capture points **64** and sending these commands to another computer which can use them to affect its own display. This appears to have an advantage in that one high-level graphics drawing command (e.g., "draw a blue line from co-ordinates (0,0) to (0,100)") can be expressed in fewer bits of data than what would be required to express the resulting set of pixels on the screen. In this case, 100 blue pixels, say using 24-bit color depth, would require 300 bytes of data, compared with a graphics drawing command that might require only about 12 bytes of data.

If the task to be achieved is to send a copy of this image to another computer, using the smallest number of data bits, then sending the graphics drawing commands seems, at first sight, to be a very effective approach to adopt. However, two factors mitigate this apparent saving. One arises when the data stream is compressed before transmission, and the other arises from reflection on modern graphics drawing techniques.

Compression is very effective when there is a lot of redundancy in the data. In the example cited above, the 300 data bytes needed to represent the blue line on the image consists of a repeating set of 3 data bytes, each representing one blue

**12**

pixel. This might be compress to as small as 5 data bytes total, one to indicate the code, three for the color, and one to indicate the binary number of pixels. Of course, the 12-byte graphics drawing command might also be compressible: nevertheless, the apparently huge savings ratio is not in fact realizable.

Modern graphics drawing commands include not only simple geometric drawing operations, but also text elements with full font and spacing specifications, and other complex constructions. This can be seen by comparing the size of, say, a word processing document (which contains the graphics drawing commands, font information and text) stored in a computer file with the size of an image of that same document, say, as a fax image stored as a file on the same device. A few years ago, the image file would always be larger than the document file; now, the reverse is often true.

Furthermore, as will be seen below, reducing the amount of data by using compact graphics drawing commands instead of direct image data is not always possible when applied to real-time systems where transmission of live, changing images is required. In this case, there are two ways to merge changes together, thus reducing the total amount of data that must be transmitted. The example used above applies to a single image; when changing images are required—as for example, with conferencing systems—further opportunities exist to reduce the total amount of data transmitted. This is an advantage of the present invention.

First, when graphic drawing commands update the same region of the image, we can capture just one resulting image containing the results of many commands. Second, successive changes to a particular region of the image, which will result in successive transmissions of that region, can be composited together. The several strategies for this updating under the present invention will now be described in more detail.

Updates for the capture rectangle may be requested by the server, or sent at fixed or variable times announced by the presenter client automatically or as determined by the presenter, or sent at the command of the presenter. The blocks sent out by the presenter client are just the blocks which have changed since the last capture. From time to time, the presenter client might send the entire set of blocks. Depending on several factors detailed below, the presenter client might send the blocks as difference (delta) blocks as opposed to the full information base blocks. Base blocks are preferred where network bandwidth is freely available but computing power at the client is limited.

For efficiency, the presenter client might only send out delta blocks for areas that have changed, since delta blocks will often compress smaller than the corresponding base block because much of the base block may remain unchanged. Thus, the presenter client maintains a copy of the last capture to allow it to generate the delta blocks.

FIG. **4**A illustrates this point. In that figure, the captured images used are divided into twelve subblocks so that unchanged portions of the captured image can be ignored. If the block labeled "B**6**" is the block being sent, block B**6** of the current copy of the captured image **69**(*a*) is compared with block B**6** of the most recently stored reference copy **69**(*b*) of the captured image (the reference copy is a copy of who the captured image looked at some point in the past). The result of the comparison will determine whether block B**6** has changed. If it hasn't, then there is no need to transmit the changes.

FIG. **4**B illustrates a similar process, but there, only block is captured from the current image for comparison with the

US 7,715,331 B2

13

stored image. This reduces the storage required for the comparison by nearly one half, but it limits consistency, as described later.

In FIG. **4**C, the images are replaced by checksums or digests, such as cyclic redundancy check ("CRC"), DFT (discrete Fourier transform) parameters, or the results of applying hashing functions appropriate for images, or the like. Although storage is greatly reduced, as only the much smaller checksums need to be saved, and comparison is quick, the digest procedure must be fast in order to provide any time economy. The main drawback is that two different blocks may have the same checksum, and then the comparison will fail to find the difference. This can be mitigated by the choice of checksum and by the unlikelihood that the comparison would fail twice in a row when the block changes again.

FIG. **4**D shows the transmission to the server of a base block when the comparison shows a change. The block is also sent to the stored image; this allows the stored image to be updated at the same time the changes are sent to the server.

FIG. **4**E shows the corresponding situation when a delta block is sent.

Obviously many combinations can occur that would provide additional savings under some load conditions. Thus the stored comparison may be a collection of base blocks, either from the same capture event or not, an array of checksums of base blocks or of delta blocks, a collection of delta blocks, results of compositing delta blocks, etc. or any combination of these.

It is possible to reduce the size of the stored comparison image to blocks which have changed recently and perhaps their neighbors, as long as the full image is stored every now and then.

Each of the modes of comparison and transmission can be altered dynamically; for example, one heuristic is to send a delta block when less than half the pixels in the capture rectangle change, and to send a base block when at least half change.

With techniques that rely on capturing graphics display commands, it is very hard to identify commands that produce overlapping elements of the image. Because of this, it is hard to know when earlier commands can be discarded because their results have been superseded. Therefore, a system relying on capturing commands must send all commands over an error-free network. By contrast, in this system, deltas can be dropped without permanent ill effects.

The foregoing assumes that the capture rectangle is broken into a number of rectangular blocks. This decomposition can be changed dynamically to have more or fewer blocks to adapt to changes in the size of the capture rectangle by the presenter as described earlier, or to changing conditions in the loading and capabilities of clients, servers, and networks. Just as the capture rectangle is broken into blocks to improve perceived rate of change, so may the block be subdivided to further isolate just the changed portion of the image. One way to accomplish this is to identify the smallest bounding rectangle of the changed portion of the image, and then to intersect this with the current block pattern. Another is to adaptively redefine the block pattern to best fit the changed area of the image. Other adaptations arise if the geometric assumptions of rectangular capture region and rectangular blocks in this example are dropped.

In general, the system of the present invention is oriented to reduce buffering in order to improve the sense of "live performance." Thus, while the structure of the server and client software could allow a number of captured images to be in the process of traveling from presenter clients to attendee clients at one time, in fact having just two images in the "pipeline"

14

from presenter to attendee at once takes advantage of processing capacity, defeats transient network breakdown, and does not overload end-to-end connection performance. This might be increased to three or four or more images in the pipeline if the network connections are fast, but the clients have slow CPUs.

FIG. **5** is a state diagram of the presenter client software. The state transitions are described here starting with the IDLE state. The presenter client is in the IDLE state while it is doing other things, such as processing data unrelated to the conferencing software or running another application whose output is to be shared with the attendees. Periodically, the presenter client will check to see if an update to the capture rectangle needs to be sent out. In considering that need, the presenter client conferencing software considers the CPU loading on the presenter client computer, taking into account any limit the presenter might have placed on what percentage of his or her machine's computing resources can be occupied with block updates, the transmission rate of the presenter's network connection (no sense preparing a block update if the network can't handle it), commands concerning flow control from the server (server flow control is described below) and other relevant parameters.

If the presenter client decides to proceed, the state changes to the BLOCK-GRAB state, where the current capture rectangle or a portion of it is grabbed from display memory. A copy of the next most recent capture rectangle is maintained so that delta blocks can be easily generated. In this state, the delta blocks are generated if they are to be used. If the delta blocks indicate that nothing has changed, the computer transitions back to the IDLE state and does not send out the captured block or its delta (which would be blank). Otherwise, the client prepares the blocks which have changed for potential transmission. The capture rectangle is divided into blocks as described above. In the BLOCK-GRAB state, the presenter client estimates the amount of work required to prepare the grabbed blocks for transmission to the server, the attendee requirements, and local hardware capabilities. If the presenter client can perform work such as transcoding much faster than the attendee clients, or even the server, then the presenter client performs that step by transitioning to the COMPRESS/TRANSCODE state. The presenter client might skip this state altogether if no transcoding is to be done and compression is not used (such as where the network connection between the presenter client and the server is much faster than the compression speed of the presenter client).

Either way, the presenter client then transitions to the NETWORK state, where it determines if the capture rectangle still needs to be sent and checks current network bandwidth. Then, the presenter client transitions to the OUTPUT state where the blocks are output, either as base blocks or as delta blocks, either compressed or uncompressed. The presenter client then returns to the IDLE state where the process repeats after a time.

In the case of displays that support multiple layers in applications or in the interface through multiple frame buffers or reserved areas of memory, the system can capture from one or more of the layers, in coordination or independently. If the client has multiple monitors, then the system can capture from some or all of the displays.

In general, the presenter client sends out a stream or streams, which can vary in format over time. The presenter client can also imbed command messages into a stream, such as a command indicating a changed color map, a pointer icon position, or a presentation hand-off command; such commands can also be sent in a separate communications channel.

US 7,715,331 B2

15

Capture can also occur in buffers for other purposes than screen display. Streams other than the shared-screen conferencing stream (outlined above and described in more detail below) can carry information to allow shared or broadcast text chat, audio, video, drawing, whiteboarding, and other communications. These streams are subject to and can enjoy the same or similar load/need analysis and balancing methods and mechanisms.

Other Client Features and Behavior

When a new conferee joins a meeting or before, the conferee selects a personal icon and a characterizing sound (a "gong") which will be the icon and gong that other conferees will associate with the joining conferee. Icons and gongs can be created using well-known techniques for creating icons and audio data. When a new conferee joins a meeting, the conferee client sends his or her personal icon and gong to each other client, via the conference server. The new conferee is then "announced" by the gong. The personal icon of the joining conferee is also added to a conferee icon list maintained on the server or at each client. If another conferee chooses to have the icon list displayed at his or her client, the entrance of the joining conferee can be noted when the new icon appears on the icon list. Other personal information about the conferee, such as name and electronic mail ("email") address may be provided by the conferee and made available to other conferees via the server. As described earlier, the visibility of icons, audibility of gongs, access to personal information, and so on, may be based on the key the conferee used to enter the meeting, on the identity of the conferee (by network address or otherwise), or on a combination of these and other validators.

The presenter can "go off-air," i.e., suspend or pause the image capturing process and can "go on-air," i.e., resume the presentation at will. The network connections can be maintained during the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-air, and no changes will be sent or scheduled by the server during the off-air time.

If clients are so configured, conferees can be given lists or iconic representations of the participants in the conference, as mentioned above. Those conferees that are presenting, those who are off-air, and those who are requesting to present can be marked. Various subsets of conferees, for example those in side-conversations, those in other meetings, those connected to a particular server, and in general those selected by some property of the system's current configuration, can also be marked. The visibility of the lists and the presence of any markings may be controlled by users, administrators, or others, based on privileges or other criteria. In addition, graphical representations of a meeting or part of a meeting, or of several meetings, may be available for display, depending on privileges.

If the presenter client computer represents images with a varying color map or palette, then the presenter client will send out color map information when the color map changes, so that the attendees observe the same color scheme as the presenter. Color map changes can occur on the presenter client display system as the presenter opens, makes changes in, or closes a program, either in a window that overlaps the capture rectangle or in a window beyond the capture rectangle used for his or her own private work.

When a change in a block is detected, the resulting changed block (base or delta) may be compressed, making use of any special hardware (for example, a Digital Signal Processor (DSP), often found on MPEG boards or set-top boxes), if it is available on the client computer. The compression codec may be lossless, or some information may be lost in compressing

16

and decompressing ("lossy" codec) if the particular application and users of the system can tolerate that and wish to take advantage of possibly better performance.

To ensure good usage of the network, the images are captured and compressed before the network is available to send them, if possible. Without this, the network might be underutilized. On the other hand, if an image is captured and compressed too early, the attendees will not see the most up-to-date information and this will reduce the efficacy of the visual component of the meeting. To achieve this good balance between system utilization and the perceived response time as seen (and possibly heard) by the meeting's attendees, the client software uses a pipeline to ensure a flow of information is always available at the network, with flow-controls to ensure that image capture and any transcoding (including compression) are never too far ahead or behind in order to balance the load among presenter client, attendee client, and conference server. Flow control is described in more detail below.

The number of blocks and the order of comparison and modification can be automatically determined by the server or set by the presenter. Thus, if conferees usually work with text reading from right to left, a right-to-left updating might be more appropriate.

The size of the window displaying the shared image on the attendee client need not match the size of the image sent from the presenter client in linear measure or in pixel measure. If the window is smaller than the image, the attendee can be given scrollbars to allow navigation around the shared image. It is also possible to configure the transcoding to scale the size of the image received by the attendee client.

The attendee client can also display the shared conference image automatically matched in size to the capture region set by the presenter, if the attendee desires and the attendee client computer is capable of such display. If the attendee client is displaying less than all of the image, the bounds of what is being shown at the attendee client can be communicated to the conference server so that the server can avoid sending blocks beyond the boundaries of the attendee's window. These blocks are not sent until scrolling requires them or they are otherwise demanded by the attendee. This point is illustrated in FIG. 6A, where an original image 50 as represented in the display coordinates of a screen 54 of attendee client 18 exceeds the size of a window 52 dedicated to its display. Scrollbars are included with window 52 to aid in navigation. Blocks 56 are not transmitted from server 14 to client 18 until the scrollbars are used or the window is resized to request the display of more of image 50.

This "clipping" of unneeded blocks can be propagated back to the presenter client by the server if appropriate (for example, if there is only one attendee), so that the presenter client does not have to process all blocks in the capture rectangle. This is illustrated in FIG. 6B, using the same attendee configuration as in FIG. 6A. In FIG. 6B, the presenter client 12 knows from conference server 14 that the shaded blocks 56 shown at the attendee screen 54 of attendee client 18 are not displayed in attendee window 52, so there is no need to capture or compare the corresponding blocks 57, marked as "do not process" in the representation 51 of the capture rectangle, which is displayed on presenter client screen 55 and shown with the an overlay 53 that corresponds to attendee window 52.

The shared conference image, text boxes, messages, control buttons and menus, and other graphical elements may be grouped in a single window or split among several windows on the client's display.

US 7,715,331 B2

**17**                                                        **18**

Consistency is a property of the display that can be chosen at the cost of somewhat reduced perception of image update speed at the attendee client. Both the server and client can be constrained to be consistent; server consistency is discussed below. FIG. **7**A gives a simple example of client consistency. An entire capture rectangle with four blocks is sent by the system, and the client waits until all four blocks are received before displaying them. Thus, the entire screen represents the same picture to the attendee as that seen somewhat earlier by the presenter. With consistency turned off, each of the four blocks is displayed as soon as possible, which leads to blocks from a previous transmission being seen alongside newer blocks, so the screen picture, at least for a time, is not consistently one that has been viewed by the presenter.

When a presenter makes a change to the part of screen that is in the capture rectangle, a signal can be given to the presenter client via the server when all attendee clients have received the update that results from the change. The presenter is then assured that all other conferees have seen the change he or she has made. An example of how this can be accomplished is given by the following. The conference server is aware of the geometry of the capture rectangle and the blocks are constantly scanned from left to right, starting at the top and moving toward the bottom. Thus the block in the lowest rightmost position signals the end of data from a particular rectangular capture by the presenter client. Since this block may not have changed and may never arrive in the server's input queue, a flag may be set by the server to indicate which block is last when a block from a new capture arrives before the last block has been sent to an attendee client If neither of these two mechanisms works, the presenter client can add a message via the server to the attendee client stating that the rectangle has been finished. Thus the attendee client can respond when it has received the entire rectangle.

In addition, a signal can be generated by the presenter client when the presenter has made no change for some set period of time or number of capture cycles. This can be relayed by the server to attendee clients, so that attendees may know that after the appropriate captured image is received, what they see is also representative of what the presenter currently sees.

If the connection to the server is lost, the client can notify the conferee and may then attempt to reconnect to the conference session, using saved parameters. The reconnection may be to a different server, as described later.

In the above description, "client" has referred to a computer system comprising hardware, an operating system, and applications software, possibly or specifically including the software necessary to participate in a conference or communication session according to this invention. All of the described operations also apply to the case when one or more users are running two or more instances of the client conferencing software on the same computer platform. This might occur when a user wishes to be a conferee in several different conferences simultaneously, or even multiple conferees in the same conference. For example, he or she can be a presenter in one conference and an attendee in another. A single person can have different identities in each client instance, so that John Smith may be known as "John" in one client instance and "Mr. Smith" in another. Two people might be using the same computer hardware alternately, and both can be participating in different conferences, or in the same conference as different conferees. The capture region of a presenter in one conference may include attendee displays from another, or this "chaining" feature may be prohibited by the system.

Another example of several clients running on one CPU occurs when several users are connected through terminals (e.g., X-terminals) to a host computer which is running the client software for each user.

If a user has a multiprocessor platform with several CPUs, then the system's client software might be configured to use two or more CPUs for the functions of a single client during a communications session.

Server Operation

This example of operation of the invention is based on sharing computer screen images; other stream types may be handled in a similar manner with similar logic, methods, and mechanisms. This is but one possible method of making the server.

At the server, a queue of data packets is maintained and is filled from an input filter and drained by output filters, one for each attendee client. The input filter and each output filter can run at its own speed. An output filter feeding a client connected over a slow network will not send every packet from the queue, but will skip over old information. This filtering process is complex, especially when the data packets represent changes from one image to the next (delta) which must be composited together in order to skip over delta blocks. This is the technique that allows the server to work with any speed network and mixed speed clients in the same meeting. The server data handling processes are described in more detail below.

The server also handles control messages, such as a request to join a meeting or a message from a client signaling that it is attempting to reconnect to a meeting after losing its connection; reconnection requests can also come from other servers when multiple servers are involved (multiple server situations are described in more detail below). The server accepts connection requests and verifies that the user of the client software is authorized to join the meeting. For each client connection, an icon and gong characterizing the user are sent to the server and then to all conferees by the server. If a nonpresenting attendee desires to become the presenter, the attendee client software signals the server and a message or signal passed to the presenter client is conveyed to the presenter to indicate the other conferee's desire.

The server accepts system information from each client connection and notes the client's requirements (e.g., all images must be 256-color images) and capabilities (e.g., CPU speed, available hardware-assist for graphics, compression, DSP, Windows® DDB available). From the system information, the server assigns the client connection to an appropriate "output filter class" as explained below. During network communication with a client, the server may measure the network response and update the system information. As required, the server can move a client connection from class to class in response to changing network characteristics so as to keep the clients in a class closely matched.

A special class of output filter sends data to another server instead of a client. This server-to-server capability allows conferences to scale to very large numbers of users. More importantly, it allows for intelligent distribution of work over a network of servers. Unlike low-level data transport layers, such as packet routing using the Internet Protocol ("IP"), servers know the meaning of the data elements they are routing, so the routing can change based on the meaning of the data in the message. For example, if the server knows that data is a delta of a display update and the computing effort required to receive and process each delta is more than a particular client has, the server can decide to not route the data packet to the client or to route the data to the client via another computer (or another process on the server) which will per-

19                                          20

form some of the necessary processing for the client, in essence to "predigest" the data for a client that needs it. As an additional example, the server can read the time stamps in the data messages, and based on the demands and resources of the clients, the network characteristics, and other information concerning the system, can decide to route the data by alternative or redundant routes through other servers.

Particulars of the Server Data Filtering Process

FIG. **8**A is a block diagram showing the flow of data in the server processes **100** used to intelligently filter and route one of the input data streams among those that the system may be transporting. As mentioned above, these data streams can be real-time shared-image conference data streams, other data streams which have similar transport and timing requirements, or arbitrary data streams. The example used here is the transport of a real-time shared-image conference data stream.

Generally, a data stream arrives at the server from a presenter client and is routed to each of the attendee clients. The complexity of the diagram is due to the fact that the server must accommodate many clients of differing capabilities. The data stream inputs from the presenter client are shown on the left in the form of a queue; four types of input stream for the example of the shared-image conference are shown, but in the preferred embodiment only one will be active at a time. Possible data stream outputs to attendee clients for the given input stream are shown on the right in the form of an editable queue.

The presenter client can dynamically change the format in which it provides data, based on the presenter client computer's capabilities, backlog, local network congestion, and information provided by the server. The data can arrive as uncompressed base blocks (raw data) on the stream labeled "ubase" if the presenter client decides not to send the differences and decides not to compress the data. If the presenter client decides, based on performance, network bandwidth, etc., to compress the data, it sends the data stream as compressed base blocks ("cbase"). The presenter client can also send the data stream as uncompressed difference (delta) blocks ("udiff") or as compressed delta blocks ("cdiff").

As each data block is received, it is time stamped by a time stamper **102** with either the true time of arrival or a later time of handling (used for when the conference is not a live conference, but is being played back). Time stamper **102** may also simply validate a time of sending stamped by the presenter client.

The data block is then fed to a server queue for that type of data block. The server queues are labeled "qubase" (for uncompressed base data), "qcbase" (for compressed base data), "qudiff" (for uncompressed delta data) and "qcdiff" (for compressed delta data). Since the presenter client provides data in only one data type (although it could provide all four data types, if the presenter had a fast machine, the server was a slow machine and the network between them had excess capacity), and the data type sent can change from time to time, filter **100** uses a queue filler **104** to fill all four queues using just the one data type provided by the presenter client. Of course, if filter **100** notes that none of the attendee clients need a particular data type, that data type can be ignored and its queue eliminated.

As shown in FIG. **8**A, the data type which is received can just be routed directly to the queue for that data type. If the received data type is uncompressed, the corresponding compressed queue is filled by running the received data blocks through a compressor **106***b* (base data) or **106***d* (delta data). If the received data type is compressed, the corresponding uncompressed queue is filled by running the received data blocks through a decompressor **108***b* or **108***d*. If the received

data type is base data, delta blocks are generated by a delta block generator **110**, which records a previous base block and differences it with a current base block; it may also reference delta blocks that it creates and stores. Delta block generator **110** is coupled to the ubase stream after decompressor **108***b* so that delta block generator **110** receives the base data whether it is sent as ubase data or cbase data. Likewise, delta block generator **110** is coupled to the udiff stream before compressor **106***d* so that both qudiff and qcdiff receive the benefit of delta block generator **110**.

For processing in the other direction, i.e., filling the base data queues having only delta data, queue filler **104** includes a compositor **112**. Compositor **112** gets its inputs from a base image frame store **114**, the udiff stream and the cdiff stream (after being uncompressed by decompressor **108***d* or a separate decompressor **116**). Base image frame store **114** maintains the equivalent of the previous full base frame. As delta frames are received, they are differenced (or, more precisely, "undifferenced") with the contents of base frame image store **114** to generate uncompressed base data Because the output of compositor **112** is coupled to the ubase stream prior to compressor **106***b*, the base frames output by compositor **112** can be used to fill the qcbase queue as well as the qubase queue. If the presenter client can switch from base data streaming to delta data streaming without sending an initial snapshot frame as delta data, compositor **112** should be coupled to the ubase stream and the cbase stream (or the output of decompressor **108***b*). Of course, the delta queues might contain base data from time to time, such as when a "checkpoint" is done to prevent an error in delta data from being propagated indefinitely.

The data blocks in the (up to) four queues are stored in time stamp order, so they may be viewed as a single complex queue of a data type comprising multiple parallel block entries compressed or uncompressed, differenced or base. The output of this complex queue can be sent to attendee clients as is, but filter **100** includes several other output mechanisms to accommodate disparate attendee client types. Base frame image store **114** might also be a source of server output, such as when a client requests a full capture rectangle image. This might occur when an attendee client has lost its place, lost its network connection and reconnected, or is joining a conference for the first time.

Although the four output queues can be viewed as a single queue, ordered by the time stamps, there could be up to four different queue entries for each time-stamp value. A queue synchronizer **130** uses arbitration or prioritization techniques to settle any discrepancy between presenter client time stamps and server receipt time stamps.

The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection. Reassignment can occur dynamically as the connection or client loading change, or when requested by the client. A monitor process (not shown) on the server monitors the activity of the output filters to shift attendee clients from class to class if the clients are either too fast or too slow for the class they are in. This is done dynamically, and the characteristics of all clients in a class as well as those in other classes are considered in balancing all classes.

Typically, Class 1 is used for fast attendee clients on a fast network. A Class 1 client receives all the data blocks, from one or more of the server queues. Because a Class 1 client

US 7,715,331 B2

21

receives all the blocks, the server need not track which blocks were sent to which clients. Some Class 1 clients will be able to decompress compressed base blocks as fast as they get them, and will take the blocks from the qcbase queue. Other Class 1 clients will be able to handle every data block, but only if they are delta blocks.

Class 2 is used for fast network connections to slow machines, such as 386s connected to corporate LANs. A Class 2 client might not be able to process each block, even uncompressed blocks, in which case filter **100** will discard blocks. A block discarder **132** is provided in filter **100** to track which blocks have been discarded for which Class 2 clients. Class 2 clients are provided with base data types (ubase and cbase) and not the delta data types so that block discarder **132** can discard some blocks without any loss of critical information. There is a loss in frame rate when blocks are discarded, but that loss is not as critical as the loss of delta data blocks. In addition, the memory and time required to track dropping base blocks for each Class 2 client is much less than for tracking the discarding of delta blocks. To avoid slowing Class 2 service for all Class 2 clients to the speed of the slowest Class 2 client, one output of block discarder **132** is provided for each Class 2 client. Thus, a faster Class 2 client will experience a higher frame rate as it will receive more data blocks than a slower Class 2 client.

Class 3 is typically used for clients that cannot even handle delta data blocks on a regular basis because of network limitations or client processing limitations. Even though a client might be fast enough to handle uncompressing data blocks, if its network connection is not fast enough to send even the compressed data blocks, the client will be classed as a Class 3 client because not even every delta block can be sent to the client. So that the client can present a conference in substantially real-time if needed, delta blocks are composited by filter **100** so that multiple base and delta blocks can be, in effect, replaced by a single data block. To accommodate the differing needs of each Class 3 client, a separate queue is set up by filter **100** for each Class 3 client. As should be apparent, filter **100** has to do more work for a Class 3 client than for a Class 1 client, so it is to the server's benefit to upgrade clients as their speeds increase or their network connections improve.

Filter **100** maintains a "qmulti" queue for each Class 3 client. Three qmulti queues for three Class 3 clients are shown in FIG. **8**A. A qmulti queue receives inputs from the qubase and qudiff queues. Where those two queues are not used, the qcbase and qcdiff queues are used instead, but are first uncompressed using decompressors **134**b, **134**d. The delta data blocks and a base block stored in a base image frame store **136** are composited by a base compositor **138** to form one composited base image from a base image and one or more delta images. A delta compositor **140** is used to form one composited delta image from a plurality of delta images. The output of base compositor **138** and delta compositor **140** are then fed through respective compressors **142**b. **142**d, resulting in four output data streams (ubase, cbase, udiff, cdiff) fed to a discarder **144** which discards data blocks which the attendee client for that qmulti queue cannot handle. If the particular attendee client does not need all four outputs (typically, any one client will use only one output), the processing for those unused queues within the qmulti queue can be skipped, since the queue only needs to service that client. As with base frame image store **114**, base frame image store **136** can supply Class 3 clients with full frames upon request or as needed.

Discarder **144** drops blocks based on parameters about the network and client known to the server and to filter **100** as well as parameters and requests (e.g., "slow down," "speed

22

up," or frame rate specifications) received from the client. The dropping of blocks is preferably done on a block-by-block basis, but it can also involve discarding all the blocks in the presenter client's capture rectangle; the related issue of consistency is discussed below. If it turns out that more than one Class 3 client has the same requirements, all but one of the qmulti queues might be virtual queues. In effect, the processing for all the qmulti queues for those similar clients is done once, with each getting a copy of the results of that processing. For example, one multi-client qmulti queue might be handling a plurality of 386-class client machines running over a corporate ISDN line. Other qmulti queues might then supply other similar machines which are connected to the server by modem (e.g., 14.4 or 28.8 kilobyte data rates), LANs, T1 lines, etc. If any of these lumped Class 3 clients deviates from the common requirement, then its virtual qmulti queue would then become a real qmulti queue and would perform processing separate from the other queues. Among all Class 3 output queues, the various separate compositors **138**, **140** may have different workloads from the fact that the number of delta blocks composited together and the number of blocks discarded will vary according to the capacity of the attendee clients serviced by the qmulti queue.

The use of more than one output class avoids a slow connection's retarding a fast connection. Filter **100** includes a buffer reclaimer **150** which examines the queues to determine if portions of the queue buffers have already been read by Class 1, Class 2, and fast Class 3 clients, and are not going to be used by slow Class 3 clients (they will be discarded). If that is the case, then buffer reclaimer **150** marks those locations in the queue buffers as reusable, to save on memory space.

The different output classes and the monitor processes on each data stream allow the server to handle data streams at different speeds for clients of different capabilities and network connections of different bandwidths. The streaming of update information formed into blocks improves the perception of low latency, but it may be desirable for some applications to reduce the mixture of blocks from different capture events that show on the attendee's screen at one time. The system can be set to provide this consistency by delaying the updating until a whole rectangle can be shown. One form of this adaptation can occur at the server, as shown by the example of FIG. **7**B. There, a capture rectangle is broken into four blocks (**1**,**2**,**3**,**4**). The server maintains a consistency flag which can be either "off" or "on." If the consistency flag is off and the server receives data representing blocks **1**A, **2**A, **3**A and **4**A (taken at time A) from the presenter client and is able to send out blocks **1**A and **2**A, and in the meantime receives blocks **1**B, **2**B, **3**B and **4**B, the server will send out **3**B as the next block, reasoning that **3**B is more updated than **3**A so it is a better block to send out. However, if the consistency flag is on, the server sends the old blocks **3**A and **4**A anyway, so that the client can maintain a time-consistent display. Following **3**A and **4**A, the server sends blocks **1**B-**4**B and so on. Clearly, consistency requires additional memory and produces added latency. This trade-off is decided upon between the server and the receiving clients, based on a variety of factors described above. If the network, the server and the client can easily handle consistency, then the consistency flag might be turned on, but where display updating happens quickly and there are other constraints on the system, the consistency flag might be turned off.

As described above, the server provides control of information flow to keep fast attendee clients supplied with updates as often as possible, and to avoid sending slow clients updates they cannot use or that will overburden their network connections. The server also provides flow control for pre-

23

senter clients, as needed, by determining the fastest rate of updating required by attendee clients, and then signaling the presenter client to grab blocks no faster than the fastest consumer can demand them, so that the presenter will not have to waste resources collecting and processing data that no client can use or no network can afford to carry.

Storage Services

FIG. **8**B illustrates a more complex conference server which handles the more general case. The server in the general case might maintain additional output and additional input queue components for transmitting information to other servers and for storage services, including caching, short-term storing, recording, and archiving, and for later playback. These purposes are distinguished as follows: caching provides fast memory hardware support in improving the performance of the server; short-term storage provides backup and refresh capability for extremely slow or temporarily disconnected clients, for newly connected servers that may need information older than that normally held in the output queue, for quick-turnaround failure recovery, and for other short-term needs; conference sessions are recorded when they are primarily intended for later viewing by users of the system who may or may not be participating in the session; an archival session captures all or part of a meeting as it occurs and is intended for users who typically were conferees in that session and have a reason to review the session later. Uses of recorded sessions, especially when they incorporate synchronized voice, include live online training sessions that also serve for future offline training, technical and marketing demonstrations, and formal presentations that can be broadcast or accessed remotely at will. Archived sessions have uses other than review, including briefing absentees, capturing interactions involving or aiding technical support, evaluating sales personnel, and the like. Of course, these needs and characterizations are not exclusive or exhaustive.

Possible features and methods for storage handling will now be listed. The emphasis will be on recording and archiving, but shorter term storage modes will share many of these characteristics.

During any session, there can be multiple "storage server" queues, or "storage streams," saving output to one or more media. These can be controlled by the server itself, by recorder-like interfaces (similar to a video cassette recorder, or "VCR") at the clients, or by other interfaces operated by conferees. Each stream can be independently controlled, or one controller can control multiple storage streams. The storage facility can operate concurrently in an ongoing meeting to record a live conference, or it can be used by itself to capture a recording for later replay.

It is possible to control who can record a meeting, how much data they can record (by time or by disk capacity, for example); the type of information they can record (by stream, by user sets, or the like), the storage medium (disk, tape, etc.), and when recording starts. Recording might be set to automatically start when a certain user corrects, when the first connection is made, when a certain number of conferees are connected, when the first person presents, when a particular person presents, at a particular (real) time, after a particular duration from the beginning of the meeting, or because of some other triggering event. It is also possible to control the end of recording, based on similar triggering events or triggers related to capacity, elapsed time, etc. The controlling can be done by a conferee at a particular client, by a moderator, or the like.

Possible storage targets include local disk files, local database servers or back-ends, remote database servers or back-ends, remote storage engines relying on the data structures,

24

controls, and methods of the system of the present invention (example system architectures are described below), and local or remote permanent storage media (optical, magnetic, magneto-optical, etc.). Permanent storage can also be used by the system to assist recovery from disaster. The storage stream could also be directed to an email message or to another computer application within the system of the present invention or beyond it.

It is possible to control the quality of storage input and playback output. Each storage stream can have an associated quality parameter associated with it so that it behaves as though connected at a particular network speed. Thus a stream might be stored or a playback stream might be produced that was suitable only for replay at a given speed. Or several playback streams could be simultaneously produced from the same stored information for several different particular playback rates. If most or all of the original session data is stored, then replay might perform the same adaptive filtering described in FIG. **8**A for real-time "live" meetings, so that the single storage source could be played back at multiple, adaptive rates.

Since there would be added value in being able to access recorded information, it is appropriate to describe how billing controls might be incorporated. Billing could be performed when the original recording is made, or when a recording is played back. Billing might be based on units of time used or on units of storage consumed, at the time of recording or at the time of replay. Billing for recording and playing may be independent. Any tracking that needs to be made to implement the billing functions can be incorporated into the storage and playback services of the communications system.

It is possible to tailor the data stored. Since a conference typically involves multiple data streams, one or more may be chosen for storing. Some streams might go to one storage device or modality as described above, others might go to different ones. Synchronization between streams (e.g., voice and imagery) can be maintained, even when the streams are stored in different places and ways.

Stored information can be replayed through another communications session established by the system according to the present invention, or it can be sent through other communications channels, for example, email, file transfer protocol ("FTP"), or physical media transfer by postal or courier services, etc., and replayed by the recipient using the client software according to the present invention. Stored material might be replayed from a copy local to the user's computer, or it might be retrieved after WWW navigation to a replay-enabled Web site. Retrieval might involve streaming the data in the ways described above, or transferring the data by email, FTP, WWW download, or the like. With Web based retrieval, support could be provided for browsing by content, searching by user-defined keys, controlling access by user-provided keys, access lists, privilege levels, or user-provided payment options (e.g., credit card number on file).

Control modes on replay might include: control by server without user interaction for a single data stream (like a pay-per-view movie in which each attendee who joins gets to see the playback forward from the from the point of joining); control by the server, without interaction but with multiple streams (e.g., all attendees get to see the movie from the beginning regardless of when they join the show); by an external moderator; by VCR-style controls at one or more client computers. Each set of controls can affect either all the sets of streams or a particular grouping of streams. Replay can occur at the original real-time recording rate, at faster-than-real-time (like fast forward play on VCRs), in VCR-style single stepping modes, and in the various reverse modes as

US 7,715,331 B2

25

well. Random access and jump playback by index marking, by time codes, by presenter, or by other organization could be supported.

In addition to the stored meeting contents, any other document or data object might be uploaded and stored with the meeting (e.g., meeting agenda, minutes of a previous meeting, or supporting materials). Upload is another type of data stream that passes into the system server and is then relayed to a suitable storage entity residing on the same or a different host. Attachments can be retrieved either with specialized functions of the client software, by navigating Web pages and using a Web browser, or by other retrieval mechanism. Attachments are subject to all of the same controls as the recorded meeting contents with regard to access, billing, playback, etc.

The above-described elements of the more generalized conference server concepts are illustrated in FIG. **8**B. In addition to the instances of the single output filter processes **100**, the more complex server functions shown in FIG. **8**B includes inputs for different sources, such as other servers (where the complex server shown might be an intermediate server for a large broadcast), storage sites for replay and import channels, and outputs to other intermediate servers, storage sites, and export channels.

Multiple Servers

Up to this point, the conference server has generally been referred to as a single computer running conferencing software. The server functions described so far may be performed on several different computers running conference server software connected over a computer network. FIG. **9**A shows a configuration with four conference servers **14**(*a*)-(*d*), one presenter client **12**, and eleven attendee clients **18** (some of which are separately identified with letters). Three conferee clients are connected to each server. The four servers are completely connected, that is, a connection is shown between each pair of servers. With many servers, this degree of interconnection would be unrealistically complex, expensive, unneeded, and performance degrading. One of many useful techniques, a "tree topology," for interconnecting numerous servers is described below.

There are three classes of advantages from having several servers active in a given conference.

Static advantages result from a configuration and division of tasks that may persist throughout the conferencing session. The following are among these advantages.

(WAN economy and local performance) A conferee may find economy in being able to connect to a nearby server—where nearby may mean geographic closeness, or in the same network service area, or on the same local area network, or the like. Thus in FIG. **9**A, attendee client **18**(*a*) may find it cheaper to connect to server **14**(*a*) than to server **14**(*c*), while in turn client **18**(*c*) may find it cheaper to connect to server **14**(*c*) than to server **14**(*a*). At the same time, there may be better performance of the system with these local connections compared with a longer path with many hops to a more distant server.

(Client migration and homogeneous concentration) The advantage of having all of a server's attendee clients be the same and additionally of having them be the same as the presenter client has been discussed. There can be an advantage then of assigning similar clients to a single server when several servers are available and performance is not otherwise degraded. For example, in FIG. **9**B, attendee clients **18**(*c*) and **18**(*d*) are identically configured computers running the same operating systems with the same display requirements as the presenter client **12**, so both have been moved from their original servers (indicated by dotted arrows) and reassigned

26

to server **14**(*a*), as designated by the dashed arrows. The same advantage may also be found when clients of a server are in the same output class (as discussed above under the single server); thus, reassignment of clients in a given class so that one or more servers have all or most of their clients in that class can improve performance by making those servers' processing loads more uniform. Finally, as described under the discussion of WAN economy and FIG. **9**A, homogeneity may also involve nearness, and for this reason client reassignment may achieve that goal as well. In addition to reassigning clients to servers already participating in the conferencing session as above, it is also possible for the system to recruit additional servers where these resources are provided but not yet assigned to the particular meeting. Thus, server **14**(*b*) may be automatically connected to the server-server structure for the meeting pictured in FIG. **9**B in order to provide connections for the three clients **18**(*b*).

(Tree branching for load reduction and scalability) In FIG. **10**A, a tree topological configuration can provide economy in traffic handling and improved performance. Information from presenter client **12** is communicated to server **14**(*a*) and then to the other servers and on to attendee clients **18**, following the solid arrows. In this configuration, each server is shown handling four data connections of a single stream type; a single server would have to handle twenty-eight data connections to connect the presenter client to all the attendee clients. If attendee client **18**(*a*) issues a command or request to server **14**(*a*), represented by the dotted arrow, the message will be responded to by server **14**(*c*) or passed to server **14**(*b*), and handled there or in turn passed to server **14**(*a*), with these two paths also shown with dotted arrows. This means although some commands or requests may need to be seen by three servers, each server will see and process only a fraction of the total such messages. Just as the tree configuration allows a given number of conferees to hold a meeting more efficiently than with a single conference server, it also means that relatively few extra servers need to be added to expand the meeting and maintain the tree configuration. For example, if R+1 is the number of data connections per server, and ceiling(x) is the smallest integer greater than or equal to a real number x, then the number of servers S is required to hold a conference with C conferees, assuming one presenter and using the tree configuration, is (R{circumflex over ( )}ceiling (log.sub.R(C−1))−1)/(R−1). In particular, using R=3, which is the value in FIG. **10**A, forty servers will suffice for eighty-two clients. More realistically, if R=100, then 10,101 servers win provide the advantages of the tree configuration to a presenter and one million attendees. This takes only 101 extra servers over what would be required if the presenter client were directly connected to 10,000 servers, each of which served **100** clients. But the latter configuration, exemplified by FIG. **10**B with R=3 and C=28, is not realistic, since presenter client **12** would be deluged with independent commands or requests to update, or resend, or similar messages; in other words, the presenter client would have traffic in excess of the capacity of any server **14**. Based on distributing the server functions over many machines, and employing this tree topology for propagating information among servers, server-to-server communications and management provided by the present invention allow the number of participants in a meeting to increase exponentially with only linear degradation of the performance. Similar analysis applies if server capacities are not uniform, that is, if different servers can handle different numbers of data connections.

Adaptive advantages result from reconfiguration and redistribution of tasks in response to relatively long-term changes in the system during the conference session.

US 7,715,331 B2

27

(Backup server) If a server fails or becomes isolated from the network, then its clients may be connected over previously inactive backup links to other servers. Attempts can be made to reestablish communication with a server that has dropped out. If unsuccessful, its workload may be distributed to other servers. In FIG. **9**C, attendee client **18**(*c*) has conference server **14**(*c*) as its principal server, but the dashed arrow indicates the assignment of server **14**(*a*) as a backup server. Should the connection between client **18**(*c*) and server **14**(*c*) fail, as indicated by the "X" on the arrow between them, or should server **14**(*c*) fail or become isolated from the net, then server **14**(*a*) can respond to commands from and provide updates to client **18**(*c*). Presenter clients and servers themselves can be assigned backup servers as well. Thus the dashed arrow between servers **14**(*a*) and **14**(*d*) indicates that each has been assigned as a backup for the other. Should the link between servers **14**(*a*) and **14**(*b*) fail, as indicated by the "X" on the arrow between them, or server **14**(*b*) fail or become isolated from the net, then server **14**(*d*) can take over traffic previously routed to server **14**(*a*). It is also possible to have servers ready, but not active, as backups, or to have mirroring servers for even more secure redundancy. Since the state of the conference can be announced to all servers, the system may be configured so that a disrupted conference session can be robustly resumed with minimal loss of data and time.

(Transformation factoring) The transformations or transcodings that a block may undergo in transit from the presenter client to an attendee client may include differencing, error-correction encoding or decoding ("source coding"), compression or decompression (both for "channel coding", or just one for purposes of bandwidth matching; lossy or lossless), encryption or decryption ("privacy, security, or authentication coding"), compositing with other differences or with base blocks, conversion from DDB to DIB and back, storing, replaying, copying, or the like. Editing, mixing, data from different sources or presenters, mixing data of different kinds, duplicating, changing the order, the format, the storage or playback quality, etc., are other examples of transformations, which are neither exclusive nor exhaustive. Some or all of these may be performed and the order of performing them may change. As previously discussed, some may be performed by a conferee client, some by a conference server. When several servers are available or when several clients have different capabilities and resources, these functions may be delegated or migrated to different machines. For example, in FIG. **9**D presenter client **12** is differencing, conference server **14**(*a*) is compressing, server **14**(*b*) is distributing the decompression task to attendee client **18**(*b*) (which has decompression hardware), server **14**(*d*) is compositing the resulting delta block with a previous delta block, and attendee client **18**(*d*) is compositing the result with an old base block. This advantage is viewed as adaptive, since the loading configuration that makes a particular distribution favorable may change slowly during the conference session, but it could be a static advantage when some machines have much greater capabilities than others (such as compression or decompression hardware).

(Distributed and redundant flow control) The architecture and logic of the filter process as described above and illustrated in FIGS. **8**A,B may be distributed among several servers and even clients. Thus, like the functional transformations, portions of the queues themselves, as well as the internal operations of the filtering process, may be found on different platforms at different localities in the network, and at different times. Not only may the information and functionality be so distributed to improve memory economy or

28

gain memory or processing speed, but the system can be made more robust by redundant storage, and more responsive by parallelizing the pipeline. The queues may also be segmented sequentially over several platforms. These different aspects are shown in FIG. **9**E. Here, qcdiff is stored redundantly on servers **14**(*a*) and **14**(*b*); on server **14**(*a*), qcdiff uses the special compression facilities provided by an attached hardware device **15**. One card of qmulti is stored on server **18**(*c*) (perhaps a machine with very fast reliable surplus memory) while the rest are on server **14**(*c*). While qcbase is housed on server **14**(*b*) using a compression codec (possibly hardware based) on client **18**(*b*), it operates in parallel with qubase on server **14**(*d*), which uses a discarder on client **18**(*d*) (there is additional undiagrammed parallelism implicit in having portions of the output queue on all four servers). Finally, qudiff is segmented sequentially with the first part (qudiff.beg) on server **14**(*a*) and the last part (qudiff.end) on server **14**(*d*). Note that in the last case, the two segments of qudiff are not even adjacent in the network linkage shown. Another type of distribution of the queues is given in FIG. **9**F. Assuming the presenter client breaks the capture rectangle into four blocks B1, B2, B3, B4, it illustrates, using just qubase, how the stream data can be decomposed and distributed over all four conference servers **14**(*a–d*), so that the subqueue qubase.B1 of uncompressed blocks B1 are on server **14**(*a*), the subqueue qubase.B2 of uncompressed blocks B2 are on server **14**(*b*), etc.; this represents another form of parallelism. These are simple examples; there are more complex analogues when there are more servers, and all of them may occur in various combinations. The various techniques of RAID (Redundant Array of Inexpensive Disks) striping with recovery from errors are also applicable. All of the distribution schemes mentioned here may also vary over time.

These are specifically adaptive advantages, but the static advantages also have parallels here, since a backup server may also be close, since a change in presenter may warrant a new tree configuration, and since an output class change may warrant a new homogeneous concentration reassignment.

Dynamic advantages result from reconfiguration and redistribution of tasks in response to relatively short term changes in the system during the conferencing session. The following are among the dynamic advantages.

(Content-based routing) Unlike IP routing for example, the system has access to the contents of the information being routed. Thus it can read the time stamps, type of data, and other information included in the base or delta block data or other system data. It can use this together with measured properties of the network interconnections of the servers and clients to determine best-estimate optimal routing between and through its components. In FIG. **9**G, one route from presenter client **12** to attendee client **18**(*d*) (through server **14**(*b*)) is shown in double arrows, another (through server **14**(*d*)) in heavy arrows, to illustrate that one route may be preferable under some conditions, but as conditions change, the system may select a different route.

(Redundant routing) The system can send image or other data by several routes at once. This can improve performance, since the earliest to arrive at the destination may trigger the discard of later-arriving data This can improve the resiliency and robustness of the system, since it is more likely some data will get to the destination. It can also improve reliability or accuracy, since several versions may be compared at the destination to see if they are identical. In case of discrepant data at the destination, retransmission or some arbitration method can be requested, depending on the purpose of the redundant attempts to insure delivery. For example, again in FIG. **9**G, information from presenter client **12** may be sent by

US 7,715,331 B2

**29**

conference server **14**(*a*) using both routes, indicated by the double arrows and the heavy arrows, to server **14**(*d*) and then to attendee client **18**(*d*).

These are specifically dynamic advantages, but the static and adaptive advantages also have parallels here as well. This can be summarized in an additional dynamic advantage.

(Dynamic reconfiguration) Any of the configurations described above and the parameters determining them and the routing schemes can be altered depending on changes in client, server, and network capabilities, needs, resources, and loads as announced or demanded by clients, or as measured by the system, or as specified by conferees or system administrators, or other prevailing or desired conditions.

Any combination of advantages from these three groups may apply. There will in general be tradeoffs among these advantages. The system can be given specific configuration preferences, or it can automatically adjust during use according to preset optimization goals, or it can adaptively set optimization goals and adjust the configuration to approach them.

Example of Server Architecture

So far, a server or each of a set of servers operating together has been viewed as a computer performing the server functions described. An example of server architecture and use will now be given, without suggesting the necessity for, or the exclusiveness of, this architecture to accomplish the communications serving functions on single or multiple and interconnected servers described above. Also, the previous examples have dealt with a single conferencing meeting or other communications session; the method to be described below can also accommodate several meetings on the same underlying hardware and the conferencing software as provided by the present invention. Again, the description of this method is not intended to suggest that this is the only way in which the invention can accomplish multiple simultaneous communications sessions. Any references to the image-sharing example should be extended to arbitrary data streams.

FIG. **11** shows an architecture of a single server and a single meeting. The primary component of this architecture is a server manager **36** (identified in this diagram as "ServMgr 'InfoPass'"), which is directed by a meeting manager **32** (identified in this diagram as "MeetMgr 'TheCompany'"). Meeting manager **32** is an unowned, quiescent, resident, interrupt-driven process (similar to a "daemon" process used with Unix and other operating systems). It may or may not be running on the same CPU as WWW server **30**(*a*); it may or may not be running on the same CPU **38** (called here "Beowulf") as server manager **36** "InfoPass." The server manager is also an unowned, quiescent, resident, interrupt-driven process. Each CPU that is involved in the system for providing server functions in meetings set up by a meeting manager has exactly one server manager running on it; that server manager can be viewed as the meeting manager's agent on that CPU. The meeting is directly supervised by communications session server ("CSS") **40**(*a*), called here "Meeting #1 'Product Support.'" When server manager **36** receives a command from meeting manager **32** that includes the information on a meeting and on the first conferee that wishes to connect, the server manager creates a CSS to handle the meeting. The CSS is an owned, evanescent, quiescent, interrupt-driven process. The CSS is owned by the server manager and is killed a period of time after all the conferee clients connected to its meeting disconnect or fail to respond.

In FIG. **11** there are three conferee clients **17**(*a*)-(*c*) connected to the meeting. Clients **17**(*a*),(*b*) use a client-server protocol provided by the system, which might be a combination of Transmission Control Protocol ("TCP") and User Datagram Protocol ("UDP"), for example. Client **17**(*c*) uses

**30**

another protocol, here exemplified as Hypertext Transfer Protocol ("HTTP"). The CSS **40**(*a*) provides an included "gateway" layer **40**(*b*) for each connection protocol other than the system protocol, and this layer translates the client's nonsystem protocol to the system protocol. The acceptance of different protocols may aid the system's operation across firewalls or adaptation to clients' restricted network connections, for example.

A potential conferee **17**(*a*) has navigated his or her WWW browser to Web server **30**(*a*), and has asked through the Web page presented to connect to the meeting (as described above in the discussion of FIG. **2**). There may be alternative ways, indicated here as **30**(*b*),(*c*), to connect to the meeting, including direct access to the meeting manager or its database **34** (called here "Meeting DB"). The meeting manager uses this database to hold information concerning the meeting (the database need not be on the same computer as the meeting manager). This information was created when the person who set up the meeting requested that the meeting be scheduled, gave descriptive information for the meeting, specified the keys and privileges, and provided other administrative information. The database is reconfigurable and easily extensible to include many and varied meeting attributes. It may be accessed by a programming interface. Potential new conferee client **17**(*a*) sends a request to join the meeting, and then supplies the key for the meeting that the potential conferee has obtained previously. Potential client **17**(*a*) may also send previously selected identification information such as icon, gong, etc., and this may be stored in Meeting DB or in some other sort of directory service. After the meeting manager has validated potential client **17**(*a*), it sends a message that causes the client software to run on the potential client and then sends that client software the address information for the CSS, such as a URL and port number. At that time, the client software may also receive address information for backup CSSs in case the connection to the meeting fails and automatic or manual attempts to reconnect to the initial CSS fail as well. The client then connects to the meeting, and may pass to the CSS its identification information.

A CSS is created to supervise a single meeting. The monitoring-filtering-queuing structures and procedures of FIGS. **8**A,B are performed by the CSS, so FIGS. **8**A,B could be viewed as part of the internal working of each CSS in FIGS. **11-22** (in the case of distributed server functions described in FIGS. **9**D-F, only part of FIGS. **8**A,B might be descriptive of a particular CSS). Indeed, there will be a version of FIG. **8**A applying to each data stream the CSS handles as multipoint real-time traffic from a presenter client. The structure of FIG. **8**B shows schematically how these and other multiple input and output data streams are processed. The CSS also handles other input from and output to clients, such as information about attendee and presenter clients that helps with flow control, commands or requests from clients, labeled pointer icon positions, and other stream data and control traffic.

In FIG. **11**, a dot-and-dash line **14** has been drawn around the structure that corresponds to the term "server" in the earlier parts of the description of the present invention; this may be a helpful analogy, but the description of the example here is only one possible explication of server functions.

FIG. **12** shows a slightly more complex situation than FIG. **11**. Here, the server manager has created three CSSs to supervise three meetings. Conferee client **17**(*a*) (labeled here "Jim") is simultaneously connected to two meetings. If Jim is permitted, he can share the information he receives from one meeting with the participants in the other.

Server managers are responsible for measuring network connection bandwidth, reliability, CPU load, and other

US 7,715,331 B2

**31**

parameters, and determining the configuration of any and all CSSs they may own at any given time based on these measurements and other considerations.

FIG. **13** shows a more complex arrangement than FIG. **12**. Now, there are two CPUs, **38**(*a*) and **38**(*b*); each has its own server manager, but both are directed by the same meeting manager. Server manager #**1 36**(*a*) has created two CSSs to handle two meetings, and server manager #**2 36**(*b*) has created a single CSS. Conferee client **17**(*a*) is now connected to two meetings on two different CPUs, possibly distant from each other.

FIG. **14** exemplifies the situation when there are several meeting managers by showing two meeting managers **32**(*a*), (*b*) active. Each has its own meeting database **34**(*a*),(*b*). Each directs the server manager **36**(*a*),(*b*) on a single CPU **38**(*a,b*). Server manager **36**(*a*) has created two CSSs **40**(*a*),(*b*) to handle two meetings. The other server manager **36**(*b*) has created a single CSS **40**(*c*). The only connection required between these two instances of the system is the presence of client **17**(*a*) "Jim" in two meetings, one in each instance of the system.

If a need arises to let a second meeting manager set up meetings on a CPU that already has a server manager managed by a meeting manager, then the currently running server manager forks or clones itself and the new server manager becomes the agent for the newly involved meeting manager. Thus, there is a one-to-one correspondence between server managers running on a given CPU and meeting managers that set up meetings on that CPU. As an illustration, in Panel **1** of FIG. **15**, meeting manager **32**(*b*) sends a message to server manager **36**(*a*) on CPU **38** that causes server manager **36**(*b*) to be created. Then afterward, in Panel **2**, meeting manager **32**(*b*) and server manager **36**(*b*) start the meeting through the new CSS **40**(*b*). Conferee "Jim" **17**(*a*) has joined both meetings, but there need be no other relationship between the two meetings shown. In the situations below, there will be no difference if server managers for different meeting managers are on the same CPU or on different CPUs.

FIG. **16** shows a single server manager **36** that has created three CSSs **40**(*a*)-(*c*) on one CPU **38**, but now these CSSs all handle the same meeting (called "Meeting #**3** 'Sales'"). The same meeting might require additional CSSs on the same CPU if process limitations were exceeded by a great number of client connections and their requirements, or the like. In order to coordinate their work, the three CSSs communicate using a system-provided server-server protocol. This protocol may use the same sort of blend of networking protocols as described for the client-server connection, or it may be quite different. For diagrammatic purposes, FIGS. **16**-**20** show interprocess communication links only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between CSSs **40**(*a*) and **40**(*c*) in FIG. **16**. This interprocess communication allows one CSS to send presenter client output to another, for example; this was described above in the discussion of FIG. **8**A. More detail on this is given below in the discussion of FIGS. **21** and **22**. Conferee client **17**(*a*) "Jim" is known to two CSSs **40**(*b*),(*c*), but is actively connected only to CSS #**3 40**(*c*). The connection to CSS #**2 40**(*b*) is a backup assignment (as described above in the discussion of FIG. **9**C). Should CSS #**3** fail, then "Jim" can automatically be connected to the meeting through CSS #**2**.

FIG. **17** shows a single meeting manager that directs two server managers **36**(*a,b*) that have created three CSSs **40**(*a, b,c*) on two CPUs **38**(*a,b*), since these CSSs all handle the same meeting (called "Meeting #**3** 'Sales'"). The same meeting might require additional CSSs on additional CPUs if the

**32**

CPUs were distant from each other, but closer to their respective sets of connected clients, or if process limitations were exceeded by a great number of client connections and their requirements, or the like. The advantages described in the discussion of FIGS. **9**A-G, **10**A, B provide numerous reasons for multiple servers (which in this context means multiple CSSs) that handle the same meeting and that may be distributed over a number of CPUs. As in FIG. **16**, the three CSSs communicate using a system-provided server-server protocol. In addition, the two server managers communicate using this or a similar protocol in order to coordinate the full span of this meeting. They exchange the performance measurements they make in order to adaptively configure the CSSs. For example, conferee client **17**(*a*) "Jim" begins the meeting connected to CSS #**2**. At some point, the server managers determine that it is likely that better service will be obtained by "migrating" this connection from CSS #**2 40**(*b*) to CSS #**3 40**(*c*) and so from CPU **38**(*a*) to CPU **38**(*b*) (as described above in the discussion of FIG. **9**B). This reconnection may be performed automatically. Moreover, the creation of CSS #**3** to handle this meeting and the interprocess communication channels between CSSs and between server managers may be established automatically to improve performance and balance loads (as further described above in the discussion of FIG. **9**B). The creation of additional CSSs, on the same machine or on different machines, to handle the same meeting is the basis of the scalability of the present invention.

It is possible for several meeting managers to each direct a server manager that has created one or more CSSs, and these CSSs all handle the same meeting. This is pictured in FIG. **18** with two meeting managers **32**(*a*),(*b*) and their respective databases **34**(*a*),(*b*). This could be the situation if two different companies own the meeting managers and might wish to hold a joint meeting (here called "Meeting #**4** 'Joint Sales'"). The user or administrator that sets up such a multiply managed meeting may manually declare the organization of the management (e.g., the meeting managers involved, the CPUs, the number of CSSs, and other structural, organizational, managerial parameters), or the setup may be done automatically by the system, or it may be done interactively with automated support. Here meeting managers **32**(*a*),(*b*) also communicate using the system-provided server-server protocol. They exchange the meeting information, so that their two databases **34**(*a*),(*b*) are consistent. They also exchange messages that indicate that this is to be a joint meeting, and they inform their server managers of this. Potential conferees join through either meeting manager. The appearance of the meeting may be the same for all conferees, independent of the number of CSSs, server managers, CPUs, or meeting managers involved. Again, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another CSS (from **40**(*c*) to **40**(*b*)), even when the new CSS is on a CPU in the domain of a different meeting manager (from CPU **38**(*b*) in the domain of meeting manager **32**(*b*) to CPU **38**(*a*) in the domain of meeting manager **32**(*a*)).

FIG. **19** extends the situation of FIG. **18**. The two meeting managers are shown directing their server managers in a joint meeting. This time, server manager **36**(*c*) has created two CSSs **40**(*c*),(*d*) for the meeting on the same CPU **38**(*c*), and meeting manager **32**(*a*) has directed two server managers **36**(*a*),(*b*) to create CSSs **40**(*a*),(*b*) for the meeting on two different CPUs **38**(*a*),(*b*). Thus this is a combination of the situations pictured in FIGS. **16**-**18**. Again, for diagrammatic purposes, FIGS. **19** and **20** show interprocess communication links among server managers only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between server managers **36**(*a*)

US 7,715,331 B2

33

and **36**(*c*) in FIG. **19**. As before, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another. CSS **40**(*b*), even when the new CSS is in the domain of a different meeting manager.

If a CSS fails, the server manager process may create a new CSS, the clients may be migrated to other CSSs already active on the same CPU, or clients may be migrated to other CSSs newly created or already handling the meeting at other locations in the system, as indicated above. If a CPU fails or becomes isolated from the network or system, the meeting manager process can attempt to reestablish network connection with the CPU and send the server manager information to create a CSS to handle the meeting, or the meeting manager can communicate with one or more server managers on still accessible CPUs to create one or more CSSs to handle the meeting. In addition clients that have backup connections beyond the failed CPU can be migrated to CSSs handling the meeting. If there are several meeting managers participating in the management of a meeting, and a meeting manager becomes disabled or isolated from the network, then another meeting manger may attempt to establish sufficiently many CSSs through server managers it can reach to carry the workload. These adaptations may occur automatically, or be initiated by a system administrator.

The diagrams in FIGS. **11-19** suggest the range of variability in coordinating meetings and server functions. Many other combinations can be formed from the situations pictured there or may be suggested by them. For example, if a global directory service for meetings is provided, then there could even be a layer of management above the meeting managers, which might be termed a Global Manager.

FIG. **20** illustrates a method for determining which CSSs pass output information to other CSSs that are handling the same meeting. The configuration of meeting managers, server managers and CSSs is the same as in FIG. **19**, except that one client **12** is presenting, the others **18** are attending, and no backup link is shown. From time to time, the server managers determine and agree on appropriate propagation topologies that resemble a tree or trees (trees and their advantages were described above in the discussion of FIGS. **10**A, B) and post a copy **42** of the current choice at each of their CSSs. These are directed acyclic graphs ("DAGs"), which contain no loops, so that the CSS can send out the information with no risk of endlessly cycling it. Each stream being handled has its own propagation DAG, and they may change independently among streams; as described below, each stream may have several propagation DAGs. In FIG. **20**, presenter client **12** is viewed as the root of the tree, and CSS #**1** delivers presenter output information to CSS #**2** and to CSS #**3**; in turn, CSS #**3** delivers that information to CSS #**4**; all CSSs also deliver the information to their connected attendee clients **18**.

FIG. **21** represents the situation of FIG. **20** with the topological information of the directed graph **42** emphasized by rearranging the CSSs to resemble the tree specified in the propagation DAG **42** of FIG. **20**.

FIG. **22** represents the situation of FIG. **20** with the same topological information **42**(*a*) emphasized in FIG. **21** and with the addition of another possible propagation topology **42**(*b*) for the same stream. Secondary and multiple propagation DAGs for the same data stream allow the system to reroute the information being sent or to send it redundantly (both as described above in the discussion of FIG. **9**G).

The foregoing suggests that minimal server platform needs for this example would be a network connection and an operating system providing an interrupt service and multitasking, with or without hardware support.

34

System Extensions and Extendibility

Up to this point, there have been multiple servers dealing with multiple clients, where "client" has referred to an enduser's computer or an instance of the conferencing software running on it. But it may happen that the reconfigurations, transformations, and routings performed by a server or servers described above extend to assigning tasks to intermediate devices such as routers, bridges, gateways, modems, hardware codecs, and the like. There may be also be cases where a client lacks display capabilities, but provides other functions to the system or acts as a monitor or recorder of activity. There may be configurations where all server functions are performed on client computers, so there is no specified server node in the networked system. In the preferred embodiment, performance may require that there be one CSS per CPU.

Both the server and client software architectures are adaptable. Not only may features be added on that increase the variety of communication possible, such as text chat, audio, and shared drawing areas, but proprietary codecs, transformations, stream operators, and the like may be incorporated as plug-in modules. Addition of streams of abstract data types can be accommodated by the system and in turn allow the system to be expanded and reconfigured.

When operating with data streams that admit asynchronous unnotified updating (where intermediate updates can be dropped if they are made obsolete by later arriving data updates), which are those that are appropriate for multispeeding, the system is robust under occasional loss of information and can thus take advantage of high-speed networking protocols like User Datagram Protocol ("UDP") that do not provide reliable transmission but provide greater network throughput performance than reliable protocols. The system can also be configured to provide secure transport for a data stream, and so could be used to carry the display command streams on which are based other image-sharing systems, but then there would be advantage from multispeeding, although the scalability and other advantages of the present invention would be available.

Codecs, transformations, and transcodings described above for the image-sharing example may have analogues that play similar roles with similar advantages in the system's handling of other data streams. It is also recognized that there are other cases of transcoding from one type of data to another, such as text to page image via rasterization, page image to text via optical character recognition, text to speech via speech synthesis, and speech to text via speech recognition. Such tasks may involve transformations in different orders than described above, including decompression at the presenter client and compression at the attendee client. These possibilities are accommodated by the present invention.

The system contains no obstructions to operating across firewalls with permissions. The system is compatible with agents, network proxies, and other stand-in entities, with a variety of network context and content filters, with multiple network protocols for client connections, with bandwidth matching transcoders, with hybrid wireless and land based networks, with asymmetric networks, with clustered CPU networks, with streaming multimedia and signal processing systems, with serial, parallel, and vector processors, and with many other specialized technologies; properly configured and supplied with appropriate permissions, the system either operates transparently with them or enjoys increased performance by employing and extending their advantages. Faster processor speed and greater bandwidth do not obviate the utility of the present invention; instead, they improve its performance.

US 7,715,331 B2

35                                          36

As mentioned before, the described communications system not only applies to the transport of streams of image data, and to other examples mentioned, but also generally applies to the transport, storing, replaying, scheduling, multispeeding, and other handling and processing of other data streams as well.

One way of seeing the flexibility of the system is to refer to FIG. 23, where several applications covering different separations in time and space for the communicants are listed.

The above description is illustrative and not restrictive. Many variations of the invention will become apparent to those of skill in the art upon review of this disclosure. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A conferencing system comprising:

a conference server;

at least one client, the at least one client including a web browser; and

at least one network connection coupling the conference server and the at least one client, the conference server providing conferencing data to the at least one client via the at least one network connection after establishing a client-server connection, the client-server connection established via the web browser at the at least one client having been navigated to a Universal Resource Locator associated with a conference, and wherein one or more characteristics of the provided conferencing data are based on client or server information examined in real time and subsequent to both the client-server connection having been established and the client joining the conference.

**2**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a size of at least part of the conferencing data.

**3**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least some contents within the conferencing data.

**4**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least some information related to at least part of the conferencing data.

**5**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one source of at least part of the conferencing data.

**6**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one destination of at least part of the conferencing data.

**7**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a rate of reception of at least part of the conferencing data.

**8**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises a rate of transmission of at least part of the conferencing data.

**9**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises hardware involved in processing at least part of the conferencing data.

**10**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises software involved in processing at least part of the conferencing data.

**11**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics of the provided conferencing data comprises at least one protocol used in processing at least part of the conferencing data.

**12**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least a size of at least part of the conferencing data.

**13**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least a calculation of a size of at least part of the conferencing data.

**14**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least some content within the conferencing data.

**15**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least some information related to at least part of the conferencing data.

**16**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one source of at least part of the conferencing data.

**17**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one destination of at least part of the conferencing data.

**18**. The conferencing system of claim **1**, wherein the client or server information examined is related to a rate of reception of at least a part of the conferencing data.

**19**. The conferencing system of claim **1**, wherein the client or server information examined is related to a rate of transmission of at least a part of the conferencing data.

**20**. The conferencing system of claim **1**, wherein the client or server information examined is related to hardware involved in processing at least part of the conferencing data.

**21**. The conferencing system of claim **1**, wherein the client or server information examined is related to software involved in processing at least part of the conferencing data.

**22**. The conferencing system of claim **1**, wherein the client or server information examined is related to at least one protocol used in processing at least part of the conferencing data.

**23**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of the server.

**24**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of at least one of the clients.

**25**. The conferencing system of claim **1**, wherein the client or server information examined comprises a speed of at least one of the network connections.

**26**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of the server.

**27**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of at least one of the clients.

**28**. The conferencing system of claim **1**, wherein the client or server information examined comprises a load of at least one of the network connections.

**29**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics is based on at least one modification to a conference environment originated by the server.

US 7,715,331 B2

**37**

**30**. The conferencing system of claim **1**, wherein a characteristic of the one or more characteristics is based at least one modification to a conference environment originated by at least one client.

**31**. The conferencing system of claim **1**, wherein the client or server information comprises at least one modification to a conference environment originated by the server.

**32**. The conferencing system of claim **1**, wherein the client or server information comprises at least one modification to a conference environment originated by at least one client.

**33**. The system of claim **1**, wherein the at least one client is configured to provide the conference server with a key prior to joining the conference, the key identifying one or more privileges of the at least one client during the conference.

**34**. The system of claim **33**, wherein the one or more privileges includes entering the conference.

**35**. The system of claim **33**, wherein the one or more privileges includes being a presented during the conference.

**36**. The system of claim **33**, wherein the one or more privileges includes access to information about another attendee in the conference.

**37**. The system of claim **33**, wherein the one or more privileges includes changing a conference setting.

**38**. The system of claim **1**, wherein the client or server information is examined at various points during the conference.

**39**. A method for conferencing between a server and at least one client in a conferencing system, comprising:

> establishing a network connection between the server and the at least one client, the network connection estab-

**38**

> lished via a web browser at the least one client having been navigated to a Universal Resource Locator associated with a conference;

> examining client or server information in real time and subsequent to both the client-server connection having been established and the client joining the conference; and

> providing conferencing data from the server to the at least one client after establishing a client-server connection and the at least one client having joined the conference, wherein one or more characteristics of the conferencing data are based on the examined client or server information.

**40**. The method of claim **39**, further comprising determining one or more characteristics of conferencing data for delivery during a first portion of the conference, the determination based on current capabilities of the at least one client validated after establishing the client-server connection but prior to the at least one client joining the conference.

**41**. The method of claim **40**, wherein the one or more characteristics of conferencing data for delivery during the first portion of the conference are changed in favor of the one or more characteristics of the conferencing data based on the client or server information examined subsequent to both the client-server connection having been established and the client joining the conference.

**42**. The method of claim **39**, wherein the client or server information is examined at multiple points during the conference thereby resulting in an adjustment of the one or more characteristics of the conferencing data provided during the conference.

\*    \*    \*    \*    \*

**- 279 -**



US007813304B2

(12) **United States Patent**
Salesky et al.

(10) Patent No.: **US 7,813,304 B2**
(45) Date of Patent: **\*Oct. 12, 2010**

(54) **PROVIDING CONFERENCING DATA IN A NETWORK COMMUNICATIONS SYSTEM BASED ON CLIENT CAPABILITIES**

(75) Inventors: **Joseph Salesky**, Cameron Park, CA (US); **Peter Madams**, Moraga, CA (US); **John Flower**, Walnut Creek, CA (US); **Clint Kaul**, San Mateo, CA (US); **Benjamin Wells**, Walnut Creek, CA (US); **Edward Arthur Ho-Ming Janne**, San Francisco, CA (US)

(73) Assignee: **Pixion, Inc.**, San Ramon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 290 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/012,767**

(22) Filed: **Feb. 4, 2008**

(65) **Prior Publication Data**

US 2008/0183808 A1    Jul. 31, 2008

**Related U.S. Application Data**

(60) Continuation of application No. 11/086,507, filed on Mar. 21, 2005, now Pat. No. 7,369,515, which is a continuation of application No. 10/600,144, filed on Jun. 19, 2003, now Pat. No. 7,197,535, which is a continuation of application No. 09/523,315, filed on Mar. 10, 2000, now abandoned, which is a division of application No. 08/823,744, filed on Mar. 25, 1997, now Pat. No. 6,343,313.

(60) Provisional application No. 60/014,242, filed on Mar. 26, 1996.

(51) **Int. Cl.**
*H04L 12/16* (2006.01)
(52) **U.S. Cl.** ....................... 370/260; 370/261; 709/203
(58) **Field of Classification Search** ...................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,110,560 A *    8/1978 Leary et al. ................. 379/339

(Continued)

OTHER PUBLICATIONS

*Pixion, Inc.* v. *Citrix Systems, Inc. et al.* (N.D. Cal. C-09-03496 (SI)), "Defendant Citrix Systems, Inc.'s and Citrix Online, LLC's Answer to Complaint for Patent Infringement and Counterclaims for Declaratory Relief" (Nov. 6, 2009).

(Continued)

*Primary Examiner*—Robert W Wilson
(74) *Attorney, Agent, or Firm*—Carr & Ferrell LLP

(57) **ABSTRACT**

An improved networked computer communications system handles arbitrary streams of data, and transports at varying speeds those streams where intermediate updates can be dropped if they are made obsolete by later arriving data updates, optimizing the utilization of network and node resources. Complex buffering by system server software allows distributed, parallel, or redundant processing, transmission, and storage for performance, reliability, and robustness. Various parameters of the system can be monitored, and the system can be reconfigured automatically based on the observations. Varied techniques reduce the perceived end-to-end latency and take advantage of software and hardware capabilities that assets connected to the system may possess. One conferencing system allows conference participants to share all or a portion of the display seen on their computer screens. The conferees may be at sites removed from each other, or may view a recorded presentation or archived conference at different times. Conference participants are either "presenters" who can modify the display or "attendees" who cannot modify the display. A pointer icon, which can be labeled to identify the conferee, is displayed on the shared image area Each conferee can modify the position of his or her own pointer, even when not presenting, so that every participant can see what each conferee is pointing to, should a conferee choose to point to an element of the display. These and other features apply to other data streams shared in the conference or in meetings where there is no shared-image data stream.

**36 Claims, 37 Drawing Sheets**



## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,414,621 | A | 11/1983 | Bown et al. |
| 5,241,625 | A | 8/1993 | Epard et al. |
| 5,455,599 | A | 10/1995 | Cabral et al. |
| 5,485,212 | A | 1/1996 | Frederick |
| 5,506,832 | A | 4/1996 | Arshi et al. |
| 5,530,795 | A | 6/1996 | Wan |
| 5,550,982 | A | 8/1996 | Long et al. |
| 5,553,083 | A | 9/1996 | Miller |
| 5,563,649 | A | 10/1996 | Gould et al. |
| 5,600,646 | A | 2/1997 | Polomski |
| 5,617,539 | A | 4/1997 | Ludwig et al. |
| 5,649,104 | A | 7/1997 | Carleton et al. |
| 5,689,553 | A | 11/1997 | Ahuja et al. |
| 5,689,641 | A | 11/1997 | Ludwig et al. |
| 5,706,290 | A | 1/1998 | Shaw et al. |
| 5,727,002 | A | 3/1998 | Miller et al. |
| 5,737,448 | A | 4/1998 | Gardos |
| 5,740,371 | A | 4/1998 | Wallis |
| 5,764,235 | A | 6/1998 | Hunt et al. |
| 5,764,731 | A | 6/1998 | Yablon |
| 5,774,668 | A | 6/1998 | Choquier et al. |
| 5,790,818 | A | 8/1998 | Martin |
| 5,793,365 | A | 8/1998 | Tang et al. |
| 5,793,980 | A | 8/1998 | Glaser et al. |
| 5,802,322 | A | 9/1998 | Niblett |
| 5,822,523 | A | 10/1998 | Rothschild et al. |
| 5,826,025 | A | 10/1998 | Gramlich |
| 5,845,265 | A | 12/1998 | Woolston |
| 5,859,979 | A | 1/1999 | Tung et al. |
| 5,877,762 | A | 3/1999 | Young |
| 5,909,543 | A | 6/1999 | Tanaka et al. |
| 5,956,027 | A | 9/1999 | Krishnamurthy |
| 5,983,263 | A | 11/1999 | Rothrock et al. |
| 6,081,829 | A | 6/2000 | Sidana |
| 6,167,432 | A | 12/2000 | Jiang |
| 6,246,758 | B1 | 6/2001 | Low et al. |
| 6,249,291 | B1 | 6/2001 | Popp et al. |
| 6,313,863 | B1 | 11/2001 | Chida |
| 6,314,501 | B1 | 11/2001 | Gulick et al. |
| 6,343,313 | B1 | 1/2002 | Salesky et al. |
| 6,345,297 | B1 | 2/2002 | Grimm et al. |
| 6,560,707 | B2 | 5/2003 | Curtis et al. |
| 6,594,699 | B1 | 7/2003 | Sahai et al. |
| 6,772,335 | B2 | 8/2004 | Curtis et al. |
| 7,013,327 | B1 | 3/2006 | Hickman et al. |
| 7,369,515 | B2 * | 5/2008 | Salesky et al. ............... 370/260 |
| 7,426,191 | B2 * | 9/2008 | Salesky et al. ............... 370/260 |
| 2003/0140159 | A1 | 7/2003 | Campbell et al. |

## OTHER PUBLICATIONS

USPTO Patent Full-Text and Image Database, Results of Search, Hits 51 through 94 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF..., visited Nov. 6, 2009, pp. 1-2.

USPTO Patent Full-Text and Image Database, Results of Search, Hits 1 through 50 out of 94, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF..., visited Nov. 6, 2009, pp. 1-3.

"Frequently Asked Questions (FAQ) on the Multicast Backbone (MBONE)," Steve Casner, Dec. 22, 1994, ftp://isi.edu/mbone/faq.txt, visited Nov. 6, 2009, pp. 1-12.

"MBone Virtual Classroom for Engineering Distance Education," Tom Miller et al., pp. 1-6, dated 2009.

"Distance Education Using Linux and MBone," Kelly Davis, Linux Journal, Oct. 1, 2000, http://www.linuxjournal.com/print/4018, visited Nov. 6, 2009, pp. 1-10.

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr. 1996, http://www.savetz.com/mbone/, visited Nov. 6, 2009, 90 pages (part 1 of 2).

"MBONE: Multicasting Tomorrow's Internet," Kevin Savetz et al., IDG, Apr. 1996, http://www.savetz.com/mbone/, visited Jan. 14, 2010, 86 pages (part 2 of 2).

"MBone Provides Audio and Video Across the Internet," Michael R. Macedonia et al., IEEE Computer Magazine, Apr. 1994, pp. 1-12.

"Groupware: Video Papers," Usability First: Groupware: Video Papers, http://www.usabilityfirst.com/groupware/vbib.txl, visited Nov. 6, 2009, pp. 1-8.

"A Forum for Supporting Interactive Presentations to Distributed Audiences," Ellen A. Isaacs et al., Proceedings of Computer-Supported Cooperative Work, ACM, 1994, pp. 405-416.

"A Comparison of Face-to-Face and Distributed Presentations," Ellen A. Isaacs et al., Proceedings of Conference on Computer-Human Interaction (CHI), ACM Press, 1995, pp. 354-361.

"Transmission Control Protocol," Information Sciences Institute, University of Southern California, 1981, 83 pages.

Eleftheriadis, A. et al., "Meeting Arbitrary QoS Constraints Using Dynamic Rate Shaping of Coded Digital Video," Proceedings of the 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, pp. 1-12.

Frederick, R., "Experiences with Real-Time Software Video Compression," Xerox PARC, 1994, pp. 1-4.

Jeffay, K. et al., "Adaptive, Best-Effort Delivery of Digital Audio and Video Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 12 pages.

Jeffay, K. et al., "Transport and Display Mechanisms for Multimedia Conferencing Across Packet-Switched Networks," University of North Carolina at Chapel Hill, Department of Computer Science, 1993, 28 pages.

Macedonia, M. et al., "Mbone Provides Audio and Video Across the Internet," IEEE Computer, 1994, 12 pages.

McCanne, S. et al., "Receiver-Driven Layered Multicast," University of California, Berkeley and Lawrence Berkeley National Laboratory, 1996, 14 pages.

Schulzrinne, H. et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Request for Comments, 1989, 66 pages.

Stallings, W., "Data and Computer Communications," Fourth Edition, Copyright 1985, 1988, 1991, and 1994, 12 pages.

Wakeman, I., "Packetized Video-Options for Interaction Between the User, the Network and the Codec," The Computer Journal, vol. 36, No. 1, 1993, pp. 55-67.

Wolf, K. et al., "Multimedia Application Sharing in a Heterogeneous Environment," ACM Multimedia 95—Electronic Proceedings, 1995, 14 pages.

United States District Court for the Northern District of California, Claim Construction Order re: U.S. Patent No. 6,343,313; Jul. 28, 2004.

U.S. Appl. No. 11/925,960, Joseph Salesky, Negotiation and Validation of a Client in a Video Conference, filed Oct. 28, 2007.

U.S. Appl. No. 11/925,999, Joseph Salesky, Presenter Client Operations, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,049, Joseph Salesky, Client Classification and Management, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,052, Joseph Salesky, Management of Stored Conference Data, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,055, Joseph Salesky, Conference Server Redundancy, filed Oct. 28, 2007.

US 7,813,304 B2

Page 3

U.S. Appl. No. 11/926,058, Joseph Salesky, Load Reduction and Scalability, filed Oct. 28, 2007.

U.S. Appl. No. 11/926,060, Joseph Salesky, Conference Server Operations, filed Oct. 28, 2007.

U.S. Appl. No. 12/012,642, Joseph Salesky, Providing Conference Data in a Network Communication System Based on Client or Server Information Examined During a Conference, filed Feb. 4, 2008.

"Exhibit A, Uniform Resource Locators (URL)," Request for Comments: 1738, Network Working Group, Berners-Lee et al., Dec. 1994, pp. 1-27.

"Exhibit B, The WorldWideWeb browser" Tim Berners-Lee, http://www.w3.org/People/Berners-Lee/WorldWideWeb. html, (date unknown), pp. 1-3.

"Exhibit C, World Wide Web Clients," http://www.w3.org/Clients.html, Oct. 5, 1994, pp. 1-4.

"Exhibit D, WWW—The Libwww Line Mode Browser," http://www.w3.org/LineMode/, May 4, 1998, pp. 1-2.

"Exhibit E, Command Line Syntax," http://www.w3.org/LineMode/User/CommandLine.html, Mar. 22, 1998, pp. 1-5.

"Exhibit F, Line Mode Browser Commands," http://www.w3.org/LineMode/User/Commands.html, Dec. 9, 1996, pp. 1-4. "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," Case No. 3:09-cv-03496-SI, *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-4.

"Exhibit A, List of Invalidating Prior Art," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-22.

"Exhibit B, U.S. Patent No. 7,369,515: Invalidity Contention Based on ORCA Video Conferencing System—Aug. 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit C, U.S. Patent No. 7,426,191: Invalidity Contention Based on ORCA Video Conferencing System—Aug. 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-12.

"Exhibit D, U.S. Patent No. 7,369,515: Invalidity Contention Based on INTERNET TV with CU-SeeMe—Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-32.

"Exhibit E, U.S. Patent No. 7,426,191: Invalidity Contention Based on INTERNET TV with CU-SeeMe—Copyright 1995," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit F, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States

District Court Northern District of California, Jan. 19, 2010, pp. 1-19.

"Exhibit G, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent No. 5,553,083," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-23.

"Exhibit H, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-26.

"Exhibit I, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent No. 5,727,002," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-28.

"Exhibit J, U.S. Patent No. 7,369,515: Invalidity Contention Based on United States Patent Application Publication No. 2003/0140159," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-15.

"Exhibit K, U.S. Patent No. 7,426,191: Invalidity Contention Based on United States Patent Application Publication No. 2003/0140159," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-14.

"Exhibit L, List of Potential Prior Art Not Presently Relied Upon," Case No. 3:09-cv-03496-SI, "Defendants and Counterclaimants' Preliminary Invalidity Contentions Pursuant to Patent L.R. 3-3 and 3-4," *Pixion, Inc.* v. *Citrix Systems, Inc.*, United States District Court Northern District of California, Jan. 19, 2010, pp. 1-2.

"CU-SeeMe Reflectors World Wide," http://www.ludvigsen.hiof.no/webdoc/cu/cu-reflector__list.html, visited Dec. 11, 2009, p. 1 of 1.

Amazon.com, "MBONE: Multicasting Tomorrow's Internet," http://www.amazon.com/exec/obidos/ASIN/1568847238/theunofficiinter..., visited Nov. 6, 2009, pp. 1-4.

"Appendix 1, The CUSeeMe System," http://www.agocg.ac.uk/reports/mmedia/apple/app1.htm, visited Dec. 11, 2009, pp. 1-4.

"Appendix D-3: Appendix D, *Realtime Data, LLC.* v. *Packeteer Inc. et al.*, Invalidity of U.S. Patent No. 6,624,741 Pursuant to 35 U.S.C. 102(a) and 102(b) and/or 103 by CU-SeeMe, offered for sale, sold, and/or publicly used at least as early as Mar. 1, 1999," pp. 1-12.

"Beginner's Guide to the Session Directory Tool (Sdr)," Computing Sciences Berkeley Lab, http://acs.lbl.gov/OldMisc/mbone/sdr.begin.html, visited Nov. 6, 2009, pp. 1-3.

"Control Issues in Multimedia Conferencing," J.R. Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 133-143.

**US 7,813,304 B2**

Page 4

"Dick Cogger Recollections, 1968-2001," Oral And Personal Histories of Computing at Cornell, Cornell University Office of Information Technologies, http://www2.cit.cornell.edu/computer/history/Cogger.html, visited Dec. 11, 2009, pp. 1-20.

"Copyright Information, CU-SEEME," Copyright 1993, 1994, 1995, 1996 Cornell University, http://web.archive.org/web/19970702085029/cu-seeme.cornell.edu/Copy..., visited Dec. 4, 2009, pp. 1-3.

"Cornell University CU-SeeMe Page," Table of Contents, http://web.archive.org/web/19961219182241/http://cu-seeme.cornell.edu/, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe Desktop VideoConferencing Software," Tim Dorcey, Cornell University, http://myhome.hanafos.com/~soonjp/dorcey.html, visited Dec. 4, 2009, pp. 1-5.

"CU-SeeMe in the press," http://web.archive.org/web/19970702085145/cu-seeme.cornell.edu/Press..., visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Reflector," http://sattlers.org/mickey/CU-SeeMe/faqs/reflectors.html, visited Dec. 4, 2009, pp. 1-5.

"Cu-SeeMe Resources for BaBar," updated Aug. 16, 1996, http://wwwpub.utdallas.edu/~joe/babar/cuseeme.html, visited Dec. 14, 2009, pp. 1-2.

"CU-SeeMe Site Map," http://sattlers.org/mickey/Cu-SeeMe/outlineSite.html, visited Dec. 4, 2009, pp. 1-3.

"CU-SeeMe Video," updated Dec. 21, 1995, http://web.archive.org/web/19980112072121/www.indstate.edu/msattler/..., visited Dec. 4, 2009, pp. 1-4.

"Readme file: Cornell Video 'CU-SeeMe0.60'," Richard Cogger, Feb. 2, 1994, http://p25ext.lanl.gov/e866/offline/CU-SeeMe0.60.README.2-2.txt, visited Dec. 11, 2009, pp. 1-8.

"Re: CU-SeeMe Web app for the MAC," Mark Lentczner, Jun. 28, 1995, http://baby.indstate.edu/CU-SeeMe/devl_archives/jun_95/0620.html, visited Dec. 14, 2009, pp. 1-2.

"Re: Anybody got 'Go CU-SeeMe Go!' working," Carol J. Qazi, Jun. 7, 1995, http://baby.indstate.edu/CU-SeeMe/devl_archives/jun_95/0188.html, visited Dec. 14, 2009, pp. 1.

United States Copyright Office, Public Catalog search result, "Internet TV with CU-SeeMe/Michael Sattler," http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&SAB1=c..., visited Dec. 4, 2009, p. 1.

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 107 pages (part 1 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 110 pages (part 2 of 3).

"Internet TV with CU-SeeMe," Michael Sattler, Sams.net Publishing, ISBN 1-57521-006-1, 1995, 106 pages (part 3 of 3).

Connexions: The Interoperability Report, "Special Issue: NetWorld+Interop 95 Las Vegas Companion," vol. 9, No. 3, Mar. 1995, pp. 1-48.

"CU-SeeMe," Wikipedia, http://en.wikipedia.org/wiki/CUSeeMe, visited Jan. 18, 2010, pp. 1-3.

"XTV: A Framework for Sharing X Window Clients in Remote Synchronous Collaboration," Abdel-Wahab et al., Old Dominion University, Department of Computer Science, pp. 1-15.

Automatome, Newsletter of the Automation & Scientific Development SIS, American Association of Law Libraries, pp. 1-10.

"A generic, distributed Whiteboard overlay using Java and the MBone," Mattias Mattsson et al., Luleå University, Sweden, Department of Computer Science/Centre for Distance-spanning Technology, pp. 1-4.

"Mbone Conferencing Applications," http://www-mice.cs.ucl.ac.uk/multimedia/software/main.html, visited Nov. 6, 2009, pp. 1-2.

"Mosaic+XTV=CoReview," K.J. Maly et al., Old Dominion University Computer Science Department and H. Syed et al., Innovative Aerodynamic Technologies, pp. 0-18.

"The UCL Transcoding Gateway (UTG)," http://www-mice.cs.ucl.ac.uk/multimedia/software/utg/, visited Nov. 6, 2009, pp. 1-2.

"The Human Factors of MBone Videoconferences: Recommendations for Improving Sessions and Software," Andrew S. Patrick, Mar. 3, 1999, Communications Research Centre, Ottawa, http://jcmc.indiana.edu/vol4/issue3/patrick.html, visited Nov. 6, 2009, pp. 1-35.

"The CU-SeeMe Project," http://myhome.hanafos.com/~soonjp/project.html, visited Dec. 4, 2009, pp. 1-8.

"CU-SeeMe README file," Dick Cogger, Sep. 8, 1995, http://ftp.zcu.cz/mirrors/mice/CU-SeeMe/Mac.CU-SeeMe0.83b3/READ..., visited Dec. 11, 2009, pp. 1-14.

"The Rapport Multimedia Conferencing System—A Software Overview," J. Robert Ensor et al., AT&T Bell Laboratories, downloaded from IEEE Xplore, Jan. 5, 2010, pp. 52-58.

"ORCA Video Conferencing System CU-SeeMe Software," U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Aug. 1995, pp. 1-26.

"User-Centred Design of an MBone Videoconference Polling Tool," Andrew Patrick, Ph.D., Communications Research Centre, Ottawa, Canada, Mar. 11, 1998, http://debra.dgbt.crc.ca/mbone/mpoll/development/, visited Jul. 10, 2002, pp. 1-10.

"MMConf: An Infrastructure for Building Shared Multimedia Applications," Terrence Crowley et al., Association for Computing Machinery CSCW '90 Proceedings, Oct. 1990, pp. 329-342.

US 5,715,404, 02/1998, Katseff et al. (withdrawn)

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4A



FIG. 4B



FIG. 4C



FIG. 4D



FIG. 4E



FIG. 5



FIG. 6A



FIG. 6B

Capture rectangle

| Block 1 | Block 2 |
| Block 3 | Block 4 |

Capture at presenter client

**Illustration of the effect of specifying consistency at the attendee client**
(other delays in displaying assumed to be caused by loading at client)

| Time order | Received at client | Displayed by client | |
| | | Consistency OFF | Consistency ON |
|---|---|---|---|
| 1 | Block 1 | | |
| 2 | Block 2 | Block 1 | |
| 3 | Block 3 | Block 2 | |
| 4 | Block 4 | Block 3 | |
| 5 | ... | Block 4 | Blocks 1-4 |
| 6 | ... | ... | ... |

FIG. 7A

**Illustration of the effect of specifying consistency at the server**
(other delays in sending assumed to be caused by loading at attendee client)

| Time order | Received by server | Sent by server | |
|---|---|---|---|
| | | Consistency OFF | Consistency ON |
| 1 | Block 1A | | |
| 2 | Block 2A | | |
| 3 | Block 3A | Block 1A | Block 1A |
| 4 | Block 4A | | |
| 5 | Block 1B | | |
| 6 | Block 2B | Block 2A | Block 2A |
| 7 | Block 3B | Block 3B | Block 3A |
| 8 | Block 4B | Block 4B | Block 4A |
| 9 | Block 1C | Block 1C | |
| 10 | | | Block 1B |
| 11 | ... | ... | ... |

Capture A at presenter client

| Capture rectangle | |
|---|---|
| Block 1A | Block 2A |
| Block 3A | Block 4A |

Capture B at presenter client

| Capture rectangle | |
|---|---|
| Block 1B | Block 2B |
| Block 3B | Block 4B |

Capture C at presenter client

| Capture rectangle | |
|---|---|
| Block 1C | Block 2C |
| Block 3C | Block 4C |

FIG. 7B



FIG. 8A



FIG. 8B



FIG. 9A



**FIG. 9B**



FIG. 9C



FIG. 9D



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 10A



FIG. 10B



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

FIG. 23

Time vs. Space diagram of some system applications

**Time**

|  | Now | Later |
|---|---|---|
| **Here** | Recording and previewing a presentation | Reviewing an archived earlier conference as a participant. |
| **There** | Joining a real-time conference connecting participants at different, possibly quite distant, locations. | Viewing a prerecorded presentation or reviewing an archived conference as a nonparticipant. |

**Space**

US 7,813,304 B2

**1**

PROVIDING CONFERENCING DATA IN A
NETWORK COMMUNICATIONS SYSTEM
BASED ON CLIENT CAPABILITIES

CROSS-REFERENCE TO RELATED
APPLICATIONS

The present application is a continuation application of U.S. patent application Ser. No. 11/086,507 filed Mar. 21, 2005 now U.S. Pat. No. 7,369,515 and entitled "Providing Conferencing Data in a Network Communications System Based on Client Capabilities"; U.S. patent application Ser. No. 11/086,507 is a continuation of U.S. patent application Ser. No. 10/600,144, filed Jun. 19, 2003 now U.S. Pat. No. 7,197,535 and entitled "Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System"; U.S. patent application Ser. No. 10/600, 144 is a continuation application of U.S. patent application Ser. No. 09/523,315, filed Mar. 10, 2000 and entitled "Real-Time, Multi-Point, Multi-Speed, Multi-Stream Scalable Computer Network Communications System," now abandoned; U.S. patent application Ser. No. 09/523,315 is a divisional application of U.S. patent application Ser. No. 08/823, 744, filed Mar. 25, 1997, now U.S. Pat. No. 6,343,313, issued Jan. 29, 2002 and entitled "Computer Conferencing System with Real-Time Multipoint, Multi-Speed, Multi-Stream Scalability"; U.S. Pat. No. 6,343,313 claims the benefit of U.S. provisional patent application No. 60/014,242, filed on Mar. 26, 1996 all of which the present application incorporates by reference. The present application is also related to U.S. patent application Ser. No. 10/753,702, filed on Jan. 7, 2004 and entitled "Providing Data Updates in a Network Communications System Based on Connection or Load Parameters" and U.S. patent application Ser. No. 11/086,506, filed on Mar. 21, 2005 and entitled "Providing Conference Data in a Network Communications System Based on Client or Server Information Examined During a Conference."

BACKGROUND OF THE INVENTION

The present invention relates generally to the field of shared computer communications and computer conferencing. In particular, one embodiment of a conferencing system according to the present invention facilitates the conferencing of two or more persons, each with a computer at one or more locations with a shared visual display and additional communication capabilities such as video, shared drawing, audio, text chat, etc. and facilitates the recording and later playback of the communications.

Existing conferencing systems can be described as either video conferencing systems or "whiteboard" systems. In a video conferencing system, a snap-shot of the conference presentation is taken at regular intervals, such as thirty times per second. Given that the image on a computer display is not changing nearly that often, video conferencing wastes large amounts of bandwidth. In a whiteboard system, the presenter at the conference draws within a whiteboard application or imports the output of another program into the whiteboard program for manipulation. When the presenter is ready to present a snap-shot, the presenter presses a "send" button and the whiteboard program updates all the attendees' displays with the image created by the presenter. This type of system, while requiring less bandwidth than video conferencing, is clumsy to use, lacks real-time responses, and limits the presenter to the tools provided with the whiteboard program.

Existing shared-display or shared-image systems rely on interception and communication of display or graphics sys-

**2**

tem commands or depend on conferees' having similar hardware and software platforms. These systems lack flexibility and performance if the network connections are unreliable or have narrow bandwidth, or they require uniform hardware or software installations.

Existing systems that provide single or multiple data stream handling of a nature different than shared-image conferencing depend on wide bandwidth network connections or on all participants having similar platforms.

SUMMARY OF THE INVENTION

An improved general purpose data-stream computer network transport system and, in particular, an improved desktop conferencing system is provided by virtue of the present invention. The desktop conferencing system is used to display a shared collaboration among conference participants ("conferees"), with one or more individuals located at each remote site connected to the conference. Typically, at any particular time some conferees are not able to modify the shared images, and thus they are "attendees," as opposed to "presenters." Preferably, only one conferee is the presenter at any one time. A pointer icon for each conferee can be displayed on the screen, and the conferee is able to modify the location of his or her pointer, even if the conferee is not one who can modify the shared display itself. Each of the pointers can be labeled to distinguish each of the conferees.

In a specific implementation of the desktop conferencing system, conferee client computers ("conferee clients") connect to the "conference server," a computer or several networked computers (any of which may also be used by a conferee as a client computer) running conferencing software, typically by navigating a World Wide Web ("WWW" or "Web") browser through a predetermined Universal Resource Locator ("URL") that indicates a Web page describing the conference. The conference can be set up any time earlier by anyone with access to this server function. At the time of setup, one or more password character strings ("keys") can be specified for the conference. The key that a conferee gives at the time of attempting to connect to the conference server determines whether that conferee will be allowed access to the conference and what the conferee's initial privileges will be for participating in the conference and for modifying the setup of the conference. These privileges include but are not are not limited to the following: entering the conference, being a presenter, having a pointer, seeing the icons or other identifying information of other attendees, hiding or sharing one's own icon or identifying information, changing descriptive information such as the name, time, and purpose of the conference, changing keys, and changing others' privileges. The privileges can be modified during the conference by conferees or others who are so authorized. In general terms, the privileges include those that conferees might enjoy in person at a conventional, physical meeting. In the description below, a conferencing or other communications session provided by the present invention will sometimes be called a "meeting."

A presenter uses his or her computer to begin a conference presentation by connecting to the conference server. Conferencing software on the presenter client computer captures a portion of the screen display of the presenter client and sends the captured region (after possibly compressing it or applying other transformations) to the conference server. The captured region can be anything the presenter client can have displayed on its screen or a portion thereof, whether or not the hardware or other software producing or managing any part of the display is aware of the conferencing system.

3

When the attendee selects a link from the Web page to begin the conferencing session for that attendee, this action initiates the attendee client conferencing software. The attendee client then obtains a current view of the captured region from the conference server. The position of a pointer icon on a conferee's view of the captured region and an icon specified by the conferee might be communicated to each of the other attendee and presenter clients, so that each of the participants can see what each conferee is pointing at should a conferee choose to point to an element of the shared captured region. A particular conference can include more than one presenter; all conferees may be presenters, or all conferees may be non-presenting attendees. The latter may happen if a conference is set up to review a previously recorded or archived conference.

In a simple embodiment, the entire screen of the presenter is shown to all of the attendees. In a more complex embodiment, multiple subsets of multiple presenters' screens might be made available to all attendees while other subsets of the displays of the presenters are viewable by a subset of the attendees, thus allowing private side "conversations." These side conversations can be flexibly reconfigured during the conference, according to the conferees' privileges; participants in side conversations can have separate pointers whose positions are independent of, and whose labeling icons are distinguished from, those appearing in the general conference.

As each conferee joins a conference, the client and the conference server agree on the capabilities of the client, such as display bit-depth, bandwidth of the connection between client and the conference server, processor speed of the client, and the amount of memory available to each client. These parameters may be modified by the conferee, the client, or the server: this can be done automatically or on demand. If the conference server determines that a client has sufficient computing resources, some of the tasks, such as image data compression (for presenter clients), decompression (for attendee clients), update scheduling (both types of clients), and other image transformations and server management functions can be assigned to the client computers. The client computers might be personal computers, workstations, X-terminals, cable or satellite TV set-top boxes ("STBs"), personal digital assistants ("PDAs"), game playing machines, WebTV™s, network computers ("NCs"), Infopads, visual telephones, and other existing or as yet undeveloped input and/or output devices. These clients might be connected to the server computer or computers (and the server computers might be interconnected) by high or low bandwidth electrical or optical connections, radio, infrared, microwave, telephone modem, or hybrid combinations of these, or other existing or as yet undeveloped data communication technologies.

The system can supply a range of coder-decoder ("codec") facilities for the compression and decompression of images (in order to reduce bandwidth requirements during network transmission) and for the matching of image representations to client display requirements including input or output format transcoding (in order that the shared image appear visually similar to presenter and attendee). In addition, codecs may be provided by the system for such purposes as error-correction, encryption, or audio and video noise reduction, or others. User-provided or proprietary codecs for these purposes and more can also be incorporated into the system. Any of these codecs may be in form of software or specialized hardware. Multiple codecs may be provided for the same function; should the system determine that one is better suited for that function, then it may be selected, and the codec can be

4

changed dynamically when conditions change, such as client requirements, server needs, and network loading.

At least one embodiment of the present invention provides real-time, multi-point, multi-speed transport over a computer network for data streams other than the visual conference shared images described above, including but not limited to audio, video, shared paint and drawing spaces, text chat, and other real-time object streams where intermediate updates may be dropped; in particular, the data streams may combine any or all of these types of data, which may be produced by multiple presenters, and arbitrary data streams may be combined with these. The features of connecting to servers, setting up conferences, keying privileges, passing identifications, accommodating multiple dissimilar platforms and network connections, and configuring subsets of conferees apply equally to these other data streams. In the more general case, the "communications server" connects the "source" and "sink" client machines of the "communicants" during a communication session.

But the system is not limited to real-time; thus, for example, archiving is provided. It is not limited to multi-point; thus, for example, a single user can record for later playback; being scalable means it works well for a few users and provides a similar communications service and experience with many users. It is not limited to multi-speed; thus, for example, data streams where lost information cannot be easily updated by later versions can be accommodated. It is not limited to multi-stream; for the shared screen-image stream (frequently used here as an example) by itself offers great utility. Indeed, it does not require a network: for example, the same computer could be the recording and archiving server for a presenter using it as a client; or the same computer could run presenter client software, attendee client software, and the communication server software connecting them so that a presentation might be previewed from the attendee's point of view.

Although a simple embodiment uses a single computer as the communications server, a more complex embodiment connects several computers in performing the server functions. The server-to-server interconnections can optimize routing by using information provided in the data stream or measured on the network, optimize wide-area network (WAN) usage by connecting clients to nearby servers, provide backup reliability by migrating clients, provide scalability of conference size through splitting the data stream, improve performance and robustness through redundant routing, and distribute functions of the system's transport pipeline (such as compression, decompression, and update scheduling) over several server and client computers. These services can be provided automatically depending on resources of the computers and network (for example, measured net speed and central processing unit, or "CPU," load) and facilities available (for example, announced client characteristics, such as CPU speed, compression and/or decompression hardware, or display parameters). They can also be configured and constrained by the server computer administrators or others with appropriate privileges.

Existing systems do not provide one or more of the following, which are explained in greater detail below: multi-speed at server and client, multiple reconfigurable coder-decoder transformations and transcodings, storage services (for, e.g., caching, failure recovery, recording, archiving, and playback), keyed access and privilege granting, adaptable servers and clients, multiple servers, adaptive and redundant server-to-server routing, load sharing among clients and servers, adaptive server-to-client matching, client/server and server/server backup and reconnection, multiple protocols for client

US 7,813,304 B2

5

connections, dynamic reconfiguration of server functions, and scaling beyond single process, host, or network limitations automatically or upon request.

A more complete understanding of the nature, features, and advantages of the invention will be realized by referring to the following description and claims together with the associated drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a desktop conferencing system based on the present invention.

FIG. 2 is a flowchart illustrating the connection of a conferee client computer to a conference server shown in FIG. 1.

FIG. 3 is a block diagram of the data flow in an architecture commonly supporting computer graphical user interfaces.

FIG. 4A is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when full images are compared, and the transmission of the changed information to the conference server.

FIG. 4B is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a new block is compared with the corresponding block in an old full image, and the transmission of the changed information to the conference server.

FIG. 4C is a logic diagram illustrating the comparison of new and old captured images by the presenter client, when a checksum of a new block is compared with the checksum of an old corresponding block, and the transmission of the changed information to the conference server.

FIG. 4D is a data flow diagram illustrating the updating of the stored old image with a new captured block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 4E is a logic diagram illustrating the updating of the stored old image in various formats with a new delta block by the presenter client, and the transmission of the changed information to the conference server.

FIG. 5 is a state diagram illustrating the operation of the image capture process of the presenter client software.

FIG. 6A is a diagram showing attendee client block clipping.

FIG. 6B is a diagram showing presenter client block clipping.

FIG. 7A is a diagram illustrating the client consistency setting.

FIG. 7B is a diagram illustrating the server consistency setting.

FIG. 8A is a block data flow diagram illustrating the operation of server processes monitoring and filtering a single presenter data stream according to the present invention.

FIG. 8B is a block data flow diagram illustrating the operation of server processes monitoring and filtering multiple input and output data streams according to the present invention.

FIG. 9A is a block diagram illustrating interconnections of several communications servers and communicant clients in a single communications session according to the present invention.

FIG. 9B is a block diagram illustrating interconnections of several communications servers and communicant clients, including migrated and recruited connections, in a single communications session according to the present invention.

FIG. 9C is a block diagram illustrating interconnections of several communications servers and communicant clients,

6

including backup connections for clients and servers, in a single communications session according to the present invention.

FIG. 9D is a block diagram illustrating interconnections of several communications servers and communicant clients, including decomposition of transformation sequences and functional delegation, in a single communications session according to the present invention.

FIG. 9E is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queues and processing, in a single communications session according to the present invention.

FIG. 9F is a block diagram illustrating interconnections of several communications servers and communicant clients, including distribution and parallelization of output queue contents and processing, in a single communications session according to the present invention.

FIG. 9G is a block diagram illustrating interconnections of several communications servers and communicant clients, including multiple and redundant routing, in a single communications session according to the present invention.

FIG. 10A is a block diagram illustrating a multi-layered tree topology for connections of several communications servers with communicant clients in a single communications session according to the present invention.

FIG. 10B is a block diagram illustrating a single-layer tree topology for connections of several conference servers with communicant clients in a single communications session according to the present invention.

FIG. 11 is a diagram of the example architecture for a single server with a single meeting, according to the present invention.

FIG. 12 is a diagram of the example architecture for a server with several meetings running on a single CPU, according to the present invention.

FIG. 13 is a diagram of the example architecture for a single meeting manager directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 14 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on several CPUs, according to the present invention.

FIG. 15 is a diagram of the example architecture for several meeting managers directing several servers with several meetings, running on the same CPU, according to the present invention.

FIG. 16 is a diagram of the example architecture for a single server with a single meeting, but the meeting is controlled by several instances of a communications session server ("CSS") running on the same CPU, according to the present invention.

FIG. 17 is a diagram of the example architecture for a single meeting manager directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 18 is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on the same CPU, with additional CSSs for the same meeting running on other CPUs, according to the present invention.

FIG. 19 is a diagram of the example architecture for several meeting managers directing several servers with a single

7

meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention.

FIG. 20 is a diagram of the example architecture for several meeting managers directing several servers with a single meeting where the meeting is controlled by several instances of a CSS running on different CPUs, according to the present invention. In this diagram, the propagation topology information is shown.

FIG. 21 is a diagram of the graph of the propagation topology information in FIG. 20.

FIG. 22 is a diagram of the graph of the propagation topology information in FIG. 20 together with the information for an additional propagation topology.

FIG. 23 is a time vs. space diagram showing some typical applications of the present invention.

DESCRIPTION OF THE PREFERRED
EMBODIMENT

FIG. 1 shows a desktop conferencing system 10 according to one embodiment of the present invention. Desktop conferencing system 10 is shown with three attendee clients 18 and one presenter client 12. Following the arrows, presenter client 12 is connected to attendee client 18 through a conference server 14 and data network 16. The presenter and attendees may also participate in an ordinary telephone call or a conventional conference call using telephones 20 connected through conference switch 22. The voice conferencing might also be carried out through an audio connection on a data network; indeed, telephone network 24 and data network 16 could be the same.

The group of users can comprise from as few as one user, who might record a presentation or lecture or video-mail onto a session archive 23 for later distribution; or two people who wish to share information or collaborate on some work product; or a small group of users, as in a typical business conference call; to many tens of thousands or hundreds of thousands of users using the network as a broadcast rather than interactive medium. In the last case, the voice conferencing might also be broadcast, and could involve one-way telephone conference calls, radio, multicast network audio (such as MBone), or the like.

The presenter client conferencing software, which is usually distributed tightly bound with the attendee client software to facilitate presenter hand-offs from conferee to conferee, captures information (such as image, sound, or other output information) from a program or programs running on the presenter's machine and relays it to the server, as explained in more detail below. The server relays this information to all of the attendee client computers participating in the same session or conference, transforming (in manners and by methods described below) the data as required. A more detailed description of the operation of the system by way of the example of transporting a stream of shared-image data during a conferencing usage of the software now follows.

During a conferencing session, presenter client 12 takes periodic "snap-shots" of the application screen image contained within a rectangular boundary determined by the presenter, breaks the screen shot into smaller rectangular blocks, compares these blocks to information from a previous screen shot. A block that has changed is passed to conference server 14 after it has undergone possibly two transformations and received identification marking ("ID stamps"). The first transformation may form the difference, using a set difference, exclusive-or (XOR), or other difference method, of the new and old block in order to extract information on the

8

changes only. The second transformation may compress the block using a publicly available compression algorithm such as JPEG (Joint Photographic Experts Group) or PNG (Portable Network Graphics), or licensed proprietary methods of compression. The need for the two transformations is determined by the system depending on such parameters as client characteristics, server and network loading, and user requests. The two transformations and possibly many others may be also performed by the server, another client, or another facility available on the network.

The presenter client identifies where the block is in the capture rectangle with a block-location ID stamp; it identifies the time with a time-stamp; it may also identify itself with an origin stamp, and provide other ID stamps as needed. In order to provide synchrony in the system, conference server 14 can issue time synchronization signals. The conference server may also add time-stamps on receipt of blocks, and will need to update time-stamps when a recorded or archived conference is played back.

The changed blocks, however transformed, with ID stamps, are held on the conference server until they have been sent to all attendee client computers 18, or it has been determined by flow control that there is no longer a need to hold them. Flow control between presenter client 12 and server 14 and between server 14 and attendee client 18 determines how often the attendee client receives information updating the image; this flow control, described in more detail below, depends on the characteristics and configurations of the clients, the server, and the network. Attendee client 18 can also send a command to conference server 14 to obtain the latest image change information.

Attendee client 18 uses whatever change information it receives to update its screen display of the shared image. The attendee client may need to decompress the changed block information and to composite differences with previously received image information. The reverse transformations of decompression and composition may instead be performed by other computers.

From time to time, attendee client 18 communicates the position of the attendee pointer (if the conferee has selected this option) to conference server 14, which distributes the pointer position and a chosen identifying icon to each of the other conferee clients, which may then add a representation of the icon or other identifying label at the position indicated by the pointer information to the shared image on the client's display. The purpose of these pointers and labels is to allow conferees to reference particular elements of the shared image, possibly while describing the elements to the other conferees over the audio conferencing session (via a telephone conference call or an Internet audio conferencing application, for example).

FIG. 2 is a flowchart showing the process of introducing a conferee client 17 (client 17 refers t a generic client which might also be a presenter client 12 or an attendee client 18) to a conference ongoing on server 14, assuming that the conference setup is performed via the WWW. First, the conferee locates a conference listing. This may be done by finding or being told a URL or using a locator service such as ULS.™. or LDAP™. The conferee also specifies an icon to be used as a pointer label. Then the conferee points a WWW browser to the conference listing, where the server offering this listing or an associated server validates the conferee and provides information that allows the attendee client conferencing software to start and to connect to conference server 14 itself, possibly after further validation. Other information may be passed to the conferee client at this time as well. The connection to a server can also be accomplished in different ways, such as

US 7,813,304 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

using stored parameters that allow meetings to be resumed after the network connection is temporarily broken, or using client software having a hard-coded list of meetings. Once the attendee client software is running, it communicates commands and pointer icon position to conference server **14**, and conference server **14** supplies an initial conference image and later screen updates to client **17** (which is initially an attendee client **18**).

An attendee can become a presenter by sending the appropriate attendee-to-presenter command to conference server **14**. In the simplest embodiment with a single presenter, a message is sent to the presenter's screen indicating that an attendee wishes to take the presenting role; if the current presenter approves, then the roles are exchanged. In more complex embodiments, there can be a presenter arbitration mechanism, or multiple presenters may be allowed. The ability for a presenter or an attendee to be involved in any particular conferencing session and the assignment of presenters in the conference can be controlled by requiring appropriate keys from the presenter and the attendees.

Referring back to FIG. **1**, data network **16** can be provided by dial-up connections, local area networks (LANs), wide area networks (WANs), internets, intranets, the global Internet, or a combination of these or any other computer data communications links. In a specific embodiment, the conferee client computers are personal computers, workstations, or other computing hardware systems, running operating systems such as MacOS™, Windows™ 3.1 or 3.11, Windows™ 95, Windows™ NT™, Unix™, OS/2™, NEXTStep™, BeOS™, JavaOS™, or the like. There is no requirement that the operating systems or hardware of the conferee clients all be the same.

Conference server **14** matches the form of the image to the attendee clients before sending it. Most computer screen images are represented as a bitmap of pixels whose layout is device-dependent. To be able to send images from one device to another, a transformation or transcoding is often required. The captured image information may be transcoded into a device-independent format for transmission and transcoded back to a device-dependent format for each attendee's screen; if, however, the mix of attendee clients is such that a device-independent format is not needed, no conversion is done. If these or other transcoding operations are carried out at the presenter client's side, the server side, or the attendee client's side, depending on where excess capacity or superior capability exists. The choice of device-dependent vs. device-independent bitmaps (DDB vs. DIB) is made automatically by the server, in response to the number and type of conferee clients. For example, a meeting with just two conferees, each running a Windows™ PC with similar 256-color graphics configurations, may use DDBs and achieve high performance with low overhead However, where differently configured clients are connected in a conference, server **14** transcodes the images to fit the attendee's screen capability.

Multiple codecs may be involved in the transcoding of screen formats as well as other image transformations described herein. It may even happen that different codecs will be used on different blocks in the same image, depending on availability of the codec's host computer, the transformation needs, the loading on client, server, and network, or other conditions relevant to the system's performance.

Server **14** also fits the images to the attendee's CPU capability. Server **14** can be a server operated by the presenter (who would then have full control over the server's resources), or it can be owned or operated by an unrelated third party or even an attendee who never presents. It is possible to have a third party whose involvement is solely as

a facilitator of conferences. Operating server **14** is simpler than operating a videoconference hub, since the bandwidth is much lower. One aspect of the present invention is the realization that real-time conferencing can be had without resort to full-motion video transmission, as the item being monitored, a portion of a computer display, does not change as fast as a full-motion video. A similar observation applies to many other data communications streams.

Instead of full-motion video, attendees' screens are updated as the presenter's screen is modified, or less frequently for attendees with slow machines. The screen is modified from left-to-right within a row of blocks, and rows are updated top-to-bottom to improve the perception of low latency.

In some cases, server **14** might be operating without attendees. Such a configuration is useful where the presenter wishes to "record" a session for later playback. Even a session with attendees can be recorded for later playback, possibly including a recording of the voice conferencing. These stored sessions might be stored in session archive **23** or elsewhere. The shared image session can be synchronized with the voice conference by using the time stamps on the block data. When the recorded session is played back, it is an example of conference server **14** operating with attendees but no presenter.

The blocks may be held at the server as full images, as differences ("deltas") from previously received full images, as deltas from previous delta blocks, or as some combination of these, depending on the capabilities of the presenter and attendee clients. Periodically, a server may "checkpoint" the image deltas. To do this, the server requests a full image of a block from the presenter client and uses the full image as a replacement for all the accumulated image deltas for that block. The server might also request the entire captured region from the presenter client, or send the entire region to an attendee client upon request.

The conference server acts as a software-controlled switch that connects the presenter client with the attendee clients, taking into account that the speed of information transfer from the presenter client can change and the speed of transfer to the attendee clients can change and be simultaneously different for different attendees. The workload of the entire system is shared and distributed among the client and server computers, and even other computers that do not perform client or server functions.

Presenter Client Capture Operation

The capture operation and transport technology improves over former approaches by reducing the amount of work required and so enhances performance. In addition, the technique can be tuned to best suit the workload on the hardware and software platforms and network connections involved, manually or automatically. In particular, this tuning dynamically matches the capture operation to the amount of computer power available (while running the other software the conferee may wish to use) and the speed of connection to the network. Existing systems that capture graphics display commands, transmit them, and then use them to recreate the original display appear to have great compression, which entails economy of network transmission. But comparison with the description below of the present invention will reveal that the savings are not so great when the task is to communicate data streams which can be updated by later transmissions.

The presenter selects an area of his or her computer display to be shared ("capture region"); it need not be a rectangular area. More than one capture region may be selected at a time and multiple regions may overlap. The selection may be made on a screen display, in a memory representation of a display,

US 7,813,304 B2

| 11 | 12 |

or in an aliased representation of either; the selection can be changed at any time. If the client has multiple monitors or multiple displays on a single monitor, independent selection can be made for each. A window provided by the presenter client computer's operating system, or by an application or other program, may be designated as the capture region, and then the capture region can be adjusted automatically if the window is moved or resized. This may be a fixed window, or the capture operation can be set to follow the selection of the current ("top" or "focus") window automatically. In a simple embodiment, the presenter selects a rectangular region on the screen ("capture rectangle"). For efficient transmission, the capture rectangle is broken up into rectangular subregions (blocks) to give good perception of response time. For example, if the presenter has selected all of an 800-by-600-pixel screen display to be within the capture rectangle, then it might be broken up into twelve 200-by-200-pixel square blocks. If the capture rectangle is later adjusted smaller, the blocks are changed to be made up of smaller rectangles, or the capture rectangle is divided into fewer blocks, or both; correspondingly, if the capture rectangle is later adjusted larger, the blocks are changed to be larger rectangles or the capture rectangle is divided into more blocks, or both. For efficient handling of blocks, the blocks are preferably kept between 1000 and 4000 pixels in size. As the blocks are updated on the attendee's screen, they are presented from the top row to the bottom row and from left to right within a row.

The presenter defines the shape of the capture region and can change, control, reposition, and resize it. In some computer systems, when the region is rectangular, the capture rectangle may be marked by a transparent window that stays visible; in other systems, it is appropriate to use four graphical objects that move together to mark the boundary of the capture rectangle.

FIG. **3** shows the display architecture of a typical computer shown with application programs **60**(*a*)-(*c*), and graphic display mechanisms **62**(*a*)-(*c*) with graphics commands capture points **64**(*a*)-(*c*). The graphics display mechanisms **62** send their output to a screen image storage area **66** which in turn presents an image to the user on a computer display **68**. Existing techniques of image sharing depend on intercepting graphics display commands (graphic instructions, display commands, graphics subsystem calls, etc.) at graphics commands capture points **64** and sending these commands to another computer which can use them to affect its own display. This appears to have an advantage in that one high-level graphics drawing command (e.g., "draw a blue line from co-ordinates (0,0) to (0,100)") can be expressed in fewer bits of data than what would be required to express the resulting set of pixels on the screen. In this case, 100 blue pixels, say using 24-bit color depth, would require 300 bytes of data, compared with a graphics drawing command that might require only about 12 bytes of data.

If the task to be achieved is to send a copy of this image to another computer, using the smallest number of data bits, then sending the graphics drawing commands seems, at first sight, to be a very effective approach to adopt. However, two factors mitigate this apparent saving. One arises when the data stream is compressed before transmission, and the other arises from reflection on modern graphics drawing techniques.

Compression is very effective when there is a lot of redundancy in the data. In the example cited above, the 300 data bytes needed to represent the blue line on the image consists of a repeating set of 3 data bytes, each representing one blue pixel. This might be compress to as small as 5 data bytes total, one to indicate the code, three for the color, and one to

indicate the binary number of pixels. Of course, the 12-byte graphics drawing command might also be compressible: nevertheless, the apparently huge savings ratio is not in fact realizable.

Modern graphics drawing commands include not only simple geometric drawing operations, but also text elements with full font and spacing specifications, and other complex constructions. This can be seen by comparing the size of, say, a word processing document (which contains the graphics drawing commands, font information and text) stored in a computer file with the size of an image of that same document, say, as a fax image stored as a file on the same device. A few years ago, the image file would always be larger than the document file; now, the reverse is often true.

Furthermore, as will be seen below, reducing the amount of data by using compact graphics drawing commands instead of direct image data is not always possible when applied to real-time systems where transmission of live, changing images is required. In this case, there are two ways to merge changes together, thus reducing the total amount of data that must be transmitted. The example used above applies to a single image; when changing images are required—as for example, with conferencing systems—further opportunities exist to reduce the total amount of data transmitted. This is an advantage of the present invention.

First, when graphic drawing commands update the same region of the image, we can capture just one resulting image containing the results of many commands. Second, successive changes to a particular region of the image, which will result in successive transmissions of that region, can be composited together. The several strategies for this updating under the present invention will now be described in more detail.

Updates for the capture rectangle may be requested by the server, or sent at fixed or variable times announced by the presenter client automatically or as determined by the presenter, or sent at the command of the presenter. The blocks sent out by the presenter client are just the blocks which have changed since the last update. From time to time, the presenter client might send the entire set of blocks. Depending on several factors detailed below, the presenter client might send the blocks as difference (delta) blocks as opposed to the full information base blocks. Base blocks are preferred where network bandwidth is freely available but computing power at the client is limited.

For efficiency, the presenter client might only send out delta blocks for areas that have changed, since delta blocks will often compress smaller than the corresponding base block because much of the base block may remain unchanged. Thus, the presenter client maintains a copy of the last capture to allow it to generate the delta blocks.

FIG. **4**A illustrates this point. In that figure, the captured images used are divided into twelve subblocks so that unchanged portions of the captured image can be ignored. If the block labeled "B6" is the block being sent, block B6 of the current copy of the captured image **69**(*a*) is compared with block B6 of the most recently stored reference copy **69**(*b*) of the captured image (the reference copy is a copy of who the captured image looked at some point in the past). The result of the comparison will determine whether block B6 has changed. If it hasn't, then there is no need to transmit the changes.

FIG. **4**B illustrates a similar process, but there, only block is captured from the current image for comparison with the stored image. This reduces the storage required for the comparison by nearly one half, but it limits consistency, as described later.

13

14

In FIG. **4**C, the images are replaced by checksums or digests, such as cyclic redundancy check ("CRC"), DFT (discrete Fourier transform) parameters, or the results of applying hashing functions appropriate for images, or the like. Although storage is greatly reduced, as only the much smaller checksums need to be saved, and comparison is quick, the digest procedure must be fast in order to provide any time economy. The main drawback is that two different blocks may have the same checksum, and then the comparison will fail to find the difference. This can be mitigated by the choice of checksum and by the unlikelihood that the comparison would fail twice in a row when the block changes again.

FIG. **4**D shows the transmission to the server of a base block when the comparison shows a change. The block is also sent to the stored image; this allows the stored image to be updated at the same time the changes are sent to the server.

FIG. **4**E shows the corresponding situation when a delta block is sent.

Obviously many combinations can occur that would provide additional savings under some load conditions. Thus the stored comparison may be a collection of base blocks, either from the same capture event or not, an array of checksums of base blocks or of delta blocks, a collection of delta blocks, results of compositing delta blocks, etc. or any combination of these.

It is possible to reduce the size of the stored comparison image to blocks which have changed recently and perhaps their neighbors, as long as the full image is stored every now and then.

Each of the modes of comparison and transmission can be altered dynamically; for example, one heuristic is to send a delta block when less than half the pixels in the capture rectangle change, and to send a base block when at least half change.

With techniques that rely on capturing graphics display commands, it is very hard to identify commands that produce overlapping elements of the image. Because of this, it is hard to know when earlier commands can be discarded because their results have been superseded. Therefore, a system relying on capturing commands must send all commands over an error-free network. By contrast, in this system, deltas can be dropped without permanent ill effects.

The foregoing assumes that the capture rectangle is broken into a number of rectangular blocks. This decomposition can be changed dynamically to have more or fewer blocks to adapt to changes in the size of the capture rectangle by the presenter as described earlier, or to changing conditions in the loading and capabilities of clients, servers, and networks. Just as the capture rectangle is broken into blocks to improve perceived rate of change, so may the block be subdivided to further isolate just the changed portion of the image. One way to accomplish this is to identify the smallest bounding rectangle of the changed portion of the image, and then to intersect this with the current block pattern. Another is to adaptively redefine the block pattern to best fit the changed area of the image. Other adaptations arise if the geometric assumptions of rectangular capture region and rectangular blocks in this example are dropped.

In general, the system of the present invention is oriented to reduce buffering in order to improve the sense of "live performance." Thus, while the structure of the server and client software could allow a number of captured images to be in the process of traveling from presenter clients to attendee clients at one time, in fact having just two images in the "pipeline" from presenter to attendee at once takes advantage of processing capacity, defeats transient network breakdown, and does not overload end-to-end connection performance. This might be increased to three or four or more images in the pipeline if the network connections are fast, but the clients have slow CPUs.

FIG. **5** is a state diagram of the presenter client software. The state transitions are described here starting with the IDLE state. The presenter client is in the IDLE state while it is doing other things, such as processing data unrelated to the conferencing software or running another application whose output is to be shared with the attendees. Periodically, the presenter client will check to see if an update to the capture rectangle needs to be sent out. In considering that need, the presenter client conferencing software considers the CPU loading on the presenter client computer, taking into account any limit the presenter might have placed on what percentage of his or her machine's computing resources can be occupied with block updates, the transmission rate of the presenter's network connection (no sense preparing a block update if the network can't handle it), commands concerning flow control from the server (server flow control is described below) and other relevant parameters.

If the presenter client decides to proceed, the state changes to the BLOCK-GRAB state, where the current capture rectangle or a portion of it is grabbed from display memory. A copy of the next most recent capture rectangle is maintained so that delta blocks can be easily generated. In this state, the delta blocks are generated if they are to be used. If the delta blocks indicate that nothing has changed, the computer transitions back to the IDLE state and does not send out the captured block or its delta (which would be blank). Otherwise, the client prepares the blocks which have changed for potential transmission. The capture rectangle is divided into blocks as described above. In the BLOCK-GRAB state, the presenter client estimates the amount of work required to prepare the grabbed blocks for transmission to the server, attendee requirements, and local hardware capabilities. If the presenter client can perform work such as transcoding much faster than the attendee clients, or even the server, then the presenter client performs that step by transitioning to the COMPRESS/TRANSCODE state. The presenter client might skip this state altogether if no transcoding is to be done and compression is not used (such as where the network connection between the presenter client and the server is much faster than the compression speed of the presenter client).

Either way, the presenter client then transitions to the NET-WORK state, where it determines if the capture rectangle still needs to be sent and checks current network bandwidth. Then, the presenter client transitions to the OUTPUT state where the blocks are output, either as base blocks or as delta blocks, either compressed or uncompressed. The presenter client then returns to the IDLE state where the process repeats after a time.

In the case of displays that support multiple layers in applications or in the interface through multiple frame buffers or reserved areas of memory, the system can capture from one or more of the layers, in coordination or independently. If the client has multiple monitors, then the system can capture from some or all of the displays.

In general, the presenter client sends out a stream or streams, which can vary in format over time. The presenter client can also imbed command messages into a stream, such as a command indicating a changed color map, a pointer icon position, or a presentation hand-off command; such commands can also be sent in a separate communications channel. Capture can also occur in buffers for other purposes than screen display. Streams other than the shared-screen conferencing stream (outlined above and described in more detail

US 7,813,304 B2

15

below) can carry information to allow shared or broadcast text chat, audio, video, drawing, whiteboarding, and other communications. These streams are subject to and can enjoy the same or similar load/need analysis and balancing methods and mechanisms.

Other Client Features and Behavior

When a new conferee joins a meeting or before, the conferee selects a personal icon and a characterizing sound (a "gong") which will be the icon and gong that other conferees will associate with the joining conferee. Icons and gongs can be created using well-known techniques for creating icons and audio data. When a new conferee joins a meeting, the conferee client sends his or her personal icon and gong to each other client, via the conference server. The new conferee is then "announced" by the gong. The personal icon of the joining conferee is also added to a conferee icon list maintained on the server or at each client. If another conferee chooses to have the icon list displayed at his or her client, the entrance of the joining conferee can be noted when the new icon appears on the icon list. Other personal information about the conferee, such as name and electronic mail ("email") address may be provided by the conferee and made available to other conferees via the server. As described earlier, the visibility of icons, audibility of gongs, access to personal information, and so on, may be based on the key the conferee used to enter the meeting, on the identity of the conferee (by network address or otherwise), or on a combination of these and other validators.

The presenter can "go off-air," i.e., suspend or pause the image capturing process and can "go on-air," i.e., resume the presentation at will. The network connections can be maintained during the off-air period, but no changes will be sent to the server. Similarly, an attendee can request to be off-air, and no changes will be sent or scheduled by the server during the off-air time.

If clients are so configured, conferees can be given lists or iconic representations of the participants in the conference, as mentioned above. Those conferees that are presenting, those who are off-air, and those who are requesting to present can be marked. Various subsets of conferees, for example those in side-conversations, those in other meetings, those connected to a particular server, and in general those selected by some property of the system's current configuration, can also be marked. The visibility of the lists and the presence of any markings may be controlled by users, administrators, or others, based on privileges or other criteria. In addition, graphical representations of a meeting or part of a meeting, or of several meetings, may be available for display, depending on privileges.

If the presenter client computer represents images with a varying color map or palette, then the presenter client will send out color map information when the color map changes, so that the attendees observe the same color scheme as the presenter. Color map changes can occur on the presenter client display system as the presenter opens, makes changes in, or closes a program, either in a window that overlaps the capture rectangle or in a window beyond the capture rectangle used for his or her own private work.

When a change in a block is detected, the resulting changed block (base or delta) may be compressed, making use of any special hardware (for example, a Digital Signal Processor (DSP), often found on MPEG boards or set-top boxes), if it is available on the client computer. The compression codec may be lossless, or some information may be lost in compressing and decompressing ("lossy" codec) if the particular application and users of the system can tolerate that and wish to take advantage of possibly better performance.

16

To ensure good usage of the network, the images are captured and compressed before the network is available to send them, if possible. Without this, the network might be underutilized. On the other hand, if an image is captured and compressed too early, the attendees will not see the most up-to-date information and this will reduce the efficacy of the visual component of the meeting. To achieve this good balance between system utilization and the perceived response time as seen (and possibly heard) by the meeting's attendees, the client software uses a pipeline to ensure a flow of information is always available at the network, with flow-controls to ensure that image capture and any transcoding (including compression) are never too far ahead or behind in order to balance the load among presenter client, attendee client, and conference server. Flow control is described in more detail below.

The number of blocks and the order of comparison and modification can be automatically determined by the server or set by the presenter. Thus, if conferees usually work with text reading from right to left, a right-to-left updating might be more appropriate.

The size of the window displaying the shared image on the attendee client need not match the size of the image sent from the presenter client in linear measure or in pixel measure. If the window is smaller than the image, the attendee can be given scrollbars to allow navigation around the shared image. It is also possible to configure the transcoding to scale the size of the image received by the attendee client.

The attendee client can also display the shared conference image automatically matched in size to the capture region set by the presenter, if the attendee desires and the attendee client computer is capable of such display. If the attendee client is displaying less than all of the image, the bounds of what is being shown at the attendee client can be communicated to the conference server so that the server can avoid sending blocks beyond the boundaries of the attendee's window. These blocks are not sent until scrolling requires them or they are otherwise demanded by the attendee. This point is illustrated in FIG. 6A, where an original image 50 as represented in the display coordinates of a screen 54 of attendee client 18 exceeds the size of a window 52 dedicated to its display. Scrollbars are included with window 52 to aid in navigation. Blocks 56 are not transmitted from server 14 to client 18 until the scrollbars are used or the window is resized to request the display of more of image 50.

This "clipping" of unneeded blocks can be propagated back to the presenter client by the server if appropriate (for example, if there is only one attendee), so that the presenter client does not have to process all blocks in the capture rectangle. This is illustrated in FIG. 6B, using the same attendee configuration as in FIG. 6A. In FIG. 6B, the presenter client 12 knows from conference server 14 that the shaded blocks 56 shown at the attendee screen 54 of attendee client 18 are not displayed in attendee window 52, so there is no need to capture or compare the corresponding blocks 57, marked as "do not process" in the representation 51 of the capture rectangle, which is displayed on presenter client screen 55 and shown with the an overlay 53 that corresponds to attendee window 52.

The shared conference image, text boxes, messages, control buttons and menus, and other graphical elements may be grouped in a single window or split among several windows on the client's display.

Consistency is a property of the display that can be chosen at the cost of somewhat reduced perception of image update speed at the attendee client. Both the server and client can be constrained to be consistent; server consistency is discussed

US 7,813,304 B2

17                                                                                    18

below. FIG. **7**A gives a simple example of client consistency. An entire capture rectangle with four blocks is sent by the system, and the client waits until all four blocks are received before displaying them. Thus, the entire screen represents the same picture to the attendee as that seen somewhat earlier by the presenter. With consistency turned off, each of the four blocks is displayed as soon as possible, which leads to blocks from a previous transmission being seen alongside newer blocks, so the screen picture, at least for a time, is not consistently one that has been viewed by the presenter.

When a presenter makes a change to the part of screen that is in the capture rectangle, a signal can be given to the presenter client via the server when all attendee clients have received the update that results from the change. The presenter is then assured that all other conferees have seen the change he or she has made. An example of how this can be accomplished is given by the following. The conference server is aware of the geometry of the capture rectangle and the blocks are constantly scanned from left to right, starting at the top and moving toward the bottom. Thus the block in the lowest rightmost position signals the end of data from a particular rectangular capture by the presenter client. Since this block may not have changed and may never arrive in the server's input queue, a flag may be set by the server to indicate which block is last when a block from a new capture arrives before the last block has been sent to an attendee client If neither of these two mechanisms works, the presenter client can add a message via the server to the attendee client stating that the rectangle has been finished. Thus the attendee client can respond when it has received the entire rectangle.

In addition, a signal can be generated by the presenter client when the presenter has made no change for some set period of time or number of capture cycles. This can be relayed by the server to attendee clients, so that attendees may know that after the appropriate captured image is received, what they see is also representative of what the presenter currently sees.

If the connection to the server is lost, the client can notify the conferee and may then attempt to reconnect to the conference session, using saved parameters. The reconnection may be to a different server, as described later.

In the above description, "client" has referred to a computer system comprising hardware, an operating system, and applications software, possibly or specifically including the software necessary to participate in a conference or communication session according to this invention. All of the described operations also apply to the case when one or more users are running two or more instances of the client conferencing software on the same computer platform. This might occur when a user wishes to be a conferee in several different conferences simultaneously, or even multiple conferees in the same conference. For example, he or she can be a presenter in one conference and an attendee in another. A single person can have different identities in each client instance, so that John Smith may be known as "John" in one client instance and "Mr. Smith" in another. Two people might be using the same computer hardware alternately, and both can be participating in different conferences, or in the same conference as different conferees. The capture region of a presenter in one conference may include attendee displays from another, or this "chaining" feature may be prohibited by the system.

Another example of several clients running on one CPU occurs when several users are connected through terminals (e.g., X-terminals) to a host computer which is running the client software for each user.

If a user has a multiprocessor platform with several CPUs, then the system's client software might be configured to use two or more CPUs for the functions of a single client during a communications session.

Server Operation

This example of operation of the invention is based on sharing computer screen images; other stream types may be handled in a similar manner with similar logic, methods, and mechanisms. This is but one possible method of making the server.

At the server, a queue of data packets is maintained and is filled from an input filter and drained by output filters, one for each attendee client. The input filter and each output filter can run at its own speed. An output filter feeding a client connected over a slow network will not send every packet from the queue, but will skip over old information. This filtering process is complex, especially when the data packets represent changes from one image to the next (delta) which must be composited together in order to skip over delta blocks. This is the technique that allows the server to work with any speed network and mixed speed clients in the same meeting. The server data handling processes are described in more detail below.

The server also handles control messages, such as a request to join a meeting or a message from a client signaling that it is attempting to reconnect to a meeting after losing its connection; reconnection requests can also come from other servers when multiple servers are involved (multiple server situations are described in more detail below). The server accepts connection requests and verifies that the user of the client software is authorized to join the meeting. For each client connection, an icon and gong characterizing the user are sent to the server and then to all conferees by the server. If a non-presenting attendee desires to become the presenter, the attendee client software signals the server and a message or signal passed to the presenter client is conveyed to the presenter to indicate the other conferee's desire.

The server accepts system information from each client connection and notes the client's requirements (e.g., all images must be 256-color images) and capabilities (e.g., CPU speed, available hardware-assist for graphics, compression, DSP, Windows.®. DDB available). From the system information, the server assigns the client connection to an appropriate "output filter class" as explained below. During network communication with a client, the server may measure the network response and update the system information. As required, the server can move a client connection from class to class in response to changing network characteristics so as to keep the clients in a class closely matched.

A special class of output filter sends data to another server instead of a client. This server-to-server capability allows conferences to scale to very large numbers of users. More importantly, it allows for intelligent distribution of work over a network of servers. Unlike low-level data transport layers, such as packet routing using the Internet Protocol ("IP"), servers know the meaning of the data elements they are routing, so the routing can change based on the meaning of the data in the message. For example, if the server knows that data is a delta of a display update and the computing effort required to receive and process each delta is more than a particular client has, the server can decide to not route the data packet to the client or to route the data to the client via another computer (or another process on the server) which will perform some of the necessary processing for the client, in essence to "predigest" the data for a client that needs it. As an additional example, the server can read the time stamps in the data messages, and based on the demands and resources of the

19

clients, the network characteristics, and other information concerning the system, can decide to route the data by alternative or redundant routes through other servers.

Particulars of the Server Data Filtering Process

FIG. **8**A is a block diagram showing the flow of data in the server processes **100** used to intelligently filter and route one of the input data streams among those that the system may be transporting. As mentioned above, these data streams can be real-time shared-image conference data streams, other data streams which have similar transport and timing requirements, or arbitrary data streams. The example used here is the transport of a real-time shared-image conference data stream.

Generally, a data stream arrives at the server from a presenter client and is routed to each of the attendee clients. The complexity of the diagram is due to the fact that the server must accommodate many clients of differing capabilities. The data stream inputs from the presenter client are shown on the left in the form of a queue; four types of input stream for the example of the shared-image conference are shown, but in the preferred embodiment only one will be active at a time. Possible data stream outputs to attendee clients for the given input stream are shown on the right in the form of an editable queue.

The presenter client can dynamically change the format in which it provides data, based on the presenter client computer's capabilities, backlog, local network congestion, and information provided by the server. The data can arrive as uncompressed base blocks (raw data) on the stream labeled "ubase" if the presenter client decides not to send the differences and decides not to compress the data. If the presenter client decides, based on performance, network bandwidth, etc., to compress the data, it sends the data stream as compressed base blocks ("cbase"). The presenter client can also send the data stream as uncompressed difference (delta) blocks ("udiff") or as compressed delta blocks ("cdiff").

As each data block is received, it is time stamped by a time stamper **102** with either the true time of arrival or a later time of handling (used for when the conference is not a live conference, but is being played back). Time stamper **102** may also simply validate a time of sending stamped by the presenter client.

The data block is then fed to a server queue for that type of data block. The server queues are labeled "ubase" (for uncompressed base data), "qcbase" (for compressed base data), "qudiff" (for uncompressed delta data) and "qcdiff" (for compressed delta data). Since the presenter client provides data in only one data type (although it could provide all four data types, if the presenter had a fast machine, the server was a slow machine and the network between them had excess capacity), and the data type sent can change from time to time, filter **100** uses a queue filler **104** to fill all four queues using just the one data type provided by the presenter client. Of course, if filter **100** notes that none of the attendee clients need a particular data type, that data type can be ignored and its queue eliminated.

As shown in FIG. **8**A, the data type which is received can just be routed directly to the queue for that data type. If the received data type is uncompressed, the corresponding compressed queue is filled by running the received data blocks through a compressor **106**b (base data) or **106**d (delta data). If the received data type is compressed, the corresponding uncompressed queue is filled by running the received data blocks through a decompressor **108**b or **108**d. If the received data type is base data, delta blocks are generated by a delta block generator **110**, which records a previous base block and differences it with a current base block; it may also reference delta blocks that it creates and stores. Delta block generator

20

**110** is coupled to the ubase stream after decompressor **108**b so that delta block generator **110** receives the base data whether it is sent as ubase data or cbase data. Likewise, delta block generator **110** is coupled to the udiff stream before compressor **106**d so that both qudiff and qcdiff receive the benefit of delta block generator **110**.

For processing in the other direction, i.e., filling the base data queues having only delta data, queue filler **104** includes a compositor **112**. Compositor **112** gets its inputs from a base image frame store **114**, the udiff stream and the cdiff stream (after being uncompressed by decompressor **108**d or a separate decompressor **116**). Base image frame store **114** maintains the equivalent of the previous full base frame. As delta frames are received, they are differenced (or, more precisely, "undifferenced") with the contents of base frame image store **114** to generate uncompressed base data Because the output of compositor **112** is coupled to the ubase stream prior to compressor **106**b, the base frames output by compositor **112** can be used to fill the qcbase queue as well as the qubase queue. If the presenter client can switch from base data streaming to delta data streaming without sending an initial snapshot frame as delta data, compositor **112** should be coupled to the ubase stream and the cbase stream (or the output of decompressor **108**b). Of course, the delta queues might contain base data from time to time, such as when a "checkpoint" is done to prevent an error in delta data from being propagated indefinitely.

The data blocks in the (up to) four queues are stored in time stamp order, so they may be viewed as a single complex queue of a data type comprising multiple parallel block entries compressed or uncompressed, differenced or base. The output of this complex queue can be sent to attendee clients as is, but filter **100** includes several other output mechanisms to accommodate disparate attendee client types. Base frame image store **114** might also be a source of server output, such as when a client requests a full capture rectangle image. This might occur when an attendee client has lost its place, lost its network connection and reconnected, or is joining a conference for the first time.

Although the four output queues can be viewed as a single queue, ordered by the time stamps, there could be up to four different queue entries for each time-stamp value. A queue synchronizer **130** uses arbitration or prioritization techniques to settle any discrepancy between presenter client time stamps and server receipt time stamps.

The attendee clients are classified into one of three classes: Class 1 clients are fast clients on a fast network; Class 2 clients are slow clients on a fast network; Class 3 clients are clients on slow networks and/or slow clients which cannot process and/or receive the data required of Class 2 clients. Each attendee client is assigned to a class, on the basis of announced or measured characteristics of the client and its network connection. Reassignment can occur dynamically as the connection or client loading change, or when requested by the client. A monitor process (not shown) on the server monitors the activity of the output filters to shift attendee clients from class to class if the clients are either too fast or too slow for the class they are in. This is done dynamically, and the characteristics of all clients in a class as well as those in other classes are considered in balancing all classes.

Typically, Class 1 is used for fast attendee clients on a fast network. A Class 1 client receives all the data blocks, from one or more of the server queues. Because a Class 1 client receives all the blocks, the server need not track which blocks were sent to which clients. Some Class 1 clients will be able to decompress compressed base blocks as fast as they get

US 7,813,304 B2

21                                                                                      22

them, and will take the blocks from the qcbase queue. Other Class 1 clients will be able to handle every data block, but only if they are delta blocks.

Class 2 is used for fast network connections to slow machines, such as $386s$ connected to corporate LANs. A Class 2 client might not be able to process each block, even uncompressed blocks, in which case filter 100 will discard blocks. A block discarder 132 is provided in filter 100 to track which blocks have been discarded for which Class 2 clients. Class 2 clients are provided with base data types (ubase and cbase) and not the delta data types so that block discarder 132 can discard some blocks without any loss of critical information. There is a loss in frame rate when blocks are discarded, but that loss is not as critical as the loss of delta data blocks. In addition, the memory and time required to track dropping base blocks for each Class 2 client is much less than for tracking the discarding of delta blocks. To avoid slowing Class 2 service for all Class 2 clients to the speed of the slowest Class 2 client, one output of block discarder 132 is provided for each Class 2 client. Thus, a faster Class 2 client will experience a higher frame rate as it will receive more data blocks than a slower Class 2 client.

Class 3 is typically used for clients that cannot even handle delta data blocks on a regular basis because of network limitations or client processing limitations. Even though a client might be fast enough to handle uncompressing data blocks, if its network connection is not fast enough to send even the compressed data blocks, the client will be classed as a Class 3 client because not even every delta block can be sent to the client. So that the client can present a conference in substantially real-time if needed, delta blocks are composited by filter 100 so that multiple base and delta blocks can be, in effect, replaced by a single data block. To accommodate the differing needs of each Class 3 client, a separate queue is set up by filter 100 for each Class 3 client. As should be apparent, filter 100 has to do more work for a Class 3 client than for a Class 1 client, so it is to the server's benefit to upgrade clients as their speeds increase or their network connections improve.

Filter 100 maintains a "qmulti" queue for each Class 3 client. Three qmulti queues for three Class 3 clients are shown in FIG. 8A. A qmulti queue receives inputs from the qubase and qudiff queues. Where those two queues are not used, the qcbase and qcdiff queues are used instead, but are first uncompressed using decompressors 134b, 134d. The delta data blocks and a base block stored in a base image frame store 136 are composited by a base compositor 138 to form one composited base image from a base image and one or more delta images. A delta compositor 140 is used to form one composited delta image from a plurality of delta images. The output of base compositor 138 and delta compositor 140 are then fed through respective compressors 142b. 142d, resulting in four output data streams (ubase, cbase, udiff, cdiff) fed to a discarder 144 which discards data blocks which the attendee client for that qmulti queue cannot handle. If the particular attendee client does not need all four outputs (typically, any one client will use only one output), the processing for those unused queues within the qmulti queue can be skipped, since the queue only needs to service that client. As with base frame image store 114, base frame image store 136 can supply Class 3 clients with full frames upon request or as needed.

Discarder 144 drops blocks based on parameters about the network and client known to the server and to filter 100 as well as parameters and requests (e.g., "slow down," "speed up," or frame rate specifications) received from the client. The dropping of blocks is preferably done on a block-by-block basis, but it can also involve discarding all the blocks in the

presenter client's capture rectangle; the related issue of consistency is discussed below. If it turns out that more than one Class 3 client has the same requirements, all but one of the qmulti queues might be virtual queues. In effect, the processing for all the qmulti queues for those similar clients is done once, with each getting a copy of the results of that processing. For example, one multi-client qmulti queue might be handling a plurality of 386-class client machines running over a corporate ISDN line. Other qmulti queues might then supply other similar machines which are connected to the server by modem (e.g., 14.4 or 28.8 kilobyte data rates), LANs, T1 lines, etc. If any of these lumped Class 3 clients deviates from the common requirement, then its virtual qmulti queue would then become a real qmulti queue and would perform processing separate from the other queues. Among all Class 3 output queues, the various separate compositors 138, 140 may have different workloads from the fact that the number of delta blocks composited together and the number of blocks discarded will vary according to the capacity of the attendee clients serviced by the qmulti queue.

The use of more than one output class avoids a slow connection's retarding a fast connection. Filter 100 includes a buffer reclaimer 150 which examines the queues to determine if portions of the queue buffers have already been read by Class 1, Class 2, and fast Class 3 clients, and are not going to be used by slow Class 3 clients (they will be discarded). If that is the case, then buffer reclaimer 150 marks those locations in the queue buffers as reusable, to save on memory space.

The different output classes and the monitor processes on each data stream allow the server to handle data streams at different speeds for clients of different capabilities and network connections of different bandwidths. The streaming of update information formed into blocks improves the perception of low latency, but it may be desirable for some applications to reduce the mixture of blocks from different capture events that show on the attendee's screen at one time. The system can be set to provide this consistency by delaying the updating until a whole rectangle can be shown. One form of this adaptation can occur at the server, as shown by the example of FIG. 7B. There, a capture rectangle is broken into four blocks (1,2,3,4). The server maintains a consistency flag which can be either "off" or "on." If the consistency flag is off and the server receives data representing blocks 1A, 2A, 3A and 4A (taken at time A) from the presenter client and is able to send out blocks 1A and 2A, and in the meantime receives blocks 1B, 2B, 3B and 4B, the server will send out 3B as the next block, assuming that 3B is more updated than 3A so it is a better block to send out. However, if the consistency flag is on, the server sends the old blocks 3A and 4A anyway, so that the client can maintain a time-consistent display. Following 3A and 4A, the server sends blocks 1B-4B and so on. Clearly, consistency requires additional memory and produces added latency. This trade-off is decided upon between the server and the receiving clients, based on a variety of factors described above. If the network, the server and the client can easily handle consistency, then the consistency flag might be turned on, but where display updating happens quickly and there are other constraints on the system, the consistency flag might be turned off.

As described above, the server provides control of information flow to keep fast attendee clients supplied with updates as often as possible, and to avoid sending slow clients updates they cannot use or that will overburden their network connections. The server also provides flow control for presenter clients, as needed, by determining the fastest rate of updating required by attendee clients, and then signaling the presenter client to grab blocks no faster than the fastest con-

US 7,813,304 B2

23

sumer can demand them, so that the presenter will not have to waste resources collecting and processing data that no client can use or no network can afford to carry.

Storage Services

FIG. **8**B illustrates a more complex conference server which handles the more general case. The server in the general case might maintain additional output and additional input queue components for transmitting information to other servers and for storage services, including caching, short-term storing, recording, and archiving, and for later playback. These purposes are distinguished as follows: caching provides fast memory hardware support in improving the performance of the server; short-term storage provides backup and refresh capability for extremely slow or temporarily disconnected clients, for newly connected servers that may need information older than that normally held in the output queue, for quick-turnaround failure recovery, and for other short-term needs; conference sessions are recorded when they are primarily intended for later viewing by users of the system who may or may not be participating in the session; an archival session captures all or part of a meeting as it occurs and is intended for users who typically were conferees in that session and have a reason to review the session later. Uses of recorded sessions, especially when they incorporate synchronized voice, include live online training sessions that also serve for future offline training, technical and marketing demonstrations, and formal presentations that can be broadcast or accessed remotely at will. Archived sessions have uses other than review, including briefing absentees, capturing interactions involving or aiding technical support, evaluating sales personnel, and the like. Of course, these needs and characterizations are not exclusive or exhaustive.

Possible features and methods for storage handling will now be listed. The emphasis will be on recording and archiving, but shorter term storage modes will share many of these characteristics.

During any session, there can be multiple "storage server" queues, or "storage streams," saving output to one or more media. These can be controlled by the server itself, by recorder-like interfaces (similar to a video cassette recorder, or "VCR") at the clients, or by other interfaces operated by conferees. Each stream can be independently controlled, or one controller can control multiple storage streams. The storage facility can operate concurrently in an ongoing meeting to record a live conference, or it can be used by itself to capture a recording for later replay.

It is possible to control who just records a meeting, how much data they can record (by time or by disk capacity, for example); the type of information they can record (by stream, by user sets, or the like), the storage medium (disk, tape, etc.), and when recording starts. Recording might be set to automatically start when a certain user corrects, when the first connection is made, when a certain number of conferees are connected, when the first person presents, when a particular person presents, at a particular (real) time, after a particular duration from the beginning of the meeting, or because of some other triggering event. It is also possible to control the end of recording, based on similar triggering events or triggers related to capacity, elapsed time, etc. The controlling can be done by a conferee at a particular client, by a moderator, or the like.

Possible storage targets include local disk files, local database servers or back-ends, remote database servers or back-ends, remote storage engines relying on the data structures, controls, and methods of the system of the present invention (example system architectures are described below), and local or remote permanent storage media (optical, magnetic,

24

magneto-optical, etc.). Permanent storage can also be used by the system to assist recovery from disaster. The storage stream could also be directed to an email message or to another computer application within the system of the present invention or beyond it.

It is possible to control the quality of storage input and playback output. Each storage stream can have an associated quality parameter associated with it so that it behaves as though connected at a particular network speed. Thus a stream might be stored or a playback stream might be produced that was suitable only for replay at a given speed. Or several playback streams could be simultaneously produced from the same stored information for several different particular playback rates. If most or all of the original session data is stored, then replay might perform the same adaptive filtering described in FIG. **8**A for real-time "live" meetings, so that the single storage source could be played back at multiple, adaptive rates.

Since there would be added value in being able to access recorded information, it is appropriate to describe how billing controls might be incorporated. Billing could be performed when the original recording is made, or when a recording is played back. Billing might be based on units of time used or on units of storage consumed, at the time of recording or at the time of replay. Billing for recording and playing may be independent. Any tracking that needs to be made to implement the billing functions can be incorporated into the storage and playback services of the communications system.

It is possible to tailor the data stored. Since a conference typically involves multiple data streams, one or more may be chosen for storing. Some streams might go to one storage device or modality as described above, others might go to different ones. Synchronization between streams (e.g., voice and imagery) can be maintained, even when the streams are stored in different places and ways.

Stored information can be replayed through another communications session established by the system according to the present invention, or it can be sent through other communications channels, for example, email, file transfer protocol ("FTP"), or physical media transfer by postal or courier services, etc., and replayed by the recipient using the client software according to the present invention. Stored material might be replayed from a copy local to the user's computer, or it might be retrieved after WWW navigation to a replay-enabled Web site. Retrieval might involve streaming the data in the ways described above, or transferring the data by email, FTP, WWW download, or the like. With Web based retrieval, support could be provided for browsing by content, searching by user-defined keys, controlling access by user-provided keys, access lists, privilege levels, or user-provided payment options (e.g., credit card number on file).

Control modes on replay might include: control by server without user interaction for a single data stream (like a pay-per-view movie in which each attendee who joins gets to see the playback forward from the from the point of joining); control by the server, without interaction but with multiple streams (e.g., all attendees get to see the movie from the beginning regardless of when they join the show); by an external moderator; by VCR-style controls at one or more client computers. Each set of controls can affect either all the sets of streams or a particular grouping of streams. Replay can occur at the original real-time recording rate, at faster-than-real-time (like fast forward play on VCRs), in VCR-style single stepping modes, and in the various reverse modes as well. Random access and jump playback by index marking, by time codes, by presenter, or by other organization could be supported.

25    26

In addition to the stored meeting contents, any other document or data object might be uploaded and stored with the meeting (e.g., meeting agenda, minutes of a previous meeting, or supporting materials). Upload is another type of data stream that passes into the system server and is then relayed to a suitable storage entity residing on the same or a different host. Attachments can be retrieved either with specialized functions of the client software, by navigating Web pages and using a Web browser, or by other retrieval mechanism. Attachments are subject to all of the same controls as the recorded meeting contents with regard to access, billing, playback, etc.

The above-described elements of the more generalized conference server concepts are illustrated in FIG. **8**B. In addition to the instances of the simple output filter processes **100**, the more complex server functions shown in FIG. **8**B includes inputs for different sources, such as other servers (where the complex server shown might be an intermediate server for a large broadcast), storage sites for replay and import channels, and outputs to other intermediate servers, storage sites, and export channels.

Multiple Servers

Up to this point, the conference server has generally been referred to as a single computer running conferencing software. The server functions described so far may be performed on several different computers running conference server software connected over a computer network. FIG. **9**A shows a configuration with four conference servers **14**(a)-(d), one presenter client **12**, and eleven attendee clients **18** (some of which are separately identified with letters). Three conferee **18** clients are connected to each server. The four servers are completely connected, that is, a connection is shown between each pair of servers. With many servers, this degree of interconnection would be unrealistically complex, expensive, unneeded, and performance degrading. One of many useful techniques, a "tree topology," for interconnecting numerous servers is described below.

There are three classes of advantages from having several servers active in a given conference.

Static advantages result from a configuration and division of tasks that may persist throughout the conferencing session. The following are among these advantages.

(WAN economy and local performance) A conferee may find economy in being able to connect to a nearby server—where nearby may mean geographic closeness, or in the same network service area, or on the same local area network, or the like. Thus in FIG. **9**A, attendee client **18**(a) may find it cheaper to connect to server **14**(a) than to server **14**(c), while in turn client **18**(c) may find it cheaper to connect to server **14**(c) than to server **14**(a). At the same time, there may be better performance of the system with these local connections compared with a longer path with many hops to a more distant server.

(Client migration and homogeneous concentration) The advantage of having all of a server's attendee clients be the same and additionally of having them be the same as the presenter client has been discussed. There can be an advantage then of assigning similar clients to a single server when several servers are available and performance is not otherwise degraded. For example, in FIG. **9**B, attendee clients **18**(c) and **18**(d) are identically configured computers running the same operating systems with the same display configurations as the presenter client **12**, so both have been moved from their original servers (indicated by dotted arrows) and reassigned to server **14**(a), as designated by the dashed arrows. The same advantage may also be found when clients of a server are in the same output class (as discussed above under the single

server); thus, reassignment of clients in a given class so that one or more servers have all or most of their clients in that class can improve performance by making those servers' processing loads more uniform. Finally, as described under the discussion of WAN economy and FIG. **9**A, homogeneity may also involve nearness, and for this reason client reassignment may achieve that goal as well. In addition to reassigning clients to servers already participating in the conferencing session as above, it is also possible for the system to recruit additional servers where these resources are provided but not yet assigned to the particular meeting. Thus, server **14**(b) may be automatically connected to the server-server structure for the meeting pictured in FIG. **9**B in order to provide connections for the three clients **18**(b).

(Tree branching for load reduction and scalability) In FIG. **10**A, a tree topological configuration can provide economy in traffic handling and improved performance. Information from presenter client **12** is communicated to server **14**(a) and then to the other servers and on to attendee clients **18**, following the solid arrows. In this configuration, each server is shown handling four data connections of a single stream type; a single server would have to handle twenty-eight data connections to connect the presenter client to all the attendee clients. If attendee client **18**(a) issues a command or request to server **14**(a), represented by the dotted arrow, the message will be responded to by server **14**(c) or passed to server **14**(b), and handled there or in turn passed to server **14**(a), with these two paths also shown with dotted arrows. This means although some commands or requests may need to be seen by three servers, each server will see and process only a fraction of the total such messages. Just as the tree configuration allows a given number of conferees to hold a meeting more efficiently than with a single conference server, it also means that relatively few extra servers need to be added to expand the meeting and maintain the tree configuration. For example, if R+1 is the number of data connections per server, and ceiling(x) is the smallest integer greater than or equal to a real number x, then the number of servers S is required to hold a conference with C conferees, assuming one presenter and using the tree configuration, is (R{circumflex over ( )}ceiling (log.sub.R(C−1))−1)/(R−1). In particular, using R=3, which is the value in FIG. **10**A, forty servers will suffice for eighty-two clients. More realistically, if R=100, then 10,101 servers win provide the advantages of the tree configuration to a presenter and one million attendees. This takes only 101 extra servers over what would be required if the presenter client were directly connected to 10,000 servers, each of which served **100** clients. But the latter configuration, exemplified by FIG. **10**B with R=3 and C=28, is not realistic, since presenter client **12** would be deluged with independent commands or requests to update, or resend, or similar messages; in other words, the presenter client would have traffic in excess of the capacity of any server **14**. Based on distributing the server functions over many machines, and employing this tree topology for propagating information among servers, server-to-server communications and management provided by the present invention allow the number of participants in a meeting to increase exponentially with only linear degradation of the performance. Similar analysis applies if server capacities are not uniform, that is, if different servers can handle different numbers of data connections.

Adaptive advantages result from reconfiguration and redistribution of tasks in response to relatively long-term changes in the system during the conference session.

(Backup server) If a server fails or becomes isolated from the network, then its clients may be connected over previously inactive backup links to other servers. Attempts can be

US 7,813,304 B2

27                                          28

made to reestablish communication with a server that has dropped out. If unsuccessful, its workload may be distributed to other servers. In FIG. 9C, attendee client 18(c) has conference server 14(c) as its principal server, but the dashed arrow indicates the assignment of server 14(a) as a backup server. Should the connection between client 18(c) and server 14(c) fail, as indicated by the "X" on the arrow between them, or should server 14(c) fail or become isolated from the net, then server 14(a) can respond to commands from and provide updates to client 18(c). Presenter clients and servers themselves can be assigned backup servers as well. Thus the dashed arrow between servers 14(a) and 14(d) indicates that each has been assigned as a backup for the other. Should the link between servers 14(a) and 14(b) fail, as indicated by the "X" on the arrow between them, or server 14(b) fail or become isolated from the net, then server 14(d) can take over traffic previously routed to server 14(a). It is also possible to have servers ready, but not active, as backups, or to have mirroring servers for even more secure redundancy. Since the state of the conference can be announced to all servers, the system may be configured so that a disrupted conference session can be robustly resumed with minimal loss of data and time.

(Transformation factoring) The transformations or transcodings that a block may undergo in transit from the presenter client to an attendee client may include differencing, error-correction encoding or decoding ("source coding"), compression or decompression (both for "channel coding", or just one for purposes of bandwidth matching; lossy or lossless), encryption or decryption ("privacy, security, or authentication coding"), compositing with other differences or with base blocks, conversion from DDB to DIB and back, storing, replaying, copying, or the like. Editing, mixing, data from different sources or presenters, mixing data of different kinds, duplicating, changing the order, the format, the storage or playback quality, etc., are other examples of transformations, which are neither exclusive nor exhaustive. Some or all of these may be performed and the order of performing them may change. As previously discussed, some may be performed by a conferee client, some by a conference server. When several servers are available or when several clients have different capabilities and resources, these functions may be delegated or migrated to different machines. For example, in FIG. 9D presenter client 12 is differencing, conference server 14(a) is compressing, server 14(b) is distributing the decompression task to attendee client 18(b) (which has decompression hardware), server 14(d) is compositing the resulting delta block with a previous delta block, and attendee client 18(d) is compositing the result with an old base block. This advantage is viewed as adaptive, since the loading configuration that makes a particular distribution favorable may change slowly during the conference session, but it could be a static advantage when some machines have much greater capabilities than others (such as compression or decompression hardware).

(Distributed and redundant flow control) The architecture and logic of the filter process as described above and illustrated in FIGS. 8A,B may be distributed among several servers and even clients. Thus, like the functional transformations, portions of the queues themselves, as well as the internal operations of the filtering process, may be found on different platforms at different localities in the network, and at different times. Not only may the information and functionality be so distributed to improve memory economy or gain memory or processing speed, but the system can be made more robust by redundant storage, and more responsive by parallelizing the pipeline. The queues may also be segmented

sequentially over several platforms. These different aspects are shown in FIG. 9E. Here, qcdiff is stored redundantly on servers 14(a) and 14(b); on server 14(a), qcdiff uses the special compression facilities provided by an attached hardware device 15. One card of qmulti is stored on client 18(c) (perhaps a machine with very fast reliable surplus memory) while the rest are on server 14(c). While qcbase is housed on server 14(b) using a compression codec (possibly hardware based) on client 18(b), it operates in parallel with qubase on server 14(d), which uses a discarder on client 18(d) (there is additional undiagrammed parallelism implicit in having portions of the output queue on all four servers). Finally, qudiff is segmented sequentially with the first part (qudiff.beg) on server 14(c) and the last part (qudiff.end) on server 14(d). Note that in the last case, the two segments of qudiff are not even adjacent in the network linkage shown. Another type of distribution of the queues is given in FIG. 9F. Assuming the presenter client breaks the capture rectangle into four blocks B1, B2, B3, B4, it illustrates, using just qubase, how the stream data can be decomposed and distributed over all four conference servers 14(a–d), so that the subqueue qubase.B1 of uncompressed blocks B1 are on server 14(a), the subqueue qubase.B2 of uncompressed blocks B2 are on server 14(b), etc.; this represents another form of parallelism. These are simple examples; there are more complex analogues when there are more servers, and all of them may occur in various combinations. The various techniques of RAID (Redundant Array of Inexpensive Disks) striping with recovery from errors are also applicable. All of the distribution schemes mentioned here may also vary over time.

These are specifically adaptive advantages, but the static advantages also have parallels here, since a backup server may also be close, since a change in presenter may warrant a new tree configuration, and since an output class change may warrant a new homogeneous concentration reassignment.

Dynamic advantages result from reconfiguration and redistribution of tasks in response to relatively short term changes in the system during the conferencing session. The following are among the dynamic advantages.

(Content-based routing) Unlike IP routing for example, the system has access to the contents of the information being routed. Thus it can read the time stamps, type of data, and other information included in the base or delta block data or other system data. It can use this together with measured properties of the network interconnections of the servers and clients to determine best-estimate optimal routing between and through its components. In FIG. 9G, one route from presenter client 12 to attendee client 18(d) (through server 14(b)) is shown in double arrows, another (through server 14(d)) in heavy arrows, to illustrate that one route may be preferable under some conditions, but as conditions change, the system may select a different route.

(Redundant routing) The system can send image or other data by several routes at once. This can improve performance, since the earliest to arrive at the destination may trigger the discard of later-arriving data This can improve the resiliency and robustness of the system, since it is more likely some data will get to the destination. It can also improve reliability or accuracy, since several versions may be compared at the destination to see if they are identical. In case of discrepant data at the destination, retransmission or some arbitration method can be requested, depending on the purpose of the redundant attempts to insure delivery. For example, again in FIG. 9G, information from presenter client 12 may be sent by conference server 14(a) using both routes, indicated by the double arrows and the heavy arrows, to server 14(d) and then to attendee client 18(d).

29

30

These are specifically dynamic advantages, but the static and adaptive advantages also have parallels here as well. This can be summarized in an additional dynamic advantage.

(Dynamic reconfiguration) Any of the configurations described above and the parameters determining them and the routing schemes can be altered depending on changes in client, server, and network capabilities, needs, resources, and loads as announced or demanded by clients, or as measured by the system, or as specified by conferees or system administrators, or other prevailing or desired conditions.

Any combination of advantages from these three groups may apply. There will in general be tradeoffs among these advantages. The system can be given specific configuration preferences, or it can automatically adjust during use according to preset optimization goals, or it can adaptively set optimization goals and adjust the configuration to approach them.

Example of Server Architecture

So far, a server or each of a set of servers operating together has been viewed as a computer performing the server functions described. An example of server architecture and use will now be given, without suggesting the necessity for, or the exclusiveness of, this architecture to accomplish the communications serving functions on single or multiple and interconnected servers described above. Also, the previous examples have dealt with a single conferencing meeting or other communications session; the method to be described below can also accommodate several meetings on the same underlying hardware and the conferencing software as provided by the present invention. Again, the description of this method is not intended to suggest that this is the only way in which the invention can accomplish multiple simultaneous communications sessions. Any references to the image-sharing example should be extended to arbitrary data streams.

FIG. 11 shows an architecture of a single server and a single meeting. The primary component of this architecture is a server manager 36 (identified in this diagram as "ServMgr 'InfoPass'"), which is directed by a meeting manager 32 (identified in this diagram as "MeetMgr 'TheCompany'"). Meeting manager 32 is an unowned, quiescent, resident, interrupt-driven process (similar to a "daemon" process used with Unix and other operating systems). It may or may not be running on the same CPU as WWW server 30(a); it may or may not be running on the same CPU 38 (called here "Beowulf") as server manager 36 "InfoPass." The server manager is also an unowned, quiescent, resident, interrupt-driven process. Each CPU that is involved in the system for providing server functions in meetings set up by a meeting manager has exactly one server manager running on it; that server manager can be viewed as the meeting manager's agent on that CPU. The meeting is directly supervised by a communications session server ("CSS") 40(a), called here "Meeting #1 'Product Support.'" When server manager 36 receives a command from meeting manager 32 that includes the information on a meeting and on the first conferee that wishes to connect, the server manager creates a CSS to handle the meeting. The CSS is an owned, evanescent, quiescent, interrupt-driven process. The CSS is owned by the server manager and is killed a period of time after all the conferee clients connected to its meeting disconnect or fail to respond.

In FIG. 11 there are three conferee clients 17(a)-(c) connected to the meeting. Clients 17(a), (b) use a client-server protocol provided by the system, which might be a combination of Transmission Control Protocol ("TCP") and User Datagram Protocol ("UDP"), for example. Client 17(c) uses another protocol, here exemplified as Hypertext Transfer Protocol ("HTTP"). The CSS 40(a) provides an included "gateway" layer 40(b) for each connection protocol other than the

system protocol, and this layer translates the client's nonsystem protocol to the system protocol. The acceptance of different protocols may aid the system's operation across firewalls or adaptation to clients' restricted network connections, for example.

A potential conferee 17(a) has navigated his or her WWW browser to Web server 30(a), and has asked through the Web page presented to connect to the meeting (as described above in the discussion of FIG. 2). There may be alternative ways, indicated here as 30(b),(c), to connect to the meeting, including direct access to the meeting manager or its database 34 (called here "Meeting DB"). The meeting manager uses this database to hold information concerning the meeting (the database need not be on the same computer as the meeting manager). This information was created when the person who set up the meeting requested that the meeting be scheduled, gave descriptive information for the meeting, specified the keys and privileges, and provided other administrative information. The database is reconfigurable and easily extensible to include many and varied meeting attributes. It may be accessed by a programming interface. Potential new conferee client 17(a) sends a request to join the meeting, and then supplies the key for the meeting that the potential conferee has obtained previously. Potential client 17(a) may also send previously selected identification information such as icon, gong, etc., and this may be stored in Meeting DB or in some other sort of directory service. After the meeting manager has validated potential client 17(a), it sends a message that causes the client software to run on the potential client and then sends that client software the address information for the CSS, such as a URL and port number. At that time, the client software may also receive address information for backup CSSs in case the connection to the meeting fails and automatic or manual attempts to reconnect to the initial CSS fail as well. The client then connects to the meeting, and may pass to the CSS its identification information.

A CSS is created to supervise a single meeting. The monitoring-filtering-queuing structures and procedures of FIGS. 8A,B are performed by the CSS, so FIGS. 8A,B could be viewed as part of the internal working of each CSS in FIGS. 11-22 (in the case of distributed server functions described in FIGS. 9D-F, only part of FIGS. 8A,B might be descriptive of a particular CSS). Indeed, there will be a version of FIG. 8A applying to each data stream the CSS handles as multipoint real-time traffic from a presenter client. The structure of FIG. 8B shows schematically how these and other multiple input and output data streams are processed. The CSS also handles other input from and output to clients, such as information about attendee and presenter clients that helps with flow control, commands or requests from clients, labeled pointer icon positions, and other stream data and control traffic.

In FIG. 11, a dot-and-dash line 14 has been drawn around the structure that corresponds to the term "server" in the earlier parts of the description of the present invention; this may be a helpful analogy, but the description of the example here is only one possible explication of server functions.

FIG. 12 shows a slightly more complex situation than FIG. 11. Here, the server manager has created three CSSs to supervise three meetings. Conferee client 17(a) (labeled here "Jim") is simultaneously connected to two meetings. If Jim is permitted, he can share the information he receives from one meeting with the participants in the other.

Server managers are responsible for measuring network connection bandwidth, reliability, CPU load, and other parameters, and determining the configuration of any and all CSSs they may own at any given time based on these measurements and other considerations.

US 7,813,304 B2

**31**

FIG. **13** shows a more complex arrangement than FIG. **12**. Now, there are two CPUs, **38**(*a*) and **38**(*b*); each has its own server manager, but both are directed by the same meeting manager. Server manager #1 **36**(*a*) has created two CSSs to handle two meetings, and server manager #2 **36**(*b*) has created a single CSS. Conferee client **17**(*a*) is now connected to two meetings on two different CPUs, possibly distant from each other.

FIG. **14** exemplifies the situation when there are several meeting managers by showing two meeting managers **32**(*a*), (*b*) active. Each has its own meeting database **34**(*a*),(*b*). Each directs the server manager **36**(*a*),(*b*) on a single CPU **38**(*a,b*). Server manager **36**(*a*) has created two CSSs **40**(*a*),(*b*) to handle two meetings. The other server manager **36**(*b*) has created a single CSS **40**(*c*). The only connection pictured between these two instances of the system is the presence of client **17**(*a*) "Jim" in two meetings, one in each instance of the system.

If a need arises to let a second meeting manager set up meetings on a CPU that already has a server manager managed by a meeting manager, then the currently running server manager forks or clones itself and the new server manager becomes the agent for the newly involved meeting manager. Thus, there is a one-to-one correspondence between server managers running on a given CPU and meeting managers that set up meetings on that CPU. As an illustration, in Panel **1** of FIG. **15**, meeting manager **32**(*b*) sends a message to server manager **36**(*a*) on CPU **38** that causes server manager **36**(*b*) to be created. Then afterward, in Panel **2**, meeting manager **32**(*b*) and server manager **36**(*b*) start the meeting through the new CSS **40**(*b*). Conferee "Jim" **17**(*a*) has joined both meetings, but there need be no other relationship between the two meetings shown. In the situations below, there will be no difference if server managers for different meeting managers are on the same CPU or on different CPUs.

FIG. **16** shows a single server manager **36** that has created three CSSs **40**(*a*)–(*c*) on one CPU **38**, but now these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on the same CPU if process limitations were exceeded by a great number of client connections and their requirements, or the like. In order to coordinate their work, the three CSSs communicate using a system-provided server-server protocol. This protocol may use the same sort of blend of networking protocols as described for the client-server connection, or it may be quite different. For diagrammatic purposes, FIGS. **16**-**20** show interprocess communication links only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between CSSs **40**(*a*) and **40**(*c*) in FIG. **16**. This interprocess communication allows one CSS to send presenter client output to another, for example; this was described above in the discussion of FIG. **8**A. More detail on this is given below in the discussion of FIGS. **21** and **22**. Conferee client **17**(*a*) "Jim" is known to two CSSs **40**(*b*),(*c*), but is actively connected only to CSS #**3** **40**(*c*). The connection to CSS #**2** **40**(*b*) is a backup assignment (as described above in the discussion of FIG. **9**C). Should CSS #**3** fail, then "Jim" can automatically be connected to the meeting through CSS #**2**.

FIG. **17** shows a single meeting manager that directs two server managers **36**(*a,b*) that have created three CSSs **40**(*a, b,c*) on two CPUs **38**(*a,b*), and these CSSs all handle the same meeting (called "Meeting #3 'Sales'"). The same meeting might require additional CSSs on additional CPUs if the CPUs were distant from each other, and closer to their respective sets of connected clients, or if process limitations were exceeded by a great number of client connections and their

**32**

requirements, or the like. The advantages described in the discussion of FIGS. 9A-G, 10A, B provide numerous reasons for multiple servers (which in this context means multiple CSSs) that handle the same meeting and that may be distributed over a number of CPUs. As in FIG. **16**, the three CSSs communicate using a system-provided server-server protocol. In addition, the two server managers communicate using this or a similar protocol in order to coordinate the full span of this meeting. They exchange the performance measurements they make in order to adaptively configure the CSSs. For example, conferee client **17**(*a*) "Jim" begins the meeting connected to CSS #**2**. At some point, the server managers determine that it is likely that better service will be obtained by "migrating" this connection from CSS #**2** **40**(*b*) to CSS #**3** **40**(*c*) and so from CPU **38**(*a*) to CPU **38**(*b*) (as described above in the discussion of FIG. **9**B). This reconnection may be performed automatically. Moreover, the creation of CSS #**3** to handle this meeting and the interprocess communication channels between CSSs and between server managers may be established automatically to improve performance and balance loads (as further described above in the discussion of FIG. **9**B). The creation of additional CSSs, on the same machine or on different machines, to handle the same meeting is the basis of the scalability of the present invention.

It is possible for several meeting managers to each direct a server manager that has created one or more CSSs, and these CSSs all handle the same meeting. This is pictured in FIG. **18** with two meeting managers **32**(*a*),(*b*) and their respective databases **34**(*a*),(*b*). This could be the situation if two different companies own the meeting managers and might wish to hold a joint meeting (here called "Meeting #4 'Joint Sales'"). The user or administrator that sets up such a multiply managed meeting may manually declare the organization of the management (e.g., the meeting managers involved, the CPUs, the number of CSSs, and other structural, organizational, managerial parameters), or the setup may be done automatically by the system, or it may be done interactively with automated support. Here meeting managers **32**(*a*),(*b*) also communicate using the system-provided server-server protocol. They exchange the meeting information, so that their two databases **34**(*a*),(*b*) are consistent. They also exchange messages that indicate that this is to be a joint meeting, and they inform their server managers of this. Potential conferees join through either meeting manager. The appearance of the meeting may be the same for all conferees, independent of the number of CSSs, server managers, CPUs, or meeting managers involved. Again, conferee client **17**(*a*) "Jim" may be either backed up or migrated to another CSS (from **40**(*c*) to **40**(*b*)), even when the new CSS is on a CPU in the domain of a different meeting manager (from CPU **38**(*b*) in the domain of meeting manager **32**(*b*) to CPU **38**(*a*) in the domain of meeting manager **32**(*a*)).

FIG. **19** extends the situation of FIG. **18**. The two meeting managers are shown directing their server managers in a joint meeting. This time, server manager **36**(*c*) has created two CSSs **40**(*c*),(*d*) for the meeting on the same CPU **38**(*c*), and meeting manager **32**(*a*) has directed two server managers **36**(*a*),(*b*) to create CSSs **40**(*a*),(*b*) for the meeting on two different CPUs **38**(*a*),(*b*). Thus this is a combination of the situations pictured in FIGS. **16**-**18**. Again, for diagrammatic purposes, FIGS. **19** and **20** show interprocess communication links among server managers only between nearest neighbors; this is not meant to indicate that there are not other directly established links, say between server managers **36**(*a*) and **36**(*c*) in FIG. **19**. As before, conferee client **17**(*a*) "Jim"

US 7,813,304 B2

33

34

may be either backed up or migrated to another. CSS **40**(*b*), even when the new CSS is in the domain of a different meeting manager.

If a CSS fails, the server manager process may create a new CSS, the clients may be migrated to other CSSs already active on the same CPU, or clients may be migrated to other CSSs newly created or already handling the meeting at other locations in the system, as indicated above. If a CPU fails or becomes isolated from the network or system, the meeting manager process can attempt to reestablish network connection with the CPU and send the server manager information to create a CSS to handle the meeting, or the meeting manager can communicate with one or more server managers on still accessible CPUs to create one or more CSSs to handle the meeting. In addition clients that have backup connections beyond the failed CPU can be migrated to CSSs handling the meeting. If there are several meeting managers participating in the management of a meeting, and a meeting manager becomes disabled or isolated from the network, then another meeting manger may attempt to establish sufficiently many CSSs through server managers it can reach to carry the workload. These adaptations may occur automatically, or be initiated by a system administrator.

The diagrams in FIGS. **11-19** suggest the range of variability in coordinating meetings and server functions. Many other combinations can be formed from the situations pictured there or may be suggested by them. For example, if a global directory service for meetings is provided, then there could even be a layer of management above the meeting managers, which might be termed a Global Manager.

FIG. **20** illustrates a method for determining which CSSs pass output information to other CSSs that are handling the same meeting. The configuration of meeting managers, server managers and CSSs is the same as in FIG. **19**, except that one client **12** is presenting, the others **18** are attending, and no backup link is shown. From time to time, the server managers determine and agree on appropriate propagation topologies that resemble a tree or trees (trees and their advantages were described above in the discussion of FIGS. **10**A, B) and post a copy **42** of the current choice at each of their CSSs. These are directed acyclic graphs ("DAGs"), which contain no loops, so that the CSS can send out the information with no risk of endlessly cycling it. Each stream being handled has its own propagation DAG, and they may change independently among streams; as described below, each stream may have several propagation DAGs. In FIG. **20**, presenter client **12** is viewed as the root of the tree, and CSS #**1** delivers presenter output information to CSS #**2** and to CSS #**3**; in turn, CSS #**3** delivers that information to CSS #**4**; all CSSs also deliver the information to their connected attendee clients **18**.

FIG. **21** represents the situation of FIG. **20** with the topological information of the directed graph **42** emphasized by rearranging the CSSs to resemble the tree specified in the propagation DAG **42** of FIG. **20**.

FIG. **22** represents the situation of FIG. **20** with the same topological information **42**(*a*) emphasized in FIG. **21** and with the addition of another possible propagation topology **42**(*b*) for the same stream. Secondary and multiple propagation DAGs for the same data stream allow the system to reroute the information being sent or to send it redundantly (both as described above in the discussion of FIG. **9**G).

The foregoing suggests that minimal server platform needs for this example would be a network connection and an operating system providing an interrupt service and multitasking, with or without hardware support.

System Extensions and Extendibility

Up to this point, there have been multiple servers dealing with multiple clients, where "client" has referred to an enduser's computer or an instance of the conferencing software running on it. But it may happen that the reconfigurations, transformations, and routings performed by a server or servers described above extend to assigning tasks to intermediate devices such as routers, bridges, gateways, modems, hardware codecs, and the like. There may be also be cases where a client lacks display capabilities, but provides other functions to the system or acts as a monitor or recorder of activity. There may be configurations where all server functions are performed on client computers, so there is no specified server node in the networked system. In the preferred embodiment, performance may require that there be one CSS per CPU.

Both the server and client software architectures are adaptable. Not only may features be added on that increase the variety of communication possible, such as text chat, audio, and shared drawing areas, but proprietary codecs, transformations, stream operators, and the like may be incorporated as plug-in modules. Addition of streams of abstract data types can be accommodated by the system and in turn allow the system to be expanded and reconfigured.

When operating with data streams that admit asynchronous unnotified updating (where intermediate updates can be dropped if they are made obsolete by later arriving data updates), which are those that are appropriate for multispeeding, the system is robust under occasional loss of information and can thus take advantage of high-speed networking protocols like User Datagram Protocol ("UDP") that do not provide reliable transmission but provide greater network throughput performance than reliable protocols. The system can also be configured to provide secure transport for a data stream, and so could be used to carry the display command streams on which are based other image-sharing systems, but then there would be advantage from multispeeding, although the scalability and other advantages of the present invention would be available.

Codecs, transformations, and transcodings described above for the image-sharing example may have analogues that play similar roles with similar advantages in the system's handling of other data streams. It is also recognized that there are other cases of transcoding from one type of data to another, such as text to page image via rasterization, page image to text via optical character recognition, text to speech via speech synthesis, and speech to text via speech recognition. Such tasks may involve transformations in different orders than described above, including decompression at the presenter client and compression at the attendee client. These possibilities are accommodated by the present invention.

The system contains no obstructions to operating across firewalls with permissions. The system is compatible with agents, network proxies, and other stand-in entities, with a variety of network context and content filters, with multiple network protocols for client connections, with bandwidth matching transcoders, with hybrid wireless and land based networks, with asymmetric networks, with clustered CPU networks, with streaming multimedia and signal processing systems, with serial, parallel, and vector processors, and with many other specialized technologies; properly configured and supplied with appropriate permissions, the system either operates transparently with them or enjoys increased performance by employing and extending their advantages. Faster processor speed and greater bandwidth do not obviate the utility of the present invention; instead, they improve its performance.

US 7,813,304 B2

35

As mentioned before, the described communications system not only applies to the transport of streams of image data, and to other examples mentioned, but also generally applies to the transport, storing, replaying, scheduling, multispeeding, and other handling and processing of other data streams as well.

One way of seeing the flexibility of the system is to refer to FIG. 23, where several applications covering different separations in time and space for the communicants are listed.

The above description is illustrative and not restrictive. Many variations of the invention will become apparent to those of skill in the art upon review of this disclosure. The scope of the invention should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

**1**. A conferencing system comprising:

a conference server; and

at least one client coupled to the conference server by way of at least one network connection, the at least one client including a web browser, wherein the conference server provides conferencing data to the at least one client via the at least one network connection after a client-server connection is established in response to the web browser at the at least one client having been navigated to a Uniform Resource Locator (URL) associated with a conference, and one or more characteristics of the provided conferencing data are based on current capabilities of the at least one client, the current capabilities validated in real time after establishing the client-server connection but prior to the at least one client joining the conference.

**2**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is the size of at least part of the conferencing data.

**3**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is the source of at least part of the conferencing data.

**4**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is the rate of reception of at least part of the conferencing data.

**5**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is the hardware involved in processing at least part of the conferencing data.

**6**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is at least one modification to a conference environment originated by the server.

**7**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a quantity of reception of at least part of the conferencing data.

**8**. The conferencing system of claim **1**, wherein the at least one client is configured to negotiate with the conference server as to the current capabilities of the at least one client after establishing the client-server connection but prior to the at least one client joining the conference.

**9**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is contents of the conferencing data.

**10**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is information about at least part of the conferencing data.

**11**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a destination of at least part of the conferencing data.

36

**12**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a rate of transmission of at least part of the conferencing data.

**13**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is software involved in processing at least part of the conferencing data.

**14**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a protocol used in processing at least part of the conferencing data.

**15**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a modification to a conference environment originated by at least one client.

**16**. The conferencing system of claim **1**, wherein one characteristic of the provided conferencing data is a quantity of transmission of at least part of the conferencing data.

**17**. A method for conferencing between a server and at least one client in a conferencing system, the method comprising:

establishing a network connection between the server and the at least one client, the network connection established via a web browser at the at least one client having been navigated to a Uniform Resource Locator (URL) associated with a conference;

determining one or more characteristics of conferencing data for delivery during the conference, the determination based on current capabilities of the at least one client validated in real time after establishing the client-server connection but prior to the at least one client joining the conference; and

providing the conferencing data from the server to the at least one client after establishing the network connection between the server and the at least one client and validating the current capabilities of the at least one client, the provided conference data based on the current capabilities of the at least one client.

**18**. The method of claim **17**, wherein one characteristic of the provided conference data is the size of at least part of the conferencing data.

**19**. The method of claim **17**, wherein one characteristic of the provided conference data is the source of at least part of the conferencing data.

**20**. The method of claim **17**, wherein one characteristic is a rate of reception of at least part of the conferencing data.

**21**. The method of claim **17**, wherein one characteristic is hardware involved in processing at least part of the conferencing data.

**22**. The method of claim **17**, wherein one characteristic is at least one modification to a conference environment originated by the server.

**23**. The method of claim **17**, wherein one characteristic is a quantity of reception of at least part of the conferencing data.

**24**. The conferencing system of claim **1**, wherein the at least one client is configured to provide the conference server with a key prior to joining the conference, the key identifying one or more privileges of the at least one client during the conference.

**25**. The conferencing system of claim **24**, wherein the one or more privileges includes entering the conference.

**26**. The method of claim **17**, wherein one characteristic is contents within the conferencing data.

**27**. The method of claim **17**, wherein one characteristic is information about at least part of the conferencing data.

**28**. The method of claim **17**, wherein one characteristic is a destination of at least part of the conferencing data.

US 7,813,304 B2

**37**

**29**. The method of claim **17**, wherein one characteristic is a rate of transmission of at least part of the conferencing data.

**30**. The method of claim **17**, wherein one characteristic is software involved in processing at least part of the conferencing data.

**31**. The method of claim **17**, wherein one characteristic is a protocol used in processing at least part of the conferencing data.

**32**. The method of claim **17**, wherein one characteristic is a modification to a conference environment originated by at least one client.

**38**

**33**. The method of claim **17**, wherein one characteristic is a quantity of transmission of at least part of the conferencing data.

**34**. The system of claim **24**, wherein the one or more privileges includes being a presenter during the conference.

**35**. The system of claim **24**, wherein the one or more privileges includes access to information about another attendee in the conference.

**36**. The system of claim **24**, wherein the one or more privileges includes changing a conference setting.

\* \* \* \* \*

ADRMOP,AO279,APPEAL,CLOSED,CONSOL,E-Filing,PRVADR,REFSET-PSG

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:09-cv-03496-SI

| | |
|---|---|
| Pixion, Inc. v. Citrix Systems, Inc. | Date Filed: 07/30/2009 |
| Assigned to: Hon. Susan Illston | Date Terminated: 08/20/2012 |
| Referred to: Magistrate Judge Paul Singh Grewal | Jury Demand: Both |
| (Settlement) | Nature of Suit: 830 Patent |
| Case in other court:  USCA for the Federal Circuit, 12- | Jurisdiction: Federal Question |
|     01636 | |
| Cause: 35:271 Patent Infringement | |

**Plaintiff**

| | | |
|---|---|---|
| **Pixion, Inc.** | represented by | **Colby Brian Springer** |
| *a Delaware corporation* | | Lewis and Roca LLP |
| | | 2440 W. El Camino Real |
| | | 6th Floor |
| | | Mountain View, CA 94040-1499 |
| | | 650-391-1394 |
| | | Fax: 650-391-1495 |
| | | Email: cspringer@lrlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Christine S. Watson** |
| | | Carr & Ferrell LLP |
| | | 2200 Geng Road |
| | | Palo Alto, CA 94303 |
| | | (650) 812-3400 |
| | | Fax: 650-812-3444 |
| | | Email: cwatson@carrferrell.com |
| | | *TERMINATED: 06/12/2012* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Christopher Paul Grewe** |
| | | Wilson Sonsini Goodrich & Rosati, PC |
| | | 650 Page Mill Road |
| | | 650 Page Mill Road |
| | | Palo Alto, CA 94304-1050 |
| | | 6508493057 |
| | | Fax: 6504936811 |
| | | Email: cgrewe@wsgr.com |
| | | *TERMINATED: 03/22/2012* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Nathaniel Walden Marshall Edwards ,** |
| | | Lewis and Roca, LLP |
| | | 40 N. Central Avenue |
| | | Phoniex, AZ 85004 |
| | | 602-262-5367 |
| | | Fax: |

Email: nedwards@lrlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Chae**
Carr Ferrell LLP
120 Constitution Drive
Menlo Park, CA 94025
650-812-3400
Email: rchae@carrferrell.com
*TERMINATED: 03/22/2012*
*ATTORNEY TO BE NOTICED*

**Robert Joseph Yorio**
Carr & Ferrell LLP
120 Constitution Drive
Menlo Park, CA 94025
650-812-3400
Fax: 650-812-3444
Email: yorio@carrferrell.com
*TERMINATED: 03/22/2012*
*ATTORNEY TO BE NOTICED*

**Shane Eric Olafson**
Lewis and Roca, LLP
40 North Central Avenue
Phoenix, AZ 85004
602-262-5327
Email: solafson@lrlaw.com
*ATTORNEY TO BE NOTICED*

**Terry W. Ahearn**
McDermott Will & Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650-815-7401
Fax: 650-815-7400
Email: tahearn@mwe.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Citrix Systems, Inc.**          represented by **Terry W. Ahearn**
*a Delaware corporation*          (See above for address)
                                  *LEAD ATTORNEY*
                                  *ATTORNEY TO BE NOTICED*

**Bryan Keith James**
McDermott Will and Emery
275 Middlefield Rd
Ste 100
Menlo Park, CA 94025
650-815-7467
Fax: 650-815-7401

Email: bjames@mwe.com
*ATTORNEY TO BE NOTICED*

**Leigh John Martinson**
McDermott Will & Emery, LLP
28 State St.
Boston, MA 02110
617-535-4032
Email: lmartinson@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara D Sunderland**
McDermott Will Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650-815-7400
Fax: 650-815-7401
Email: ssunderland@mwe.com
*ATTORNEY TO BE NOTICED*

**Sarah Chapin Columbia**
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
617-535-4074
Fax: 617-535-3800
Email: scolumbia@mwe.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**Citrix Online, LLC**
*a Limited Liability company*

represented by **Terry W. Ahearn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan Keith James**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leigh John Martinson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara D Sunderland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Chapin Columbia**
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
617-535-4074
Fax: 617-535-3800

Email: scolumbia@choate.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter-claimant**

**Citrix Online, LLC**          represented by   **Terry W. Ahearn**
*a Limited Liability company*                    (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Bryan Keith James**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Leigh John Martinson**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Sara D Sunderland**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Sarah Chapin Columbia**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Counter-claimant**

**Citrix Systems, Inc.**        represented by   **Terry W. Ahearn**
*a Delaware corporation*                         (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Bryan Keith James**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Leigh John Martinson**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Sara D Sunderland**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Sarah Chapin Columbia**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

V.

**Counter-defendant**

**Pixion, Inc.**                represented by   **Colby Brian Springer**
*a Delaware corporation*                         (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Christine S. Watson**
(See above for address)
*TERMINATED: 06/12/2012*
*ATTORNEY TO BE NOTICED*

**Christopher Paul Grewe**
(See above for address)
*TERMINATED: 03/22/2012*
*ATTORNEY TO BE NOTICED*

**Nathaniel Walden Marshall Edwards ,**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Chae**
(See above for address)
*TERMINATED: 03/22/2012*
*ATTORNEY TO BE NOTICED*

**Robert Joseph Yorio**
(See above for address)
*TERMINATED: 03/22/2012*
*ATTORNEY TO BE NOTICED*

**Shane Eric Olafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Terry W. Ahearn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter-claimant**

**Citrix Online, LLC**                    represented by  **Terry W. Ahearn**
*a Limited Liability company*                             (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Bryan Keith James**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leigh John Martinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara D Sunderland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Chapin Columbia**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter-claimant**

**Citrix Systems, Inc.**                   represented by    **Terry W. Ahearn**
*a Delaware corporation*                                     (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Bryan Keith James**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Leigh John Martinson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sara D Sunderland**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sarah Chapin Columbia**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**Counter-defendant**

**Citrix Online, LLC**                     represented by    **Terry W. Ahearn**
*a Limited Liability company*                               (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Bryan Keith James**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Leigh John Martinson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sara D Sunderland**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sarah Chapin Columbia**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Counter-defendant**

**Citrix Systems, Inc.**                   represented by    **Terry W. Ahearn**
*a Delaware corporation*                                     (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Bryan Keith James**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Leigh John Martinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara D Sunderland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Chapin Columbia**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2009 | 1 | COMPLAINT for Patent Infringement (Summons Issued); jury demand; against Citrix Systems, Inc. ( Filing fee $ 350, receipt number 54611006857). Filed by Pixion, Inc. (bw, COURT STAFF) (Filed on 7/30/2009) (Additional attachment(s) added on 7/30/2009: # 1 Exhibit-A (Part 1); # 2 Exhibit-A (Part 2); , # 3 Exhibit-B (Part 1); , # 4 Exhibit-B (Part 2) (bw, COURT STAFF). Modified on 7/30/2009 (bw, COURT STAFF). (Additional attachment(s) added on 7/30/2009: # 5 Civil Cover Sheet) (bw, COURT STAFF). (Entered: 07/30/2009) |
| 07/30/2009 | 2 | Summons Issued as to Citrix Systems, Inc. (bw, COURT STAFF) (Filed on 7/30/2009) (Entered: 07/30/2009) |
| 07/30/2009 | 3 | ADR SCHEDULING ORDER: Case Management Statement due by 11/17/2009. Case Management Conference set for 11/24/2009 02:00 PM. (Attachments: # 1 Standing Order for Civil Practice in Cases Assigned for all Purposes to Judge Trumbull, # 2 San Jose Judges Standing Orders, # 3 Standing Order for all Judges of the Northern District of California) (bw, COURT STAFF) (Filed on 7/30/2009) (Entered: 07/30/2009) |
| 07/30/2009 | | CASE DESIGNATED for Electronic Filing. (bw, COURT STAFF) (Filed on 7/30/2009) (Entered: 07/30/2009) |
| 07/30/2009 | 4 | REPORT on the filing or determination of an action regarding Patent Infringement (cc: form mailed to register). (bw, COURT STAFF) (Filed on 7/30/2009) (Entered: 07/30/2009) |
| 08/18/2009 | 5 | SUMMONS Returned Executed by Pixion, Inc.. Citrix Systems, Inc. served on 8/3/2009, answer due 8/24/2009. (Yorio, Robert) (Filed on 8/18/2009) (Entered: 08/18/2009) |
| 08/18/2009 | 6 | STIPULATION to Extend Time for Defendant to Respond to Plaintiffs Complaint for Patent Infringement re ( 1 ) by Pixion, Inc. (Yorio, Robert) (Filed on 8/18/2009) Linkage added on 8/19/2009 (bw, COURT STAFF). (Entered: 08/18/2009) |
| 09/15/2009 | 7 | First AMENDED COMPLAINT For Patent Infringement against Citrix Systems, Inc. Filed by Pixion, Inc. (Yorio, Robert) (Filed on 9/15/2009) Modified on 9/16/2009 (bw, COURT STAFF). (Entered: 09/15/2009) |
| 09/16/2009 | 8 | NOTICE of Appearance by Terry W. Ahearn (Ahearn, Terry) (Filed on 9/16/2009) (Entered: 09/16/2009) |
| 09/16/2009 | 9 | Declination to Proceed Before a U.S. Magistrate Judge and Request |

| | | Reassignment to a United States District Judge by Citrix Online, LLC, Citrix Systems, Inc. (Ahearn, Terry) (Filed on 9/16/2009) Modified on 9/16/2009 (bw, COURT STAFF). (Entered: 09/16/2009) |
|---|---|---|
| 09/16/2009 | 10 | Certification of Interested Parties by Citrix Online, LLC, Citrix Systems, Inc. (Ahearn, Terry) (Filed on 9/16/2009) Modified on 9/17/2009 (bw, COURT STAFF). (Entered: 09/16/2009) |
| 09/17/2009 | 11 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (cm, COURT STAFF) (Filed on 9/17/2009) (Entered: 09/17/2009) |
| 09/17/2009 | 12 | ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Charles R. Breyer for all further proceedings. Judge Magistrate Judge Patricia V. Trumbull no longer assigned to case. Signed by the Executive Committee on 9/17/09. (srm, COURT STAFF) (Filed on 9/17/2009) (Entered: 09/17/2009) |
| 09/17/2009 | 13 | MOTION for leave to appear in Pro Hac Vice of Leigh J. Martinson ( Filing fee $ 210, receipt number 54611005929.) filed by Citrix Systems, Inc.. (Attachments: # 1 receipt, # 2 proposed order)(ys, COURT STAFF) (Filed on 9/17/2009) (Entered: 09/21/2009) |
| 09/17/2009 | 14 | MOTION for leave to appear in Pro Hac Vice of Sarah Chapin Columbia ( Filing fee $ 210, receipt number 54611005928.) filed by Citrix Systems, Inc.. (Attachments: # 1 receipt, # 2 proposed order)(ys, COURT STAFF) (Filed on 9/17/2009) (Entered: 09/21/2009) |
| 09/18/2009 | | Case reassigned to Hon. Susan Illston. Hon. Charles R. Breyer no longer assigned to the case. (ha, COURT STAFF) (Filed on 9/18/2009) (Entered: 09/18/2009) |
| 09/21/2009 | 15 | ORDER relating cases to 03-2909; setting cmc for 11/20/09 at 2:30 pm. (tf, COURT STAFF) (Filed on 9/21/2009) (Entered: 09/21/2009) |
| 09/21/2009 | | Set Deadlines/Hearings: Case Management Conference set for 11/20/2009 02:30 PM. (ys, COURT STAFF) (Filed on 9/21/2009) (Entered: 09/22/2009) |
| 09/22/2009 | 16 | ORDER by Judge Charles R. Breyer granting 13 Motion for Pro Hac Vice (L J Martinson) (be, COURT STAFF) (Filed on 9/22/2009) (Entered: 09/22/2009) |
| 09/22/2009 | 17 | ORDER by Judge Charles R. Breyer granting 14 Motion for Pro Hac Vice (S C Columbia) (be, COURT STAFF) (Filed on 9/22/2009) (Entered: 09/22/2009) |
| 09/24/2009 | 18 | Summons on First Amended Complaint Issued as to Citrix Online, LLC.. (ys, COURT STAFF) (Filed on 9/24/2009) (Entered: 09/25/2009) |
| 09/24/2009 | 19 | Summons on First Amended Complaint Issued as to Citrix Systems, Inc.. (ys, COURT STAFF) (Filed on 9/24/2009) (Entered: 09/25/2009) |
| 10/09/2009 | 20 | WAIVER OF SERVICE Returned Executed filed by Pixion, Inc.. Service waived by Citrix Systems, Inc. waiver sent on 9/29/2009, answer due 11/30/2009. (Yorio, Robert) (Filed on 10/9/2009) (Entered: 10/09/2009) |
| 10/09/2009 | 21 | WAIVER OF SERVICE Returned Executed filed by Pixion, Inc.. Service waived by Citrix Online, LLC waiver sent on 9/29/2009, answer due 11/30/2009. (Yorio, Robert) (Filed on 10/9/2009) (Entered: 10/09/2009) |
| 10/30/2009 | 22 | Certificate of Interested Entities by Pixion, Inc. (Grewe, Christopher) (Filed on 10/30/2009) (Entered: 10/30/2009) |

| | | |
|---|---|---|
| 11/04/2009 | 23 | ADR Clerks Notice re: Non-Compliance with Court Order. (tjs, COURT STAFF) (Filed on 11/4/2009) (Entered: 11/04/2009) |
| 11/06/2009 | 24 | *Defendant Citrix Systems, Inc.'s and Citrix Online, LLC's* ANSWER to Complaint with Jury Trial Demanded *for Patent Infringement and Counterclaims for Declaratory Relief*, COUNTERCLAIM against Pixion, Inc. byCitrix Online, LLC, Citrix Systems, Inc.. (Ahearn, Terry) (Filed on 11/6/2009) (Entered: 11/06/2009) |
| 11/06/2009 | 25 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *ADR Certification by Citrix Systems, Inc., Citrix Online LLC and its Counsel* (Ahearn, Terry) (Filed on 11/6/2009) (Entered: 11/06/2009) |
| 11/13/2009 | 26 | **\*\*\* FILED IN ERROR. PLEASE SEE DOCKET # 28 . \*\*\*** STIPULATION and Proposed Order selecting Private ADR by Citrix Online, LLC, Citrix Systems, Inc. *Stipulation and [Proposed] Order Selecting ADR Process* (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 11/13/2009) Modified on 11/13/2009 (ewn, COURT STAFF). (Entered: 11/13/2009) |
| 11/13/2009 | 27 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Springer, Colby) (Filed on 11/13/2009) (Entered: 11/13/2009) |
| 11/13/2009 | 28 | STIPULATION and Proposed Order selecting Private ADR by Citrix Online, LLC, Citrix Systems, Inc. *Stipulation and [Proposed] Order Selecting ADR Process* (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 11/13/2009) (Entered: 11/13/2009) |
| 11/13/2009 | 29 | JOINT CASE MANAGEMENT STATEMENT *and [Proposed] Case Management Order* filed by Pixion, Inc.. (Grewe, Christopher) (Filed on 11/13/2009) (Entered: 11/13/2009) |
| 11/19/2009 | 30 | ORDER REFERRING CASE to Private ADR (tf, COURT STAFF) (Filed on 11/19/2009) (Entered: 11/19/2009) |
| 11/24/2009 | 31 | Minute Entry: Initial Case Management Conference (Date Filed: 11/24/2009). Case continued to 6/23/10 at 3:30 p.m. for Tutorial (2 hrs)Case Continued to 6/24/10 @ 3:30 p.m. for Markman (2 hours)(to set cmc after markman) (SEE MINUTE FOR PATENT SCHEDULE)() (tf, COURT STAFF) (Date Filed: 11/24/2009) (Entered: 11/24/2009) |
| 11/30/2009 | 32 | STIPULATION *TO EXTEND TIME FOR PLAINTIFF PIXION, INC. TO RESPOND TO DEFENDANT CITRIX SYSTEMS, INC. ET AL.'S COUNTERCLAIMS FOR DECLARATORY RELIEF* by Pixion, Inc.. (Springer, Colby) (Filed on 11/30/2009) (Entered: 11/30/2009) |
| 12/07/2009 | 33 | ANSWER to 24 Counterclaim byPixion, Inc.. (Springer, Colby) (Filed on 12/7/2009) Modified on 12/8/2009 (ys, COURT STAFF). (Entered: 12/07/2009) |
| 01/08/2010 | 34 | AMENDED MINUTES FROM 11/20/09 CASE MANAGEMENT CONFERENCE Case Management Conference set for 4/23/2010 03:00 PM. (tf, COURT STAFF) (Filed on 1/8/2010) (Entered: 01/08/2010) |
| 01/08/2010 | | \*\*\*Deadlines terminated. (ys, COURT STAFF) (Filed on 1/8/2010) (Entered: 01/11/2010) |
| 01/27/2010 | 35 | NOTICE by Citrix Online, LLC, Citrix Systems, Inc. *Defendants and Counterclaimants' Rule 7.1 Disclosure Statement* (Ahearn, Terry) (Filed on 1/27/2010) (Entered: 01/27/2010) |

| | | |
|---|---|---|
| 03/18/2010 | 36 | STIPULATION *AND [PROPOSED] ORDER TO CHANGE TIME PURSUANT TO CIVIL L.R. 6-2* by Pixion, Inc.. (Attachments: # 1 Proposed Order)(Springer, Colby) (Filed on 3/18/2010) (Entered: 03/18/2010) |
| 03/22/2010 | 37 | ORDER vacating dates/continuing cmc to 6/25/10 at 3:00 p.m. (tf, COURT STAFF) (Filed on 3/22/2010) (Entered: 03/22/2010) |
| 03/22/2010 | | Set Deadlines/Hearings: Case Management Conference set for 6/25/2010 03:00 PM. (ys, COURT STAFF) (Filed on 3/22/2010) (Entered: 03/23/2010) |
| 05/13/2010 | 38 | STIPULATION *to Change Time Pursuant to Civil L.R. 6-2* by Pixion, Inc.. (Attachments: # 1 Proposed Order to Change Time Pursuant to Civil L.R. 6-2)(Yorio, Robert) (Filed on 5/13/2010) (Entered: 05/13/2010) |
| 05/14/2010 | 39 | ORDER to change time. Case continued to 9/3/10 @ 3:00 p.m. for further case management conference (tf, COURT STAFF) (Filed on 5/14/2010) (Entered: 05/14/2010) |
| 05/14/2010 | | Set Deadlines/Hearings: Case Management Conference set for 9/3/2010 03:00 PM. (ys, COURT STAFF) (Filed on 5/14/2010) (Entered: 05/17/2010) |
| 08/27/2010 | 40 | CASE MANAGEMENT STATEMENT *and [Proposed] Order* filed by Pixion, Inc.. (Grewe, Christopher) (Filed on 8/27/2010) (Entered: 08/27/2010) |
| 09/09/2010 | 41 | Minute Entry: Further Case Management Conference (Date Filed: 9/9/2010). case Case continued to 11/2/10 @ 9:00 a.m. for Motion to Enforce Settlement and Further Case Management Conference (file motion 9/24/10, file opposition 10/8/10, file reply 10/15/10)() (tf, COURT STAFF) (Date Filed: 9/9/2010) (Entered: 09/09/2010) |
| 09/09/2010 | | Set Deadlines/Hearings: Case Management Conference set for 11/2/2010 09:00 AM. (ys, COURT STAFF) (Filed on 9/9/2010) (Entered: 09/10/2010) |
| 09/24/2010 | 42 | STIPULATION *Joint Stipulation to File Under Seal Citrix's Notice of Motion and Motion to Enforce Settlement Agreement; Memorandum of Points and Authorities In Support Thereof; Declaration of Sarah Chapin Columbia and Exhibits Attached Thereto* by Citrix Online, LLC, Citrix Systems, Inc.. (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 9/24/2010) (Entered: 09/24/2010) |
| 09/24/2010 | 43 | NOTICE by Citrix Online, LLC, Citrix Systems, Inc. *Notification of Lodging regarding Citrix's Notice of Motion and Motion to Enforce Settlement Agreement; Memorandum of Points and Authorities In Support Thereof; Declaration of Sarah Chapin Columbia and Exhibits Attached Thereto* (Ahearn, Terry) (Filed on 9/24/2010) (Entered: 09/24/2010) |
| 09/24/2010 | 44 | Proposed Order *Granting Citrix Systems, Inc., and Citrix Online, LLC's Motion to Enforce Settlement Agreement* by Citrix Online, LLC, Citrix Systems, Inc.. (Ahearn, Terry) (Filed on 9/24/2010) (Entered: 09/24/2010) |
| 09/28/2010 | 45 | ORDER Granting Motion to File Under Seal re 42 . (link efiled documents to this order) (tf, COURT STAFF) (Filed on 9/28/2010) (Entered: 09/28/2010) |
| 09/28/2010 | 46 | DOCUMENT E-FILED UNDER SEAL re 45 Order Granting Motion to File Under Seal - ***Citrix's Notice of Motion and Motion to Enforce Settlement Agreement; Memorandum of Points and Authorities in Support Thereof; Declaration of Sarah Chapin Columbia In Support of Citrix's Notice of Motion and Motion to Enforce Settlement Agreement* by Citrix Online, LLC, Citrix Systems, Inc..** (Attachments: # 1 Declaration, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Exhibit C to Declaration, # 5 |

| | | |
|---|---|---|
| | | Exhibit D to Declaration, # 6 Exhibit E to Declaration, # 7 Exhibit F to Declaration)(Ahearn, Terry) (Filed on 9/28/2010) Modified on 9/29/2010 (ysS, COURT STAFF). (Entered: 09/28/2010) |
| 10/08/2010 | 47 | Administrative Motion to File Under Seal *Plaintiff's Opposition to Defendant's Motion to Enforce Settlement Agreement and Supporting Declarations of Robert J. Yorio and Colby B. Springer* filed by Pixion, Inc.. Motion Hearing set for 11/2/2010 09:00 AM in Courtroom 10, 19th Floor, San Francisco. (Attachments: # 1 Proposed Order Proposed Order, # 2 Affidavit Declaration)(Watson, Christine) (Filed on 10/8/2010) (Entered: 10/08/2010) |
| 10/15/2010 | 48 | STIPULATION *Joint Stipulation to File Under Seal Citrix's Reply In Support of Motion to Enforce Settlement Agreement* by Citrix Online, LLC, Citrix Systems, Inc.. (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 10/15/2010) (Entered: 10/15/2010) |
| 10/15/2010 | 49 | NOTICE by Citrix Online, LLC, Citrix Systems, Inc *Notification of Lodging re Citrix's Reply In Support of Motion to Enforce Settlement Agreement* (Ahearn, Terry) (Filed on 10/15/2010) (Entered: 10/15/2010) |
| 10/18/2010 | 50 | ORDER granting 47 Administrative Motion to File Under Seal (tf, COURT STAFF) (Filed on 10/18/2010) (Entered: 10/18/2010) |
| 10/18/2010 | 51 | DOCUMENT E-FILED UNDER SEAL re 50 Order on Administrative Motion to File Under Seal - *Opposition to 46 Defendant Citrix Systems, Inc.'s Motion to Enforce Settlement Agreement* by Pixion, Inc.. (Watson, Christine) (Filed on 10/18/2010) Modified on 10/19/2010 (ysS, COURT STAFF). (Entered: 10/18/2010) |
| 10/18/2010 | 52 | DOCUMENT E-FILED UNDER SEAL re 50 Order on Administrative Motion to File Under Seal - *Declaration of Colby B. Springer in Support of 51 Plaintiff Pixion, Inc.'s Opposition to Defendant Citrix Systems, Inc.'s Motion to Enforce Settlement Agreement* by Pixion, Inc.. (Springer, Colby) (Filed on 10/18/2010) Modified on 10/19/2010 (ysS, COURT STAFF). (Entered: 10/18/2010) |
| 10/18/2010 | 53 | DOCUMENT E-FILED UNDER SEAL re 50 Order on Administrative Motion to File Under Seal - *Declaration of Robert J. Yorio in Support of 51 Plaintiff Pixion, Inc.'s Opposition to Defendant Citrix Systems, Inc.'s Motion to Enforce Settlement Agreement* by Pixion, Inc. (Yorio, Robert) (Filed on 10/18/2010) Modified on 10/19/2010 (ysS, COURT STAFF). (Entered: 10/18/2010) |
| 10/20/2010 | 54 | ORDER Granting Motion to File Under Seal re 48 (LINK DOCS TO THIS ORDER) (tf, COURT STAFF) (Filed on 10/20/2010) (Entered: 10/20/2010) |
| 10/20/2010 | 55 | DOCUMENT E-FILED UNDER SEAL re 54 Order Granting Motion to File Under Seal - *Citrix's Reply In Support of 46 Motion to Enforce Settlement Agreement* by Citrix Online, LLC, Citrix Systems, Inc.. (Ahearn, Terry) (Filed on 10/20/2010) Modified on 10/21/2010 (ysS, COURT STAFF). (Entered: 10/20/2010) |
| 11/01/2010 | 56 | STIPULATION *CONTINUING CASE MANAGEMENT CONFERENCE AND HEARING ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT* by Pixion, Inc.. (Attachments: # 1 Proposed Order Continuing Case Management Conference and Hearing on Defendants' Motion to Enforce Settlement Agreement)(Yorio, Robert) (Filed on 11/1/2010) (Entered: 11/01/2010) |
| | | |

| | | |
|---|---|---|
| 11/01/2010 | 57 | ORDER CONTINUING CASE MANAGEMENT CONFERENCE AND HEARING ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT Case Management Conference set for 12/9/2010 03:00 PM in Courtroom 10, 19th Floor, San Francisco. Motion Hearing set for 12/9/2010 03:00 PM in Courtroom 10, 19th Floor, San Francisco.. Signed by Judge Susan Illston on 11/01/10. (sis, COURT STAFF) (Filed on 11/1/2010) (Entered: 11/01/2010) |
| 11/01/2010 | | Set/Reset Deadlines as to 46 MOTION. Motion Hearing set for 12/9/2010 03:00 PM in Courtroom 10, 19th Floor, San Francisco. (sis, COURT STAFF) (Filed on 11/1/2010) (Entered: 11/01/2010) |
| 12/03/2010 | 58 | CLERKS NOTICE, CLERKS NOTICE Continuing Motion Hearing Case Management Conference set for 12/9/2010 09:00 AM. Motion Hearing set for 12/9/2010 09:00 AM. (tf, COURT STAFF) (Filed on 12/3/2010) (Entered: 12/03/2010) |
| 12/03/2010 | | Set/Reset Deadlines as to 46 MOTION. Motion Hearing set for 12/9/2010 09:00 AM. (ys, COURT STAFF) (Filed on 12/3/2010) (Entered: 12/06/2010) |
| 12/13/2010 | 59 | Proposed Order *(SCHEDULING)* by Pixion, Inc.. (Springer, Colby) (Filed on 12/13/2010) (Entered: 12/13/2010) |
| 12/14/2010 | 60 | Minute Entry: Motion Hearing held on 12/9/2010 before Illston. Amended complaint is due 12/17/10. (Date Filed: 12/14/2010). (Court Reporter Sullivan.) (tf, COURT STAFF) (Date Filed: 12/14/2010) Modified on 12/15/2010 (ys, COURT STAFF). (Entered: 12/14/2010) |
| 12/14/2010 | 61 | ORDER DENYING DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT re 46 (SI, COURT STAFF) (Filed on 12/14/2010) (Entered: 12/14/2010) |
| 12/17/2010 | 62 | AMENDED COMPLAINT *(Second)* against Citrix Online, LLC, Citrix Systems, Inc.. Filed byPixion, Inc.. (Attachments: # 1 Exhibit A (7369515), # 2 Exhibit B (7426191), # 3 Exhibit C (7813304), # 4 Exhibit D (7715331)) (Springer, Colby) (Filed on 12/17/2010) (Entered: 12/17/2010) |
| 12/20/2010 | 63 | ORDER Further Case Management Conference set for 5/6/2011 03:00 PM. Markman hearing set for 8/5/2011 03:30 PM. Tutorial Hearing set for 8/4/2011 03:30 PM. (tf, COURT STAFF) (Filed on 12/20/2010) (Entered: 12/20/2010) |
| 01/06/2011 | 64 | Answer to 62 Second Amended Complaint *Defendant Citrix Systems, Inc.'s and Citrix Online, LLC's Answer to Second Amended Complaint for Patent Infringement and Counterclaims for Declaratory Relief,* COUNTERCLAIM against Citrix Online, LLC, Citrix Systems, Inc. byCitrix Online, LLC, Citrix Systems, Inc.. (Ahearn, Terry) (Filed on 1/6/2011) Modified on 1/7/2011 (ys, COURT STAFF). (Entered: 01/06/2011) |
| 01/27/2011 | 65 | ANSWER to 64 Counterclaim byPixion, Inc.. (Springer, Colby) (Filed on 1/27/2011) Modified on 1/28/2011 (ys, COURT STAFF). (Entered: 01/27/2011) |
| 02/28/2011 | 66 | *** FILED IN ERROR. REFER TO DOCUMENT 68 . *** MOTION to Relate Case filed by Pixion, Inc.. (Springer, Colby) (Filed on 2/28/2011) Modified on 2/28/2011 (feriab, COURT STAFF). (Entered: 02/28/2011) |
| 02/28/2011 | 67 | Declaration of Colby B. Springer in Support of 67 MOTION to Relate Case filed byPixion, Inc.. (Related document(s) 67 ) (Springer, Colby) (Filed on 2/28/2011) Modified on 3/1/2011 (ys, COURT STAFF). (Entered: |

| | | 02/28/2011) |
|---|---|---|
| 02/28/2011 | 68 | MOTION to Relate Case to 11-694-EMC *CORRECTION OF DOCKET #* 66 filed by Pixion, Inc.. (Springer, Colby) (Filed on 2/28/2011) Modified on 3/1/2011 (ys, COURT STAFF). (Entered: 02/28/2011) |
| 03/02/2011 | 69 | ORDER RELATING CASE to 11-694. (tf, COURT STAFF) (Filed on 3/2/2011) Modified on 3/2/2011 (ys, COURT STAFF). (Entered: 03/02/2011) |
| 04/15/2011 | 70 | Consent MOTION to Consolidate Cases *and Amend the Scheduling Order* filed by Pixion, Inc.. Motion Hearing set for 5/6/2011 03:00 PM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. (Attachments: # 1 Proposed Order Proposed Order)(Springer, Colby) (Filed on 4/15/2011) (Entered: 04/15/2011) |
| 04/15/2011 | 71 | Declaration of Colby B. Springer in Support of 70 Consent MOTION to Consolidate Cases *and Amend the Scheduling Order* filed by Pixion, Inc.. (Related document(s) 70 ) (Springer, Colby) (Filed on 4/15/2011) (Entered: 04/15/2011) |
| 04/19/2011 | 72 | ORDER granting (70) Motion to Consolidate Cases in case 3:09-cv-03496-SI (consolidating 11-694) (tfS, COURT STAFF) (Filed on 4/19/2011) (Entered: 04/19/2011) |
| 04/29/2011 | 73 | JOINT CASE MANAGEMENT STATEMENT *Supplemental Joint Case Management Statement* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 4/29/2011) (Entered: 04/29/2011) |
| 05/02/2011 | 74 | Proposed MOTION for Protective Order *[Proposed] Protective Order* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 5/2/2011) (Entered: 05/02/2011) |
| 05/05/2011 | 75 | PROTECTIVE ORDER re 74 Stipulation (tf, COURT STAFF) (Filed on 5/5/2011) Modified on 5/6/2011 (ys, COURT STAFF). (Entered: 05/05/2011) |
| 05/05/2011 | 76 | ORDER Further Case Management Conference set for 8/5/2011 03:00 PM. (tf, COURT STAFF) (Filed on 5/5/2011) (Entered: 05/05/2011) |
| 05/19/2011 | 77 | ORDER Markman hearing set for 10/6/2011 03:30 PM. Tutorial Hearing set for 10/5/2011 03:30 PM. (tfS, COURT STAFF) (Filed on 5/19/2011) (Entered: 05/19/2011) |
| 07/14/2011 | 78 | CLAIM CONSTRUCTION STATEMENT *(JOINT) and Pre-Hearing Statement* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation), Pixion, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Chae, Richard) (Filed on 7/14/2011) (Entered: 07/14/2011) |
| 08/04/2011 | 79 | JOINT CASE MANAGEMENT STATEMENT *Supplemental Joint Case Management Statement* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 8/4/2011) (Entered: 08/04/2011) |
| 08/10/2011 | 80 | Minute Entry: Further Case Management Conference held 8/5/11 (Date Filed: 8/10/2011). () (tfS, COURT STAFF) (Date Filed: 8/10/2011) (Entered: 08/10/2011) |
| 09/01/2011 | 81 | CLAIM CONSTRUCTION STATEMENT - *Opening Claim Construction Brief* filed by Pixion, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 |

| | | |
|---|---|---|
| | | Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Chae, Richard) (Filed on 9/1/2011) (Entered: 09/01/2011) |
| 09/15/2011 | 82 | *Citrix Unopposed Motion to Extend The Claim Construction Briefing Schedule* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Declaration of Terry W. Ahearn ISO, # 2 Proposed Order)(Ahearn, Terry) (Filed on 9/15/2011) Modified on 9/16/2011 (ys, COURT STAFF). (Entered: 09/15/2011) |
| 09/15/2011 | 83 | *Citrix's [Provisional] Response to 81 Pixion's Opening Claim Construction Brief* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Ahearn, Terry) (Filed on 9/15/2011) Modified on 9/16/2011 (ys, COURT STAFF). (Entered: 09/15/2011) |
| 09/19/2011 | 84 | ORDER re Briefing schedule on Markman hearing. (tf, COURT STAFF) (Filed on 9/19/2011) Entered: 09/19/2011) |
| 09/19/2011 | 85 | *Citrix's Response to 81 Pixion's Opening Claim Construction Brief* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Ahearn, Terry) (Filed on 9/19/2011) Modified on 9/20/2011 (ysS, COURT STAFF). (Entered: 09/19/2011) |
| 09/26/2011 | 86 | CLAIM CONSTRUCTION STATEMENT - *Reply Brief* filed by Pixion, Inc.. (Yorio, Robert) (Filed on 9/26/2011) (Entered: 09/26/2011) |
| 09/27/2011 | 87 | CLERKS NOTICE Tutorial Hearing set for 10/5/2011 10:30 AM. (tf, COURT STAFF) (Filed on 9/27/2011) (Entered: 09/27/2011) |
| 10/03/2011 | 88 | Proposed Order *[Proposed] Order Permitting Use of Equipment for Markman Tutorial and Hearing* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 10/3/2011) (Entered: 10/03/2011) |
| 10/03/2011 | 89 | ORDER re: equipment re 88 (tf, COURT STAFF) (Filed on 10/3/2011) Modified on 10/4/2011 (ys, COURT STAFF). (Entered: 10/03/2011) |
| 10/06/2011 | 90 | Minute Entry: Tutorial Hearing held on 10/5/2011 before Illston (Date Filed: 10/6/2011), Claims Construction / Markman Hearing held on 10/5/2011 before Illston (Date Filed: 10/6/2011). (Court Reporter Kathy Wyatt.) (tf, COURT STAFF) (Date Filed: 10/6/2011) (Entered: 10/06/2011) |
| 10/06/2011 | | Set Deadlines/Hearings: Further Case Management Conference set for 12/16/2011 03:00 PM. (ysS, COURT STAFF) (Filed on 10/6/2011) (Entered: 10/11/2011) |
| 11/01/2011 | 91 | CLAIM CONSTRUCTION ORDER (SI, COURT STAFF) (Filed on 11/1/2011) (Entered: 11/01/2011) |
| 12/09/2011 | 92 | JOINT CASE MANAGEMENT STATEMENT *Supplemental Joint Case Management Statement and [Proposed] Case Management Order* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 12/9/2011) (Entered: 12/09/2011) |
| 12/14/2011 | 93 | MOTION for leave to appear in Pro Hac Vice (Filing fee $ 305.) filed by |

| | | Pixion, Inc.. (Attachments: # 1 Proposed Order)(Springer, Colby) (Filed on 12/14/2011) (Entered: 12/14/2011) |
|---|---|---|
| 12/19/2011 | 94 | ORDER granting 93 Motion for Pro Hac Vice (tf, COURT STAFF) (Filed on 12/19/2011) (Entered: 12/19/2011) |
| 12/21/2011 | 95 | Minute Entry: Further Case Management Conference HELD 12/16/11 (Date Filed: 12/21/2011). Further Case Management Conference set for 4/27/2011 03:00 PM. Jury Selection set for 10/1/2012 08:30 AM before Hon. Susan Illston. Jury Trial set for 10/1/2012 08:30 AM before Hon. Susan Illston. Motion Hearing set for 7/13/2012 09:00 AM before Hon. Susan Illston. Pretrial Conference set for 8/21/2012 03:30 PM before Hon. Susan Illston. () (tfS, COURT STAFF) (Date Filed: 12/21/2011) (Entered: 12/21/2011) |
| 12/21/2011 | 96 | PRETRIAL ORDER (Attachments: # 1 Standing Order)(tfS, COURT STAFF) (Filed on 12/21/2011) (Entered: 12/21/2011) |
| 01/04/2012 | 97 | MOTION for leave to appear in Pro Hac Vice of Shane E. Olafson ( Filing fee $ 305, receipt number 34611068876.) filed by Pixion, Inc.. (Attachments: # 1 receipt, # 2 proposed order)(ysS, COURT STAFF) (Filed on 1/4/2012) (Entered: 01/06/2012) |
| 01/11/2012 | 98 | NOTICE of Appearance by Bryan Keith James (James, Bryan) (Filed on 1/11/2012) (Entered: 01/11/2012) |
| 01/12/2012 | 99 | ORDER granting 97 Motion for Pro Hac Vice (tf, COURT STAFF) (Filed on 1/12/2012) (Entered: 01/12/2012) |
| 01/18/2012 | 100 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order Changing Time* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 1/18/2012) (Entered: 01/18/2012) |
| 01/19/2012 | 101 | ORDER re: dates. Signed by Judge Illston on 1/19/12. (tf, COURT STAFF) (Filed on 1/19/2012) (Entered: 01/19/2012) |
| 01/26/2012 | 102 | MOTION for Judgment on the Pleadings *and Memorandum of Points and Authorities in Support* filed by Pixion, Inc.. Motion Hearing set for 3/9/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 2/24/2012. Replies due by 3/2/2012. (Olafson, Shane) (Filed on 1/26/2012) (Entered: 01/26/2012) |
| 01/27/2012 | 103 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order Changing Time on the Briefing Schedule on Docket 102* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (James, Bryan) (Filed on 1/27/2012) (Entered: 01/27/2012) |
| 01/30/2012 | 104 | ORDER granting 103 Stipulation signed by Judge Illston on 1/30/12. This is a text docket entry only, there is no document associated with this order. (tf, COURT STAFF) (Filed on 1/30/2012) (Entered: 01/30/2012) |
| 02/24/2012 | 105 | RESPONSE (re 102 MOTION for Judgment on the Pleadings *and Memorandum of Points and Authorities in Support* ) *Citrix Systems, Inc. and Citrix Online, LLC's Opposition to Pixion, Inc.'s Motion for Judgment on the Pleadings* filed byCitrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 2/24/2012) (Entered: 02/24/2012) |
| 02/28/2012 | 106 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order to File Under Seal the Declaration of Terry W. Ahearn In Support of Citrix's* |

| | | |
|---|---|---|
| | | *Motion for Leave to Amend Counterclaims and the Memorandum of Points and Authorities In Support of Citrix's Motion* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 2/28/2012) (Entered: 02/28/2012) |
| 02/28/2012 | 107 | NOTICE and Motion for Leave to Amend Counterclaims by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) (Ahearn, Terry) (Filed on 2/28/2012) Modified on 2/29/2012 (ysS, COURT STAFF). (Entered: 02/28/2012) |
| 02/28/2012 | 108 | NOTICE of Lodging by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) re 107 Notice (Other), 106 STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order to File Under Seal the Declaration of Terry W. Ahearn In Support of Citrix's Motion for Leave to Amend Counterclaims and the Memorandum of Points and Authorities In Support of Citrix Notification of Lodging (Ahearn, Terry) (Filed on 2/28/2012) Modified on 2/29/2012 (ysS, COURT STAFF). (Entered: 02/28/2012)* |
| 02/28/2012 | | Set/Reset Deadlines as to 107 MOTION for Leave to File. Motion Hearing set for 4/6/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. (ysS, COURT STAFF) (Filed on 2/28/2012) (Entered: 02/29/2012) |
| 02/29/2012 | 109 | ORDER Granting Motion to File Under Seal re 106 . Signed by Judge Illston on 2/28/12. (tfS, COURT STAFF) (Filed on 2/29/2012) Modified on 3/1/2012 (ysS, COURT STAFF). (Entered: 02/29/2012) |
| 03/01/2012 | 110 | DOCUMENT E-FILED UNDER SEAL re 109 Order Granting Motion to File Under Seal - *Memorandum of Points and Authorities In Support of Citrix Systems, Inc. and Citrix Online, LLC's Motion for Leave to Amend Counterclaims* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 3/1/2012) Modified on 3/2/2012 (ysS, COURT STAFF). (Entered: 03/01/2012) |
| 03/01/2012 | 111 | DOCUMENT E-FILED UNDER SEAL re 109 Order Granting Motion to File Under Seal - *Declaration of Terry W. Ahearn In Support of 110 Citrix's Motion For Leave to Amend Counterclaims* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 1 Amended Counterclaims, # 2 Exhibit A to Amended Counterclaims, # 3 Exhibit B to Amended Counterclaims, # 4 Exhibit C to Amended Counterclaims, # 5 Exhibit D to Amended Counterclaims, # 6 Exhibit E to Amended Counterclaims, # 7 Exhibit F to Amended Counterclaims, # 8 Exhibit G to Amended Counterclaims, # 9 Exhibit H to Amended Counterclaims)(Ahearn, Terry) (Filed on 3/1/2012) Modified on 3/2/2012 (ysS, COURT STAFF). (Entered: 03/01/2012) |
| 03/01/2012 | | Set/Reset Deadlines as to 110 MOTION for Leave to File. Motion Hearing set for 4/6/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. (ysS, COURT STAFF) (Filed on 3/1/2012) (Entered: 03/02/2012) |
| 03/02/2012 | 112 | REPLY (re 102 MOTION for Judgment on the Pleadings *and Memorandum of Points and Authorities in Support* ) filed byPixion, Inc.. (Olafson, Shane) (Filed on 3/2/2012) (Entered: 03/02/2012) |
| 03/08/2012 | 113 | ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS 102 (Illston, Susan) (Filed on 3/8/2012) (Entered: 03/08/2012) |

| 03/09/2012 | 114 | *Citrix Systems, Inc. and Citrix Online, LLC's Notice and Motion for Leave to File a Motion to Compel Discovery Beyond the Limits Set in Local Rule 37* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Memorandum of Points and Authorities in Support, # 2 Declaration Terry W. Ahearn Declaration, # 3 Exhibit A to TWA Declaration, # 4 Exhibit A to the Letter Brief, # 5 Exhibit B to the Letter Brief, # 6 Exhibit C to the Letter Brief, # 7 Exhibit D to the Letter Brief, # 8 Proposed Order)(Ahearn, Terry) (Filed on 3/9/2012) Modified on 3/12/2012 (ysS, COURT STAFF). (Entered: 03/09/2012) |
| 03/12/2012 | 115 | REQUEST by Pixion, Inc. *Request to Terminate or Otherwise Disassociate Counsel for Plaintiff* (Olafson, Shane) (Filed on 3/12/2012) Modified on 3/12/2012 (ysS, COURT STAFF). (Entered: 03/12/2012) |
| 03/13/2012 | 116 | STIPULATION *re Deadline to Respond to Defendants Motion to Amend Counterclaim* filed by Pixion, Inc.. (Olafson, Shane) (Filed on 3/13/2012) (Entered: 03/13/2012) |
| 03/14/2012 | 117 | RESPONSE (re 107 MOTION for Leave to File ) *Opposition* filed byPixion, Inc.. (Springer, Colby) (Filed on 3/14/2012) (Entered: 03/14/2012) |
| 03/14/2012 | 118 | Declaration of Colby B. Springer in Support of 117 Opposition/Response to Motion *for Leave to Amend* filed byPixion, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E (1 of 2), # 6 Exhibit E (2 of 2), # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J)(Related document(s) 117 ) (Springer, Colby) (Filed on 3/14/2012) (Entered: 03/14/2012) |
| 03/16/2012 | 119 | ORDER Deadline to Respond to Defendants Motion to Amend Counterclaim filed by Pixion, Inc. Signed by Judge Illston on 3/15/12. (tfS, COURT STAFF) (Filed on 3/16/2012) (Entered: 03/16/2012) |
| 03/21/2012 | 120 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order to File Under Seal Citrix's Reply In Support of Citrix's Motion for Leave to Amend Counterclaims* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 3/21/2012) (Entered: 03/21/2012) |
| 03/21/2012 | 121 | NOTICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) *Notification of Lodging* (Ahearn, Terry) (Filed on 3/21/2012) (Entered: 03/21/2012) |
| 03/21/2012 | 122 | CERTIFICATE OF SERVICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) *Citrix's Reply ISO Motion for Leave to Amend Counterclaims; TWA Declaration ISO Citrix's Motion for Leave to Amend Counterclaims* (Ahearn, Terry) (Filed on 3/21/2012) (Entered: 03/21/2012) |
| 03/22/2012 | 123 | STIPULATION - *Withdrawal of Counsel By Consent* filed by Pixion, Inc.. (Yorio, Robert) (Filed on 3/22/2012) (Entered: 03/22/2012) |
| 03/22/2012 | 124 | ORDER signed on 3/22/12 by Judge Illston granting 114 Motion for Leave to File a Motion to Compel Discovery Beyond the Limits Set in Local Rule 37 (tfS, COURT STAFF) (Filed on 3/22/2012) (Entered: 03/22/2012) |
| 03/22/2012 | 125 | Letter Brief *Joint Letter Brief* filed byCitrix Online, LLC, Citrix Systems, Inc. (a Delaware corporation). (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Ahearn, Terry) (Filed on 3/22/2012) (Entered: 03/22/2012) |

| 03/23/2012 | 126 | Motions terminated: (120 in 3:09-cv-03496-SI) STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order to File Under Seal Citrix's Reply In Support of Citrix's Motion for Leave to Amend Counterclaims* filed by Citrix Online, LLC, Citrix Systems, Inc..., ORDER Granting Motion to File Under Seal. Signed by Judge Illston on 3/22/12. (tfS, COURT STAFF) (Filed on 3/23/2012) (Entered: 03/23/2012) |
|---|---|---|
| 03/23/2012 | 127 | DOCUMENT E-FILED UNDER SEAL re 126 Terminate Motions, Order Granting Motion to File Under Seal, - *Citrix Systems, Inc. and Citrix Online, LLC's Reply in Support of 107 , 110 Motion for Leave to Amend Counterclaims* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 3/23/2012) Modified on 3/26/2012 (ysS, COURT STAFF). (Entered: 03/23/2012) |
| 03/23/2012 | 128 | DOCUMENT E-FILED UNDER SEAL re 126 Terminate Motions, Order Granting Motion to File Under Seal, - *Declaration of Terry W. Ahearn In Support of 107 , 110 Citrix's Reply In Support of Citrix's Motion for Leave to Amend Counterclaims* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10)(Ahearn, Terry) (Filed on 3/23/2012) Modified on 3/26/2012 (ysS, COURT STAFF). (Entered: 03/23/2012) |
| 03/28/2012 | 129 | ORDER GRANTING MOTION TO COMPEL DISCOVERY (Illston, Susan) (Filed on 3/28/2012) (Entered: 03/28/2012) |
| 04/11/2012 | 130 | Minute Entry: Motion Hearing held on 4/6/2012 before Judge Illston (Date Filed: 4/11/2012). Motion for Leave to Amend is submitted. Set/Reset Hearings: Further Case Management Conference set for 5/4/2012 03:00 PM in Courtroom 10, 19th Floor, San Francisco(Court Reporter Lydia Zinn.) (tfS, COURT STAFF) (Date Filed: 4/11/2012) Modified on 4/11/2012 (tfS, COURT STAFF). (Entered: 04/11/2012) |
| 04/13/2012 | 131 | Transcript of Proceedings held on 04/06/2012, before Judge Susan Illston. Court Reporter/Transcriber Lydia Zinn, Telephone number (415) 531-6587. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/12/2012. (Zinn, Lydia) (Filed on 4/13/2012) (Entered: 04/13/2012) |
| 04/16/2012 | 132 | ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIMS 107 110 (Illston, Susan) (Filed on 4/16/2012) (Entered: 04/16/2012) |
| 04/24/2012 | 133 | STIPULATION WITH PROPOSED ORDER re 101 Order, Set Deadlines/Hearings, 96 Pretrial Order *Stipulated Request for Order Changing Time* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 4/24/2012) (Entered: 04/24/2012) |
| 04/25/2012 | 134 | ORDER by Judge Susan Illston signed on 4/25/12 granting 133 Stipulation. The deadline for completing expert discovery to May 17, 2012, for the specific purpose of completing the expert depositions of Robert Louis Stevenson and Kevin Jeffay. (tfS, COURT STAFF) (Filed on 4/25/2012) (Entered: 04/25/2012) |

| 04/27/2012 | 135 | JOINT CASE MANAGEMENT STATEMENT *Supplemental Joint Case Management Statement* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 4/27/2012) (Entered: 04/27/2012) |
|---|---|---|
| 05/08/2012 | 136 | Minute Entry: Further Case Management Conference held on 5/4/2012 before Susan Illston (Date Filed: 5/8/2012). This case shall be referred to either Magistrate-Judge Laporte or Grewal for settlement purposes. The settlement conference shall occur in June 2012. (Court Reporter n/a.) (tfS, COURT STAFF) (Date Filed: 5/8/2012) (Entered: 05/08/2012) |
| 05/08/2012 | | CASE REFERRED to Magistrate Judge Paul Singh Grewal for Settlement (ahm, COURT STAFF) (Filed on 5/8/2012) (Entered: 05/08/2012) |
| 05/22/2012 | 137 | RESPONSE to re 129 Order by Pixion, Inc.. (Attachments: # 1 Declaration of Christopher P. Grewe, # 2 Declaration of Colby B. Springer, # 3 Declaration of Valerie Leghorn)(Springer, Colby) (Filed on 5/22/2012) (Entered: 05/22/2012) |
| 05/24/2012 | 138 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order Changing Time for Settlement Conference Pursuant to Local Rule 6-2* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 5/24/2012) (Entered: 05/24/2012) |
| 05/29/2012 | 139 | ORDER signed on 5/29/12 by Judge Susan Illston granting 138 Stipulated Request for Order Changing Time for Settlement Conference Pursuant to Local Rule 6-2 filed by Citrix Online, LLC (tfS, COURT STAFF) (Filed on 5/29/2012) (Entered: 05/29/2012) |
| 06/08/2012 | 140 | STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order Changing Time for Pretrial Conference* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 141 | STIPULATION WITH PROPOSED ORDER *Joint Stipulation for Order to File Under Seal Citrix's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489; Memorandum of Point and Authorities In Support; and Declaration of Leigh Martinson In Support* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 142 | NOTICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) *Notification of Lodging* (Ahearn, Terry) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 143 | CERTIFICATE OF SERVICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) (Ahearn, Terry) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/11/2012 | 144 | CLERK'S NOTICE SETTING SETTLEMENT CONFERENCE: Settlement Conference set for 7/11/2012 at 10:00 AM in Courtroom 5, 4th Floor, San Jose before Magistrate Judge Paul S. Grewal (ofr, COURT STAFF) (Filed on 6/11/2012) (Entered: 06/11/2012) |
| 06/11/2012 | 145 | ORDER GRANTING 140 STIPULATION WITH PROPOSED ORDER *Stipulated Request for Order Changing Time for Pretrial Conference* filed by Citrix Online, LLC, Citrix Systems, Inc.. Pretrial Conference set for |

| | | 9/11/2012 03:30 PM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston.. Signed by Judge Susan Illston on 6/11/12. (tfS, COURT STAFF) (Filed on 6/11/2012) (Entered: 06/11/2012) |
|---|---|---|
| 06/12/2012 | 146 | NOTICE by Pixion, Inc. *REQUEST TO TERMINATE OR OTHERWISE DISASSOCIATE COUNSEL FOR PLAINTIFF (CHRISTINE WATSON)* (Attachments: # 1 Certificate/Proof of Service)(Springer, Colby) (Filed on 6/12/2012) (Entered: 06/12/2012) |
| 06/15/2012 | 147 | ORDER Granting Motion to File Under Seal, Motions terminated: 141 STIPULATION WITH PROPOSED ORDER *Joint Stipulation for Order to File Under Seal Citrix's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent 7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489; Memorandum of Poin filed by Citrix Online, LLC, Citrix Systems, Inc... Signed by Judge Susan Illston on 6/14/12. (tfS, COURT STAFF) (Filed on 6/15/2012) (Entered: 06/15/2012)* |
| 06/15/2012 | 148 | DOCUMENT E-FILED UNDER SEAL re 147 Order Granting Motion to File Under Seal, Terminate Motions - *Citrix's Notice and Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, and 7,877,489, and Points and Authorities In Support Thereof* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 6/15/2012) Modified on 6/18/2012 (ysS, COURT STAFF). (Entered: 06/15/2012) |
| 06/15/2012 | 149 | DOCUMENT E-FILED UNDER SEAL re 147 Order Granting Motion to File Under Seal, Terminate Motions - *Declaration of Leigh Martinson In Support of 148 Citrix's Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, and 7,877,489, and Points and Authorities* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Ahearn, Terry) (Filed on 6/15/2012) Modified on 6/18/2012 (ysS, COURT STAFF). (Entered: 06/15/2012) |
| 06/15/2012 | 150 | DOCUMENT E-FILED UNDER SEAL re 147 Order Granting Motion to File Under Seal, Terminate Motions,, *EXHIBITS re 149 Declaration of Leigh Martinson In Support of Citrix's Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, and 7,877,489 and Points and Authorities* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 6B, # 2 Exhibit 7, # 3 Exhibit 8A, # 4 Exhibit 9A, # 5 Exhibit 9B, # 6 Exhibit 10, # 7 Exhibit 11, # 8 Exhibit 12, # 9 Exhibit 13, # 10 Exhibit 14, # 11 Exhibit 15, # 12 Exhibit 16, # 13 Exhibit 17, # 14 Exhibit 18, # 15 Exhibit 19, # 16 Exhibit 20)(Ahearn, Terry) (Filed on 6/15/2012) (Entered: 06/15/2012) |
| 06/15/2012 | 151 | DOCUMENT E-FILED UNDER SEAL re 147 Order Granting Motion to File Under Seal, Terminate Motions,, *EXHIBITS re 149 DECLARATION OF LEIGH MARTINSON IN SUPPORT OF CITRIXS MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY OF U.S. PATENT NOs. 7,369,515, 7,426,191, 7,715,331, 7,813,305, AND 7,877,489, AND POINTS AND AUTHORITIES* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 21 Part 1a, # 2 Exhibit 21 Part 1b, # 3 Exhibit 21 Part 2, # 4 Exhibit 21 Part 3, # 5 Exhibit 22, # 6 Exhibit 23, # 7 Exhibit 24, # 8 Exhibit 25, # 9 Exhibit 26, # 10 Exhibit 27)(Ahearn, Terry) (Filed on |

| | | |
|---|---|---|
| | | 6/15/2012) (Entered: 06/15/2012) |
| 06/15/2012 | 152 | Proposed Order re 151 Document E-Filed Under Seal,, 148 Document E-Filed Under Seal, 150 Document E-Filed Under Seal,,, 149 Document E-Filed Under Seal,, by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 6/15/2012) (Entered: 06/15/2012) |
| 06/15/2012 | | Set/Reset Deadlines as to 148 MOTION for Summary Judgment. Motion Hearing set for 7/13/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. (ysS, COURT STAFF) (Filed on 6/15/2012) (Entered: 06/18/2012) |
| 06/21/2012 | 153 | ORDER GRANTING REQUEST TO TERMINATE OR OTHERWISE DISASSOCIATE COUNSEL FOR PLAINTIFF (CHRISTINE WATSON) re 146 Requst. signed by Judge Illston on 6/19/12. (tfS, COURT STAFF) (Filed on 6/21/2012) Modified on 6/22/2012 (ysS, COURT STAFF). (Entered: 06/21/2012) |
| 06/21/2012 | 154 | STIPULATION WITH PROPOSED ORDER *TO FILE UNDER SEAL PIXIONS OPPOSITION TO CITRIXS MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS* filed by Pixion, Inc.. (Attachments: # 1 Proposed Order)(Olafson, Shane) (Filed on 6/21/2012) (Entered: 06/21/2012) |
| 06/22/2012 | 155 | ERRATA re 154 STIPULATION WITH PROPOSED ORDER *TO FILE UNDER SEAL PIXIONS OPPOSITION TO CITRIXS MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS* by Pixion, Inc.. (Attachments: # 1 Proposed Order Granting Stipulation to File Documents Under Seal)(Olafson, Shane) (Filed on 6/22/2012) Modified on 6/25/2012 (ysS, COURT STAFF). (Entered: 06/22/2012) |
| 06/22/2012 | 156 | NOTICE by Pixion, Inc. *Notification of Lodging* (Olafson, Shane) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/22/2012 | 157 | NOTICE by Pixion, Inc. re 156 Notice (Other), 155 Errata, 154 STIPULATION WITH PROPOSED ORDER *TO FILE UNDER SEAL PIXIONS OPPOSITION TO CITRIXS MOTION FOR SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS (Certificate of Service)* (Springer, Colby) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/26/2012 | 158 | ORDER Granting Motion to File Under Seal, Motions terminated: 155 STIPULATION WITH PROPOSED ORDER filed by Pixion, Inc... Signed by Judge Susan Illston on 6/22/12. (tfS, COURT STAFF) (Filed on 6/26/2012) (Entered: 06/26/2012) |
| 06/26/2012 | 159 | DOCUMENT E-FILED UNDER SEAL re 158 Order Granting Motion to File Under Seal, Terminate Motions - *Opposition to 148 Citrix's Motion for Summary Judgment* OF NON-INFRINGEMENT AND INVALIDITY by Pixion, Inc.. (Attachments: # 1 Declaration)(Springer, Colby) (Filed on 6/26/2012) Modified on 6/27/2012 (ysS, COURT STAFF). (Entered: 06/26/2012) |
| 06/26/2012 | 160 | DOCUMENT E-FILED UNDER SEAL re 158 Order Granting Motion to File Under Seal, Terminate Motions - *Exhibits 1-6 ISO 159 Opposition to Citrix's Motion for Summary Judgment* by Pixion, Inc.. (Attachments: # 1 Exhibit 1 (Part I), # 2 Exhibit 1 (Part II), # 3 Exhibit 2-3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Springer, Colby) (Filed on 6/26/2012) Modified on 6/27/2012 (ysS, COURT STAFF). (Entered: 06/26/2012) |
| | | |

| | | |
|---|---|---|
| 06/26/2012 | 161 | DOCUMENT E-FILED UNDER SEAL re 158 Order Granting Motion to File Under Seal, Terminate Motions - *Exhibits 7-9 ISO 159 Opposition to Citrix's Motion for Summary Judgment* by Pixion, Inc.. (Attachments: # 1 Exhibit 7, # 2 Exhibit 8 (Part I), # 3 Exhibit 8 (Part II), # 4 Exhibit 9 (Part I), # 5 Exhibit 9 (Part II))(Springer, Colby) (Filed on 6/26/2012) Modified on 6/27/2012 (ysS, COURT STAFF). (Entered: 06/26/2012) |
| 06/26/2012 | 162 | DOCUMENT E-FILED UNDER SEAL re 158 Order Granting Motion to File Under Seal, Terminate Motions - *Exhibits 10-14 ISO 159 Opposition to Citrix's Motion for Summary Judgment* by Pixion, Inc.. (Attachments: # 1 Exhibit 10 (Part I), # 2 Exhibit 10 (Part II), # 3 Exhibit 11-12, # 4 Exhibit 13-14)(Springer, Colby) (Filed on 6/26/2012) Modified on 6/27/2012 (ysS, COURT STAFF). (Entered: 06/26/2012) |
| 06/26/2012 | 163 | DOCUMENT E-FILED UNDER SEAL re 158 Order Granting Motion to File Under Seal, Terminate Motions - *Exhibits 15-22 ISO 159 Opposition to Citrix's Motion for Summary Judgment* by Pixion, Inc.. (Attachments: # 1 Exhibit 15 (Part I), # 2 Exhibit 15 (Part II), # 3 Exhibit 16, # 4 Exhibit 17, # 5 Exhibit 18 (Part I), # 6 Exhibit 18 (Part II), # 7 Exhibit 19-22)(Springer, Colby) (Filed on 6/26/2012) Modified on 6/27/2012 (ysS, COURT STAFF). (Entered: 06/26/2012) |
| 07/02/2012 | 164 | STIPULATION WITH PROPOSED ORDER *Joint Stipulation for Order to File Under Seal Citrix's Reply In Support Of Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,489* filed by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/02/2012 | 165 | NOTICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) *Notification of Lodging* (Ahearn, Terry) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/02/2012 | 166 | CERTIFICATE OF SERVICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) (Ahearn, Terry) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/02/2012 | 167 | CERTIFICATE OF SERVICE by Pixion, Inc. (Olafson, Shane) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/06/2012 | 168 | ORDER Granting Motion to File Under Seal, Motions terminated: 164 STIPULATION WITH PROPOSED ORDER *Joint Stipulation for Order to File Under Seal Citrix's Reply In Support Of Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, 7,877,48* filed by Citrix Online, LLC, Citrix Systems, Inc...* Signed by Judge Susan Illston on 7/5/12. (tfS, COURT STAFF) (Filed on 7/6/2012) (Entered: 07/06/2012) |
| 07/06/2012 | 169 | DOCUMENT E-FILED UNDER SEAL re 168 Order Granting Motion to File Under Seal, Terminate Motions,, *Citrix's Reply In Support of 148 its Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, and 7,877,489* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 7/6/2012) Modified on 7/9/2012 (ysS, COURT STAFF). (Entered: 07/06/2012) |
| 07/06/2012 | 170 | DOCUMENT E-FILED UNDER SEAL re 168 Order Granting Motion to File Under Seal, Terminate Motions,, *Declaration of Leigh Martinson In Support* |

| | | |
|---|---|---|
| | | *of 169 Citrix's Reply In Support of its Motion for Summary Judgment of Non-Infringement and Invalidity of U.S. Patent Nos. 7,369,515, 7,426,191, 7,715,331, 7,813,305, and 7,877,489* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 28, # 2 Exhibit 29, # 3 Exhibit 30, # 4 Exhibit 31, # 5 Exhibit 32, # 6 Exhibit 33)(Ahearn, Terry) (Filed on 7/6/2012) Modified on 7/9/2012 (ysS, COURT STAFF). (Entered: 07/06/2012) |
| 07/06/2012 | 171 | DOCUMENT E-FILED UNDER SEAL re 168 Order Granting Motion to File Under Seal, Terminate Motions,, *Additional Exhibits to Leigh Martinson Declaration ISO Docket 170* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit 34 (Part 1), # 2 Exhibit 34 (Part 2), # 3 Exhibit 34 (Part 3), # 4 Exhibit 34 (Part 4), # 5 Exhibit 34 (Part 5), # 6 Exhibit 35, # 7 Exhibit 36, # 8 Exhibit 37, # 9 Exhibit 38)(Ahearn, Terry) (Filed on 7/6/2012) Modified on 7/9/2012 (ysS, COURT STAFF). (Entered: 07/06/2012) |
| 07/09/2012 | 172 | CLERK'S NOTICE RESETTING 7/11/2012 SETTLEMENT CONFERENCE: 7/11/2012 Settlement Conference reset to 7/12/2012 at 11:00 AM (Special Set) in Courtroom 5, 4th Floor, San Jose before Magistrate Judge Paul S. Grewal. **\*\*\*This is a text only docket entry, there is no document associated with this notice.\*\*\*** (ofr, COURT STAFF) (Filed on 7/9/2012) (Entered: 07/09/2012) |
| 07/11/2012 | 173 | Proposed Order *to Bring Equipment and Technicians into Courtroom* by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation). (Ahearn, Terry) (Filed on 7/11/2012) (Entered: 07/11/2012) |
| 07/11/2012 | 174 | ORDER TO BRING EQUIPMENT AND TECHNICIANS INTO COURTROOM re 73 Joint Case Management Statement filed by Citrix Online, LLC, Citrix Systems, Inc. Signed by Judge Paul S. Grewal on July 11, 2012. (psglc1, COURT STAFF) (Filed on 7/11/2012) (Entered: 07/11/2012) |
| 07/12/2012 | 175 | Minute Entry: Settlement Conference held. Further settlement discussions to be scheduled. (Date Filed: 7/12/2012). (Court Reporter: Not Reported.) (ofr, COURT STAFF) (Date Filed: 7/12/2012) (Entered: 07/13/2012) |
| 07/17/2012 | 176 | Minute Entry: Motion Hearing held on 7/13/2012 before Susan Illston (Date Filed: 7/17/2012). Motion for Summary Judgment is submitted. (Court Reporter Sahar Bartlett.) (tfS, COURT STAFF) (Date Filed: 7/17/2012) (Entered: 07/17/2012) |
| 07/19/2012 | 177 | NOTICE of Appearance by Sara D Sunderland (Sunderland, Sara) (Filed on 7/19/2012) (Entered: 07/19/2012) |
| 08/13/2012 | 178 | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT 148 (Illston, Susan) (Filed on 8/13/2012) (Entered: 08/13/2012) |
| 08/14/2012 | 179 | JUDGMENT (Illston, Susan) (Filed on 8/14/2012) (Entered: 08/14/2012) |
| 08/28/2012 | 180 | STIPULATION WITH PROPOSED ORDER *Joint Stipulation to File Under Seal Defendants' Bill of Costs; Bryan James Declaration ISO; Sara Sunderland Declaration ISO; Supporting Exhibits* filed by Citrix Online, LLC (a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation), Pixion, Inc.. (Attachments: # 1 Proposed Order)(Ahearn, Terry) (Filed on 8/28/2012). (Entered: 08/28/2012) |
| 08/28/2012 | 181 | NOTICE OF APPEAL to the 9th CCA Pixion, Inc.. Appeal of Judgment 179 , |

| | | |
|---|---|---|
| | | Order on Motion for Summary Judgment 178 (Appeal fee of $455 receipt number 0971-7080895 paid.) *Appeal to United States Court of Appeals for the Federal Circuit* (Springer, Colby) (Filed on 8/28/2012) (Entered: 08/28/2012) |
| 08/28/2012 | 182 | NOTICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) *Notification of Lodging* (Ahearn, Terry) (Filed on 8/28/2012) (Entered: 08/28/2012) |
| 08/28/2012 | 183 | Transcript Designation and Ordering Form for proceedings held on 07/13/2012 and 10/05/2011 before Judge Illston, re 181 Notice of Appeal, Transcript due by 9/13/2012. (Attachments: # 1 Certificate/Proof of Service) (Springer, Colby) (Filed on 8/28/2012) (Entered: 08/28/2012) |
| 08/28/2012 | 184 | CERTIFICATE OF SERVICE by Citrix Online, LLC(a Limited Liability company), Citrix Systems, Inc.(a Delaware corporation) (Ahearn, Terry) (Filed on 8/28/2012) (Entered: 08/28/2012) |
| 08/29/2012 | 185 | Transcript of Proceedings held on 7/13/12, before Judge Susan Illston. Court Reporter/Transcriber Sahar Bartlett, CSR, RPR, Telephone number (415) 626-6060/sahar_bartlett@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 11/27/2012. (Bartlett, Sahar) (Filed on 8/29/2012) (Entered: 08/29/2012) |
| 08/29/2012 | 186 | Transmission of Notice of Appeal and Docket Sheet to the Federal Circuit Court of Appeals as to 181 Notice of Appeal. Filing fee $ 455. (ERRONEOUS ATTACHMENT - Please refer attachment 3 (Attachments: # 1 Appeal Information Sheet)(ysS, COURT STAFF) (Filed on 8/29/2012) (Additional attachment(s) added on 8/29/2012: # 2 docket sheet)(ysS, COURT STAFF). (Additional attachment(s) added on 8/29/2012: # 3 Notice) (ysS, COURT STAFF). (Entered: 08/29/2012) |
| 08/29/2012 | 187 | **\*\*\* FILED IN ERROR. PLEASE SEE DOCKET # 188 \*\*\***<br><br>ORDER GRANTING JOINT STIPULATION TO FILE UNDER SEAL DEFENDANTS' BILL OF COSTS by Judge Susan Illston granting 180 Stipulation. (wsn, COURT STAFF) (Filed on 8/29/2012) Modified on 8/30/2012 (wsn, COURT STAFF). (Entered: 08/29/2012) |
| 08/30/2012 | 188 | ORDER Granting Motion to File Under Seal re 180 STIPULATION WITH PROPOSED ORDER, Joint Stipulation to File Under Seal Defendants' Bill of Costs. Signed by Judge Susan Illston on August 29, 2012. (wsn, COURT STAFF) (Filed on 8/30/2012). CORRECTION OF DOCKET # 187 . Modified on 8/30/2012 (wsn, COURT STAFF). (Entered: 08/30/2012) |
| 08/30/2012 | 189 | DOCUMENT E-FILED UNDER SEAL re 188 Order Granting Motion to File Under Seal, *Defendants' Bill of Costs* by Citrix Online, LLC(a Delaware Liability company), Citrix Systems, Inc.(a Delaware corporation). (Attachments: # 1 Exhibit A Decl of Bryan James ISO Bill of Costs, # 2 Exhibit 1 to Declaration of Bryan James, # 3 Exhibit 2 Part 1 to Declaration of Bryan James, # 4 Exhibit 2 Part 2 to Declaration of Bryan James, # 5 Exhibit 2 Part 3 to Declaration of Bryan James, # 6 Exhibit B Decl of William Barnes ISO Bill of Costs, # 7 Exhibit 1 to Declaration of William Barnes, # 8 Exhibit C Decl of Sara Sunderland ISO Bill of Costs, # 9 Exhibit 1 to |

| | | Declaration of Sara Sunderland)(Ahearn, Terry) (Filed on 8/30/2012) (Entered: 08/30/2012) |
|---|---|---|
| 09/05/2012 | 190 | USCA Case Number 12-1636 USCA for the Federal Circuit for 181 Notice of Appeal, filed by Pixion, Inc.. (ysS, COURT STAFF) (Filed on 9/5/2012) (Entered: 09/05/2012) |
| 09/06/2012 | 191 | Transcript of Proceedings held on 10-5-11, before Judge Susan Illston. Court Reporter/Transcriber Katherine Wyatt, Telephone number 925-212-5224. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 12/5/2012. (kpw, COURT STAFF) (Filed on 9/6/2012) (Entered: 09/06/2012) |
| 09/11/2012 | 192 | OBJECTIONS to re 189 Document E-Filed Under Seal,,, *Defendants' Bill of Costs* by Pixion, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Olafson, Shane) (Filed on 9/11/2012) (Entered: 09/11/2012) |
| 09/26/2012 | 193 | Report on the termination of action regarding Patent Infringement (cc: form mailed to register). (ysS, COURT STAFF) (Filed on 9/26/2012) (Entered: 09/26/2012) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/03/2012 10:12:59 | | | |
| **PACER Login:** | lr0019 | **Client Code:** | 52589-00020/7589/sls |
| **Description:** | Docket Report | **Search Criteria:** | 3:09-cv-03496-SI |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of January, 2013, I caused this

Corrected Non-Confidential Joint Appendix to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

Brian M. Jacobs
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8199

*Counsel for Appellees*

/s/ Colby B. Springer
*Counsel for Appellant*